UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TIMOTHY PLACE, NFP, *et al.,* | ) Case No. 16-0336 (JPC) |
| | ) |
| Debtors. | ) Hon. |

## **DEBTORS' JOINT PLAN OF REORGANIZATION DATED DECEMBER 15, 2020**

Bruce Dopke, Member (ARDC # 3127052)
Dopkelaw LLC
1535 W. Schaumburg Road, Suite 204
Schaumburg, IL  60194
Tel: 847-524-4811
bd@dopkelaw.com

PROPOSED COUNSEL FOR
THE DEBTORS

# TABLE OF CONTENTS

**SECTION 1.** ............................................................................................................... **01**

  **A.**   **Definitions.** ..................................................................................................... **01**

  **B.**   **Interpretation: Application of Definitions and Rules of Construction.**...................... **11**

**SECTION 2.** ............................................................................................................... **11**

  **2.1**   **Administrative Claims.** .......................................................................... **11**

  **2.2**   **Professional Compensation.** ................................................................... **12**

  **2.3**   **Priority Tax Claims..** ............................................................................ **12**

  **2.4**   **U.S. Trustee Fees.**.................................................................................. **12**

**SECTION 3**   **Classification And Treatment Of Claims And Interests.** ......................... **13**

  **3.1**   **Classification and Specification of Treatment of Claims..** ....................... **13**

  **3.2**   **Classes of Claims and Interests.**.............................................................. **13**

  **3.3**   **Acceptance or Rejection of this Plan.** .................................................... **15**

**SECTION 4**   **Means For Implementation of this Plan.**................................................ **15**

  **4.1**   **Sources of Consideration..** ..................................................................... **15**

  **4.2**   **Cancellation of 2016 Bonds..**................................................................. **15**

  **4.3**   **Issuance of 2021 Bonds.** ........................................................................ **16**

  **4.4**   **Sponsor Contribution.** .......................................................................... **16**

  **4.5**   **Series 2016C Bonds..**.............................................................................. **17**

  **4.6**   **2021 Bond Documents.**.......................................................................... **17**

  **4.7**   **Effective Date Transactions.** ................................................................. **17**

  **4.8**   **The Bond Funds and Distribution Waterfall** ........................................ **18**

  **4.9**   **Additional Terms of 2021 Bonds.**.......................................................... **19**

  **4.10**  **Sponsor Management Agreement.**.......................................................... **20**

  **4.11**  **Section 1145 Exemption.** ........................................................................ **20**

  **4.12**  **Assumption of Residency Agreements** .................................................. **20**

  **4.13**  **Reorganized Debtors' Board of Directors.** ............................................. **20**

  **4.14**  **Officers of the Reorganzied Debtors**..................................................... **20**

  **4.15**  **Employee Benefits.**................................................................................ **20**

  **4.16**  **Vesting of Assets in the Reorganized Debtors..**...................................... **21**

  **4.17**  **Restructuring Transactions.** ................................................................. **21**

i

**4.18**   **Corporate Action** ...................................................................................... **21**

**4.19**   **Section 1146 Exemption from Certain Taxes and Fees**................................. **21**

**4.20**   **Preservation of Causes of Action of the Debtors**........................................ **22**

**SECTION 5   Treatment of Executory Contracts and Unexpired Leases** . ........................................ **23**

**5.1**   **Assumption and Rejection of Executory Contracts and Unexpired Leases.**................ **23**

**5.2**   **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**................... **23**

**5.3**   **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..** ............... **23**

**5.4**   **Insurance Policies..** ..................................................................................... **24**

**5.5**   **Modifications, Amendments, Supplements, Restatements, or Other Agreements**........ **24**

**5.6**   **Centers For Medicare and Medicaid Services.** ............................................. **24**

**5.7**   **Contracts and Leases Entered Into After the Petition Date**........................... **26**

**5.8**   **Reservation of Rights.** .................................................................................. **26**

SECTION 6  Provisions Governing Distributions ...…………………………………………26

**6.1**   **Timing and Calculation of Amounts to Be Distributed.** ................................. **26**

**6.2**   **Distributions.** .............................................................................................. **26**

**6.3**   **Payments and Distributions on Disputed Claims**......................................... **27**

**6.4**   **Special Rules for Distributions to Holders of Disputed Claims.** ................... **27**

**6.5**   **Delivery of Distributions in General.** .......................................................... **27**

**6.6**   **Undeliverable Distributions and Unclaimed Property**................................... **27**

**6.7**   **Withholding and Reporting Requirements.**................................................... **27**

**6.8**   **Setoffs**......................................................................................................... **28**

**6.9**   **Insurance Claims..** ....................................................................................... **28**

**6.10**   **Applicability of Insurance Policies**............................................................ **28**

**6.11**   **Allocation of Distributions Between Principal and Unpaid Interest.**............ **28**

**6.12**   **Interest on Claims..**................................................................................... **29**

**SECTION 7   Procedures For Resolving Contingent, Unliquidated and Disputed Claims** . ............. **29**

**7.1**   **Prosecution of Objections to Claims.** .......................................................... **29**

**7.2**   **Retention of Debtors' Rights and Defenses.**................................................. **29**

**7.3**   **Distributions After Allowance.** .................................................................... **29**

**7.4**   **Estimation of Claims.**.................................................................................. **29**

**SECTION 8   Settlement, Release, Injunction and Related Provisions** . ........................................... **30**

**8.1      Compromise and Settlement of Claims, Interests and Controversies.**............................. 30

**8.2      Releases by the Debtors** .............................................................................................. 30

**8.3      Limited Releases by Holders of Claims** .................................................................... 31

**8.4      Limitation on the Scope of the Releases In Sections 8.2 and 8.3 of the Plan.** ................. 32

**8.5      Exculpation.** ................................................................................................................. 32

**8.6      Discharge of Claims.** .................................................................................................... 33

**8.7      Injunction.**.................................................................................................................... 33

**8.8      Term of Injunctions or Stays..** .................................................................................... 35

**8.9      Protection Against Discriminatory Treatment.** ......................................................... 35

**8.10    Release of Liens.**........................................................................................................... 35

**SECTION 9  Conditions Precedent To The Effective Date .** .................................................... 36

**9.1      Conditions Precedent to the Effective Date.**............................................................... 36

**9.2      Waiver of Conditions.** ................................................................................................. 37

**9.3      Effect of Failure of Conditions.**................................................................................... 37

**SECTION 10  Modification, Revocation or Withdrawal of the Plan** ...................................... 37

**10.1    Modification and Amendments.**................................................................................... 37

**10.2    Effect of Confirmation on Modifications.** .................................................................. 38

**10.3    Revocation or Withdrawal of the Plan.**....................................................................... 38

**SECTION 11. Retention of Jurisdiction** ................................................................................. 38

**11.1    Retention of Jurisdiction.**............................................................................................. 38

**SECTION 12  Miscellaneous Provisions** ................................................................................. 40

**12.1    Immediate Binding Effect.** .......................................................................................... 40

**12.2    Additional Documents.** ................................................................................................ 40

**12.3    Reservation of Rights.**.................................................................................................. 41

**12.4    Successors and Assigns..** .............................................................................................. 41

**12.5    Votes Solicited in Good Faith.**..................................................................................... 41

**12.6    Closing of Cases..**.......................................................................................................... 41

**12.7    Notices.**.......................................................................................................................... 41

**12.8    Headings.** ...................................................................................................................... 42

**12.9    Severability.** ................................................................................................................. 42

**12.10   Validity and Enforceability..** ....................................................................................... 43

iii

**12.11      Plan Supplement** ....................................................................................................... **43**

**12.12      Governing Law.**......................................................................................................... **43**

**12.13      Request for Confirmation Pursuant to Sections 1129(a) and 1129(b) of the
Bankruptcy Code.** ................................................................................................................ **43**

Timothy Place, NFP d/b/a Park Place Christian Community of Elmhurst ("**Park Place**") and Christian Healthcare Foundation, NFP d/b/a Providence Healthcare Foundation (the "**Foundation**") (collectively, the "**Debtors**") propose this Plan of Reorganization Under Chapter 11 of the Bankruptcy Code.

# SECTION 1.
## DEFINITIONS AND INTERPRETATION

**A.    Definitions.**

The following terms used herein shall have the respective meanings below:

1.1    ***2016 Bond Documents*** means the 2016 Indenture and any bonds, loan agreement, mortgage, security agreement, document, agreement, or instrument executed or delivered in connection with the issuance of the 2016 Bonds.

1.2    ***2016 Bond Trustee*** means UMB Bank, N.A., in its capacity as trustee under the 2016 Indenture, and any successor trustee in such capacity.

1.3    ***2016 Bonds*** means, collectively, the 2016A Bonds, the 2016B Bonds and the 2016C Bonds.

1.4    ***2016 Bond Redemption Payment*** means a payment made by the Sponsor to the 2016 Bond Trustee in the amount of 3% of the current principal amount of the 2016C Bonds (Six Hundred Fifty-Seven Thousand Five Hundred Sixty-Two and 50/100 Dollars ($657,562.50)) plus 3% of the accrued but unpaid interest on the principal amount of the 2016C Bonds as of the Effective Date of the Plan, which the Debtors estimate will be $68,326.49 if the Effective Date occurs on April 5, 2021, in which case, the total principal and interest which will be paid to holders of 2016C Bonds would total $725,888.99.

1.5    ***2016 Indenture*** means that certain Bond Trust Indenture, dated as of April 1, 2016, as may have been amended, modified, and/or supplemented, by and between the Issuer and the 2016 Bond Trustee, pursuant to which the 2016 Bonds were issued.

1.6    ***2016 Master Trust Indenture*** means that certain Master Trust Indenture, dated as of April 1, 2016, as may have been amended, modified, and/or supplemented, by and between the among the Debtors and the 2016 Bond Trustee as the 2016 Master Trustee thereunder.

1.7    ***2016 Master Trustee*** means UMB Bank, N.A., in its capacity as master trustee under the 2016 Master Trust Indenture, and any successor trustee in such capacity.

1.8    ***2021 Bond Documents*** means the 2021 Indenture, and any bonds, loan agreement, mortgage, security agreement, document, agreement, or instrument executed or delivered in connection with the issuance of the 2021 Bonds, including but not limited to the 2021 Master Trust Indenture and the 2021 Mortgage.

1

1.9    ***2021 Bond Trustee*** means UMB Bank, N.A., in its capacity as bond trustee under the 2021 Indenture, and any successor trustee in such capacity.

1.10    ***2021 Bonds*** means that series of bonds to be issued by the Issuer and exchanged by the holders of the 2016A and 2016B Bonds under the terms of this Plan.

1.11    ***2021 Indenture*** means that certain Bond Trust Indenture (as such indenture may be further amended, supplemented, or modified from time to time) to be entered into by and between the Issuer and the 2021 Bond Trustee pursuant to this Plan on or after the Effective Date, including all notes and instruments delivered pursuant thereto or in connection therewith in connection with the issuance of the 2021 Bonds, and which shall be in form and substance acceptable to the Debtors, the Issuer and the 2021 Bond Trustee.

1.12    ***2021 Master Trust Indenture*** means that certain Master Trust Indenture (as such indenture may be further amended, supplemented, or modified from time to time) to be entered into by and between the Reorganized Debtors and the 2021 Bond Trustee, as the 2021 Master Trustee thereunder, pursuant to this Plan on or after the Effective Date and which shall be in form and substance acceptable to the Debtors and the 2021 Bond Trustee.

1.13    ***2021 Master Trustee*** means UMB Bank, N.A., in its capacity as master trustee under the 2021 Master Trust Indenture, and any successor trustee in such capacity.

1.14    ***2021 Mortgage*** means, collectively, any mortgage amendment agreement or agreements whereby the Debtors, directly or by way of assignment, grant one or more mortgages or other liens to the 2021 Master Trustee to secure the Debtors' obligations under the 2021 Bond Documents.

1.15    ***Accrued Professional Compensation*** means, at any given moment, all accrued, contingent and/or unpaid fees for legal, financial advisory, accounting, and other services, along with all obligations for reimbursement of expenses rendered or incurred before the Effective Date under sections 327, 328, 329, 330, 331, or 1103 of the Bankruptcy Code by any retained Professional in the Cases, or under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not been denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid.

1.16    ***Administrative Claim*** means any Claim for payment of costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), and 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estate and operating the business of either of the Debtors; (ii) compensation for Accrued Professional Compensation; (iii) all fees and charges assessed against the Estate pursuant to Chapter 123 of Title 28 of the United States Code; (iv) the reimbursement of the Issuer in an amount not to exceed $30,000.00 for attorneys' fees and out of pocket expenses  incurred in connection with, and for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3)(4) and (5) of the Bankruptcy Code (provided, however, that if the Plan, its associated disclosure statement or proposed confirmation order, as submitted to the Bankruptcy Court are subject to material revision or objection by a party in

interest, or if the Debtors' request for approval of the disclosure statement or confirmation of the Plan is materially opposed or delayed, the Issuer may obtain relief from the $30,000 limitation on its professional fee and expense claim from the Court after notice and a hearing}; and (v) all requests for compensation or expense reimbursement for making a substantial contribution in the Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

1.17    *Allowed* means with respect to Claims (a) any Claim, proof of which is timely filed by the applicable bar date; (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided, that* with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time, as may be extended by the Bankruptcy Court from time to time, fixed by the Plan, the Bankruptcy Code the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. An Allowed Claim (i) includes a Disputed Claim to the extent such Disputed Claim becomes Allowed after the Effective Date and (ii) shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law. Unless otherwise specified in this Plan, in section 506(b) of the Bankruptcy Code, or by Final Order of the Bankruptcy Court, "Allowed" Claims shall not, for purposes of distributions under this Plan, include interest on such Claim accruing from and after the Petition Date. For the avoidance of doubt, the 2016 Bond Trustee shall hold an Allowed Claim in the amount of (i) $103,691,500 on account of the Series 2016A Bonds, (ii) $15,496,392 on account of the Series 2016B Bonds and (iii) $21,918,750 on account of the Series 2016C Bonds, plus unliquidated, accrued, and unpaid fees and expenses of the 2016 Bond Trustee and its professionals incurred through the Effective Date.

1.18    *Assets* means all assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Estate pursuant to section 541 of the Bankruptcy Code, Cash, Avoidance and Other Actions, equipment, inventory, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of any of the foregoing.

1.19    *Avoidance and Other Actions* means all actions, causes of action, suits, choses in action, and claims of the Debtors and/or the Estate against any entity or Person, whether direct, indirect, derivative, or otherwise arising under section 510 of the Bankruptcy Code or seeking to avoid a transfer of property or recover property pursuant to sections 542 through 550 of the Bankruptcy Code or applicable non-bankruptcy law.

1.20    *Bankruptcy Code* means title 11 of the United States Code, as now in effect or hereafter applicable to this Cases.

1.21    *Bankruptcy Court* means the United States Bankruptcy Court for the Northern District of Illinois, having jurisdiction over the Cases.

1.22    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as amended, and the Local Rules of the Bankruptcy Court, as applicable to this Cases.

1.23    ***Bar Date Order*** means, collectively, any order or orders entered by the Bankruptcy Court establishing a bar date by which a Proof of Claim must be filed in the Cases.

1.24    ***Base Management Fee*** means an amount no greater than 4.25% of gross operating revenues; provided that no more than $30,000 shall be paid each month as an operating expense, with the balance payable from Excess Cash.

1.25    ***Business Day*** means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Federal Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in Chicago, Illinois.

1.26    ***Cash*** means cash and cash equivalents of the Debtors, including, without limitation, deposits in transit whether in the form of check or electronic transfer.

1.27    ***Cash Collateral Order*** means any order, whether interim or final, allowing the use by the Debtors during the Cases of the cash collateral of the 2016 Bond Trustee.

1.28    ***Causes of Action*** means any claim, cause of action, controversy, demand, agreement, right (including to legal or equitable remedies), action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action includes, without limitation: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or Chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any claim listed in the Plan Supplement.

1.29    ***Chapter 11*** means chapter 11 of the Bankruptcy Code.

1.30    ***Cases*** means the above-captioned cases.

1.31    ***Claim*** means a claim, as defined by section 101(5) of the Bankruptcy Code, against either of the Debtors or their Assets, whether or not asserted.

1.32    ***Class*** means a class or category of Claims as classified and described in Section 3 of this Plan.

1.33    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court's docket.

1.34    ***Confirmation Hearing*** means the hearing on confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

1.35    ***Confirmation Order*** means the order entered by the Bankruptcy Court confirming this Plan in accordance with Chapter 11 of the Bankruptcy Code.

1.36    ***Consenting Holders*** means parties holding all rights with respect to voting the Series 2016 Bonds that are party to the Plan Support Agreement.

1.37    ***Park Place*** means Debtor Timothy Place, NFP d/b/a Park Place of Elmhurst.

1.38    ***Creditor*** means a holder of a Claim.

1.39    ***Cure*** means the payment of Cash by the Reorganized Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Reorganized Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.40    ***Days Cash on Hand*** shall have the meaning set forth in the 2021 Master Indenture.

1.41    ***Debtor Released Party*** or ***Debtor Released Parties*** means each of the following: (i) each member of the Debtors; (ii) each  Consenting Holder in any capacity, (iii) the Issuer, (iv) the 2016 Bond Trustee in any capacity, (v) the 2016 Master Trustee in any capacity, (vi) the 2021 Bond Trustee in any capacity, (vii) the 2021 Master Trustee in any capacity, and (viii) the current and former affiliates, subsidiaries, officers, directors, members, managers, principals, employees, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacities as such, of each of the parties described in clauses (i) through (vii).

1.42    ***Debtors*** means, collectively, Timothy Place, NFP d/b/a Park Place of Elmhurst and Christian Healthcare Foundation, NFP, as debtors and debtors in possession, and includes their respective Estates, where appropriate.

1.43    ***Debt Service Reserve Fund*** means a fund that the Debtors will establish on the Effective Date under the 2021 Indenture, as defined in the Restructuring Term Sheet and as more fully set forth in the 2021 Indenture.

1.44    ***Disclosure Statement*** means the disclosure statement in respect of the Plan, as the same may be altered, modified, or amended.

1.45    ***Disputed*** means, with respect to any Claim, any Claim that is not yet Allowed and is subject to a claims objection filed before any deadline set by the Bankruptcy Court.

1.46    ***Distribution Date*** means the date, occurring on or as soon as reasonably practicable after the Effective Date, but no later than five (5) days after the Effective Date, on which the Debtors first make the required distributions to holders of Allowed Claims as provided in this Plan.

1.47    ***Distribution Record Date*** means the Effective Date or such other date as may be designated in the Confirmation Order.

1.48    ***Distribution Waterfall*** means the waterfall described in the Restructuring Term Sheet and as more fully set forth in the 2021 Master Trust Indenture.

1.49    ***Effective Date*** means a Business Day selected by the Debtors with the consent of the 2016 Bond Trustee, which is, unless the Confirmation Order directs otherwise, no earlier than the date on which each of the conditions to this Plan's Effective Date set forth herein has either been satisfied or waived in accordance with this Plan and no later than 109 days after the Petition Date (unless that day falls on a Saturday, Sunday or a legal holiday, in which case the Effective Date would be the next day which is not a Saturday, Sunday or legal holiday.  The 109th day after the Petition Date falls on Saturday, April 3, 2021.  Accordingly, the latest day that the Effective Date may occur is Monday, April 5, 2021.

1.50    ***Entrance Fee Escrow Agreement*** means that certain escrow agreement entered into by and between MB Financial Bank and the Debtors pursuant to which the Debtors shall deposit all Entrance Fees received by the Debtors between the Petition Date and the Effective Date as approved by the Bankruptcy Court.

1.51    ***Entrance Fee Fund*** means the existing Entrance Fee Fund held by the 2016 Bond Trustee pursuant to the 2016 Master Trust Indenture, which the Debtors will maintain as more fully set forth in the 2021 Master Trust Indenture.

1.52    ***Entrance Fees*** means fees, other than security deposits, monthly rentals, or monthly services charges, paid to a Debtor by residents of living units for the purpose of obtaining the right to reside in those living units or to obtain a parking space including any refundable resident deposits described in any lease, Residency Agreement, or similar agreement with respect to those living units or parking spaces, but shall not include any such amounts held in escrow or otherwise set aside pursuant to the requirements of any such agreement or a reservation agreement prior to the occupancy of the living unit or parking space covered by such lease, Residency Agreement, or similar agreement (which amounts shall be included if an when occupancy occurs).

1.53    ***Estate*** means the estates of the Debtors created by the Debtors' Cases pursuant to section 541 of the Bankruptcy Code.

1.54    ***Excess Cash*** shall have the meaning set forth in the Restructuring Term Sheet, as more fully set forth in the 2021 Master Trust Indenture.

1.55    ***Exculpated Claims*** means any Claim related to any act or omission in connection with, related to, or arising out of the filing or administration of the Cases, the Plan, or the

transactions contemplated by the Plan, the formulation, preparation, dissemination, negotiation of any document in connection with the Plan, any agreement or other document formalizing the transactions contemplated by the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or the distribution of property pursuant to the Plan.

1.56    ***Exculpated Party*** or ***Exculpated Parties*** means each of the following: (i) the Debtors and their member or members, (ii) the Reorganized Debtors and their member or members, (iii) each member of a Consenting Holder in any capacity, (iv) the Issuer, (v) the 2016 Bond Trustee in any capacity, (vi) the 2016 Master Trustee in any capacity, (vii) the 2021 Bond Trustee in any capacity, (viii) the 2021 Master Trustee in any capacity, and (ix) the current and former officers, directors, members, managers, employees, attorneys, and advisors, each in their respective capacities as such, of each of the foregoing.

1.57    ***Executory Contract*** means a contract to which a Debtor is a party that is capable of assumption or rejection under section 365 of the Bankruptcy Code.

1.58    ***Campus*** means the continuing care retirement community known as "Park Place Elmhurst" and owned by Park Place, located in Elmhurst, Illinois.

1.59    ***Federal Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as amended.

1.60    ***Final Order*** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Cases that has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, to petition for certiorari, or to move for a new trial, reargument, or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure, or Federal Bankruptcy Rules 9023 or 9024, may be filed relating to such order shall not cause such order to not be a Final Order.

1.61    ***Foundation*** means Debtor Christian Healthcare Foundation, NFP.

1.62    ***General Unsecured Claim*** means any unsecured Claim against either of the Debtors, including, without limitation, any Resident Claim, that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim or 2016 A/B/C Bond Claim.

1.63    ***Insurance Policies*** means, collectively, all of the Debtors' insurance policies.

1.64   *Interest* means any membership, or other ownership, interest in either of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.65   *Interest Payment Date* shall have the meaning provided in the 2021 Indenture.

1.66   *Issuer* means the Illinois Finance Authority, a self-financed authority of the State of Illinois.

1.67   *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.68   *Liquidity Support Agreement* means that certain Liquidity Support Agreement pursuant to which on the Effective Date, the Sponsor will deposit $3,000,000 (the "*Liquidity Fund*") with the 2021 Bond Trustee to be held and used in accordance with such agreement for the payment by the Debtors of regular operating expenses, monthly interest or principal relating to the Series 2021 Bonds.

1.69   *Management Agreement* means that certain Management Agreement entered into by and between Park Place and the Sponsor, dated as of April 1, 2016, as may have been amended, modified, and/or supplemented.

1.70   *MB Financial Bank* shall mean MB Financial Bank, N.A. or Fifth Third Bank, N.A.

1.71   *Office of the U.S. Trustee* means the Office of The United States Trustee, 219 S. Dearborn Street, Room 873, Chicago, IL 60604.

1.72   *Other Priority Claim* means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.73   *Other Secured Claim* means any Secured Claim other than a Series 2016 A/B/C Bond Claims.

1.74   *Operating Reserve Fund* means the existing Operating Reserve Fund held by the 2016 Master Trustee pursuant the 2016 Master Trust Indenture, which the Debtors will maintain as more fully set forth in the 2021 Master Trust Indenture.

1.75   *Person* means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Debtors.

1.76   *Petition Date* means the date on which the Debtors filed petitions commencing the Cases.

1.77    **Plan** means this Plan, as altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

1.78    **Plan Supplement** means the compilation of documents and forms of documents, schedules, and exhibits to this Plan, to be filed prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules. The Plan Supplement shall include, among other documents, the 2021 Bond Documents and a schedule of the Reorganized Debtors' retained Causes of Action.

1.79    **Plan Support Agreement** means that certain Plan Support Agreement, dated as of May 14, 2021 (including, without limitation, the exhibits, attachments, and appendices thereto), entered into by and among the Debtors and the Consenting Holders on the date thereof, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof. A copy of the Plan Support Agreement is attached as **Exhibit A** to the Plan.

1.80    **Priority Tax Claim** means any Claim of a governmental unit of a kind entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.81    **Professionals** means all professionals employed in this Cases pursuant to sections 327, 328, and 1103 of the Bankruptcy Code.

1.82    **Proof of Claim** means a proof of Claim filed against either of the Debtors in the Cases.

1.83    **Refunds** means any resident refund obligations under the terms of the Residency Agreements.

1.84    **Released Party** or **Released Parties** means each of the following: (i) the Debtors and their member or members, (ii) the Reorganized Debtors and their member or members, (iii) each member of a Consenting Holder in any capacity, (iv) the Issuer, (v) the 2016 Bond Trustee in any capacity, (vi) the 2016 Master Trustee in any capacity, (vii) the 2021 Bond Trustee in any capacity, (viii) the 2021 Master Trustee in any capacity, and (ix) the current and former affiliates, subsidiaries, officers, directors, members, managers, principals, employees, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacities as such, of each of the parties described in clauses (i) through (ix).

1.85    **Releasing Party** means each holder of a Claim who has voted to accept the Plan and who has not chosen, by marking the appropriate box on the ballot, to opt out of the "Release by Holders of Claims" provided for in Section 8.3 of this Plan.

1.86    **Reorganized Debtors** means, collectively, the reorganized Timothy Place, NFP d/b/a Park Place of Elmhurst and the reorganized Christian Healthcare Foundation, NFP, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, after giving effect to the restructuring transactions occurring on the Effective Date in accordance with this Plan.

1.87    ***Residency Agreements*** means those certain residency agreements entered into by and between the residents of the Campus and Park Place and any additional documents related thereto, including any amendments, supplements, or addendums.

1.88    ***Resident*** means a Person who resides or has contracted with Park Place to reside at the Campus.

1.89    ***Resident Claim*** means any Claim which sounds in contract that a Resident may hold or assert against either of the Debtors, their Estate, or their Assets, including, without limitation, any Claim arising under, related to, or in connection with a Residency Agreement, but does not include a tort claim based in whole or in part on the breach of a tort duty which arose from or related to the Debtors' performance of duties described in a Residency Agreement.

1.90    ***Restructuring Term Sheet*** means that certain Restructuring Term Sheet, dated as of May 14, 2021, setting forth the principal terms and conditions of a financial restructuring of the outstanding indebtedness of the Debtors.  A copy of the Restructured Term Sheet is attached as **Exhibit 1** to the Plan Support Agreement.

1.91    ***Schedules*** mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs, if any, filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

1.92    ***Secured Claim*** means any Claim of a Creditor that is (i) secured by property of the Estate, to the extent of the value of the Creditor's interest in the Estate's interest in such property, as provided in section 506(a) of the Bankruptcy Code or (ii) subject to setoff under section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff, as provided in section 506(a) of the Bankruptcy Code.

1.93    ***Series 2016 A/B/C Bond Claims*** means any and all Claims in respect of the 2010A Bonds, the 2010B Bonds, or the 2010C Bonds.

1.94    ***Series 2016A Bonds*** means the Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2010A in the original aggregate principal amount of $103,691,500 issued pursuant to the 2016 Indenture.

1.95    ***Series 2016B Bonds*** means the Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2016B in the original aggregate principal amount of $15,496,392 issued pursuant to the 2016 Indenture.

1.96    ***Series 2016C Bonds*** means the Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2016C in the original aggregate principal amount of $21,918,750 issued pursuant to the 2016 Indenture.

1.97 **Series 2021 Bonds** means the Illinois Finance Authority Revenue Bonds, Series 2021 (Park Place of Elmhurst Project) to be issued by the Issuer pursuant to this Plan under the 2021 Indenture and as more fully described in Section 4.3.1 of this Plan.

1.98 **Sponsor** means Rest Haven Illiana Christian Convalescent Home d/b/a Providence Life Services, an Illinois not-for-profit corporation which is the sole member of each of the Debtors.

1.99 **Sponsor Note** means that certain promissory note in the amount of Five Million Dollars ($5,000,000) issued by the Debtors to the Sponsor on or about April 1, 2016.

1.100 **Unexpired Lease** means a lease to which a Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.101 **U.S. Trustee Fees** means all fees and charges assessed against the Estate of the Debtors under 28 U.S.C. § 1930.

1.102 **Voting Deadline** means the deadline to vote to accept or reject this Plan set forth in the Disclosure Statement or an order of the Bankruptcy Court, as such deadline may be extended or modified from time to time.

## B.     Interpretation: Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to this Plan. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Unless otherwise provided, any reference in this Plan to an existing document, exhibit, or schedule means such document, exhibit, or schedule as it may have been amended, restated, revised, supplemented, or otherwise modified. If a time or date is specified for any payments or other distribution under this Plan, it shall mean on or as soon as reasonably practicable thereafter. Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral.

## SECTION 2.
## TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

2.1 **Administrative Claims**. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims have not been classified and are treated as described herein. Except as otherwise provided in the Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different treatment than provided under the Plan, or by order of the Bankruptcy

Court, an Entity holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim that has come due for payment under any applicable order or law, as soon as practicable after the later of: (i) the fifth (5th) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Debtors; (ii) the date on which such Entity becomes the holder of such an Allowed Administrative Claim; or (iii) the date or dates when that Allowed Administrative Claim is payable by its terms, consistent with past practice and in accordance with past terms.  Administrative Claims include (and are not limited to) contract claims of individuals and entities for goods and services which they provided to the Debtors during the pendency of the Cases and claims for personal injuries which are alleged to have occurred during the pendency of the Cases.  Unless otherwise provided in the Plan or stipulated to by the Debtors, holders of Administrative Claims must file a motion for the allowance of such claims under 11 U.S.C. §503(a) no later than sixty (60) days after the Effective Date. Objections to any motion for allowance of administrative claims must be filed and served on the Debtors, the Office of the U.S. Trustee, the 2016 Bond Trustee, and the requesting party no later than 25 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable motion for allowance of administrative claim was served.

2.2     **Professional Compensation**. Professionals or other Entities asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the Debtors (or, after the Effective Date, the Reorganized Debtors), the 2016 Bond Trustee, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of such Claim for Accrued Professional Compensation no later than sixty (60) days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtors, the Office of the U.S. Trustee, the 2016 Bond Trustee, and the requesting party no later than 25 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for final allowance of such Claim for Accrued Professional Compensation was served.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and section 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

2.3     **Priority Tax Claims.** In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims have not been classified and are treated as described in Section 2.3 of the Plan. Unless otherwise agreed by the holder of an Allowed Priority Tax Claim, any Entity holding an Allowed Priority Tax Claim will receive, as determined by the Reorganized Debtors in their sole discretion and in full satisfaction of such Claim, payment in Cash in full on the later of (i) the Effective Date, or as soon as reasonably practicable thereafter as determined by the Debtors, or (ii) the date such Claim becomes an Allowed Claim.

2.4     **U.S. Trustee Fees.** All U.S. Trustee Fees will be paid in full by the Reorganized Debtors as they become due and owing.

## SECTION 3.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**3.1** **Classification and Specification of Treatment of Claims.** All Claims, except those described in Section VII(B) above, are placed in the following impaired or unimpaired Classes of Claims pursuant to sections 1123(a)(1), 1123(a)(2), and 1123(a)(3) of the Bankruptcy Code, which sections require the Plan to designate such Classes and to specify their impaired or unimpaired status. A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of the Class and is classified in a different Class to the extent that the Claim qualifies within the description of that different Class. A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released, withdrawn, waived, or otherwise satisfied under the Plan. Unless the Plan expressly provides otherwise, when a Class includes a subclass, each subclass is a separate Class for all purposes under the Bankruptcy Code, including, without limitation, voting and distribution.  Subject to all other applicable provisions of the Plan (including its distribution provisions), classified Claims shall receive the treatment set forth below. The Plan will not provide any distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, through payment by a third party. Except as specifically provided in the Plan, the Plan will not provide any distributions on account of a Claim for which the obligation to pay has been assumed by a third party.

**3.2** **Classes of Claims and Interests.**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Series 2016A/B Bond Claims | Impaired | Entitled to Vote |
| 3 | Series 2016C Bond Claims | Impaired | Entitled to Vote |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Interests in Debtors | Unimpaired | Deemed to Accept |

3.2.1 **Class 1—Other Priority Claims**. This Class is unimpaired and consists of all Allowed Other Priority Claims, if any such Claims still exist as of the Effective Date. Each Allowed Other Priority Claim shall be in a separate subclass. Except to the extent that the holder of an Allowed Other Priority Claim agrees to less favorable treatment, each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim: (i) deferred Cash payments of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim, or (ii) payment in Cash in full on the later of: (a) the fifth (5th) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Debtors; and (b) the fifth (5th) Business Day after the date on which such Other Priority Claim becomes an Allowed Claim.

3.2.2   **Class 2—2016A and 2016B Bond Claims**. This Class is impaired and consists of all 2016A and 2016B Bond Claims and includes all Claims of the holders of (i) the 2016A Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $103,691,500, (ii) the 2016B Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $15,496,392, plus (iii) accrued and unpaid interest on the principal amount of the 2016A/B Bonds through and including the Effective Date, which interest shall be paid by the 2016 Bond Trustee from the Debt Service Reserve Fund administered by the 2016 Bond Trustee.  On the Effective Date, the holders of the 2016A Bonds and 2016B Bonds shall exchange the then outstanding 2016A Bonds and 2016B Bonds for a pro rata share of 2021 Bonds issued in the aggregate original principal amount of $107,269,103.  The 2021 Bonds shall be issued as current paying bonds.  The 2021 Bonds shall bear interest at the rate of 5.125% per annum and have maturities in the years and in principal amounts as set forth on Schedule 1 to the "Restructuring Term Sheet" attached to the Disclosure Statement as Exhibit 2.  The 2021 Bonds shall be amortized as set forth in Exhibit 2 to the Disclosure Statement. The 2021 Bonds shall pay interest only for the first three (3) years following the Effective Date, and then amortize over the following thirty-seven (37) years.  Interest on the 2021 Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Exhibit 2 to the Disclosure Statement.  The 2021 Bonds will be secured by a first priority lien on all assets of Park Place. The Series 2021 Bond shall mature as set forth in Exhibit 2 to the Disclosure Statement with a final maturity of forty (40) years from the restructuring effective date (subject to bond counsel approval).  The 2021 Bonds will be subject to optional redemption prior to maturity commencing on the 5th year after the Effective Date, at a price equal to: in year 5, at a price of 102%, in year 6, at price of 101% and thereafter at par.  The 2021 transaction will not include any 2021 cash flow notes for the balance outstanding and is expected to consist of one series of bonds.

3.2.3   **Class 3 – 2016C Bond Claims**.  This Class is impaired and consists of all 2016C Bond Claims which shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $21,918,750 plus any accrued and unpaid interest due on the 2016C Bonds through and including the Effective Date.  On the Effective Date, the Sponsor will pay the 2016C Bond Redemption Payment to the 2016 Bond Trustee, who will distribute such payment pro rata to the holders of record of the 2016C Bonds in full satisfaction of the 2016C Bonds.  Upon the making of the 2016C Bond Redemption Payment, the 2016C Bonds will be cancelled and deemed to no longer be outstanding, except to the extent necessary to complete the distribution of such payment to the holders of record of the 2016C Bonds.

3.2.4   **Class 4 – Other Secured Claims**. This Class is unimpaired and consists of all Other Secured Claims. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, on the later of the Effective Date and the date such Other Secured Claim becomes Allowed, or as soon as practicable thereafter, each holder of an Allowed Other Secured Claim shall have its Other Secured Claim reinstated and the legal, equitable, and contractual rights to which the holder of such Claim is entitled shall otherwise be unaltered in accordance with section 1124 of the Bankruptcy Code.

3.2.5   **Class 5 – General Unsecured Claims**. This Class is impaired and consists of all General Unsecured Claims. Except to the extent that a holder of an Allowed General Unsecured

Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive payment in Cash of three percent (3%) of the unpaid portion of such Allowed General Unsecured Claim on the latest of (i) the fifth (5th) Business Day after the Effective Date or as soon as practicable thereafter as determined by the Debtors, (ii) the fifth (5th) Business Day after the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, (iii) the date such Allowed General Unsecured Claim becomes due and payable in the ordinary course of business, or (iv) as otherwise agreed to by the Debtors and the holder of such General Unsecured Claim, and this Plan shall otherwise leave unaltered the legal, equitable, and contractual rights to which the holder of such General Unsecured Claim is entitled; *provided, however,* that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business. The Debtors reserve their right, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

3.2.6    **Class 6 – Interests in Debtors**. This Class is unimpaired and consists of all Interests in the Debtors. On the Effective Date, the Sponsor, the sole member of each of the Debtors, will retain all membership interests in the Reorganized Debtors.

**3.3**    **Acceptance or Rejection of this Plan.**

3.3.1    **Acceptance by an Impaired Class**. In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

3.3.2    **Presumed Acceptance of this Plan**. Classes 1, 4, and 6 are not impaired under this Plan and are, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.3.3    **Voting Class**. Classes 2, 3 and 5 are impaired under this Plan and are entitled to vote to accept or reject this Plan.

**SECTION 4.
MEANS FOR IMPLEMENTATION OF THIS PLAN**

4.1    **Sources of Consideration.** Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the cash derived from the Reorganized Debtors' business operations, those certain funds established pursuant to the Restructuring Term Sheet and 2021 Bond Documents, and the Sponsor Contribution (which includes the 2016C Bond Redemption Payment).  A schedule of the source and uses of cash is attached as **Exhibit 4** to the Disclosure Statement.

4.2    **Cancellation of 2016 Bonds.** Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, the 2016 Bonds shall be cancelled, and the 2016 Bonds

and related 2016 Bond Documents shall continue in effect solely to the extent they relate to and are necessary to (i) allow for the applicable distributions pursuant to the Plan, (ii) permit the 2016 Bond Trustee and the Issuer to be compensated for fees and reimbursed for expenses including expenses of its professionals, assert its charging lien, enforce its indemnity and other rights and protections with respect to and pursuant to the 2016 Bond Documents, (iii) permit the 2016 Bond Trustee to set one or more record dates and distributions dates with respect to the distribution of funds to beneficial holders of the 2016 Bonds, as applicable, (iv) permit the 2016 Bond Trustee to appear in the Cases, and (v) permit the 2016 Bond Trustee and the Issuer to perform any functions that are necessary in connection with the foregoing clauses (i) through (iv).  Before or after the Effective Date, the Debtors are authorized to take all actions and execute and deliver all documents requested by the Issuer, and the Issuer is authorized to perform all functions that are necessary in connection with the foregoing clauses (i) through (iv) of the preceding sentence.

4.3    **Issuance of 2021 Bonds.**  On the Effective Date, the Issuer will, subject to its procedures, practices and discretion, issue new 2021 Bonds under the 2021 Indenture between the Issuer and the 2021 Bond Trustee. On the Effective Date, the holders of the 2016A Bonds and 2016B Bonds shall exchange the then outstanding 2016A Bonds and 2016B Bonds for a pro rata share of 2021 Bonds issued in the aggregate principal amount equal to $107,269,103.00.  The 2021 Bonds shall be issued as current paying bonds.  The 2021 Bonds shall bear interest at the rate of 5.125% per annum and have maturities in the years and in principal amounts as set forth in Exhibit 2 to the Disclosure Statement.  The 2021 Bonds shall be amortized as set forth in Schedule 2 of the Restructuring Term Sheet. The 2021 Bonds shall pay interest only for the first three (3) years following the Effective Date and will then amortize over the following thirty-seven (37) years. Interest on the 2021 Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Schedule 2 of the Restructuring Term Sheet.  The 2021 Bonds will be secured by a first priority lien on all assets of Park Place. The Series 2021 Bond shall mature as set forth in Schedule 2 of the Restructuring Term Sheet, with a final maturity 40 years from the restructuring effective date (subject to bond counsel approval).  The 2021 Bonds will be subject to optional redemption prior to maturity commencing on the 5th year after the Effective Date, at a price equal to: in year 5, at a price of 102%, in year 6, at price of 101% and thereafter at par.  The 2021 transaction will not include any 2021 cash flow notes for the balance outstanding and is expected to consist of one series of bonds.  Before or after the Effective Date, the Debtors are authorized to take all actions and execute and deliver all documents requested by the Issuer, and the Issuer is authorized to perform all functions that are necessary in connection with the approval and issuance of the 2021 Bonds.

4.4    **Sponsor Contribution**.  In connection with the restructuring, and as consideration for its retention of its ownership interest in the Debtors, on the Effective Date the Sponsor will pay to the Debtors, and the Debtors will then forward to the 2016 Bond Trustee, the 2016C Bond Redemption Payment (in the amount of Six Hundred Fifty-Seven Thousand Five Hundred Sixty-Two and 50/100 Dollars ($657,562.50)) plus 3% of the accrued but unpaid interest on the principal amount of the 2016C Bonds as of the Effective Date of the Plan.  In addition, the Sponsor will deposit $3,000,000 (the "**Liquidity Fund**") with the 2021 Bond Trustee to be held and used in accordance with the terms of a certain Liquidity Support Agreement (the "**LSA**") by and among the Sponsor, the Debtors and the 2021 Bond Trustee. The Liquidity Fund shall be available to the Debtors for payment of regular operating expenses as needed, and for payment of monthly interest

or principal relating to the 2021 Bonds.  To enhance the earnings on the Liquidity Fund, the LSA includes a list of permitted investments for the Liquidity Fund, which will include certain investments not customarily included in tax-exempt bond financings. For example, permitted investments are contemplated to include corporate stock and bond mutual funds.  The fund balance in the Liquidity Fund will be permitted to be counted in the calculation of Days Cash on Hand for purposes of covenant testing.  The Distribution Waterfalls will include provisions which allow the Liquidity Fund to be restored to its original balance by the Debtors if draws are made to pay operating expenses or debt service. In addition, the LSA will include terms for the "burn-off" of the Liquidity Fund over time.  In connection with the issuance of the 2016 Bonds, the Sponsor received a certain promissory note ("**Sponsor Note**"), which is subordinate in security and payment to the 2016 Bonds. In further consideration of its retention of its ownership interests in the Debtors, the Sponsor will waive, as of the Effective Date, all amounts due under the Sponsor Note.  The Sponsor and Debtors understand that they will be responsible for transaction costs of the Restructuring Transaction (the "**Sponsor Contribution**"). On the Effective Date, the existing Debt Service Reserve Fund ("**DSRF**") will be used to pay (i) accrued and unpaid interest on the 2016 Bonds through but not including the Effective Date, and (ii) the costs and expenses of the 2016 Bond Trustee and its advisors; any remaining DSRF balance immediately shall be transferred to the Debt Service Reserve Fund under the 2021 Indenture.  In addition, the Sponsor shall undertake to pay the professional fees and expenses incurred by the Debtors' counsel in this case, independent from the Sponsor's other obligations under the Plan including (without limitation) its contributions to the Liquidity Fund.

4.5    **Series 2016C Bonds**.  The 2016C Bond Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $21,918,750.00 plus any accrued and unpaid interest due on the 2016C Bonds through and including the Effective Date.  The 2016C Bonds shall be redeemed in full when the Sponsor pays the 2016C Bond Redemption Payment to the 2016 Bond Trustee, who will thereafter distribute the 2016 Bond Redemption Payment pro rata to the holders of record of the 2016 Bonds.

4.6    **2021 Bond Documents**.   In connection with the foregoing matters described in Section 4.3 of the Plan, on the Effective Date, the Issuer, the Debtors, and the 2021 Bond Trustee, as applicable, will enter into the 2021 Bond Documents, including the 2021 Indenture, the 2021 Master Indenture, and the 2021 Mortgage. Except as provided for and consistent with the Restructuring Term Sheet, the 2016 Bond Trustee shall transfer to the 2021 Bond Trustee substantially all funds and accounts created or maintained under or pursuant to the 2016 Indenture in accordance with the Plan.

4.7    **Effective Date Transactions**.  Upon the Effective Date, the Debtors shall establish and/or maintain the accounts and funds described in the 2021 Bond Documents and the Restructuring Term Sheet.  Upon the Effective Date, all Entrance Fees, including any Entrance Fees received and escrowed by the Debtor after the Petition Date pursuant to the Entrance Fee Escrow Agreement, shall be deposited with the 2021 Master Trustee in the Entrance Fee Fund. The deposits in the Entrance Fee Fund, together with the balances of the Debtors' operating accounts and the Operating Reserve Fund, as of the Effective Date, the revenues and other income of the Debtors available on the Effective Date, and the Sponsor shall be applied in the following order of priority to the extent of available funds: (i) to pay any Refunds due and owing; (ii) to pay

the professional fees and expenses incurred in connection with the transactions contemplated under the Plan (including, without limitation, any costs associated with obtaining opinions from bond counsel) subject to the Budget (but not including the professional fees, expenses and costs payable to Dopkelaw LLC in its capacity as general bankruptcy counsel to the Debtors, which the Sponsor agreed to pay pursuant to the Plan Support Agreement and the exhibits thereto); (iii) to fund the Debt Service Reserve Fund up to any shortfall, if any, to the initial Debt Service Reserve Fund requirement; (iv) to fund the Operating Account in an amount equal to approximately 45 Days Cash on Hand; and (v) to fund the Operating Reserve Fund in an amount equal to 75 Days Cash on Hand.

4.8    **The Bond Funds and Distribution Waterfall.**  The Debtors will establish and maintain certain funds in connection with the 2021 Bonds, including an entrance fee fund (the "**Entrance Fee Fund**"), a revenue fund (the "**Revenue Fund**"), an operating reserve fund (the "**Operating Reserve Fund**"), and a capital expenditures fund (the "**Capital Expenditures Fund**"). The purpose of these funds is to ensure sufficient operational liquidity and capital reserves for the Debtors and to allow the Debtors to service the 2021 Bonds.  Pursuant to the 2021 Bond Documents, the Debtors shall deposit all gross revenues (other than Entrance Fees) with the 2021 Bond Trustee for deposit in the Revenue Fund as established under the 2021 Bond Documents. Entrance Fees (after the required payment of any refunds) will be transferred to the Revenue Fund after any applicable rescission rights under the Residence Agreements have expired and such funds shall be available to flow through the Distribution Waterfall (as defined herein).  Upon the Effective Date, all Entrance Fees shall be deposited with the 2021 Bond Trustee in the Entrance Fee Fund.  Such amounts, together with the balances of the Operating Account, the Operating Reserve Fund and any Revenues available to the Debtors at such time, including the Sponsor Contribution, shall be applied in the following order of priority:

1. to pay any Refunds due to Residents who no longer reside at the Campus (or their beneficiaries);

2. to pay all professional fees and expenses incurred in connection with the Restructuring Transaction (including, without limitation, any costs associated with obtaining opinions from bond counsel but not including the fees, expenses and costs incurred by the Debtors' general bankruptcy counsel);

3. to fund the Debt Service Reserve Fund up to the shortfall, if any, to the initial Debt Service Reserve Fund requirement;

4. to fund the Operating Account in an amount equal to 45 Days Cash on Hand (approximately $2.250 million);

5. to fund the Operating Reserve Fund in an amount equal to 75 Days Cash on Hand (approximately $3.750 million); and

6. thereafter, all post-Effective Date Entrance Fees and other Revenues of the Debtors shall be deposited in the Entrance Fee Fund or the Revenue Fund, as applicable, on a weekly basis.

Subject to the next sentence, amounts on deposit in the Revenue Fund shall be made available to Park Place on a monthly basis to satisfy ongoing operations and management costs and expenses of Park Place, including, without limitation, the Base Management Fee, and replenishment of any Unrestricted Amount (collectively, the "**Operating Expenses**").  If an Event of Default (as defined in the 2021 Indenture) shall occur, then the monthly amounts on deposit in the Revenue Fund available for withdrawal to satisfy Operating Expenses shall be made available to Park Place in an amount not to exceed the amounts set forth in an operating budget established pursuant to the terms of the 2021 Indenture.

On the first Business Day of each calendar month, monies in the Revenue Fund shall be distributed in the following order of priority (the "**Distribution Waterfall**"):

- First, to the Operating Account in the amount necessary to pay anticipated Operating Expenses for the upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month), as such amount is set forth in a certificate from the Borrower delivered to the Trustee no later than 10 Business Days prior to the first Business Day of a month;

- Second, to replenish any deficiency as of the Effective Date in the Debt Service Reserve Fund necessary to make the amount therein equal the Debt Service Reserve Fund Requirement;

- Third, to the Bond Fund, in an amount equal to $1/6^{th}$ of the interest due on the next interest payment date;

- Fourth, payments to the Bond Fund in an amount equal to $1/12^{th}$ of the principal due on the next principal payment date;

- Fifth, to the Capital Expenditure Fund, in an amount equal to $1/12^{th}$ of such Fiscal Year's capital budget;

- Sixth, to replenish the balance of the Operating Reserve Fund and the Operating Account to a combined total of 135 Days Cash on Hand;

- Seventh, to replenish the balance of the Liquidity Fund for any draws made in order to restore the balance of the Liquidity Fund to $3 million; and

- Eighth, to pay deferred management fees which are due to the Sponsor, and

- Ninth, any remaining amounts after application of paragraphs first to eighth above (such remaining amounts referred to as "**Excess Cash**") shall be transferred to the Operating Reserve Fund.

4.9    **Additional Terms of 2021 Bonds**.  Additional terms and conditions with respect to the 2021 Bonds are set forth in the Restructuring Term Sheet and in the 2021 Bond Documents. To the extent of any inconsistencies between the Restructuring Term Sheet and the 2021 Bond

Documents, the 2021 Bond Documents shall govern the respective rights and obligations of the parties.

4.10    **Sponsor Management Agreement**.    On or before the Effective Date, the Management Agreement will be assumed (either by operation of the Plan or by order of Court) provided that such management agreement shall provide for an annual management fee no greater than 4.25% of gross operating revenues; provided further that no more than $30,000 shall be paid each month as an operating expense with the balance payable from Excess Cash (as described in the Plan).

4.11    **Section 1145 Exemption.** Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the 2021 Bonds shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act of 1933 (as now in effect or hereafter amended) and any other applicable state or federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities. Any Entity who solicits or participates in the offer, issuance, sale, or purchase of the 2021 Bonds issued under, or in accordance with, the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, is not liable, on account of such solicitation or participation, for violation of an applicable law, rule, or regulation governing solicitation of acceptance or rejection of the Plan or the offer, issuance, sale, or purchase of securities pursuant thereto.

4.12    **Assumption of Residency Agreements.** On the Effective Date, the Reorganized Debtors shall assume all of the Residency Agreements in their entirety.

4.13    **Reorganized Debtors' Board of Directors.**  The existing members of the Boards of Directors of the Debtors shall continue to be members of the Boards of Directors of the Reorganized Debtors.

4.14    **Officers of the Reorganized Debtors.** The existing officers of the Debtors shall continue to be officers of the Reorganized Debtors.

4.15    **Employee Benefits.**   Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtors may: (i) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity at any time, and (ii) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; provided, however, that the Debtors' or the Reorganized Debtors' performance under any employment agreement will not entitle any Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing herein shall limit, diminish, or otherwise alter the Reorganized Debtors' or the Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.

4.16    **Vesting of Assets in the Reorganized Debtors.** Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, or as soon as practicable thereafter, all property of the Debtors' Estate and all Causes of Action of the Debtors (except those released pursuant to the Releases by the Debtors) shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing the 2021 Bonds). On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.17    **Restructuring Transactions.** On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

4.18    **Corporate Action.** Upon the Effective Date, all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, and all matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors  or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors or the Reorganized Debtors, as the case may be, and any and all other agreements, documents, securities, and instruments relating to the foregoing.

4.19    **Section 1146 Exemption from Certain Taxes and Fees.** Pursuant to section 1146(a) of the Bankruptcy Code, any transfer of property and any issuance, transfer, or exchange of a security in connection with or pursuant to the Plan shall not be subject to any stamp, mortgage recording, or other similar tax, charge, or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental

officials or agents to forgo the collection of any such tax, charge, or governmental assessment and, as applicable, to accept for filing and recordation instruments or other documents pursuant to such transfer of property or to permit the issuance, transfer, or exchange of a security without the payment of any such tax, charge, or governmental assessment. Such exemption specifically applies, without limitation, to (i) the creation and recordation of any mortgage, deed of trust, lien, or other security interest; (ii) the making or assignment of any lease or sublease; (iii) any restructuring transaction authorized by the Plan, including, without limitation, any actions by Issuer in connection with the cancellation of the 2016 Bonds and the issuance of the 2021 Bonds; or (iv) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

      4.20    **Preservation of Causes of Action of the Debtors.** In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, the Exculpated Claims against the Exculpated Parties and the Debtor Released Claims against the Released Parties), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including those Causes of Action listed in the Plan Supplement, whether arising before or after the Petition Date, and the Reorganized Debtors' right to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan Supplement, the Plan, or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such Entity. Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Entity on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or the Reorganized Debtors, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by an order of the Bankruptcy Court, the Reorganized Debtors expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan. For the avoidance of doubt, nothing in this Section 4.20 of the Plan shall affect the "Release by the Debtor" provided in Section 8.2 of the Plan.

**SECTION 5.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

5.1     **Assumption and Rejection of Executory Contracts and Unexpired Leases.**
Except as otherwise provided in the Plan or in an order of the Bankruptcy Court, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by the Debtors; (ii) expired or terminated pursuant to its own terms before the Effective Date; (iii) is the subject of a motion to reject filed on or before the Effective Date; or (iv) is identified as an Executory Contract or Unexpired Lease to be rejected in the Plan Supplement filed on or before the Effective Date.  **Notwithstanding anything contained in this Plan to the contrary, each Residency Agreement, and all obligations arising thereunder, including the payment of Refunds and all other entrance deposits and fees, will be assumed by the Reorganized Debtors, as of the Effective Date, pursuant to this Plan.**  Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumption or rejection of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revert in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date. After the Effective Date, the Reorganized Debtors shall have the right to terminate, amend, or modify any contracts, leases, or other agreements without approval of the Bankruptcy Court, subject to the terms thereof.

5.2     **Claims Based on Rejection of Executory Contracts or Unexpired Leases.** All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; provided, that any such Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by section 502(b)(6) of the Bankruptcy Code. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, action by, or order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Class 5 General Unsecured Claims and shall be treated in accordance with the Plan.

5.3     **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.**
Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Plan is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by

Cure. If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption. Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full waiver, release, and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting change in control or ownership interest composition and other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

5.4    **Insurance Policies**.  Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the Insurance Policies in full force) all of their Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption and assignment of each of the Insurance Policies.

5.5    **Modifications, Amendments, Supplements, Restatements, or Other Agreements**.  Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated under the Plan.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, unless such Executory Contract or Unexpired Lease has been previously assumed by the Debtors.

5.6    **Centers For Medicare and Medicaid Services**.  In addition to the provisions of section 5.1 of the Plan, the following special provisions shall apply to the assumption and cure of the Debtor's Medicare Provider Agreement.  In the event of an inconsistency between sections 5.1 and 5.6, the provisions of this section 5.6 shall govern.

A. *Medicare Assumption Date*.  Provided that all issues regarding Debtor's cure of any defaults under its Medicare provider agreement on the Confirmation Date are addressed to the satisfaction of Centers for Medicare & Medicaid Services ("CMS"), the Debtor shall assume the Medicare provider agreement on the Effective Date ("Medicare Assumption Date").

**B. *Cure Prior to the Medicare Assumption Date.*** Prior to the Medicare Assumption Date:

(1) Compliance with Program Requirements. Debtor will comply with all applicable Medicare program requirements as set forth in Title XVIII the Social Security Act, 42 U.S.C. § 1395 et seq. ("Medicare Act"), and all relevant regulations, rules and CMS manual provisions.

(2) Cure. Apart from the provision for identified monetary defaults below, nothing withstanding anything to the contrary in the Plan and any exhibits thereto (now or as amended), or Order of Confirmation of a Plan, the term "cure," for purposes of Debtor's assumption of the Medicare provider agreement, means being governed by, and subject to, the terms and conditions of its Medicare provider agreement and the incorporated statutes, regulations, policies and procedures; and to remain liable for any debt to CMS as if the bankruptcy case had not occurred.

(3) Cure of Specific Monetary Defaults Identified Prior to the Assumption Date. Except as otherwise provided by mutual agreement between CMS and Debtor in a separate written agreement, compromise and/or extended liquidation schedule that Debtor and CMS may (but are not obligated to) enter into prior to the Medicare Assumption Date, Debtor must cure all monetary defaults due under the Medicare provider agreement that CMS has identified to the Debtor in writing before the Medicare Assumption Date.

CMS's right to cure of such identified monetary defaults will be in addition to and without limitation upon its right to recoup of Medicare debts or its other rights and authorities under the Medicare Act. If Debtor and/or CMS propose a separate agreement, compromise and/or extended liquidation schedule, the process for consideration of any such proposal will remain governed by the Medicare Act, as well as all relevant regulations, rules, and CMS manual provisions, as if Debtor were not in bankruptcy.

**C. *CMS Claims Unimpaired***. Without limiting CMS's right to payment of specific identified monetary defaults under the Medicare provider agreement that must be cured prior to assumption as set forth above, all of CMS's claims shall be unimpaired under 11 U.S.C. § 1124 and no court order entered in the Chapter 11 Case, including without limitation an order confirming a plan of reorganization in this case, shall alter, modify or impair or be deemed to alter, modify or impair any right, term or provision in the Debtor's agreements with CMS.

(1) Any amounts due on such claims shall be collected in the ordinary course of business, and the United States, on behalf of CMS, shall not be required to file any separate claim in the bankruptcy to collect any amounts due to CMS under the Medicare program, whether via proof of claim, claim for cure, or administrative claim.

(2) Nothing contained in the Plan and any exhibits thereto (now or as amended) or Order of Confirmation of a Plan shall release or operate to enjoin any claim of the United States, on behalf of CMS, against the Debtor or any non-debtor.

25

(3) Notwithstanding any provision of the Plan and any exhibits thereto (now or as amended), or Order of Confirmation of a Plan, all agreements, issues, and disputes arising under the Medicare Act, 42 U.S.C. § 1395, et seq., shall be governed exclusively by Medicare statutes, regulations, policies and procedures, without regard to the Bankruptcy Code or Bankruptcy Rules.  Judicial review of any final Medicare determinations after exhaustion of jurisdictionally required administrative remedies would lie in the statutorily designated federal court in accordance with the Medicare Act.   42 U.S.C. §§ 405(h) & 1395ii; see, e.g., 42 U.S.C. §§ 405(g), 1395ff, 1395oo.

5.7     **Contracts and Leases Entered Into After the Petition Date**.   Notwithstanding any other provision in the Plan, contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

5.8     **Reservation of Rights.** Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## SECTION 6.
## PROVISIONS GOVERNING DISTRIBUTIONS

6.1     **Timing and Calculation of Amounts to Be Distributed.** Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the Plan. Except as otherwise provided for in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

6.2     **Distributions**.  Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors. With respect to the issuance of the 2021 Bonds, such bonds shall be deemed issued and exchanged as of the Effective Date without presentment by the beneficial owners. The Distribution Record Date in connection with the holders of the 2016

Bonds shall be as early as practicable so as to enable the Debtors, the Issuer, and their respective agents to comply with the customary practices and procedures of the Depository Trust Company. All Cash distributions to be made to beneficial holders of the 2016 Bonds shall be made to the 2016 Bond Trustee, which shall make such distributions to the beneficial holders of the 2016 Bonds in accordance with the terms of the 2016 Indenture.

6.3    **Payments and Distributions on Disputed Claims**.  Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but that later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.4    **Special Rules for Distributions to Holders of Disputed Claims**. Notwithstanding any other provision of the Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

6.5    **Delivery of Distributions in General**.  Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Reorganized Debtors. Distributions to holders of Allowed Claims will be made at the address of each such holder as set forth in the Debtors' books and records, except that, in the case of holders of the 2016 Bonds, distributions will be made by means of book-entry exchange through the facilities of the Depository Trust Company in accordance with the customary practices of the Depository Trust Company, as and to the extent practicable. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. Neither the Debtors, nor the Reorganized Debtors, shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct, or fraud.

6.6    **Undeliverable Distributions and Unclaimed Property**.  In the event that any distribution to any holder is returned as undeliverable, the Reorganized Debtors shall use reasonable efforts to determine the current address of such holder. No distribution to such holder shall be made unless and until the Reorganized Debtors have determined such holder's then current address, at which time such distribution shall be made as soon as practicable; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat or abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property shall be discharged and forever barred.

6.7    **Withholding and Reporting Requirements**.  In connection with the Plan and all instruments issued in connection therewith, the Reorganized Debtors shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing

authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

6.8    **Setoffs**.  Except as otherwise provided in this Plan and subject to applicable law, the Debtors and the Reorganized Debtors as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, setoff against any Allowed Claim (which setoff shall be made against the Allowed Claim, not against any distributions to be made under the Plan with respect to such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such holder have not been otherwise released, waived, relinquished, exculpated, compromised, or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), and any distribution to which a holder is entitled under the Plan shall be made on account of the Claim, as reduced after application of the setoff described above. In no event shall any holder of a Claim be entitled to setoff any Claim against any claim, right, or Cause of Action of the Debtors or Reorganized Debtors unless such holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtors and a holder of a Claim; provided, that, where there is no written agreement between the Debtors or Reorganized Debtors, as applicable, and a holder of a Claim authorizing such setoff, nothing herein shall prejudice or be deemed to have prejudiced the right of the Debtors or the Reorganized Debtors, as applicable, to assert that any holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date. This Section shall not be applicable to the distributions to be made to or for the benefit of the beneficial holders of the 2016 Bonds.

6.9    **Insurance Claims**.  No distributions under the Plan shall be made on account of an Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to the Debtors' Insurance Policies. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim, then immediately upon such agreement, such Claim may be expunged without an objection to such Claim having to be filed and without any further notice to, action by, or order or approval of the Bankruptcy Court.

6.10    **Applicability of Insurance Policies**.  Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Except as expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

6.11    **Allocation of Distributions Between Principal and Unpaid Interest**.  With the exception of distributions on account of the 2016 Bonds, which shall be treated as provided in Classes 2 and 3 herein, to the extent that any Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for U.S. federal income tax purposes, be allocated on the Debtors' books and records to the principal

amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest.

6.12    **Interest on Claims**.  Unless otherwise specifically provided for in the Plan (including interest payable under the 2016 Bonds), postpetition interest will not accrue or be paid on Claims, and no Claim holder will be entitled to interest accruing on or after the Petition Date on any Claim. Similarly, unless otherwise specifically provided for in the Plan, postpetition interest will not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

## SECTION 7.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

7.1    **Prosecution of Objections to Claims.**  The Debtors or the Reorganized Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Reorganized Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

7.2    **Retention of Debtors' Rights and Defenses**.  Except as expressly provided in this Plan or in any order entered in the Cases before the Effective Date (including the Confirmation Order), the Reorganized Debtors after the Effective Date will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date. This section shall not be applicable to the 2016 Bond Trustee or the beneficial holders of the 2016 Bonds.

7.3    **Distributions After Allowance**.  As soon as practicable following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Debtors shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan, without any interest to be paid on account of such Claim.

7.4    **Estimation of Claims**.  The Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in

the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

# SECTION 8.
## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

8.1     **Compromise and Settlement of Claims, Interests and Controversies.** Pursuant to section 1123 of the Bankruptcy Code and Federal Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estate, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of this Plan, pursuant to section 363 of the Bankruptcy Code and Federal Bankruptcy Rule 9019(a), without any further notice to, action by, or order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against it and Causes of Action against other Persons.  The Reorganized Debtors shall provide the Bond Trustee notice of any settlements in excess of $10,000.00.

8.2     **Releases by the Debtors.** Pursuant to section 1123(b) of the Bankruptcy Code, and except as specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Debtor Released Party is deemed released by the Debtors, the Estates, and the Reorganized Debtors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertible by behalf of the Debtors or the Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively), by or on behalf of the Holder of any Claim or Interest or other entity, based on or related to, or in any manner arising from, in whole or in part, the Debtors, the 2016 Bond Documents, the Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Cases, the negotiation, formulation, or preparation of the any agreement or other document formalizing the transactions contemplated by the Plan, or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that

constitutes actual fraud, willful misconduct, or gross negligence or any breach of the Plan Support Agreement by a Released Party (collectively, the "**Debtor Released Claims**").

8.3    **Limited Releases by Holders of Claims.  As of the Effective Date and except as set forth in the Plan (including but not limited to all obligations of the Debtors and Reorganized Debtors under the Plan which shall not be deemed released), each holder of a Claim or Interest (including Bondholders) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims assertible on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the preparation, negotiation, Court approval or confirmation of the Plan, the Disclosure Statement or related agreements, documents or instruments, or the filing of any motion or document (or the failure to take action) in the Debtor's Cases (collectively, "<u>Released Claims</u>"), provided, however, the Released Claims shall not include any Claim (i) which arises out of or relates to any Executory Contract which is assumed by the Debtor through the Plan, including all Residency Agreements which are assumed by the Debtor through the Plan; (ii) which arises out of or relates to any act or omission of that party constituting willful misconduct or gross negligence; or any Claim that arises from facts and circumstances other than those which are specifically enumerated above in this section of the Plan, or (iii) which relates to the Sponsor's ownership interest or involvement in any facilities other than the Debtor.  Further, nothing contained in this Plan or the Disclosure Statement, or any other document filed in connection with such documents, shall release or be deemed to release the Released Parties from any Cause of Action held by a governmental entity existing as of the Effective Date based on  any**

**law, rule or regulation related to the Center for Medicare Services or the Department of Health and Human Services with respect to Medicare reimbursement or recoupment of amounts paid by the Center for Medicare Services which may be subject to a recoupment claim of such agencies or entities made either before or after the Effective Date.  The releases described above and set forth above in the Plan do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement, including the 2021 Bond Documents) executed to implement the Plan, including, without limitation, any legal opinion requested or required by an entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan (inclusive of the tax opinion). For purposes of the Plan and this section of the Plan, the term "Released Party or Released Parties means each of the following: (i) the Debtors and their member or members, (ii) the Reorganized Debtors and their member or members, (iii) each member of a Consenting Holder in any capacity, (iv) the Issuer, (v) the 2016 Bond Trustee in any capacity, (vi) the 2016 Master Trustee in any capacity, (vii) the 2021 Bond Trustee in any capacity, (viii) the 2021 Master Trustee in any capacity, and (ix) the current and former affiliates, subsidiaries, officers, directors, members, managers, principals, employees, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacities as such, of each of the parties described in clauses (i) through (ix).**

8.4    **Limitation on the Scope of the Releases In Sections 8.2 and 8.3 of the Plan.** Notwithstanding anything to the contrary, the releases set forth above in sections 8.2 and 8.3 of this Plan do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement, including the 2021 Bond Documents) executed to implement the Plan, including, without limitation, any legal opinion requested or required by an entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan (inclusive of a tax opinion).

8.5    **Exculpation**. Except as otherwise specifically provided in the Plan, each Debtor, each Reorganized Debtor, the Estates, and each Released Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any Exculpated Claim, except to the

extent such claim, obligation, Cause of Action, or liability arises from actual fraud, willful misconduct, or gross negligence or the breach of the Plan Support Agreement (notwithstanding advice of counsel), but in all respect such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors, the Reorganized Debtors, the Estates, and the Released Parties have, and upon completing of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the restructuring of the Claims and Interests in the Cases and in connection with the transactions contemplated by the Plan, the negotiation, formulation, or preparing any agreement or other document formalizing the transactions contemplated by the Plan, or any related agreements, instruments, or other documents (including the 2021 Bond Documents and documents and instruments related thereto and any legal opinion requested by an entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) in connection with the Plan, and the solicitation and distribution of the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8.6     **Discharge of Claims.** Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Bar Date Order, in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan (including, but not limited to, the 2016 Bond Documents), the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against liabilities of, Liens on, obligations of, and rights against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such Claim, debt, or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such Claim, debt, or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim has accepted the Plan. Except as otherwise provided herein, any default by the Debtors with respect to any Claim that existed before or on account of the filing of the Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

8.7     **Injunction.**

**FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION,**

**INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.**

**FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE PLAN, ALL RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE OBLIGATIONS RELATING TO THE 2021 BONDS), ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED, OR DISCHARGED PURSUANT TO THE PLAN.**

**THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN).**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE OBLIGATIONS RELATING TO THE 2021 BONDS) FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS, APART FROM THE INTERESTS OF THE SPONSOR IN THE DEBTORS, SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(g) OF THE BANKRUPTCY CODE.**

**ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.**

8.8     **Term of Injunctions or Stays.**  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. Upon the Effective Date, all injunctions or stays contained in the Plan or the Confirmation Order shall be in full force and effect in accordance with their terms.

8.9     **Protection Against Discriminatory Treatment.**  Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including governmental units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been a debtors under Chapter 11, have been insolvent before the commencement of the Cases (or during the Cases but before such Debtors is granted or denied a discharge), or have not paid a debt that is dischargeable in the Cases.

8.10     **Release of Liens.  Except as otherwise provided in the Plan, the 2021 Bond Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. For the avoidance of doubt, except as otherwise provided in the Plan (including the Plan Supplement, inclusive of the 2021 Bond**

Documents), all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

## SECTION 9.
## CONDITIONS PRECEDENT TO THE EFFECTVE DATE

9.1    **Conditions Precedent to the Effective Date.** It shall be a condition precedent to the Effective Date that each of the following provisions, terms, and conditions shall have been satisfied or waived pursuant to the provisions of this Plan.

a.    The Bankruptcy Court shall have entered the Confirmation Order containing findings of fact and conclusions of law satisfactory to the Debtors and the 2016 Bond Trustee, which Confirmation Order shall not be subject to any stay and shall be a Final Order, and which Confirmation Order shall include or provide, among other things:

(i)  a finding by the Bankruptcy Court that the 2021 Bonds to be issued on the Effective Date will be authorized and exempt from taxation under the applicable securities law, pursuant to section 1145 of the Bankruptcy Code;

(ii)  all provisions, terms and conditions of the Plan and related documents are approved; and

b.    all Executory Contracts or Unexpired Leases assumed by the Debtors during the Cases including under the Plan shall remain in full force and effect for the benefit of the Reorganized Debtors or their assignee(s) notwithstanding any provision in such contract or lease (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables, permits, or requires termination of such contract or lease;

c.    The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

d.    The Issuer shall have approved the issuance the 2021 Bonds;

e.    The 2021 Bonds shall have been issued by the Issuer;

f.    In connection with issuance of the 2021 Bonds, the 2021 Bond Trustee shall have received a satisfactory opinion of bond counsel that the interest on the 2021 Bonds will be excluded from gross income for federal tax purposes;

g.    The Trigger Date (as defined in the Entrance Fee Escrow Agreement) shall have occurred;

36

h.      The Plan and all Plan Supplement documents, including any amendments, modifications, or supplements thereto, shall be in form and substance acceptable to the 2016 Bond Trustee;

i.      All payments and transfers to be made on the Effective Date shall be made or duly provided for, and the Debtors or the Sponsor as applicable shall have sufficient Cash on such date to make such payments;

j.      All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained;

k.      All other actions, documents and agreements necessary to implement the Plan shall be in form and substance acceptable to the 2016 Bond Trustee and shall have been effected or executed; and

l.      The Effective Date shall be on or before the date that is 109 days following the Petition Date.

9.2    **Waiver of Conditions.**  The conditions to the Effective Date set forth in the Plan may be waived at any time by the Debtors (except for: (i) the Confirmation Order being satisfactory to the 2016 Bond Trustee, (ii) the issuance of the 2021 Bonds, (iii) the bond counsel opinion referred to in Section VII(J)(1)(f) above, (iv) the condition that the aforementioned documents and orders be reasonably acceptable to the 2016 Bond Trustee, and (v) the Effective Date shall be on or before the date that is 109 days following the Petition Date; provided, however, that the Debtors may not waive entry of an order or orders approving the Disclosure Statement and confirming the Plan.

9.3    **Effect of Failure of Conditions**.  If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against the Debtors; (ii) prejudice in any manner the rights of the Debtors, any holders of Claims, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders, or any other Entity in any respect.

## SECTION 10.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

10.1    **Modification and Amendments.**  Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan as to material terms and seek confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their right to alter, amend, or modify materially the Plan one or more times, after confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan or remedy any defect or omission, or reconcile any

inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, provided, however, that, except with the prior written consent of each of the 2016 Bond Trustee and the Consenting Holders, the Debtors may not alter, amend, or modify the Plan in any manner that: (i) alters or affects the rights or interests of the 2016 Bond Trustee or the holders of the 2016 Bonds, (ii) alters or affects the treatment of the 2016A/B Bond Claims or the 2016C Bond Claims under the Plan, (iii) alters or affects the terms or characteristics of the 2021 Bonds as set forth in the Plan prior to such alteration, amendment, or modification, or (iv) is inconsistent with the terms of the Plan Support Agreement. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with the Plan. For the avoidance of doubt, nothing in this Section shall be deemed to supplant or supersede the requirements of Bankruptcy Rule 3019.

10.2    **Effect of Confirmation on Modifications**.  Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

10.3    **Revocation or Withdrawal of the Plan**.   The Debtors reserve the right to, consistent with their fiduciary duties, revoke or withdraw the Plan before the Effective Date. If the Debtors revoke or withdraws the Plan, or if confirmation does not occur, then: (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of any Executory Contract or Unexpired Lease effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

## SECTION 11.
## RETENTION OF JURISDICTION

11.1    **Retention of Jurisdiction**.  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Cases and all matters arising out of or related to the Cases and this Plan, including jurisdiction to:

a.  allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

b.  decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

c.  resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtors are parties or with respect to which the Debtors may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including rejection Claims, cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease, (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, (iii) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, any Executory Contracts or Unexpired Leases on the list of Executory Contracts and Unexpired Leases to be assumed or rejected, and (iv) any dispute regarding whether a contract or lease is or was executory or unexpired;

d.  ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e.  adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

f.  adjudicate, decide, or resolve any and all matters related to any Cause of Action;

g.  adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

h.  enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

i.  resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551, and 553 of the Bankruptcy Code;

j.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation of the Plan or any Entities' obligations incurred in connection with the Plan (exclusive of the obligations arising under the 2021 Bonds);

k.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

l.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

m.  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

n.  adjudicate any and all disputes arising from or relating to distributions under the Plan;

o.  consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

p.  determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

q.  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan (exclusive of those documents relating to the 2021 Bonds);

r.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

s.  hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

t.  enforce all orders previously entered by the Bankruptcy Court;

u.  hear any other matter not inconsistent with the Bankruptcy Code; and

v.  enter an order concluding or closing the Cases.

## SECTION 12.
## MISCELLANEOUS PROVISIONS

12.1    **Immediate Binding Effect.**  Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, exculpation, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

12.2    **Additional Documents**.  On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, subject to the consent of the 2016 Bond Trustee. The Debtors or the Reorganized Debtors, as applicable, and all holders of

Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

12.3 **Reservation of Rights**. Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Plan, any statement or provision contained in the Plan, or any action taken or not taken by the Debtors or other Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or other Entity with respect to the holders of Claims or Interests before the Effective Date.

12.4 **Successors and Assigns**. The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of such Entity.

12.5 **Votes Solicited in Good Faith**. Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the 2016 Bonds offered under the Plan.

12.6 **Closing of Cases**. The Debtors or the Reorganized Debtors shall, promptly after the full administration of the Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Cases.

12.7 **Notices.** All notices, demands, requests, consents, approvals, and other communications ("Notice" or "Notices") hereunder shall be in writing and delivered by (i) courier or messenger service, (ii) express or overnight mail, (iii) electronic mail (with a contemporaneous telephone message at the phone number(s) listed below), or (iv) by registered or certified mail, return receipt requested and postage prepaid, addressed to the respective parties as follows:

If to Borrowers:

Timothy Place, NFP.
18601 North Creek Drive, Suite A
Tinley Park, Illinois 60477
Attention: Chief Executive Officer
Telephone: (708) 342-8100
Telecopier: (708) 342-8000

Copy to:

Dopkelaw LLC
Attn: Bruce Dopke, Esq.
1535 W. Schaumburg Road
Suite 204
Schaumburg, IL  60194
Telephone: 847-524-4811
e-mail: bd@dopkelaw.com

If to Trustee:

UMB Bank, N.A.,
Attn:  Virginia A. Housum, Senior Vice President
120 South 6th Street, Suite 1400
Minneapolis, MN  55403
Telephone: 612-308-9775
e-mail: Virginia.Housum@umb.com


Copy to:

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
Attn:   Daniel S. Bleck, Esq. and Charles W. Azano, Esq.
One Financial Center
Boston, MA 02111
Telephone:  617-542-6000
e-mail:  dsbleck@mintz.com
kjwalsh@mintz.com

or to such other addresses as any Party may hereafter designate.  Notice by courier or messenger service or by express or overnight mail shall be effective upon receipt.  Notice by electronic mail shall be effective upon delivery by the sender of a confirming telephone message.  Notice by mail shall be complete at the time of deposit in the United States mail system, but any right or duty to do any act or make any response within any prescribed period or on a date certain after the service of such Notice given by mail shall be, without further action by any Party, automatically extended three (3) days.

12.8     **Headings.** The headings used in this Plan are inserted for convenience only and neither constitute a portion of this Plan nor in any manner affect the construction of the provisions of this Plan.

12.9     **Severability.** If, prior to confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or

provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

12.10  **Validity and Enforceability.** The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. Should any provision in this Plan be determined by the Bankruptcy Court or any appellate court to be unenforceable following the Effective Date, such determination shall in no way limit the enforceability and operative effect of any and all other provisions of this Plan.

12.11  **Plan Supplement.** Any exhibits or schedules not filed with this Plan may be contained in the Plan Supplement, if any, and the Debtors hereby reserve the right to file such a Plan Supplement.

12.12  **Governing Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Illinois, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of this Plan and the restructuring transactions consummated or to be consummated in connection therewith.

12.13  **Request for Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code.** The Debtors request entry of a Confirmation Order under Bankruptcy Code section 1129(a) and, to the extent necessary, Bankruptcy Code section 1129(b).

Dated:  December 15, 2020            Respectfully Submitted,

_____

Barry VanderGenugten, Chief Financial Officer
Timothy Place, NFP d/b/a Park Place of Elmhurst


Dated:  December 15, 2020            Respectfully Submitted,

_____

Barry VanderGenugten, Chief Financial Officer
Christian Healthcare Foundation, NFP.

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "Plan Support Agreement") is made and entered into as of May 14, 2020 (the "Effective Date") by and between Timothy Place, NFP (the "Corporation"), Christian Healthcare Foundation NFP (the "Foundation" and together with the Corporation, the "Borrowers") and each of the undersigned holders of Bonds (as defined herein) (the "Consenting Holders", and together with the Borrowers, each a "Party" and collectively the "Parties").

## RECITALS

A.      The Illinois Finance Authority (the "Authority") issued its: (i) $103,691,500 Revenue Bonds (Park Place of Elmhurst Project) Series 2016A (the "Series A Bonds"), (ii) $15,496,392 Revenue Bonds (Park Place of Elmhurst Project) Series 2016B (the "Series B Bonds"), and (iii) $21,918,750 Revenue Bonds (Park Place of Elmhurst Project) Series 2016C (the "Series C Bonds" and together with the Series A Bonds and Series B Bonds, the "Series 2016 Bonds") in exchange (the "2016 Exchange") for bonds the Authority previously issued in 2010: (A) $109,115,000 Revenue Bonds, Series 2010A (Park Place of Elmhurst Project); (B) $7,875,000 Revenue Bonds, Series 2010B (Park Place of Elmhurst Project); (C) $5,000,000 Revenue Bonds, Series 2010C (Park Place of Elmhurst Project) (Accelerated Redemption Reset Option Securities (ARROS); (D) $10,275,000 Revenue Bonds, Series 2010D-1 (Park Place of Elmhurst Project) (Tax-Exempt Mandatory Paydown Securities (TEMPS-75); and (E) $15,350,000 Revenue Bonds, Series 2010D-2 (Park Place of Elmhurst Project) (Tax-Exempt Mandatory Paydown Securities (TEMPS-65) (all such bonds issued in 2010, the "Original Bonds").

B.      The Original Bonds were issued primarily to (i) pay or reimburse the Corporation for the payment of all or a portion of the costs of acquiring, constructing, renovating, remodeling and equipping certain heath facilities owned by the Borrowers, and all necessary and attendant facilities, equipment, site work, zoning, entitlements and utilities related thereto, including, but not limited to, the acquisition, construction and equipping of a continuing care retirement community consisting of approximately 173 independent living units, 10 catered living units, 46 assisted living units, 20 memory support assisted living units and 37 nursing beds, related common areas and parking, all known as Park Place Christian Community of Elmhurst ("Park Place"); (ii) provide working capital; (iii) fund debt service reserve funds; (iv) pay a portion of the interest on the Original Bonds; and (v) pay certain expenses incurred in connection with the issuance of the Original Bonds.

C.      On January 17, 2016, the Borrowers filed voluntary bankruptcy petitions under Chapter 11 of Title 11 of the United States Code.  Such filings commenced a bankruptcy case in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, styled "In re TIMOTHY PLACE, NFP, *et als.*, Case No. 16-01336 (JPC)."  Pursuant to such petitions and the plan of reorganization confirmed by the bankruptcy court in this bankruptcy proceeding, the 2016 Exchange was approved and effectuated.

Exhibit A to Debtors' Joint Plan of Reorganization Dated Dec. 15, 2020

D.      UMB Bank, N.A., is the trustee (the "Bond Trustee") under that certain Bond Trust Indenture, dated as of May 1, 2016, by and between the Bond Trustee and the Authority (the "2016 Indenture"), pursuant to which the Series 2016 Bonds were issued.

E.      Pursuant to a Loan Agreement dated as of May 1, 2016 between Authority and the Borrowers, the Authority loaned the proceeds of the 2016 Bonds to the Borrowers. The rights of the Authority under the Loan Agreement were assigned to the Bond Trustee under the terms of the 2016 Indenture.

F.      As security for the obligations owing on the Series 2016 Bonds, the Corporation granted the Bond Trustee, inter alia: (i) a first mortgage lien on the real property on which Park Place was constructed, and (ii) a first priority security interest in the personal property and fixtures located in Park Place (collectively, the "Mortgaged Property"), pursuant to a Mortgage and Security Agreement, dated as of May 1, 2016, between the Corporation and the Bond Trustee.  Pursuant to a Master Trustee Indenture, dated as of May 1, 2016, among the Borrowers and the Bond Trustee, as Master Trustee thereunder (the "Master Trust Indenture"), the Borrowers granted a security interest in its Gross Revenues (as defined in the Master Trust Indenture) as security for the payment of the Series 2016 Bonds.  The Authority also granted the Bond Trustee certain collateral under the 2016 Indenture. The 2016 Indenture, the Mortgage, the Loan Agreement and any other document or agreement delivered as security for, or in respect to, the Series 2016 Bonds or the Borrowers' obligations under any of such documents are collectively referred to herein as the "Bond Documents." In addition, repayment of the Series 2016 Bonds is secured by moneys deposited to the credit of the accounts in the related respective Debt Service Reserve Funds, established under the Bond Documents.

G.      Each Consenting Holder holds debt arising out of, or related to, the Series 2016 Bonds and the Consenting Holders hold debt, in aggregate, arising out of or related to the Series 2016 Bonds equal to at least ninety-three and 79/100 (93.79%) of the principal amount of the Series 2016 Bonds outstanding, comprised of: (i) ninety-seven and 31/100 percent (97.31%) of the Series 2016A Bonds, (ii) ninety-five and 98/100 percent (95.98%) of the Series 2016B Bonds, and (iii) seventy-four and 57/100 percent (74.57%) of the Series 2016C Bonds.

H.      Defaults, potential defaults or events of default have occurred (or will occur) under the Bond Documents.

I.      The Borrowers desire to implement a restructuring (the "Restructuring") of its financial obligations with respect to the Series 2016 Bonds on the terms and conditions set forth in the restructuring term sheet (including all exhibits therein, the "Term Sheet") attached hereto as **Exhibit 1**.

J.      The Consenting Holders have agreed to the Restructuring, solely on the terms and conditions outlined in the Term Sheet.

K.      Each of the Borrowers intend to implement the Restructuring by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the

"Bankruptcy Code") commencing cases (the "Chapter 11 Cases"), which Chapter 11 Cases the Borrowers will seek to have jointly administered, in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court") no later than September 15, 2020 (the "Outside Petition Date").

L.      Each Party has reviewed, or has had the opportunity to review, this Plan Support Agreement and the Term Sheet with the assistance of professional legal advisors of its own choosing.

## STATEMENT OF AGREEMENT

In consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      Preliminary Statements.      The statements set forth in the recitals are incorporated herein and form an integrated part of this Plan Support Agreement, subject to such modifications and amendments as may be permitted pursuant to Section 11 hereof.

2.      Effectiveness of Plan Support Agreement. Upon the execution of this Plan Support Agreement by the Parties, this Plan Support Agreement will constitute the legally binding and enforceable agreement of the Parties, effective as of the Effective Date.

3.      Agreements of the Borrowers.  Consistent with the Borrowers' business judgment and the exercise of their fiduciary duties, the following are material covenants and conditions to the agreements contained herein:

(a)      The Borrowers shall take all reasonable efforts to provide drafts of the following documents (collectively, the "Bankruptcy Documents") in form and substance reasonably satisfactory to the Consenting Holders and the Bond Trustee no later than five (5) business days prior to the Outside Petition Date:

  i)      Chapter 11 Petitions with required documents, including: (i) board resolutions, (ii) disclosure of related cases, (iii) top 20 unsecured creditors list, (iv) declaration verifying top 20 unsecured creditors list, (v) list of creditors, (vi) declaration verifying list of creditors, (vii) statement regarding equity security holders and corporate disclosure statement, (viii) declaration verifying statement regarding equity security holders and corporate disclosure statement;

  ii)     Declaration in Support of First Day Pleadings;

  iii)    Motion to Jointly Administer the Chapter 11 Cases;

  iv)     Motion to Approve Disclosure Statement and proposed Order;

v)      Joint Plan of Reorganization;

vi)      Disclosure Statement with respect to the Joint Plan of Reorganization;

vii)      Motion Authorizing Use of Cash Collateral and proposed Interim Order;

viii)      Motion to Assume Plan Support Agreement and proposed Order;

ix)      Motion to Self-Report in Lieu of an Ombudsman and proposed Order;

x)      Motion to Escrow Entrance Fees and Honor Resident Entrance Fees in the Ordinary Course and proposed Order;

xi)      Motion to Utilize Existing Cash Management System and proposed Order;

xii)      Motion Prohibiting Utilities From Discontinuing Service and proposed Order;

xiii)      Motion to Protect Confidentiality of Residents' Information and proposed Order;

xiv)      Motion to Retain General Docketing and Claims Noticing and Solicitation Agent and Proposed Order;

xv)      Motion to Retain Bondholder Notice and Solicitation Agent and proposed Order;

xvi)      Motion to Establish Bar Date and proposed Order; and

xvii)      Motion Extending Time to File Schedules and Statements and proposed Order, if needed.

(b)      The Borrowers shall take all commercially reasonable steps to obtain approvals for the Restructuring as expeditiously as is reasonably practicable under applicable law, including the solicitation of requisite acceptances by means of the Disclosure Statement.

(c)      The Borrowers shall take all commercially reasonable steps to obtain any and all requisite regulatory or third party approvals necessary to consummate the Restructuring as is reasonably practicable.

(d)      The Borrowers will take all commercially reasonable efforts to file the Chapter 11 Cases, contemporaneously with the Bankruptcy Documents, no later

than the Outside Petition Date (the date on which the Chapter 11 Cases and Bankruptcy Documents are actually filed shall be referred to herein as the "Petition Date").

(e)     The Borrowers shall take all reasonably necessary steps in seeking to obtain from the Bankruptcy Court an order confirming the Plan (as defined herein) reasonably acceptable in form and substance to the Consenting Holders and the Bond Trustee (the "Confirmation Order") on or before the date that is 95 days after the Petition Date.

(f)     The Plan effective date occurs on or before the date that is 109 days after the Petition Date (the "Effective Date").

(g)     The Borrowers shall take no action inconsistent with the Restructuring, the transactions contemplated thereby, or the expeditious confirmation and consummation of such transactions, except as otherwise permitted under this Plan Support Agreement.

(h)     Subject to the exercise of their fiduciary duties, the Borrowers shall not file a petition under the Bankruptcy Code or seek any similar relief without providing the Bond Trustee and the Consenting Holders at least five (5) business days' written notice thereof.

(i)     In the event the Borrowers propose a plan of reorganization that does not comply with this Plan Support Agreement or that constitutes a Support Agreement Termination Event, the Borrowers will not assert that the Consenting Holders or the Bond Trustee have expressly or impliedly supported, endorsed, or otherwise agreed to any financial information, including any projections or liquidation analysis, included in the Bankruptcy Documents.

(j)     The Borrowers will not:

    i)     incur any further indebtedness with priority over the Bonds;

    ii)     transfer any assets other than in the ordinary course of its business other than miscellaneous assets not necessary for the operations of Park Place; and

    iii)     take any action that would result in entry of an order terminating, whether in whole or in part, the Borrowers' exclusive right to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code.

4.     Agreements of Consenting Holders.

(a)     Ownership. Each Consenting Holder represents and warrants that, as of the date hereof, such Consenting Holder either (i) is the sole legal or beneficial

owner of a principal amount of the Series 2016 Bonds outstanding as set forth on **Schedule 1** hereto, and all related claims, rights, powers, and causes of action arising out of or in connection with or otherwise relating to such Series 2016 Bonds or the Bond Documents (collectively, the "Claims"), or (ii) has the power and authority to bind the legal and beneficial owner(s) of such Series 2016 Bonds and Claims to the terms of this Plan Support Agreement and, in either case, such Consenting Holder has full power and authority to vote on and consent to such matters concerning such Series 2016 Bonds outstanding and such Claims and to exchange, assign and transfer such Series 2016 Bonds and Claims.

(b)     Restrictions on Transfers. Until this Plan Support Agreement has been terminated in accordance with Section 8, each Consenting Holder shall not voluntarily sell, transfer, or assign any of its Series 2016 Bonds or Claims or any option thereon or any right or interest (voting or otherwise) therein unless the transferee thereof (i) has already executed this Plan Support Agreement or (ii) agrees in writing by executing the form of Joinder attached hereto as **Exhibit 2** to be bound, for the benefit of the Parties, by all of the terms of this Plan Support Agreement.  Subject to applicable securities and bankruptcy law, this Plan Support Agreement shall in no way be construed to preclude any Consenting Holder or any of its respective subsidiaries or affiliates from acquiring additional Series 2016 Bonds; *provided*, *however*, that any such additional Series 2016 Bonds acquired by such Consenting Holder or any subsidiary or affiliate thereof shall automatically be deemed to be subject to the terms of this Plan Support Agreement.

(c)     Voting on the Plan.  Subject to the terms and conditions of this Plan Support Agreement, and so long as this Plan Support Agreement has not been terminated, and further provided that the Disclosure Statement approved by the Bankruptcy Court contains information substantially similar to that set forth in the Disclosure Statement filed as part of the Bankruptcy Documents, each Consenting Holder will vote all claims that it holds or as to which it has voting authority with respect to the Series 2016 Bonds outstanding, the Claims, and all other claims, rights, or interests that exist against the Borrowers to accept a plan of reorganization proposed as part of the Chapter 11 Cases that reflects the Restructuring outlined in the Term Sheet (such plan, the "Plan") and that is filed by the Outside Petition Date.

(d)     Support.  So long as this Plan Support Agreement has not been terminated, absent the consent of the Borrowers, each Consenting Holder will not:

      i)     support or encourage, directly or indirectly, any financial restructuring or sale of assets concerning the Borrowers or their assets, other than the Restructuring;

      ii)     take any action inconsistent with the Term Sheet, the transactions contemplated hereby or thereby, or the expeditious confirmation and consummation of such transactions;

iii)      vote against the Plan or otherwise agree, consent, or provide any support, to any other chapter 11 plan or other restructuring or sale or liquidation of assets concerning the Borrowers or their assets, other than the Restructuring;

iv)      object to or otherwise commence any proceeding to oppose or alter the Plan or any of the terms of the Restructuring (or any other document filed in furtherance of, and that is consistent with the Restructuring);

v)      make (and will not direct the Bond Trustee to make) any election under Section 1111(b) of the Bankruptcy Code, and will vote against and/or direct the Bond Trustee to object to any action or motion to make such an election; or

vi)      direct the Bond Trustee to take any action or otherwise act in a manner contrary to the terms of this Plan Support Agreement.

(e)    <u>Adequate Information; Compliance with Section 1125(g) of the Bankruptcy Code</u>.  Each Consenting Holder has obtained "adequate information" (within the meaning of that phrase for purposes of 11 U.S.C. Section 1125(a)(1)) regarding the Restructuring and that the Borrowers have provided all material, relevant information that the Consenting Holder has requested in advance of executing this Plan Support Agreement. Additionally, for purposes of this Plan Support Agreement, the solicitation of its support of the Plan in accordance with the terms and conditions hereof complies with applicable law and that each Consenting Holder was solicited in a manner complying with applicable law.

(f)    <u>Appearing in the Bankruptcy Court</u>.  Notwithstanding any provision in this Plan Support Agreement to the contrary, nothing in this Plan Support Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Bankruptcy Court so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Plan Support Agreement and the Restructuring and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring.

(g)    <u>Direct the Bond Trustee</u>.  To the extent necessary, each Consenting Holder will direct the Bond Trustee to take actions consistent with this Plan Support Agreement.

(h)    <u>Documents</u>. The Consenting Holders shall direct the Bond Trustee to take all reasonable efforts to draft or cause to be drafted the following documents in form and substance satisfactory to the Consenting Holders no later than the Outside Petition Date:

i)      Cash Collateral Order;

ii)     2020 Bond Indenture;

iii)    2020 Second Amended and Restated Master Trust Indenture; and

iv)    2020 Loan Agreement (collectively with the documents listed in (i) through (iii) above, the "<u>Plan Support Documents</u>").

5.    <u>Representations and Warranties of the Borrowers</u>. Each of the Borrowers represent and warrant to the Consenting Holders that the following statements are true, correct, and complete as of the date hereof:

(a)    it has all requisite corporate or similar authority to enter into this Plan Support Agreement and, subject to any necessary Bankruptcy Court approval, carry out the transactions contemplated hereby and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of the Borrowers' obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

(b)    the execution, delivery, and, subject to any necessary Bankruptcy Court approval, performance by such Borrowers of this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)    the execution, delivery, and performance by such Borrowers of this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state, or governmental authority or regulatory body;

(d)    to the best of its knowledge, after reasonable diligence, the information provided in connection with the Restructuring and this Plan Support Agreement did not and does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; and

(e)    this Plan Support Agreement is, and after the Petition Date but subject to the assumption of this Plan Support Agreement pursuant to 11 U.S.C. § 365, shall be, a legally valid and binding obligation of such Borrower, enforceable in accordance with its terms.

6.    <u>Representations and Warranties of the Consenting Holders</u>. Each Consenting Holder represents and warrants to the Borrowers that the following statements are true, correct, and complete as of the date hereof:

(a)      it has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Plan Support Agreement and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

(b)      the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)      the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

(d)      this Plan Support Agreement is the legally valid and binding obligation of such Consenting Holder, enforceable in accordance with its terms.

7.      <u>Alternative Transactions</u>.  From and after execution of this Plan Support Agreement until it is terminated pursuant to Section 8 hereof, neither of the Borrowers, nor any of their respective officers, directors, employees, agents, representatives, or affiliates (including any investment banker or financial advisor retained by the Borrowers or any of the foregoing) shall, directly or indirectly, encourage, solicit, or initiate any inquiry or proposal from, or encourage, solicit, or initiate any negotiations with, or solicit or initiate any discussions with any person or entity (other than the Consenting Holders and the Bond Trustee or an affiliate, associate, representative or agent of the Consenting Holders) concerning any potential sale of the Borrowers or restructuring of the Borrowers or a transaction that is similar to, in conflict with or in substitution of the Restructuring pursuant to the terms hereof (each, an "<u>Alternative Transaction</u>"), or agree to endorse or take any other action to facilitate any Alternative Transaction, unless the Borrowers have obtained the prior written consent of the Consenting Holders holding all rights related to or otherwise having voting authority with respect to 75% of the principal amount of the Series 2016 Bonds held collectively by the Consenting Holders who are signatory hereto (the "<u>Requisite Consenting Holders</u>").

8.      <u>Termination of Support Agreement</u>. Upon the occurrence of any Support Agreement Termination Event, this Plan Support Agreement shall be deemed terminated upon written notice from the non-breaching Party to the breaching Party.  In the event of any such termination, all Parties shall be immediately relieved of any obligations hereunder.  If the Chapter 11 Cases have been filed prior to such occurrence, such notice may be provided as part of a motion for relief from the automatic stay; *provided* that nothing herein shall be deemed to require a motion for relief from the automatic stay to effect such termination *provided further*, in the Chapter 11 Cases, the Borrowers shall have two (2) business days to seek a Bankruptcy Court determination that no Support Agreement Termination Event has occurred.  Notwithstanding the above or anything else in this Plan

Support Agreement to the contrary, upon termination of this Plan Support Agreement, any Consenting Holder shall be entitled as of right to change or withdraw its vote in favor of the Plan and be relieved from all obligations of a Consenting Holder under this Plan Support Agreement (collectively, a "Withdrawal"), with prior written notice thereof to the Borrowers and, if applicable, compliance with Rule 3018 of the Federal Rules of Bankruptcy Procedure.  The occurrence of any one or more the following shall constitute a "Support Agreement Termination Event":

  (a) Failure by the Parties hereto to agree to the form and substance of any of the Plan Support Documents or the Bankruptcy Documents by the earlier of the Petition Date or the Outside Petition Date;

  (b) Any of the Bankruptcy Documents is withdrawn, materially modified or amended (except in the case of a document which is an interim order, by replacement with a final order that would otherwise meet the requirements of a Bankruptcy Document, or with the consent of the Consenting Holders and/or the Bond Trustee);

  (c) The Borrowers fail to file the Bankruptcy Documents on the Petition Date;

  (d) The Petition Date does not occur on or before the Outside Petition Date;

  (e) Either of the Borrowers:

   i) files or supports confirmation of, or fails to actively oppose confirmation of, a plan of reorganization that requests or would result in a withdrawal, modification, or amendment of the Plan, or that, as to any provision of the Plan, materially adversely affects the Consenting Holders;

   ii) files a motion, pleading, objection, lawsuit, or administrative or adversary proceeding (or takes any action in support of such a motion or pleading filed by another party) in the Bankruptcy Court or other court, or otherwise assists in any of the foregoing, that requests or would result in a withdrawal, modification, or amendment (including in the case of document which is an interim order, by replacement with a final order) of the Restructuring; or

   iii) files a motion, complaint, application, or other request seeking to disallow, subordinate, or limit in any way the Series 2016 Bonds held by the Consenting Holders, the Claims, or the liens of the Consenting Holders and/or the Bond Trustee, or seeking entry of an order by the Bankruptcy Court disallowing, subordinating, or limiting in

any way the Bonds, Claims, or liens of the Consenting Holders and/or the Bond Trustee, or asserting a claim against any Consenting Holder and/or the Bond Trustee to avoid any transfer or obligation, or seeking any other monetary or equitable relief from or against any Consenting Holder and/or the Bond Trustee, in its capacity as such.

(f)    Following the Petition Date, the Bankruptcy Court has:

    i)    not entered an order authorizing the assumption of this Plan Support Agreement under Section 365 of the Bankruptcy Code within thirty (30) days of the Petition Date or such later date as is agreed to in writing by the Requisite Consenting Holders;

    ii)    entered an order materially staying, reversing, vacating, materially amending or modifying the Cash Collateral Order (which for purposes hereof shall include any interim or final cash collateral order) without the prior written approval of the Bond Trustee, or fails to enter an order approving the use of Cash Collateral on an interim basis on or before the date that is 4 days after the Petition Date, and on a final basis on or before the date that is 40 days after the Petition Date on such terms as set out in the Cash Collateral Order;

    iii)    not approved the Disclosure Statement on or before the date that is 40 days after the Petition Date, or by such later date as is agreed to in writing by the Requisite Consenting Holders;

    iv)    not entered the Confirmation Order on or before the date that is 95 days after the Petition Date, or by such later date as is agreed to in writing by the Requisite Consenting Holders;

    v)    entered an order denying confirmation of the Plan;

    vi)    entered an order pursuant to Section 1104 of the Bankruptcy Code appointing a trustee or appointing an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code), including, without limitation, to operate and manage the Borrowers' business (unless the motion resulting in such order was filed or supported by the Bond Trustee), or the Borrowers file a motion, application or other pleading consenting to or acquiescing in any such appointment;

vii)      entered an order dismissing any of the Chapter 11 Cases or an order pursuant to Section 1112 of the Bankruptcy Code converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

viii)     enters an order suspending any of the Chapter 11 Cases under Section 305 of the Bankruptcy Code;

ix)      enters an order in any of the Chapter 11 Case, over the objection of the Bond Trustee, approving financing pursuant to Section 364 of the Bankruptcy Code that (i) would grant an additional security interest or a lien that is equal or senior to that of the Bond Trustee on any collateral, or (ii) would grant to any party other than the Bond Trustee a super priority administrative claim that is senior or equal to that granted to the Bond Trustee under the Cash Collateral Order; or

x)      granted relief that is inconsistent with this Plan Support Agreement or the Plan or that would result in a withdrawal, modification, or amendment of the Restructuring that is contrary to the Term Sheet and that has a material adverse effect on the Consenting Holders; *provided* that such relief has not resulted from any action or inaction by any of the Consenting Holders or the Bond Trustee.

(g)   The Effective Date of the Plan shall not have occurred by the date that is 109 days after the Petition Date or by such later date as is agreed to by the Requisite Consenting Holders;

(h)   An injunction, judgment, order, decree, ruling, or charge shall have been entered that prevents consummation of the Restructuring and that remains in effect for longer than 30 days;

(i)   There is a mutual written agreement to terminate this Plan Support Agreement by the Parties;

(j)   Failure by the Borrowers to comply with any obligations under this Plan Support Agreement, other than those set forth in this Section 8, and such failure is not cured within five (5) business days after written notice thereof has been given to the Borrowers;

(k)   Failure by the Borrowers to comply with any obligations under this Section 8; and

(l)   Failure by any of the Consenting Holders to comply with any of their obligations under this Plan Support Agreement, and such failure is not cured

within five (5) business days after written notice thereof has been given by the Borrowers to such Consenting Holder and the Bond Trustee.

A Support Agreement Termination Event may be waived in writing by the Requisite Consenting Holders and/or the Borrowers, as applicable.

9.      Effect of Termination.  Upon termination of this Plan Support Agreement, all obligations hereunder, shall terminate and shall be of no force and effect.

10.      Cooperation; Further Assurances; Acknowledgment; Definitive Documents.  The Parties shall cooperate with each other and shall coordinate their activities (to the extent practicable) in respect of all commercially reasonable actions necessary to consummate the Restructuring.  The Parties further agree to execute and deliver such other instruments and to perform such commercially reasonable acts, in addition to the matters herein specified, as may be appropriate or necessary, from time to time, to effectuate the Restructuring.

11.      Amendments. This Plan Support Agreement may not be modified, amended or supplemented except in a writing signed by the Parties.

12.      GOVERNING LAW; JURISDICTION.      THIS PLAN SUPPORT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF OR IN CONNECTION WITH, THIS PLAN SUPPORT AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE STATE OF ILLINOIS HAVING JURISDICTION, AND BY EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING; PROVIDED, THAT AFTER THE PETITION DATE THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ISSUES RELATING TO THIS PLAN SUPPORT AGREEMENT PROVIDED THAT THE BANKRUPTCY COURT SHALL FOLLOW APPLICABLE CHOICE OF LAW RULES.

13.      Specific Performance. It is understood and agreed by the Parties that the exact nature and extent of damages resulting from a breach of this Plan Support Agreement are uncertain at the time of entering into this Plan Support Agreement and that breach of this Plan Support Agreement would result in damages that would be difficult to determine

with certainty.  It is understood that money damages would not be a sufficient remedy for any breach of this Plan Support Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach.  Such remedies shall be deemed the exclusive remedies for breach of this Plan Support Agreement by any Party or its representatives.

14.    Survival. Notwithstanding any sale of the Series 2016 Bonds outstanding or Claims in accordance with Section 4(b) of this Plan Support Agreement, the agreements and obligations herein shall survive such sale and shall continue in full force and effect for the benefit of the Borrowers and the Consenting Holders in accordance with the terms hereof, and any purchaser of such Series 2016 Bonds and/or Claims shall be bound by and subject to the terms of this Plan Support Agreement.

15.    Headings. The headings of the Sections, paragraphs, and subsections of this Plan Support Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

16.    Successors and Assigns; Severability; Several Obligations. This Plan Support Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives. The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof. The agreements, representations, and obligations of the Consenting Holders under this Plan Support Agreement are, in all respects, several and not joint.

17.    No Third-Party Beneficiaries. Unless expressly stated herein, this Plan Support Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

18.    Consideration. No consideration shall be due or paid to the Consenting Holders and the Bond Trustee for agreement of the Consenting Holders to support the Restructuring and to vote in favor of the Plan in accordance with the terms and conditions of this Plan Support Agreement, other than the Borrowers' agreement to pursue the Restructuring and to file, pursue confirmation of, and implement the Plan in accordance with the terms and conditions of this Plan Support Agreement, which the Parties acknowledge is fair and sufficient consideration to support the Parties' respective agreements hereunder.

19.    Prior Negotiations; Entire Agreement. This Plan Support Agreement constitutes the entire agreement of the Parties related to the Restructuring, and supersedes all other prior negotiations with respect to the subject matter hereof, except that the Parties acknowledge that all Bond Documents shall continue in full force and effect.

20.    Counterparts. This Plan Support Agreement and any amendments, joinders (including the joinder in the form of **Exhibit 2** hereto), consents, or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original

and all of which shall constitute one and the same agreement. Facsimile or scanned signatures on this Plan Support Agreement shall be treated as originals for all purposes.

     21.   <u>Construction</u>. This Plan Support Agreement shall be deemed to have been negotiated and prepared at the joint request, direction, and construction of the Parties, and at arm's length and shall be interpreted without favor to any Party.

     22.   <u>Time of the Essence</u>. Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Plan Support Agreement.

     23.   <u>Notices</u>. All notices, demands, requests, consents, approvals, and other communications ("<u>Notice</u>" or "<u>Notices</u>") hereunder shall be in writing and delivered by (i) courier or messenger service, (ii) express or overnight mail, (iii) electronic mail (with a contemporaneous telephone message at the phone number(s) listed below), or (iv) by registered or certified mail, return receipt requested and postage prepaid, addressed to the respective parties as follows:

    A.

If to Borrowers:

    Timothy Place, NFP.
    18601 North Creek Drive, Suite A
    Tinley Park, Illinois  60477
    Attention: Chief Executive Officer
    Telephone: (708) 342-8100
    Telecopier: (708) 342-8000

Copy to:

    Stahl Cowen Crowley Addis LLC
    Attn: Bruce Dopke, Esq.
    55 West Monroe Street, Suite 1200
    Telephone: 312-377-7870
    e-mail: bdobke@stahlcowen.com

If to Trustee:

    UMB Bank, N.A.,
    Attn:  Virginia A. Housum, Senior Vice President
    120 South 6th Street, Suite 1400
    Minneapolis, MN  55403
    Telephone: 612-308-9775
    e-mail: Virginia.Housum@umb.com

Copy to:

    Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Attn: Daniel S. Bleck, Esq.
Kevin J. Walsh, Esq.
One Financial Center
Boston, MA 02111
Telephone:  617-542-6000
e-mail:  dsbleck@mintz.com
kjwalsh@mintz.com

Copy to: Consenting Bondholders
[See Schedule 1 Attached Hereto]

or to such other addresses as any Party may hereafter designate.  Notice by courier or messenger service or by express or overnight mail shall be effective upon receipt.  Notice by electronic mail shall be effective upon delivery by the sender of a confirming telephone message.  Notice by mail shall be complete at the time of deposit in the United States mail system, but any right or duty to do any act or make any response within any prescribed period or on a date certain after the service of such Notice given by mail shall be, without further action by any Party, automatically extended three (3) days.

24.    _Reservation of Rights_. Except as expressly provided in this Plan Support Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies, and interests, including its Claims.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated, or this Plan Support Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights.  Except as required by the Bankruptcy Code to assume, perform, or disclose this Plan Support Agreement, pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Plan Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

25.    _Nature of Consenting Holder Obligations_.    The obligations of each Consenting Holder hereunder shall be several, and not joint with the obligations of any other Consenting Holder herein, and no Consenting Holder shall be responsible in any way for the performance of the obligations of any other Consenting Holder hereunder.  Nothing herein or in any other agreement or document, and no action taken by any Consenting Holder pursuant hereto or thereto, shall be deemed to constitute the Consenting Holders as a group, a partnership, an association, a joint venture or any other kind of entity, or to create a presumption that the Consenting Holders are in any way acting in concert or as a group with respect to such obligations or the transaction contemplated by this Plan Support Agreement.  Each Consenting Holder shall be entitled to protect and enforce its rights, including without limitation, the rights arising out of this Plan Support Agreement, and it shall not be necessary for any other Consenting Holder to be joined as an additional party in the proceeding for such purpose.

26.    <u>Automatic Stay</u>.    The Borrowers acknowledge that after any commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Plan Support Agreement or a Withdrawal shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code.

27.   <u>Support Agreement Not a Plan</u>. This Plan Support Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code. The Plan will not become effective unless and until the Bankruptcy Court enters an order confirming the Plan and the Plan becomes effective in accordance with its terms.  This Plan Support Agreement is not intended to constitute a solicitation or acceptance of the Plan.

BORROWERS:

**Timothy Place, NFP**

By: _Barry VanderGenugten_

Print Name: _Barry VanderGenugten_

Title: _CFO_

**Christian Healthcare Foundation NFP**

By: _Barry VanderGenugten_

Print Name: _Barry VanderGenugten_

Title: _CFO_

CONSENTING HOLDERS:



By:

Its Authorized Representative
and not individually

Aggregate principal amount of Bonds held on
execution date hereof: $89,739,000

| CUSIP | Amount |
|-------|--------|





Its Authorized Representative
and not individually

Aggregate principal amount of Bonds held on effective
date hereof: $24,227,000

CUSIP                    Amount

## SCHEDULE 1

"CONSENTING HOLDERS"

| Consenting Bondholder | Principal Amount of Series 2016 Bonds Owned |
|---|---|
| ██ ████████ ████████████ ████ ████████████████ ████████████ ████ | ████████████ ████████████ ████████████ |
| ████████████ ████████████ ████████████ ████████ | ████████████ ██████ █ ███ ████████████ |

# **EXHIBIT 1**

TERM SHEET

## RESTRUCTURING TERM SHEET

This Restructuring Term Sheet (this "***Term Sheet***"), dated as of May 14, 2020, sets forth certain of the principal terms and conditions of a financial restructuring (the "***Restructuring Transaction***") of the outstanding indebtedness of Timothy Place, NFP (the "***Corporation***"), and Christian Healthcare Foundation, NFP (the "***Foundation***" and together with the Corporation, the "***Borrowers***"), including, without limitation, (i) $103,691,500 Illinois Finance Authority (the "***Issuer***") Revenue Bonds (Park Place of Elmhurst Project) Series 2016A (the "***Series A Bonds***"), (ii) $15,496,392 Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2016B (the "***Series B Bonds***"), and (iii) $21,918,750 Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2016C (the "***Series C Bonds***" and together with the Series A Bonds and Series B Bonds, the "***Series 2016 Bonds***") pursuant to that certain Bond Trust Indenture (the "***Indenture***") dated as of May 1, 2016, between the Issuer and UMB Bank, n.a., as trustee (the "***Trustee***").

The Restructuring Transaction contemplates, among other things, an exchange (the "***Proposed Exchange***") of the outstanding Series 2016 Bonds in the aggregate principal amount of approximately $141,106,642, plus any accrued and unpaid interest thereon, as provided for herein, for new Series 2020 Bonds (as hereinafter defined). This Term Sheet contemplates the consummation of the Restructuring Transaction through a Plan of Reorganization (the "***Plan***") in a Chapter 11 proceeding of the Borrowers (the "***Anticipated Bankruptcy Proceeding***") pending before a court of a competent jurisdiction (the "***Bankruptcy Court***") as more fully described below.

This Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of mutually acceptable definitive documentation between the Borrowers, the Issuer and the Trustee acting at the direction of a majority of the holders of the Series 2016 Bonds (such majority holders of the Series 2016 Bonds, the "***Majority Holders***"). This Term Sheet is not and shall not be deemed to be a solicitation of votes for the acceptance of any plan of reorganization, including without limitation, the Plan, or the Proposed Exchange.

**THE TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE SERIES 2016 BONDS. THE TERM SHEET IS SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND COMPARABLE STATE STATUTES. NOTHING IN THE TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES AND DEFENSES OF THE BORROWERS, THE TRUSTEE, THE MAJORITY HOLDERS, AND ALL OTHER PARTIES.**

Capitalized terms not otherwise defined herein shall have the meanings given to them in the Indenture.

### A.      Implementation of Restructuring Transaction

| | |
|---|---|
| **Proposed Exchange Process** | The Restructuring Transaction will be implemented through the Plan.  The Series 2020 Bonds (as described herein, the "***Series 2020 Bonds***") will be issued on the effective date of the Plan (the "***Effective Date***").  The Series 2020 Bonds will be issued pursuant to an Indenture of Trust ("***2020 Indenture***" and together with all related documents necessary for the issuance of the Series 2020 Bonds, the "***2020 Bond Documents***") between the Issuer and the Trustee.

The Borrowers will commence the Anticipated Bankruptcy Proceedings and will file the Plan and 2020 Bond Documents and a disclosure statement to the Plan (the "***Disclosure*** |

| | |
|---|---|
| | *Statement*"), that is acceptable to the Trustee and the Majority Holders, which contains the terms and conditions outlined in this Term Sheet, on the timeline set forth below. Prior to the commencement of the Anticipated Bankruptcy Proceeding, the Borrowers shall provide copies of drafts of the Plan, Disclosure Statement and other pleadings, and documents, including the 2020 Bond Documents (collectively, the "*Solicitation Documents*") to the Trustee and the Majority Holders for their review and consent. Any substantive amendments, modifications or supplements to the Solicitation Documents shall be reviewed by, and acceptable to, the Trustee and the Majority Holders; provided, however, that no amendment, modification, or supplement shall be materially different from the Term Sheet. |
| **Majority Bondholder Support** | Prior to the commencement of the Anticipated Bankruptcy Proceeding, and subject to the timeline set forth herein, the Majority Holders agree to take all necessary steps to enter into a binding support agreement (the "*Support Agreement*") concerning the Majority Holders' commitment to and support of the Plan and the Proposed Exchange.<br><br>The Majority Holders agree to not take any actions inconsistent with this Term Sheet, and to direct the Trustee not to take any actions inconsistent with this Term Sheet. The Majority Holders agree to consent to the Restructuring Transaction as set forth in the Plan and the Proposed Exchange by delivering duly executed and completed consents on a timely basis pursuant to the ongoing solicitation of votes for the Proposed Exchange and shall not change such consents; provided, however, such consents shall only be binding to the extent set out in the Support Agreement. The Majority Holders agree not to otherwise commence any proceeding to oppose the Plan and the Proposed Exchange or object to the Restructuring Transaction during the term of the Support Agreement. All such actions by the Majority Holders are subject to the terms of the Support Agreement. |
| **Majority Holders Retention of Bonds and Claims** | The Majority Holders agree that they shall not sell, transfer, assign, or otherwise dispose of, directly or indirectly, any of the Series 2016 Bonds, or any right, claim, or interest (voting or otherwise) related to or arising from the Series 2016 Bonds, subject to the terms and conditions of the Support Agreement. |

**B.     Terms of Restructuring**

| | |
|---|---|
| **Exchange** | On the Effective Date, the holders of the Series A Bonds and Series B Bonds shall exchange the then outstanding Series A Bonds and Series B Bonds for a pro rata share of Series 2020 Bonds issued in the aggregate principal amount equal to approximately $107,269,103. |
| **Series 2020 Bonds** | The Series 2020 Bonds shall be issued as current paying bonds with an aggregate principal amount equal to 90% of the outstanding Series A Bonds and Series B Bonds. The Series 2020 Bonds shall bear interest at the rate of 5.125% per annum and have maturities in the years and in principal amounts as set forth on Schedule 1 hereto. The Series 2020 Bonds shall further be subject to mandatory redemption/amortization as set forth in Schedule 2 hereto. The Series 2020 Bonds shall pay interest only for the first three (3) years following the Effective Date, and then amortize over the following thirty-seven (37) years. Interest on the Series 2020 Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Schedule 2. |

2

| | |
|---|---|
| | The Series 2020 Bonds will be secured by a first priority lien on all assets of the Corporation. The Series 2020 Bond shall mature as set forth in Schedule 2, with a final maturity approximately 40 years from the restructuring effective date (subject to bond counsel approval).<br><br>The Series 2020 Bonds will be subject to optional redemption prior to maturity commencing on the 5th year after the Effective Date, at a price equal to: in year 5, at a price of 102%, in year 6, at price of 101% and thereafter at par.<br><br>The 2020 transaction will not include any 2020 cash flow notes for the balance outstanding and is expected to consist of one series of bonds. |
| **Series C Bonds** | On the Effective Date, the Sponsor will provide sufficient cash to the Borrower to redeem 100% of the Series C Bonds for a cash payment of 3% of the accreted value of the outstanding Series C Bonds as of the closing of the Proposed Exchange. Upon payment, the Series C Bonds will be cancelled and deemed to no longer be outstanding. |
| **Liquidity Support Agreement and Sponsor Contribution** | On the Effective Date, Providence Life Services (the "*Sponsor*") will deposit $3,000,000 (the "*Liquidity Fund*") with the Trustee to be held and used in accordance with the terms of a certain Liquidity Support Agreement, by and among the Sponsor, the Borrowers and the Trustee. The Liquidity Fund shall be available to the Borrowers for payment of regular operating expenses as needed, for payment of monthly interest or principal relating to the Series 2020 Bonds.<br><br>To enhance the earnings on the Liquidity Fund, the Borrowers and Sponsor propose that the LSA include a list of permitted investments for the Liquidity Fund, which will include certain investments not customarily included in tax-exempt bond financings. For example, permitted investments are contemplated to include corporate stock and bond mutual funds.<br><br>The fund balance in the Liquidity Fund will be permitted to be counted in the calculation of Days Cash on Hand for purposes of covenant testing.<br><br>The Distribution Waterfalls will include provisions that allow the Liquidity Fund to be restored to its original balance by the Borrowers if draws are made to pay operating expenses or debt service. In addition, the LSA will include terms for the "burn-off" of the Liquidity Fund over time. ["burn-off" TBD] .<br><br>In connection with the issuance of the Series 2016 Bonds, the Sponsor received a certain promissory note ("*Sponsor Note*"), which is subordinate in security and payment to the Series 2016 Bonds. In further consideration of the Proposed Exchange, Sponsor will waive, as of the Effective Date, all amounts due under the Sponsor Note.<br><br>The Sponsor and Borrowers understand that they will be responsible for transaction costs of the Restructuring Transaction (the "*Sponsor Contribution*"). On the Effective Date, the existing Debt Service Reserve Fund ("*DSRF*") will be used pay (i) accrued and unpaid interest on the Series 2016 Bonds through but not including the Effective Date, and (ii) the costs and expenses of the Trustee and its advisors; any remaining DSRF balance immediately shall be transferred to the Debt Service Reserve Fund under the 2020 Indenture. |
| **Priority/Security** | The Series 2020 Bonds will be secured by a first priority lien on all assets of the Corporation. |

| Management Fees | The existing management agreement with the Sponsor shall be assumed in the Anticipated Bankruptcy Proceeding, provided that such management agreement shall provide for an annual management fee no greater than 4.25% of gross operating revenues; provided further that no more than $30,000 shall be paid each month as an operating expense ("***Base Management Fee***"), with the balance payable from Excess Cash (as described herein). |
|---|---|
| Entrance Fees | The Borrowers shall not reduce the amount of any current Entrance Fees or monthly fees or offer any new discounts to Entrance Fee pricing or create any further benefit programs which reduces current amounts by greater than five percent (5%), without consent of the holders of a majority of principal amount of the Series 2020 Bonds. |

| Indenture Held/Debtor Held Funds | |
|---|---|
| Operating Account | Upon the Effective Date, Borrowers shall maintain the existing Operating Account, which shall be subject to the lien of the Trustee under the 2020 Indenture pursuant to a deposit account control agreement reasonably acceptable to the Trustee.  The Operating Account shall contain 45 Days Cash on Hand as an unrestricted amount as of the Effective Date (the "***Unrestricted Amount***"). |
| Entrance Fee Fund | Upon the Effective Date, the Borrowers shall maintain the existing Entrance Fee Fund under the 2020 Indenture.  After the Effective Date, pursuant to the 2020 Indenture, all Entrance Fees of the Corporation shall be required to be deposited in the Entrance Fee Fund.<br><br>Entrance Fees (after the required payment of any refunds) will be transferred to the Revenue Fund after any applicable rescission rights under the Residence Agreements have expired and such funds shall be available to flow through the Distribution Waterfall (as defined herein). |
| Revenue Fund | Upon the Effective Date, the Corporation shall maintain the existing Revenue Fund with the Trustee, subject to the lien of the 2020 Indenture, pursuant to which all revenues and other income of the Corporation (the "***Revenues***") shall, on and after the Effective Date, be deposited.  Funds from the Revenue Fund shall be withdrawn pursuant to the Distribution Waterfall below. |
| Operating Reserve Fund | Upon the Effective Date, the Corporation shall maintain the existing Operating Reserve Fund with the Trustee, subject to the lien of the 2020 Indenture, and fund such Operating Reserve Fund with an amount such that the balance therein shall have 75 Days Cash on Hand as of the Effective Date.   The amounts in the Operating Reserve Fund shall be available to the Corporation for Operating Expenses (as defined herein). |
| Capital Expenditures Fund | Upon the Effective Date, the Borrowers shall maintain the existing Capital Expenditures Fund with the Trustee, subject to the lien of the 2020 Indenture.  The Capital Expenditures Fund will be funded on a monthly basis from the Revenue Fund (in such order and priority as set forth in the Distribution Waterfall) in an amount equal to one-twelfth of each fiscal year's capital expenditures budget, as set forth in the 10-year projections in the Disclosure Statement, and increased by CPI Index each year thereafter.  The Capital Expenditures Fund will be available to fund the Borrower's capital expenditures and will not be included in |

4

| | |
|---|---|
| | calculations of Days Cash on Hand. Any balance in the Capital Expenditures Fund at the end of a fiscal year will remain in said fund; provided that the balance of the amount on deposit in the Capital Expenditures Fund will at no time exceed $3,000,000. In the event amounts in the Operating Account and Operating Reserve Fund are insufficient to fund operating expenses, the amounts in the Capital Expenditure Fund may be applied to such purpose. |
| **Bond Fund** | Upon the Effective Date, the Borrowers shall maintain the existing Bond Fund with the Trustee, subject to the lien of the 2020 Indenture. In accordance with the Distribution Waterfall below, the Bond Fund will receive (i) the monthly payments of principal and interest due and payable under the Series 2020 Bonds. |
| **Debt Service Reserve Fund** | Upon the Effective Date, the Borrowers shall maintain the existing Debt Service Reserve Fund with the Trustee, subject to the lien of the 2020 Indenture. Upon the Effective Date, amounts in the Debt Service Reserve Fund shall be applied in the following order of priority: (i) to pay accrued and unpaid interest on the Series 2016 Bonds through but not including the Effective Date, then (ii) fees and expenses of the Trustee and its advisors (to the extent not covered by the Sponsor Contribution), and (iii) the remaining balance shall be transferred to the Debt Service Reserve Fund under the 2020 Indenture. The Debt Service Reserve Fund shall not become an asset of the Borrowers, but shall remain funds held by the Trustee for the benefit of the holders of the Series 2020 Bonds. The Debt Service Reserve Fund Requirement shall equal the Maximum Annual Debt Service (for purposes of calculating Maximum Annual Debt Service for the Debt Service Reserve Fund Requirement, the anticipated final payment in year 40 of the bond debt service shall not be included in such calculation). Any draw on the Debt Service Reserve Fund shall be an event of default under the Series 2020 Indenture. |
| **Distribution Waterfall** | Upon the Effective Date, all Entrance Fees shall be deposited with the Trustee in the Entrance Fee Fund. Such amounts, together with the balances of the Operating Account, the Operating Reserve Fund, as of the Effective Date and any Revenues available to the Borrowers at such time, including the Sponsor Contribution, shall be applied in the following order of priority:<br><br>1. to pay any Refunds;<br>2. to pay all professional fees and expenses incurred in connection with the Restructuring Transaction (including, without limitation, any costs associated with obtaining opinions from bond counsel);<br>3. to fund the Debt Service Reserve Fund up to the shortfall, if any, to the initial Debt Service Reserve Fund requirement;<br>4. to fund the Operating Account in an amount equal to 45 Days Cash on Hand (approximately $2.250 million);<br>5. to fund the Operating Reserve Fund in an amount equal to 75 Days Cash on Hand (approximately $3.750 million); and<br><br>Thereafter, all post-Effective Date Entrance Fees and other Revenues of the Borrowers shall be deposited in the Entrance Fee Fund or the Revenue Fund, as applicable, on a weekly basis.<br><br>Subject to the next sentence, amounts on deposit in the Revenue Fund shall be made available to the Corporation on a monthly basis to satisfy ongoing operations and management costs and expenses of the Corporation, including, without limitation, the Base Management Fee, and replenishment of any Unrestricted Amount (collectively, the "**Operating Expenses**"). If an Event of Default (as defined in the 2020 Indenture) shall occur, then the monthly amounts on deposit in the Revenue Fund available for withdrawal to satisfy Operating Expenses shall |

5

|  | be made available to the Corporation in an amount not to exceed the amounts set forth in an operating budget established pursuant to the terms of the 2020 Indenture.<br><br>On the first Business Day of each calendar month, monies in the Revenue Fund shall be distributed in the following order of priority (the "***Distribution Waterfall***"):<br><br>• First, to the Operating Account the amount necessary to pay anticipated Operating Expenses for the upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month), as such amount is set forth in a certificate from the Borrower delivered to the Trustee no later than 10 Business Days prior to the first Business Day of a month;<br><br>• Second, to replenish any deficiency as of the Effective Date in the Debt Service Reserve Fund necessary to make the amount therein equal the Debt Service Reserve Fund Requirement;<br><br>• Third, to the Bond Fund, in an amount equal to $1/6^{th}$ of the interest due on the next interest payment date;<br><br>• Fourth, to the Bond Fund, in an amount equal to $1/12^{th}$ of the principal due on the next principal payment date;<br><br>• Fifth, to the Capital Expenditure Fund, in an amount equal to $1/12^{th}$ of such Fiscal Year's capital budget;<br><br>• Sixth, to replenish the balance of the Operating Reserve Fund and the Operating Account to a combined total of 135 Days Cash on Hand;<br><br>• Seventh, to replenish the balance of the Liquidity Fund for any draws made in order to restore the balance of the Liquidity Fund to $3 million; and<br><br>• Eighth, any remaining amounts after application of paragraphs first to seventh above (such remaining amounts referred to as "***Excess Cash***") shall be transferred to the Operating Reserve Fund. |
| **Operating/Financial Covenants** | |
| **Days Cash on Hand Covenant** | The Corporation shall provide reporting of Days Cash on Hand semiannually commencing six (6) months after the Effective Date (each such date being a "***Testing Date***").   In addition, the Corporation covenants to maintain not less than the amounts shown below on each Testing Date:<br><br>First Testing Date: 100<br>Second Testing Date: 100<br>Third Testing Date: 110<br>Fourth Testing Date: 110<br>Fifth Testing Date and thereafter: 120<br><br>Note: Projections will be updated with the Restructured Bonds so that projected ratios can be compared with covenant levels. The levels above may need further refinement if surplus cushion exists. |

| | |
|---|---|
| **Debt Service Coverage Ratio Covenant** | Commencing the fiscal year ending December 31, 2020 (the "***Initial Testing Date***"), the Corporation shall achieve a DSCR of not less than 1.10x. The ratio shall be tested quarterly on a rolling four quarter basis, commencing on the Initial Testing Date.  The required DSCR will increase to 1.15x for the Testing Dates that occur on December 31, 2021 and thereafter.

The numerator of the DSCR will include net Entrance Fees (i.e., Entrance Fees, [but not Initial Entrance Fees], received during such period minus Entrance Fees refunded during such period) and the denominator will be Maximum Annual Debt Service on the Series 2020 Bonds.

If the Debt Service Coverage Ratio on a testing date is below 1.10x for the Initial Testing Date or below 1.15x for the Testing Dates that occur on December 31, 2021 and thereafter, but above 1.0x, and the Days Cash on Hand Ratio is equal to or above 150 for the same time period, then the Borrowers can avoid an Event of Default. However, an Event of Default will be triggered if the Debt Service Coverage Ratio is below 1.0x.

To the extent the Liquidity Fund is drawn upon for any reason, such amounts will be taken into account in calculating the numerator to the Debt Service Coverage Ratio.

Any additional indebtedness for Phase II will not be counted for purpose of the DSCR until the earlier of (i) stabilization (90% occupancy of the Phase II independent living units) or (ii) the forty ninth (49th) month following issuance of the Phase II indebtedness. |
| **Additional Indebtedness (parity with Series 2020 Bonds)** | The Borrowers shall not be permitted to issue any additional indebtedness that would be *pari passu* in priority of payment and security with the Series 2020 Bonds except for (i) Capitalized Leases not to exceed $1,000,000 in the aggregate; (ii) refunding indebtedness which demonstrates annual debt service savings, pursuant to the terms and conditions acceptable to the majority in principal amount of Series 2020 Bondholders and simultaneously with the refunding of any Series 2020 Bonds, with the applicable discounts; and (iii) indebtedness relating to the financing of additional construction of independent living units not to exceed 70 units ("***Phase II***"), provided that prior to the incurrence of such indebtedness (A) there is a guaranteed maximum price or stipulated contract for construction; (B) no default has occurred under the Bond Documents; (C) certification from the Corporation that (w) at least 92% of the independent living units in the existing Facility are occupied and (x) at least 70% of the independent living units in Phase II have been reserved with deposits equal to 10% of the Entrance Fees; (D) the Days Cash on Hand and DSCR covenants have all been met as of the most recent testing date; and (E) a Consultant forecast shows that the DSCR from and after the third fiscal year following completion of Phase II will be at least 1.25 and the Days Cash on Hand at the end of the first Fiscal Year in which the average occupancy of such Independent Living Units is forecasted to reach eighty-five percent (85%) will be at least 200, upon closing of such additional indebtedness.

Additional Indebtedness related to Phase II shall only be permitted if no more than 70% of such Additional Indebtedness is fixed rate long term indebtedness or as otherwise agreed to by a majority of bondholders and may have priority rights in a waterfall to entrance fees from Phase II.

No additional indebtedness shall be secured on a senior basis to the Series 2020 Bonds. |

| | |
|---|---|
| | No additional subordinate indebtedness or non-recourse indebtedness may be incurred until the Series 2020 Bonds are paid in full. |
| **IL Occupancy Covenants** | Commencing with the first fiscal quarter following the Effective Date, the Corporation shall maintain an occupancy level of no less than 85% for the independent living units (the "***IL Occupancy Covenant***"). |
| **Assisted Living and Nursing Center Occupancy Covenants** | Commencing with the first fiscal quarter following the Effective Date, the Corporation shall maintain (i) an 82% occupancy level for Assisted Living ("***AL***") units and (ii) an 82% occupancy level for Nursing Center ("***NC***") units, which shall be measured as the average occupancy of the AL and NC units, as applicable, on a rolling four quarter basis (the "***AL/NC Occupancy Covenant***"). |
| **Failure to meet covenants** | (i)  If the Corporation fails to meet the Days Cash on Hand Covenant, the AL/NC Occupancy Covenant, or the DSCR Covenant as of any testing date, then upon the first occurrence of such non-compliance, the Borrowers shall be required to retain a management consultant acceptable (which approval shall not be unreasonably withheld) to the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2020 Bonds, to provide a report and improvement plan to the Trustee.  The proposed management consultant will be deemed **not** acceptable unless a majority has consented to the proposed management consultant within 14 days. |
| | (ii)  If the Borrowers fail to meet the Days Cash on Hand Covenant, the AL/NC Occupancy Covenant or the DSCR Covenant by the end of the fourth quarter after the report and improvement plan are provided, the Borrowers shall, *if so directed by the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2020 Bonds*, appoint an independent third party manager acceptable to such holders or if a third party manager is then managing the facility, replace the manager with a manager acceptable to such holders; provided however that if at the end of such fourth quarter, a Consultant certifies that the Borrowers have complied with all of their recommendations (except any recommendation to replace the Sponsor, as manager), then the period for compliance with such covenants shall be extended by four additional quarters; provided that if the manager fails to comply with such recommendations at any time during such extended four quarter period (other than a replacement of the Sponsor, as a manager) then at any such time, a majority of bondholders may cause replacement of manager.  In the event the Consultant recommends a replacement of the Sponsor, as manager, failure to comply with such recommendation will not result in a change in the Sponsor, as manager unless the Borrowers fail to meet the covenants within eight quarters of the first violation. For avoidance of doubt, failure to comply with such covenants after the extended period (if applicable) may result in a change of management if directed by the majority of bondholders. |
| | (iii)  If on any testing date, the DSCR is 1.0x or below or the Days Cash on Hand is less than the applicable covenant amount by 20 or more Days Cash on Hand on each Testing Date, it shall constitute an Event of Default under the 2020 Indenture. |
| | (iv)  Same remedies in (i) above will apply for failure to meet the IL Occupancy Covenant, provided that the Borrower shall be required to hire a marketing consultant in lieu of a management consultant.  If the Borrowers fail to meet the IL Occupancy Covenant by the end of the fourth quarter after the report and improvement plan are provided, the Borrowers shall, at the direction of the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2020 Bonds, replace the marketing agent, or if there is no acting marketing |

| | |
|---|---|
| | agent, the Borrowers shall be required to hire a marketing agent acceptable to the Trustee. |
| **Reporting Requirements** | |
| **Reporting** | The Borrowers shall deliver monthly financial statements (including a balance sheet, an income statement, an escrow statement and a cash flow statement) and a monthly report on marketing, occupancy and sales within 45 days following the prior month end comparing actual results to budget and shall include an explanation of variances of more than 10% from budgeted amounts. Such financial statements shall also include an Entrance Fee analysis. Monthly reporting will be replaced by quarterly reporting after year 3 if, and for so long as, the Borrowers are in compliance with all of their covenants under 2020 Bond Documents; *provided* that quarterly reporting shall revert to monthly reporting in the event that the Borrowers go out of compliance with any of their covenants under the 2020 Bond Documents. <br><br> The Borrowers shall enter into a new Continuing Disclosure Agreement providing for the same reporting as required by the existing Continuing Disclosure Agreement (in addition to the information required above), except for any amendments thereto required to reflect changes to Rules 15c2-12. |
| **Update Calls** | For the first year from the Effective Date, the Corporation shall hold monthly calls for holders of the Series 2020 Bonds. After such time, the Corporation shall hold quarterly calls, unless a majority of bondholders requests monthly calls. |
| **General Provisions** | |
| **New 2020 Bond Documents** | The 2020 Bond Documents shall be prepared or, as applicable, amended and modified in a manner necessary to effectuate the Restructuring Transaction. The 2020 Bond Documents and other agreements governing the Restructuring Transaction shall, except as provided herein, contain all of the existing covenants, defaults and provisions contained in the Indenture and such additional provisions as acceptable to the Majority Holders and consistent with the Term Sheet. |
| **Release/Exculpation** | The Restructuring Transaction contemplated by the Term Sheet shall contain customary release, injunction and exculpation provisions for all Parties to the Restructuring Transaction to the extent available under applicable law. The Parties hereby agree that they will use respective best efforts to obtain approval of such release, injunction and exculpatory provisions, which by way of example only shall include opposing any effort by any person or entity that is not a Party to this Term Sheet to eliminate or reduce the scope of such release, injunction and exculpation provisions. |
| **Binding Effect** | The obligation of each of the undersigned parties to pursue the Restructuring Transaction in accordance with the terms hereof is subject to (i) the negotiation, execution and delivery of mutually acceptable final documentation, (ii) receipt of all necessary consents, including any consent of any party's credit or other committee or board of directors and any regulatory approvals, (iii) receipt of a satisfactory tax opinion confirming that the interest on the 2020 Bonds will be excluded from gross income for federal income tax purposes under the |

| | |
|---|---|
| | Internal Revenue Code, and (iv) the Effective Date occurring on or before that date that is 109 days after the Petition Date. |
| **Miscellaneous** | This Term Sheet shall be governed by the laws of the State of Illinois.<br><br>This Term Sheet may be executed in one or more counterparts, and when all counterparts have been executed, each executed counterpart will have the force and effect of the original. |
| **Timeline** | The following timeline will be applicable:<br><br>(1) Petition Date – The date on which the Borrowers file the Anticipated Bankruptcy Proceeding with the Bankruptcy Court.<br><br>(2) Petition Date + 4 days – Entry of Interim Cash Collateral Order;<br><br>(3) Petition Date + 40 days – Entry of Final Cash Collateral Order, and approval of Disclosure Statement and Solicitation Procedures;<br><br>(4) Petition Date + 50 days – Solicitation of Plan;<br><br>(5) Petition Date + 95 days – Confirmation of Plan; and<br><br>(6) Petition Date + 109 days – Effective Date of Plan. |

Schedule 1

Series 2020 Bond Maturities

| | | | |
|---|---|---|---|
| Series 2016 A&B Par: | | $119,187,892 | |
| Series 2020 Par: | | $107,269,103 | 90% |
| Coupon: | | 5.125% | |

| Year | Principal | Interest | Debt Service |
|---|---|---|---|
| 5/15/2021[1] | - | 4,123,156.14 | 4,123,156.14 |
| 5/15/2022 | - | 5,497,541.52 | 5,497,541.52 |
| 5/15/2023 | - | 5,497,541.52 | 5,497,541.52 |
| 5/15/2024 | 767,889 | 5,497,541.52 | 6,265,430.52 |
| 5/15/2025 | 807,244 | 5,458,187.22 | 6,265,431.22 |
| 5/15/2026 | 848,615 | 5,416,815.96 | 6,265,430.96 |
| 5/15/2027 | 892,106 | 5,373,324.44 | 6,265,430.44 |
| 5/15/2028 | 937,827 | 5,327,604.02 | 6,265,431.02 |
| 5/15/2029 | 985,890 | 5,279,540.38 | 6,265,430.38 |
| 5/15/2030 | 1,036,417 | 5,229,013.52 | 6,265,430.52 |
| 5/15/2031 | 1,089,534 | 5,175,897.14 | 6,265,431.14 |
| 5/15/2032 | 1,145,372 | 5,120,058.52 | 6,265,430.52 |
| 5/15/2033 | 1,204,073 | 5,061,358.22 | 6,265,431.22 |
| 5/15/2034 | 1,265,781 | 4,999,649.48 | 6,265,430.48 |
| 5/15/2035 | 1,330,653 | 4,934,778.20 | 6,265,431.20 |
| 5/15/2036 | 1,398,848 | 4,866,582.22 | 6,265,430.22 |
| 5/15/2037 | 1,470,539 | 4,794,891.26 | 6,265,430.26 |
| 5/15/2038 | 1,545,905 | 4,719,526.14 | 6,265,431.14 |
| 5/15/2039 | 1,625,132 | 4,640,298.52 | 6,265,430.52 |
| 5/15/2040 | 1,708,420 | 4,557,010.50 | 6,265,430.50 |
| 5/15/2041 | 1,795,977 | 4,469,453.98 | 6,265,430.98 |
| 5/15/2042 | 1,888,021 | 4,377,410.16 | 6,265,431.16 |
| 5/15/2043 | 1,984,782 | 4,280,649.08 | 6,265,431.08 |
| 5/15/2044 | 2,086,502 | 4,178,929.00 | 6,265,431.00 |
| 5/15/2045 | 2,193,435 | 4,071,995.78 | 6,265,430.78 |
| 5/15/2046 | 2,305,848 | 3,959,582.22 | 6,265,430.22 |
| 5/15/2047 | 2,424,023 | 3,841,407.52 | 6,265,430.52 |
| 5/15/2048 | 2,548,254 | 3,717,176.34 | 6,265,430.34 |
| 5/15/2049 | 2,678,852 | 3,586,578.32 | 6,265,430.32 |
| 5/15/2050 | 2,816,144 | 3,449,287.16 | 6,265,431.16 |
| 5/15/2051 | 2,960,471 | 3,304,959.78 | 6,265,430.78 |
| 5/15/2052 | 3,112,195 | 3,153,235.64 | 6,265,430.64 |
| 5/15/2053 | 3,271,695 | 2,993,735.64 | 6,265,430.64 |
| 5/15/2054 | 3,439,369 | 2,826,061.28 | 6,265,430.28 |
| 5/15/2055 | 3,615,637 | 2,649,793.62 | 6,265,430.62 |
| 5/15/2056 | 3,800,938 | 2,464,492.22 | 6,265,430.22 |
| 5/15/2057 | 3,995,737 | 2,269,694.14 | 6,265,431.14 |
| 5/15/2058 | 4,200,518 | 2,064,912.62 | 6,265,430.62 |
| 5/15/2059 | 4,415,795 | 1,849,636.08 | 6,265,431.08 |
| 5/15/2060 | 31,674,665 | 1,623,326.58 | 33,297,991.58 |

[1]  The amount of interest payable for the first year is subject to change based on the final determination of the Effective Date.

11

| | 107,269,103 | 166,702,633.60 | 273,971,736.60 |

Schedule 2

Series 2020 Mandatory Sinking Fund Schedule

## **EXHIBIT 2**

JOINDER

## FORM OF JOINDER

This Joinder to the Plan Support Agreement, dated as of [_____] [__], 2020, by and among the Borrowers and the Consenting Holders (the "**Support Agreement**"), is executed and delivered by _____ (the "**Joining Party**") as of _____, 2020.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Support Agreement.

1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Plan Support Agreement (and all exhibits and annexes thereto), attached to this Joinder as **Annex I** (as such Plan Support Agreement, exhibits and annexes may be hereafter amended, restated, or otherwise modified from time to time).  The Joining Party shall hereafter be deemed to be a "Consenting Holder" and a "Party" for all purposes under the Plan Support Agreement.

2.  <u>Representations and Warranties</u>. With respect to the Series 2016 Bonds set forth below its name on the signature page hereof and all related claims, rights, and causes of action arising out of or in connection with or otherwise relating to such Series 2016 Bonds, the Joining Party hereby makes to the Borrowers the representations and warranties of the Consenting Holders set forth in the Plan Support Agreement.

3.  <u>Notices</u>.  For purposes of notices and other communications to be delivered to the Joining Party the relevant addresses and facsimile numbers are set forth below.

4.  <u>Governing Law</u>.  This Joinder shall be governed by and construed in accordance with the laws of The State of Illinois, without regard to any conflict of laws provisions that would require the application of the law of any other jurisdiction.

\* \* \* \* \*

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**EXHIBIT 3**

Budget

# Monthly Cash Flow
## Timothy Place, Inc. d/b/a Park Place of Elmhurst

**Month 1 Begins:**                    5/18/20

| Month 1 Ends | 5/31/20 | 6/30/20 | 7/31/20 | 8/31/20 | 9/30/20 |
|---|---|---|---|---|---|
| **Cash on Hand (beginning of month)** | 2,937,207 | 2,186,144 | 1,901,980 | 1,994,343 | 1,839,032 |
| | | | | | |
| **CASH RECEIPTS** | | | | | |
| Transfer from Trustee- operating & capital | - | 1,905,554 | 2,216,231 | 2,123,868 | 2,244,584 |
| Transfer from Trustee - EF refunds | | 323,190 | 730,910 | - | - |
| Fire settlement | | | | 100,000 | |
| Collections- PPP Fund | 539,782 | 837,718 | | | |
| Collections - A/R | 705,000 | 1,560,000 | 1,572,000 | 1,607,000 | 1,560,000 |
| Entrance Fees | 344,500 | 240,150 | 749,000 | 360,000 | 1,030,750 |
| Transfer to Trustee cash deposits | (1,589,282) | (2,637,868) | (2,321,000) | (2,067,000) | (2,590,750) |
| **TOTAL CASH RECEIPTS** | - | 2,228,744 | 2,947,141 | 2,123,868 | 2,244,584 |
| **Total Cash Available (before cash out)** | 2,937,207 | 4,414,888 | 4,849,121 | 4,118,211 | 4,083,616 |
| | | | | | |
| **CASH PAID OUT** | | | | | |
| Purchased Services & Supplies | 281,000 | 431,000 | 431,000 | 431,000 | 431,000 |
| | | | | | |
| Payroll  & payroll related | 340,000 | 665,500 | 681,500 | 868,811 | 681,500 |
| Marketing | 25,000 | 55,600 | 55,600 | 55,600 | 55,600 |
| Accounting & legal (non-bankruptcy) | - | 3,650 | 19,500 | - | - |
| Utilities | 39,500 | 80,500 | 80,500 | 80,500 | 80,500 |
| Insurance | 600 | 6,730 | 44,230 | 6,730 | 6,730 |
| Taxes (real estate, etc.) | - | - | - | - | 80,517 |
| **SUBTOTAL** | 686,100 | 1,242,980 | 1,312,330 | 1,442,641 | 1,335,847 |
| Capital escrow payment | - | 96,342 | 96,342 | 96,342 | 96,342 |
| Interest escrow payment | | 621,196 | 621,196 | 621,196 | 621,196 |
| Fire mitigation costs (To be reimbursed) | | 100,000 | | | |
| Capital purchase | 20,040 | 129,200 | 94,000 | 119,000 | 124,000 |
| Entrance Fee Refunds | 44,923 | 323,190 | 730,910 | - | - |
| **TOTAL CASH PAID OUT** | 751,063 | 2,512,908 | 2,854,778 | 2,279,179 | 2,177,385 |
| **Cash Position (End of Month)** | 2,186,144 | 1,901,980 | 1,994,343 | 1,839,032 | 1,906,231 |

**Payroll Protection Program loan in separate account:**

| | | |
|---|---|---|
| Loan proceeds - May 6, 2020 | 1,377,500 | 837,718 |
| Draw for Eligible Payroll and Eligible | | |
| nonpayroll costs | (539,782) | (837,718) |
| Balance | 837,718 | - |

Note: Notwithstanding anything to the contrary herein, shortly before the commencement of the Chapter 11 Cases, Park Place (a) will make an additional payment to its employees in the amount of their accrued earnings as of the Petition Date, and (b) place deposits with essential non-insider trade creditors in the amount of such vendor's estimated claims against Park Place which have accrued but are not yet payable as of the Petition Date. The intent of these payments and deposits is to help insure that employees and trade creditors will not have unsecured claims against Park Place in its Chapter 11 Case.

**EXHIBIT 4**

Milestones if Borrowers receive PPP Loan

In the event the Borrowers receive the PPP Loan, the following Milestones shall apply:

(1)      On or before May 29, 2020, each of the Borrowers will execute the Term Sheet in form and substance as attached to this Agreement as **Exhibit 1**;

(2)      On or before May 29, 2020, each of the Borrowers will execute the Plan Support Agreement in form and substance as attached to this Agreement as **Exhibit 2**;

(3)      On or before June 12, 2020, the Borrowers will provide to the Trustee with final drafts of all Bankruptcy Documents (as defined in the Plan Support Agreement);

(4)      The Borrowers shall review and provide their comments on the 2020 Bond Documents (as defined in the Term Sheet) no later than two (2) weeks after receiving the drafts of the 2020 Bond Documents from the Trustee;

(5)      On or before June 26, 2020, the Parties to agree on the form and substance of the Bankruptcy Documents and the 2020 Bond Documents; and

(6)      Each of the Borrowers shall file petitions commencing the Chapter 11 Cases no later than two (2) Business Days after they Borrowers receive notice concerning the determination of forgiveness of the PPP Loan; and

(7)      Notwithstanding Milestones (1) through (6) above, the Borrowers shall file petitions commencing the Chapter 11 Cases no later than September 15, 2020.

99653000v.1