THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| TIMOTHY PLACE, NFP, *et al.,* | ) Case No. 16-0336 (JPC) |
| | ) |
| Debtors. | ) (Jointly Administrated) |
| | ) Hon. Jacqueline P. Cox |

**<u>DEBTORS' JOINT DISCLOSURE STATEMENT DATED DECEMBER 15, 2020</u>**

Bruce Dopke, Member (ARDC # 3127052)
Dopkelaw LLC
1535 W. Schaumburg Road, Suite 204
Schaumburg, IL  60194
Tel: 847-524-4811
bd@dopkelaw.com

PROPOSED COUNSEL FOR
THE DEBTORS

# TABLE OF CONTENTS

**INTRODUCTORY NARRATIVE** ……………………………………………………… ….1

**I.   INTRODUCTION** ........................................................................................... **5**

  **A.   General** ........................................................................................................ 5

  **B.   Covid-19.** ..................................................................................................... 6

  **C.   Frequently Asked Questions.** ..................................................................... 7

  **D.   Classification and Treatment of Claims Under The Plan.** ........................ 9

  **E.   Summary of Confirmation Requirements.** ................................................ 13

  **F.   Voting Instructions and Deadline.** ............................................................ 14

    1.   General Information ................................................................................ 14

    2.   Administrative Claims. ........................................................................... 14

    3.   Unimpaired Classes Are Deemed to Accept the Plan and Do Not Vote. .......... 14

    4.   Claims Which Are Not Allowed. ........................................................... 14

    5.   Voting and Record Date. ........................................................................ 14

  **G.   The Confirmation Hearing.** ...................................................................... 15

  **H.   Definitions.** ................................................................................................ 16

    1.   Defined Terms.. ...................................................................................... 16

    2.   Interpretation of Terms. ......................................................................... 16

**II.   BACKGROUND INFORMATION** ............................................................... **16**

  **A.   Description of the Debtors.** ....................................................................... 16

  **B.   Capital Structure of the Debtors.** ............................................................ 177

  **C.   Administration of Park Place.** .................................................................. 18

    1.   Park Place Operations ............................................................................ 18

    2.   Financial Results from 2020. ................................................................. 18

  **D.   Residents of Park Place.** ........................................................................... 19

  **E.   Regulatory Agencies.** ................................................................................ 19

**III.   EVENTS LEADING TO BANKRUPTCY** ..................................................... **20**

**IV.   SUMMARY OF THE PLAN SUPPORT AGREEMENT** ............................... **21**

  **A.   Key Terms to the Restructuring.** .............................................................. 222

**B.   Sponsor Contribution** ....................................................................................... 22

**C.   The Bond Funds and Distribution Waterfall.** ...................................................... 23

**V.   APPROVAL FOR THE 2021 BONDS** .................................................................... 25

**VI.  THE CASES** ............................................................................................................... 25

**A.   Initial Motions.** ......................................................................................................... 25

1.   Motion for Entry of an Order Authorizing the Debtors to Assume Plan  Support
Agreement ........................................................................................................... 26

2.   Motion (I) Scheduling Hearing And Establishing Notice And Objection Procedures For
The Approval Of Disclosure Statement; (II) Approving The Disclosure Statement; and (III)
Granting Related Relief ....................................................................................... 26

3.   Motion for Authority to Use of Cash Collateral. ................................................ 26

4.   Motion to Escrow Residents' Entrance Fees. ..................................................... 26

5.   Motion To Authorize Procedures To Protect And Maintain The Confidentiality Of
Resident And Consumer Information. .................................................................. 277

6.   Motion to Continue Using Existing Cash Management Systems. ........................ 27

7.   Motion For Entry Of Interim And Final Orders:  (A) Prohibiting Utilities From altering,
Refusing, or Discontinuing Services On Account Of Prepetition Invoices; (B) Establishing
Procedures For Determining Requests For Additional Adequate Assurance; And (C)
Granting Related Relief. ...................................................................................... 27

8.   Applications To Employ Professionals. ............................................................... 27

9.   Motion to Motion for Determination that Appointment of Patient Care Ombudsman is
Unnecessary. ....................................................................................................... 288

10.  Motion For Entry Of An Order (A) Establishing Bar Dates For Filing Certain Proofs of
Claim, (B) Approving The Form And Manner For Filing Proofs Of Claim, (C) Approving
Notice Thereof, and (D) Grants Related Relief .................................................... 28

**B.   Timetable for the Cases.** .......................................................................................... 28

**VII. PLAN OF REORGANIZATION** .............................................................................. 28

**A.   Classification and Treatment of Claims Under the Plan.** ................................... 28

**B.   Treatment of Administrative Claims, Priority Tax Claims, and U.S. Trustee Fees.**. 29

1.   Administrative Claims ........................................................................................ 29

2.   Professional Compensation ................................................................................ 29

3.   Priority Tax Claims ............................................................................................ 30

4.   U.S. Trustee Fees. All U.S. Trustee Fees will be paid in full by the Reorganized Debtors
as they become due and owing. ................................................................................... 30

**C.   Classification and Treatment of Claims and Interests** ............................................... 30

1.   Classification and Specification of Treatment of Claims. .................................... 30

2.   Class 1 – Other Priority Claims. ......................................................................... 311

3.   Class 2 – 2016A/B Bond Claims.. ....................................................................... 31

4.   Class 3 – 2016C Bond Claims. ............................................................................ 31

5.   Class 4 – Other Secured Claims. ......................................................................... 32

6.   Class 5 – General Unsecured Claims.   ................................................................ 32

7.   Class 6 – Interests In the Debtors. ....................................................................... 32

**D.   Acceptance or Rejection of the Plan.** ........................................................................ 33

1.   Acceptance by an Impaired Class. ....................................................................... 33

2.   Presumed Acceptance of the Plan. ....................................................................... 33

3.   Voting Class. ........................................................................................................ 33

**E.   Means for Implementation of the Plan.** .................................................................... 33

1.   Sources of Consideration. .................................................................................... 33

2.   Cancellation of 2016 Bonds. ............................................................................... 33

3.   Issuance of 2021 Bonds. ...................................................................................... 33

4.   2021 Bond Documents. ....................................................................................... 344

5.   Effective Date Transactions. ................................................................................ 34

6.   Additional Terms of 2021 Bonds. ........................................................................ 34

7.   Section 1145 Exemption. ..................................................................................... 34

8.   Sponsor Management Agreement. ....................................................................... 355

9.   Reorganized Debtors' Board of Directors. .......................................................... 355

10.  Officers of the Reorganized Debtors. .................................................................. 35

11.  Employee Benefits.. ............................................................................................. 35

12.  Vesting of Assets in the Reorganized Debtors. ................................................... 35

13.  Restructuring Transactions. ................................................................................. 366

14.  Corporate Action. ................................................................................................ 36

15.  Section 1146 Exemption from Certain Taxes and Fees. ...................................... 36

16.  Preservation of Causes of Actions of the Debtors. ............................................. 377

iii

**F.    Treatment of Executory Contracts and Unexpired Leases.**..........................37

    1.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ...................37

    2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.......................38

    3.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases...................38

    4.    Insurance Policies.................................................................399

    5.    Modifications, Amendments, Supplements, Restatements, or Other Agreements........399

    6.    Centers For Medicare and Medicaid Services.......................................39

    7.    Reservation of Rights.. ...........................................................39

    **G.    Contracts and Leases Entered Into After the Petition Date.** .......................39

**H.    Provisions Governing Distributions.** .................................................40

    1.    Timing and Calculation of Amounts to Be Distributed. .....................................40

    2.    Distributions..........................................................................40

    3.    Payments and Distributions on Disputed Claims..........................................40

    4.    Special Rules for Distributions to Holders of Disputed Claims.. .......................40

    5.    Delivery of Distributions in General. ....................................................40

    6.    Undeliverable Distributions and Unclaimed Property. .....................................41

    7.    Withholding and Reporting Requirements. ................................................41

    8.    Setoffs..............................................................................41

    9.    Insurance Claims. .....................................................................42

    10.    Applicability of Insurance Policies.....................................................422

    11.    Allocation of Distributions Between Principal and Unpaid Interest..................42

    12.    Interest on Claims...................................................................42

    1.    Prosecution of Objections to Claims.. ..................................................42

    2.    Retention of Debtors' Rights and Defenses...............................................42

    3.    Distributions After Allowance...........................................................43

    4.    Estimation of Claims. .................................................................433

**J.    Conditions Precedent to the Effective Date.**.........................................43

    1.    Conditions Precedent to the Effective Date...............................................43

    2.    Waiver of Conditions..................................................................44

    3.    Effect of Failure of Conditions.........................................................44

**K.**    **Modification, Revocation or Withdrawal of the Plan.**........................................................455

    1.    Modification and Amendments.............................................................................455

    2.    Effect of Confirmation on Modifications...........................................................45

    3.    Revocation or Withdrawal of the Plan...............................................................45

  **L.**    **Retention of Jurisdiction** ……………………………………………………………..47

  **M.**    **Miscellaneous Provisions.** ..................................................................................48

    1.    Immediate Binding Effect...................................................................................48

    2.    Additional Documents.........................................................................................48

    3.    Reservation of Rights. ........................................................................................48

    4.    Successors and Assigns. .....................................................................................48

    5.    Votes Solicited in Good Faith.............................................................................48

    6.    Closing of Cases.................................................................................................48

**VIII.**    **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF
REORGANIZATION** ..........................................................................................................**49**

  **A.**    **Elements of Confirmation.** ..................................................................................49

  **B.**    **Best Interests of Creditors.** .................................................................................49

  **C.**    **Feasibility of the Plan.** ........................................................................................50

  **D.**    **Sufficient Acceptances.** ....................................................................................511

**IX.**    **EFFECTS OF PLAN CONFIRMATION** .........................................................................**51**

  **A.**    **Compromise and Settlement of Claims, Interests, and Controversies.** ....................52

  **B.**    **Releases by the Debtors.** .....................................................................................52

  **C.**    **Limited Releases by Holders of Claims.** ...........................................................533

  **D.**    **Exculpation.** ........................................................................................................54

  **E.**    **Discharge of Claims.** ...........................................................................................55

  **F.**    **Injunction.**............................................................................................................55

  **G.**    **Term of Injunctions or Stays.**............................................................................56

  **H.**    **Protection Against Discriminatory Treatment.**................................................57

  **I.**    **Release of Liens.** ..................................................................................................57

**X.**    **RISK FACTORS** ................................................................................................................**57**

  **A.**    **Classification of Claims and Interests.** ...............................................................57

  **B.**    **Insufficient Acceptances.** ....................................................................................58

**C.**   **Confirmation Risks.** .......................................................................................... 58

**D.**    **Conditions Precedent May Not Occur.** ..................................................... 58

**E.**    **Uncertainty of Financial Projections.** ...................................................... 59

**F.**   **Adverse Publicity.** .................................................................................. 59

**G.**  **Coronavirus** ........................................................................................... 59

**XI.** **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE  PLAN** ......... **60**

**A.**  **Liquidation Under Chapter 7.** .................................................................. 60

**B.**  **Alternative Plan of Reorganization.** ......................................................... 60

**XII.** **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ............... **60**

**A.**  **U.S. Federal Income Tax Consequences to the Debtors.** ............................ 62

**B.**  **U.S. Federal Income Tax Consequences to Holders Under a Bond Exchange.** ......... 62

**C.**  **U.S. Federal Income Tax Consequences of Holding 2021 Bonds.** ............... 63

**D.**  **Information Reporting and Backup Withholding.** ...................................... 64

**XIII.**    **CONCLUSION AND RECOMMENDATIONS** ...................................................... **65**

## INTRODUCTORY NARRATIVE

Timothy Place, NFP d/b/a Park Place Christian Community of Elmhurst ("**Park Place**") and Christian Healthcare Foundation, NFP d/b/a Providence Healthcare Foundation (the "**Foundation**") (collectively, the "**Debtors**") have filed a Plan of Reorganization (the "**Plan**") in these bankruptcy cases (the "**Cases**"). The Plan will become effective if enough creditors whose rights would be changed by the Plan agree to it, and the Bankruptcy Court finds that the Plan meets the requirements of the Bankruptcy Code.

**Claims and Creditors who will not be affected by the Plan:**

The Plan, as currently proposed, will *not* affect:

a. the Residency Agreements between Park Place and the people who live at Park Place of Elmhurst and their beneficiaries;

b. the Debtors' employees;

c. people who have placed deposits with Park Place to reserve units in Park Place of Elmhurst;

d. vendors and service providers who do business with Park Place in the ordinary course of Park Place's business; and

e. State, federal and local units of government, including without limitation all taxing and regulatory authorities.

If you have a claim that falls into one of the five categories noted immediately above, you will not be required to do anything to keep your rights against the Debtors in full force and effect as they exist now and as they existed prior to the commencement of these Cases.

**Bondholder Claims which will be affected by the Plan:**

Park Place owns and runs a continuing care retirement community (a "**CCRC**") located in Elmhurst, Illinois which does business under the name of "Park Place of Elmhurst" (the "**Campus**"). The Campus was built with funds which were received from the sale of Illinois municipal bonds issued to bondholders in 2010 by the Illinois Finance Authority (the "**Issuer**") in the aggregate original principal amount of $175,540,000 (the "**2010 Bonds**").

In January of 2016, the Debtors filed Chapter 11 bankruptcy cases in the Bankruptcy Court (the "**2016 Cases**"). In March of 2016, the Bankruptcy Court confirmed the Debtors' joint plan of reorganization (the "**2016 Plan**") which provided, among other things, for a balance sheet

restructure of Debtors' bond debt and for the exchange of the $146,125,000 of then-outstanding 2010 Bonds for a new issue of municipal bonds in the original principal amount of $146,125,000.

On April 1, 2016, the Issuer issued the replacement 2016 bonds as provided by the 2016 Plan which consisted of $103,691,500 of Revenue Bonds, Series 2016A (Park Place of Elmhurst Project ("**2016A Bonds**"), $20,514,750 of Revenue Bonds, Series 2016B (Park Place of Elmhurst Project ("**2016B Bonds**") and $21,918,750 of Excess Cash Revenue Bonds, Series 2016C (Park Place of Elmhurst Project) ("**2016C Bonds**" and collectively with the 2016A and 2016B Bonds, the "**2016 Bonds**").

As described in greater detail in this Disclosure Statement, the Debtors (through their Plan in the present Cases) have proposed that the holders of the 2016 Bonds will receive the following treatment:

    a.   the holders of 2016A Bonds and 2016B Bonds (who are classified in Class 2 of the Plan) shall exchange those bonds for a pro rata share of a new municipal bond issue (defined herein and in the Plan as the "**2021 Bonds**") in the aggregate original principal amount of $107,269,103.00 (which is approximately 90% of the current principal amount which is due on the 2016A and 2016B Bonds). The 2021 Bonds shall bear interest at 5.125% per annum and mature in 40 years. The 2021 Bonds will be secured with liens on substantially all property of the Debtors.

    b.   The holders of the 2016C Bonds (who are classified in Class 3 of the Plan) will receive a pro-rata share of a payment in the amount of $657,562.50 plus 3% of the accrued but unpaid interest on the principal amount of the 2016C Bonds as of the Effective Date of the Plan (the "**2016C Bond Redemption Payment**") which will initially be paid to Park Place by Rest Haven Illiana Christian Convalescent Home, d/b/a Providence Life Services, an Illinois not-for-profit corporation which is the sole member of each of the Debtors (the "**Sponsor**") and will then be transferred to the 2016 Bond Trustee for *pro rata* distribution to the holders of the 2016C Bonds, which payment will redeem 100% of the 2016C Bonds.

    c.   [i]In addition to the 2016C Bond Redemption Payment, the Sponsor will provide liquidity support (essentially, a $3 Million, non-interest bearing line of credit) to Park Place to support the Debtors' operations once it emerges from Chapter 11. In addition, the Sponsor has undertaken to pay the professional fees, expenses and costs incurred by the general bankruptcy counsel retained by the Debtors in these Cases, which will provide additional liquidity to support the Debtors' future operations.

In the four years since the Debtors completed their 2016 bankruptcy cases, it has become clear that the balance sheet restructure achieved through the 2016 Plan did not go far enough to address the essential economic fact which led to the filing of the 2016 Cases, which was, the fact

that the Debtors owe far more bond debt than they could ever service, given the nature of their business as a CCRC.  The restructuring of the 2016A and 2016 B Bonds and the redemption of the 2016C Bonds on the terms outlined above and in the Plan is the product of spirited negotiation between the Debtors, the Sponsor, the 2016 Bond Trustee and the holders of more than eighty-four percent (84%) of the 2016 A Bonds, more than eighty-three percent (83%) of the 2016 B Bonds and more than sixty-two percent of the 2016 C Bonds, to reach a fair and a long term solution to the Debtors' financial circumstances.  This solution, in addition to its positive results for the holders of the Debtors' bonds, will provide further assurance that confirmation of the Plan will firmly place Park Place in a position to continue to provide excellent care and service to the people who live at the Campus.

## **DISCLAIMER**

IF YOU ARE ENTITLED TO VOTE TO APPROVE THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR COPY OF THIS DISCLOSURE STATEMENT. THE DEBTORS URGE YOU TO VOTE TO ACCEPT THE PLAN.

EACH HOLDER OF A CLAIM AGAINST OR INTEREST IN THE DEBTORS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND SECTION 1125 OF THE BANKRUPTCY CODE. NO HOLDER OF A CLAIM SHOULD RELY ON ANY INFORMATION RELATING TO THE DEBTORS, THEIR PROPERTY, OR THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT AND THE ATTACHED EXHIBITS.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. ALTHOUGH THE DEBTORS BELIEVE AND HAVE MADE EVERY EFFORT TO ENSURE THAT THIS SUMMARY PROVIDES ADEQUATE INFORMATION WITH RESPECT TO THE PLAN, THE SUMMARY DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED TO THE EXTENT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. IF THERE IS ANY INCONSISTENCY BETWEEN THE PLAN AND THE SUMMARY OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. ACCORDINGLY, EACH HOLDER OF A CLAIM SHOULD REVIEW THE PLAN IN ITS ENTIRETY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3016, AND LOCAL BANKRUPTCY RULE 3016-1 AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. ENTITIES OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR

TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTORS AS TO HOLDERS OF CLAIMS AGAINST THE DEBTORS.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS. ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESS AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND SHOULD NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS

DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND THE EFFECTIVE DATE OCCURS, THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS THAT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR THAT ARE NOT ENTITLED TO VOTE ON THE PLAN).

THE DEBTORS RECOMMEND THAT CREDITORS SUPPORT AND VOTE TO ACCEPT THE PLAN. IT IS THE OPINION OF THE DEBTORS THAT THE TREATMENT OF CREDITORS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS. ACCORDINGLY, THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

## I. INTRODUCTION

### A.    **General**

The following introduction is qualified by the Debtors' Plan proposed by them as debtors and debtors in possession dated December 15, 2020, which is attached hereto as Exhibit 1, and the more detailed information and financial statements contained elsewhere in this document. The Debtors believe that confirmation and implementation of the Plan is in the best interests of creditors and that the Plan provides the best alternative available to creditors.

On December 15, 2020 (the "**Petition Date**"), the Debtors filed voluntary petitions for reorganization under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Cases are currently pending before the United States Bankruptcy Court for the Northern District of Illinois (the "**Bankruptcy Court**").

Park Place owns and operates the Campus, which does business as a CCRC. The Debtors continue to be in possession of their properties and are managing their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting a debtor to rehabilitate, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code. Consummating a plan is the principal objective of a chapter 11 case, including the Cases. A bankruptcy court's confirmation of a plan binds a debtor, any entity acquiring property under the plan, any creditor or equity interest holder of the debtor and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of a debtor's liabilities in accordance with the terms of the confirmed plan.

The Debtors have prepared this disclosure statement ("**Disclosure Statement**") as required by section 1125 of the Bankruptcy Code, Bankruptcy Rule 3016(c), and Local Rule 3016-1. It is being distributed to holders of Claims and Interests against the Debtors to assist such holders in evaluating the feasibility of the Plan and the manner in which their Claims and Interests are treated, and in determining that the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code. The purpose of this Disclosure Statement is to assist those entitled to vote on the Plan to make an informed judgment when voting to accept or reject the Plan.

This Disclosure Statement describes the background of the Debtors and the significant events leading up to the filing of the Cases on the Petition Date. It also summarizes the Plan, which divides Claims and Interests into Classes and provides for the treatment of Allowed Claims.

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION WITH RESPECT TO THE MERITS OF THE PLAN. ALL CREDITORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS EXHIBITS CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE TO ACCEPT OR REJECT THE PLAN.**

### B.    Covid-19.

As the COVID-19 virus is especially dangerous to the health of the older population, Park Place takes its commitment and responsibility to protect the health and safety of its Residents, patients, and staff very seriously.  Park Place has enacted a number of precautions to protect the people in its charge.  Together with the Sponsor, Park Place closely monitors guidance from the Centers for Disease Control and Prevention (CDC) and local Health Departments regarding protocols for visitors on the Campus. Park Place adjusts its protocols in line with DuPage County and state directives. It contacts family members and responsible parties on a daily basis to provide information and transparency and make direct phone calls when needed to communicate any updates to close family members of Residents.  In addition, Park Place helps Residents and their

families find ways to connect safely, whether that is by coordinating a video chat (such as Facebook, FaceTime, or Zoom), phone call, or other creative solutions.

While Park Place respects the independence, dignity, and self-determination of each of its Residents, it has strongly encouraged Residents to engage in social distancing, wear face masks, and perform hand hygiene, to protect themselves and their neighbors.  Park Place helps ensure that its Residents have the groceries, medications, and supplies they need.

Concerning staff, before the start of each shift, all staff are screened with a questionnaire asking about their symptoms and their proximity to others who may be infected, as well as a temperature check.  Essential vendors who enter the building are subjected to the same screening process.  Employees and vendors are required to wear a mask at all times while inside the Campus buildings. Those employees working more than four hours have their temperature checked a second time mid shift.

Cloth face masks are reasonably effective in limiting the spread of infection from the person wearing them to the people around them. We have distributed cloth masks to all Residents, and require them to wear the masks when they are in public areas or during an interaction with a staff member (such as a housekeeper in an apartment, or an aide assisting with activities of daily living). Park Place's staff are required to wear face masks while at work. Staff in healthcare wear surgical masks and face shields for optimal protection.

Sadly, the Campus has not been immune to the effects of the nationwide Covid-19 pandemic.  Since March of 2020, four (4) Residents and thirty (30) staff were infected by the Covid-19 virus.  Of these, one 1 Resident succumbed to the disease – a loss which Park Place mourns.  Given the highly contagious nature of Covid-19 and the frailty of may of Park Place's Residents, Park Place is grateful that its efforts have been successful, thus far, to protect the vast majority of its Residents and staff from this dreadful national scourge.

### C.   <u>**Frequently Asked Questions.**</u>

THE INFORMATION PRESENTED IN THE ANSWERS TO THE QUESTIONS SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THIS DISCLOSURE STATEMENT AND THE PLAN.

*Why am I receiving this document?*

This Disclosure Statement is being delivered to you because you either are or may be the holder of, or have otherwise asserted, a Claim against the Debtors. This Disclosure Statement is intended to provide you with information sufficient to make an informed decision as to whether to vote to accept or reject the Plan.

*Who is eligible to vote to accept or reject the Plan?*

A holder of a Claim in a Class that is impaired under the Plan is entitled to vote to accept or reject the Plan. Generally, a Class of Claims is impaired unless the Plan leaves unaltered the legal, equitable, and contractual rights to which the Claims in such Class entitle the holders of such Claims. Under the Plan, Classes 2, 3 and 5 are considered impaired, and holders of Claims in these impaired Classes are entitled to vote.

*I am a resident of Park Place. Am I eligible to vote to accept or reject the Plan?*

Your status as a Resident does not make you eligible to vote on the Plan. The Plan provides for the assumption of your Residency Agreement and the cure of any defaults thereunder. Under the Plan, your rights as a Resident remain the same as they were prior to the commencement of the Cases. Accordingly, in your capacity as a Resident, you are considered to be an unimpaired creditor, and as such you are ineligible to vote either for or against the Plan. This does not mean, however, that you are precluded from challenging the assumption of your Residency Agreement or confirmation of the Plan itself. Furthermore, if you have claims against the Debtors that do not arise under your Residency Agreement, then you may be eligible to vote for or against the Plan on the basis of these other claims.

*If I am eligible to vote, why should I vote to accept the Plan?*

The Debtors believe that the Plan provides the best means for achieving the maximum distribution on account of your prepetition Claim. The Plan, as presently drafted, is the product of months of difficult negotiations and has the support of bondholders holding more than eighty-four percent (84%) of the 2016 A Bonds, more than eighty-three percent (83%) of the 2016 B Bonds and more than sixty-two percent of the 2016 C Bonds as of the Petition Date. In addition, and as described below, holders of Claims in each Class will receive a better return under the Plan than they would in a potential liquidation.

*How do I vote to accept or reject the Plan?*

If you are entitled to vote on the Plan because you are the holder of a Claim in Classes 2 and 3 that is allowed or has been temporarily allowed for voting purposes, as applicable, you must complete, sign, and return the enclosed ballot or ballots (each a "**Ballot**") in accordance with the ballot instructions being delivered to you simultaneously herewith.

*What if I am entitled to vote to accept or reject the Plan and do not vote?*

In general, within any particular Class of Claims, only those holders of Claims who actually vote to accept or to reject the Plan will determine whether the Plan is accepted by the requisite holders of Claims in such Class. A Class of Creditors is deemed to have accepted the Plan if the holders representing at least two-thirds (2/3) in dollar amount and more than fifty (50%) percent in number of those voting vote to accept the Plan.

*What happens if the Plan is not accepted by each Class entitled to vote on the Plan?*

If no Class of Claims votes to accept the Plan, then the Plan will not be confirmed or consummated in its present form. Conversely, as long as the requisite holders of Claims in at least one impaired Class vote to accept the Plan, the Debtors may seek confirmation pursuant to section 1129(b) of Bankruptcy Code (which will require a determination by the Bankruptcy Court that the Plan is "fair and equitable" and "does not discriminate unfairly" as to each impaired Class that does not accept the Plan or is deemed to have rejected it). The Debtors believe that the Plan satisfies section 1129(b) of the Bankruptcy Code and, in any case, have reserved the right to modify the Plan to achieve confirmation.

*When will the Plan be confirmed?*

The Bankruptcy Court will schedule and conduct a hearing concerning confirmation of the Plan. The Plan Confirmation Hearing may be continued or adjourned, however, and even if it is held, there is no guaranty that the Bankruptcy Court will find that the requirements of the Bankruptcy Code with respect to confirmation have been met. In addition, there are additional conditions set forth in the Plan that must be satisfied or waived in accordance with the Plan before the Plan will become effective. The Debtors have requested that the Bankruptcy Court schedule a hearing to consider confirmation of the Plan on [          , 2020 at __:__ _.m. (prevailing Central Time) ], before Honorable [          ], at the United States Bankruptcy Court for the Northern District of Illinois, Courtroom [    ], U.S. Courthouse, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, 60604.  Due to the Covid-19 measures enacted by the Court, it is likely that the Confirmation Hearing will be conducted online, and no party will need to appear in Court "in-person."

*When will the Plan Supplement be filed and what will it include?*

No later than one week before the Disclosure Statement Approval Hearing, the Debtors will file a "Plan Supplement," which will likely include the following: (i) the 2021 Bond Documents and (ii) any additional documents filed before the Effective Date as supplements or amendments to the Plan. The detailed terms of the documents to be contained in the Plan Supplement have yet to be finalized and will continue to be negotiated by the Debtors.

**D.     Classification and Treatment of Claims Under The Plan.**

Certain Classes of Claims are impaired under the Plan and, accordingly, are entitled to vote on the Plan. The Debtors are seeking votes to accept the Plan from holders of Claims in these Classes. For a description of the Classes of Claims and their treatment under the Plan, see Section 3 of the Plan – Classification and Treatment of Claims and Interests.

Estimated Claim amounts for certain Classes are based upon a preliminary analysis by the Debtors of the Claims pursuant to its books and records. There can be no assurance that these estimates are correct. The following treatments are possible only if the Plan is approved and the Debtors' estimate of the amount of the Claims in Classes 2 and 3 of the Plan are materially correct.

9

The timing of distributions under the Plan, if any, is subject to conditions described in later sections of this Disclosure Statement.

Each Class of Claims, except Administrative Claims, Priority Tax Claims, and U.S. Trustee Fees, are placed in the following Classes and will receive the following treatment under the Plan:

<u>Summary of Classification and Treatment of Claims Under the Plan</u>

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| Class 1 – Other Priority Claims | $0 | No | This Class consists of all Allowed Other Priority Claims, if any such Claims exist as of the Effective Date. Each Allowed Other Priority Claim shall be in a separate subclass. Except to the extent that the holder of an Allowed Other Priority Claim agrees to less favorable treatment, each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim, and to the extent permitted by Section 1129(a)(9) of the Bankruptcy Code: (i) deferred Cash payments of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim, or (ii) payment in Cash in full on the later of: (a) the third (3rd) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Debtors; and (b) the third (3rd) Business Day after the date on which such Other Priority Claim becomes an Allowed Claim. |
| Class 2 - Series 2016A and 2016B Bond Claims | 2016A Bonds: $103,691,500; and 2016B Bonds:  $15,496,392 | Yes | On the Effective Date, the holders of the 2016A Bonds and 2016B Bonds shall exchange the then outstanding 2016A Bonds and 2016B Bonds for a pro rata share of 2021 Bonds issued |

10

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| | | | in the aggregate original principal amount of $107,269,103. |
| | | | The 2021 Bonds shall be issued as current paying bonds. The 2021 Bonds shall bear interest at the rate of 5.125% per annum and have maturities in the years and in principal amounts as set forth on Schedule 1 to the "Restructuring Term Sheet" attached to this Disclosure Statement as Exhibit 2. The 2021 Bonds shall be amortized as set forth in Exhibit 2 hereto. The 2021 Bonds shall pay interest only for the first three (3) years following the Effective Date, and then amortize over the following thirty-seven (37) years. Interest on the 2021 Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Exhibit 2.<br><br>The 2021 Bonds will be secured by a first priority lien on all assets of Park Place. The Series 2021 Bond shall mature as set forth in Exhibit 2 with a final maturity of forty (40) years from the restructuring effective date (subject to bond counsel approval). The 2021 Bonds will be subject to optional redemption prior to maturity commencing on the 5th year after the Effective Date, at a price equal to: in year 5, at a price of 102%, in year 6, at price of 101% and thereafter at par. The 2021 transaction will not include any 2021 cash flow notes for the balance outstanding and is expected to consist of one series of bonds.<br><br>On the Effective Date, the Sponsor will provide sufficient cash to the Debtors to redeem 100% of the 2016C Bonds for a cash payment |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| Class 3 - Series 2016C Bond Claims | $21,918,750 | Yes | equal to 3% of the principal amount plus 3% of the accrued but unpaid interest on the principal amount of the 2016C Bonds as of the closing of the Proposed Exchange (estimated to total $725,741.95) which will occur on the Effective Date. Upon such payment, the 2016C Bonds will be cancelled and deemed to no longer be outstanding. |
| Class 4 - Other Secured Claims | $0 | No | This Class consists of all Other Secured Claims. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, on the later of the Effective Date and the date such Other Secured Claim becomes Allowed, or as soon as practicable thereafter, each holder of an Allowed Other Secured Claim shall have its Other Secured Claim reinstated and the legal, equitable, and contractual rights to which the holder of such Claim is entitled shall otherwise be unaltered in accordance with section 1124 of the Bankruptcy Code. |
| Class 5 - General Unsecured Claims | $0 | Yes | This Class consists of all General Unsecured Claims. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each General Unsecured Claim, each holder of an Allowed |

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| | | | General Unsecured Claim will receive payment in Cash of three percent (3%) of the unpaid portion of such Allowed General Unsecured Claim on the latest of: (i) the third (3rd) Business Day after the Effective Date or as soon as practicable thereafter as determined by the Debtors, (ii) the third (3rd) Business Day after the date on which such General Unsecured Claim becomes an Allowed Claim, (iii) the date such Allowed General Unsecured Claim becomes due and payable in the ordinary course of business, or (iv) as otherwise agreed to by the Debtors and the holder of such General Unsecured Claim, and the Plan shall otherwise leave unaltered the legal, equitable, and contractual rights to which the holder of such General Unsecured Claim is entitled. **The Debtors reserve their rights, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.** |
| Class 6 - Interests in Debtor | N/A | No | This Class consists of all Interests in the Debtors.  On the Effective Date, the Sponsor will retain its membership interests in the Reorganized Debtors. |

### E.    Summary of Confirmation Requirements.

Under the Bankruptcy Code, only holders of Claims and interests that are "impaired" are entitled to vote to accept or reject the Plan. The Bankruptcy Code further provides that a Class that is left unimpaired under the Plan is deemed to have accepted the Plan, and a Class that receives no distribution under the Plan is deemed to have rejected the Plan. The Bankruptcy Code requires, as

a condition to confirmation of a consensual plan of reorganization, that each impaired Class of Claims accept the Plan. A class of creditors is deemed to accept a plan if the holders of at least two-thirds in dollar amount and more than one-half in number of those creditors that actually cast ballots vote to accept such plan. A class of interest holders is deemed to accept a plan if the holders of at least two-thirds in amount of those interest holders that actually cast ballots, vote to accept such plan. Pursuant to section 1129(b) of the Bankruptcy Code, a plan may be confirmed even if it is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan and the bankruptcy court finds that the plan is "fair and equitable" and "does not discriminate unfairly" as to each impaired class that does not accept the plan or that is deemed to have rejected it.

### F.   <u>Voting Instructions and Deadline.</u>

1.   <u>General Information</u>. Under the Bankruptcy Code, certain Classes of Creditors are deemed to accept or reject the Plan, and the vote of these Classes will not be solicited.

2.   <u>Administrative Claims</u>.   Holders of Administrative Claims will not be entitled to vote on the Plan.

3.   <u>Unimpaired Classes Are Deemed to Accept the Plan and Do Not Vote</u>.  If a Creditor holds a Claim included within a Class that is not impaired under the Plan, then pursuant to section 1126(f) of the Bankruptcy Code, that Creditor is deemed to have accepted the Plan with respect to such Claim, and its vote of such Claim will not be solicited. Classes 1, 4 and 6 are not impaired under the Plan and will be deemed to accept the Plan.

4.   <u>Claims Which Are Not Allowed</u>.  The Bankruptcy Code provides that only the holders of Allowed Claims are entitled to vote on the Plan.  A Claim to which an objection has been filed is not an Allowed Claim unless and until the Bankruptcy Court rules on the objection and allows the Claim. If the Bankruptcy Court has not ruled on the objection or status of such a Claim, but the holder of a Claim wishes to vote, the holder of the Claim may petition the Bankruptcy Court to estimate its claim for voting purposes under Bankruptcy Rule 3018(a). Consequently, although holders of such Claims may receive ballots, their votes will not be counted unless the Bankruptcy Court, prior to the Voting Deadline, rules on the objection and allows the Claim or, on proper request under Bankruptcy Rule 3018(a) prior to the Confirmation Hearing, temporarily allows the Claim in an amount that the Bankruptcy Court deems proper for the purpose of voting on the Plan.

5.   <u>Voting and Record Date</u>.  If a Creditor holds a Claim classified in a voting Class of Claims under the Plan, the Creditor's acceptance or rejection of the Plan is important and must be in writing and filed on time. The record date for determining which creditors may vote

on the Plan is [        , 2021]. The Voting Deadline is [       , 2021], at 5:00 p.m. (prevailing Central Time).

        a.    <u>How to Vote</u>.  IN ORDER FOR A VOTE TO BE COUNTED, THE BALLOT MUST BE PROPERLY COMPLETED AND RETURNED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT.

        b.    <u>Ballots</u>.  Creditors must use only the ballot or ballots sent to them with this Disclosure Statement. If a Creditor has Claims in more than one Class, it should receive multiple ballots.

IF YOU ARE A MEMBER OF A VOTING CLASS AND DID NOT RECEIVE A BALLOT FOR SUCH CLASS, OR IF SUCH BALLOT IS DAMAGED OR LOST, OR IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, PLEASE CONTACT:

Globic Advisors, Inc.
485 Madison Avenue, 7th Floor
New York, NY 10022
Tel: 212.227.9699
Fax: 212.271.3252

**G.**    <u>**The Confirmation Hearing.**</u>

      The Debtors have requested that the Bankruptcy Court schedule a hearing to consider confirmation of the Plan on [        , 2021, at __:__ _.m. (prevailing Central Time), before the Honorable [        ], U.S. Bankruptcy Judge, at the United States Bankruptcy Court for the Northern District of Illinois, Court 680, U.S. Courthouse, Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604. The Bankruptcy Court has ordered that objections, if any, to confirmation of the Plan be filed and served within the time and in the manner described in the Confirmation Notice and Order that accompany this Disclosure Statement. The date of the Confirmation Hearing may be continued at such later time(s) as the Bankruptcy Court may announce during the Confirmation Hearing or any continued hearing without further notice.  Due to the Covid-19 measures enacted by the Court, it is likely that the Confirmation Hearing will be conducted online, and no party will need to appear in Court "in-person."

      If the Plan is confirmed by the Bankruptcy Court, it will be binding on all Claim and Interest holders regardless of whether an individual Claim or Interest holder has supported or opposed the Plan.

      CREDITORS ARE NOT REQUIRED TO ATTEND THE CONFIRMATION HEARING UNLESS THEY HAVE EVIDENCE OR ARGUMENT TO PRESENT TO THE BANKRUPTCY COURT CONCERNING THE MATTERS TO BE ADDRESSED AT THE CONFIRMATION HEARING.

H.    **Definitions.**

1.    Defined Terms.  As used in this Disclosure Statement, terms defined in the Plan annexed hereto and not otherwise specifically defined herein will have the meanings attributed to them in the Plan.

2.    Interpretation of Terms.  Each definition in this Disclosure Statement and in the Plan includes both the singular and the plural. Headings are for convenience or reference and shall not affect the meaning or interpretation of this Disclosure Statement.

## II.    BACKGROUND INFORMATION

A.    **Description of the Debtors.**

Park Place is an Illinois not-for-profit corporation formed in May 2004 for the purpose of constructing, owning and operating a CCRC known as Park Place of Elmhurst, in Elmhurst, Illinois. Park Place is exempt from federal income taxation under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(3) of the Internal Revenue Code.

The Foundation is an Illinois not-for-profit corporation formed in January 2004 to support and advance Christian care and services to the elderly and infirm by supporting health-related research, the development of a continuum of appropriate living arrangements, and programs and services to support a quality of life for those who suffer from disabilities and age-related illnesses and infirmities. The Foundation is exempt from federal income taxation under section 501(a) of the Internal Revenue Code as an organization described in section 501(c)(3) of the Internal Revenue Code.

Park Place is a controlled affiliate of the Sponsor. The Sponsor has no payment obligations under the 2021 Bonds.

The Campus is situated on approximately 12.6 acres in Elmhurst, Illinois. Park Place is licensed under Illinois Assisted Living and Shared Housing Act, Illinois Life Care Facilities Act, and by the Illinois Department of Public Health. Generally, CCRCs provide senior citizens with a full range of affordable living accommodations and healthcare services during their retirement years, from independent living to skilled nursing care. As such, CCRCs allow seniors to live in the same location as their healthcare needs change over time. In addition, CCRCs provide Residents with various social and entertainment outlets for all stages of retirement life. Park Place offers 181 units of varying sizes for independent living, 46 assisted living suites, 20 memory support assisted living units, and 37 nursing beds in its health center (the "**Health Center**") to provide short-term rehabilitation and long term care to its Residents and to individuals living in the community. The Health Center is certified for Medicare by the United States Department of Health and Human Services' Centers for Medicare & Medicaid Services, and is also licensed by the Illinois State Department of Health.

**B.**  **Capital Structure of the Debtors.**

To finance the construction and development of the Campus, the Issuer issued its: (i) $109,115,000 Revenue Bonds (Park Place of Elmhurst Project) Series 2010A (the "**Series 2010A Bonds**"), (ii) $7,875,000 Revenue Bonds (Park Place of Elmhurst Project) Series 2010B (the "**Series 2010B Bonds**"), (iii) $5,000,000 Revenue Bonds (Park Place of Elmhurst Project)(Accelerated Redemption Reset Option Securities (ARROS) Series 2010C (the "**Series 2010C Bonds**"), (iv) $10,275,000 Revenue Bonds (Park Place of Elmhurst Project)(Tax-Exempt Mandatory Paydown Securities (TEMPS-75)), Series 2010D-1 (the "**Series 2010D-1 Bonds**") (v) $15,350,000 Revenue Bonds (Park Place of Elmhurst Project)(Tax-Exempt Mandatory Paydown Securities (TEMPS-65)), Series 2010D-2 (the "**Series 2010D-2 Bonds**" and, collectively with the Series 2010D-1 Bonds, the "**Series 2010D Bonds**"); (vi) $15,275,000 Revenue Bonds, Series 2010D-3 (the "**Series 2010D-3 Bonds**"), and (vii) $12,650,000 Revenue Bond (Taxable Revenue), Series 2010E (the "**Series 2010E Bonds**" and together with the Series 2010A Bonds, Series 2010B Bonds, Series 2010C Bonds, Series 2010D-1 Bonds, Series 2010D- 2 Bonds, and Series 2010D-3 Bonds, the "**2010 Bonds**"). UMB Bank, N.A. served as successor trustee (the "**2010 Bond Trustee**") under a certain Bond Trust Indenture, dated as of May 1, 2010 ("**2010 Bond Indenture**"), by and between the prior bond trustee (Wells Fargo Bank, N.A.) and the Issuer, pursuant to which the 2010 Bonds were issued.

Pursuant to a Loan Agreement dated as of May 1, 2010 (the "**2010 Loan Agreement**"), between the Issuer and the Debtors, the Issuer loaned the proceeds of the 2010 Bonds to the Debtors. The rights of the Issuer under the 2010 Loan Agreement were assigned to the 2010 Bond Trustee under the 2010 Bond Indenture.

The Debtors used the proceeds of the 2010 Bonds primarily to: (i) pay or reimburse the Debtors for the payment of all or a portion of the costs of acquiring, constructing, renovating, remodeling and equipping Park Place and all necessary and attendant facilities, equipment, site work, zoning, entitlements and utilities related thereto; (ii) provide working capital; (iii) fund debt service reserve funds; (iv) pay a portion of the interest on the 2010 Bonds; and (v) pay certain expenses incurred in connection with the issuance of the 2010 Bonds.

On January 17, 2016, the Debtors filed the Cases in this judicial district and division which was captioned as In re Timothy Place, NFP, et als. and docketed as case number 16-01336 (JPC) (as defined above as the 2016 Case).  The 2016 Case was filed to implement a balance sheet restructure of $146,125,000 of principal bond debt due under the 2010 Bonds as provided by the terms of a pre-petition agreement which the Debtor had reached with holders of approximately 74% of the 2010 Bonds.

The Debtors filed the 2016 Plan in the 2016 Case on January 17, 2016.  On March 29, 2016, the bankruptcy court entered an order which confirmed the 2016 Plan.  Thereafter, the Debtors' bondholders exchanged their 2010 Bonds for pro rata shares of the 2016 Bonds.  The claims and interests of the Debtors' non-bondholder creditors were unimpaired and unaffected by the 2016 Case and the 2016 Plan.  The Sponsor retained its ownership of the Debtors pursuant to the terms of the 2016 Plan.

The 2016 Bonds were issued under that certain Bond Trust Indenture, dated as of May 1, 2016, by and between UMB Bank, N.A., as the trustee thereunder (the "**2016 Bond Trustee**") the Issuer (the "**2016 Indenture**").  Pursuant to a Loan Agreement dated as of May 1, 2016 between Issuer and the Debtors (the "**2016 Loan Agreement**"), the Issuer loaned the proceeds of the 2016 Bonds to the Debtors.  The rights of the Issuer under the Loan Agreement were assigned to the 2016 Bond Trustee under the terms of the 2016 Indenture.

As security for the obligations owing on the Series 2016 Bonds, the Debtors granted the 2016 Bond Trustee, inter alia: (i) a first mortgage lien on the real property on which the Campus was constructed, and (ii) a first priority security interest in the personal property and fixtures located in the Campus (collectively, the "**Mortgaged Property**"), pursuant to a Mortgage and Security Agreement, dated as of May 1, 2016, between the Debtors and the Bond Trustee.  Pursuant to a Master Trustee Indenture, dated as of May 1, 2016, among the Debtors and the 2016 Bond Trustee, as Master Trustee thereunder (the "**2016 Master Trust Indenture**"), the Debtors granted a security interest in its Gross Revenues (as defined in therein) as security for the payment of the Series 2016 Bonds.  The Issuer also granted the 2016 Bond Trustee certain collateral under the 2016 Indenture. The 2016 Indenture, the Mortgage, the 2016 Loan Agreement and any other document or agreement delivered as security for, or in respect to, the Series 2016 Bonds or the Debtors' obligations under any of such documents are collectively referred to herein as the "**2016 Bond Documents**."

As of the Petition Date, the outstanding principal amount owed on the 2016A Bonds was $103,691,500, the outstanding principal amount owed on the 2016B Bonds was $15,496,392.00 and the outstanding principal amount owed on the 2016C Bonds was $21,918,750.00.

### C.    Administration of Park Place.

1.    Park Place Operations.  Pursuant to the 2016 Plan, on or about the effective date of the 2016 Plan, the Sponsor and Park Place entered into a Management Agreement (the "**Management Agreement**"), substantially in the form which was attached to the exhibits to the Plan Supplement filed in the 2016 Case as Doc. 163-1, page 280.  The Management Agreement was designed to enable the Sponsor to provide management and related support services to enable the Debtors to fulfill their charitable tax-exempt purposes, which include, the ownership and operation of a quality, cost effective CCRC. Specifically, the Management Agreement calls for the Sponsor to provide certain administrative, management, support services, and general operational oversight of Park Place. The Debtors are to pay the Sponsor monthly fees under the Management Agreement. As part of the Plan, the existing management agreement with the Sponsor shall be assumed by Park Place under Section 365 of the Bankruptcy Code (11 U.S.C. §365), provided that such management agreement shall provide for an annual management fee no greater than 4.25% of gross operating revenues; provided further that no more than $30,000 shall be paid each month as an operating expense ("**Base Management Fee**"), with the balance payable from Excess Cash (as described in the Plan).

2.    Financial Results from 2020.  For the ten (10) months ending on October 30, 2020, Park Place recorded total operating revenues of approximately $15,686,984.00, net income before debt service of approximately $4,724,027.00, and a net loss (after debt service) of

approximately $1,892,467. As of October 31, 2020, Park Place reported total assets of approximately $135,437,008, total liabilities of approximately $241,124,949.00, and (negative) net assets of approximately ($105,436,252). The Debtors' consolidated financial statements for 2017 (which is the last year that audited financial statements were prepared for the Debtors) are attached hereto as <u>Exhibit 3</u>.

**D.** **<u>Residents of Park Place</u>.** Before occupying the Campus, each Resident is required to enter into a Residency Agreement with Park Place. The Residency Agreement provides the terms and conditions for the occupancy of each Resident in an independent living unit in the Campus and also outlines the Resident's obligations regarding payment of Entrance Fees, the Resident's rights to refund of such Entrance Fee, and other monthly charges that may be due to the Debtors during the duration of the Resident's stay at the Campus (referred to herein as the "**<u>Monthly Service Fees</u>**").

The Debtors currently offer prospective independent living Residents the choice of four residency plans, each evidenced by a different Residency Agreement. The residency plans primarily differ with regard to the required Entrance Fee, the Monthly Service Fees, and the amount subject to refund thereunder. Generally, the purpose of the Entrance Fee is to pay for operating expenses, certain project costs, retire debt, and generate investment income for the benefit of Park Place and its Residents. Prospective Residents typically pay $15,000.00 of the Entrance Fee upon execution of a Residency Agreement, and the remaining balance prior to occupancy. The Entrance Fees range from $375,000 to $950,000, depending upon the Residency Agreement and unit selected.

Under the Residency Agreement, Park Place provides Residents the life care benefit, through which Residents gain priority access to medical care at substantially discounted rates, including priority access to the assisted living center, memory support center, and Health Center.

The Residency Agreements set forth the terms of any refund rights that may be due Residents. Under the Plan, the Debtors seek to assume all Residency Agreements and to continue fulfilling all of their obligations thereunder.

**ALL RESIDENCY AGREEMENTS WILL BE ASSUMED UNDER THE PLAN.**

**E.** **<u>Regulatory Agencies.</u>**

The Residency Agreements, Entrance Fees, and other aspects of Park Place's operations are subject to regulation by the Illinois Department of Public Health ("**<u>IDPH</u>**") under the Life Care Facilities Act.

The Life Care Facilities Act provides that no provider of life care services may enter into a life care contract with a Prospective Resident until IDPH has issued a permit with respect to the life care facility. The Prospective Resident is afforded the right to rescind his or her lifecare contract without penalty or future obligation within fourteen days after making the initial deposit, signing the agreement, or receipt of a disclosure statement of financial condition, whichever occurs

last. In the event of such rescission, all money or property paid or transferred by such entity shall be fully refunded.

## III.    EVENTS LEADING TO BANKRUPTCY

When Park Place first opened the Campus in February 2012, the Debtors' financial health was negatively affected by the real estate market not having rebounded from the 2008 recession so as to enable the Debtors to service their debt under the 2010 Bonds.  During this period, the Debtors began negotiations with the 2010 Bond Trustee and an informal committee of bondholders holding approximately 74.18% of the outstanding aggregate principal amount of Series 2010 Bonds (the "**2010 Consenting Bondholders**").  Eventually, however, the Debtors defaulted under the 2010 Bond Indentures.

Ultimately, on January 17, 2016, the Debtors filed the 2016 Cases that resulted in confirmation of the 2016 Plan.

After the 2016 Cases concluded and until May 14, 2020, the Debtors made timely payments to the 2016 Bond Trustee which were required to be made under the 2016A Bonds and the 2016B Bonds.  With respect to the 2016C Bonds (which are payable only from Excess Cash (as defined in the 2016 Plan)), the Debtors paid a single $23,126 interest payment to the Bond Trustee on May 15, 2017.  Park Place has never generated enough "Excess Cash" to trigger further payments of principal or interest to the Bond Trustee with respect to the 2016C Bonds.

The 2016B Bonds were to be paid from the proceeds of the then-remaining first-generation entrance fees and second-generation entrance fees as apartment units at the Campus were reoccupied.  However, since the completion of the 2016 Cases, second generation entrance fees have not been available in sufficient amounts to pay the principal amount of the 2016B Bonds mostly due to slower than expected turnover in occupancy.  In the Spring of 2019, the Debtors commissioned a consultant to review the situation.  On July 15, 2019, the consultant reported on appropriate assumptions around morbidity and mortality of the Residents at Park Place but made no recommendations for changes in managing Residents moving through the continuum of care offered at Park Place.  In effect, the Residents of the Campus were living longer than expected, which is an altogether good thing which happened to have a negative impact on Park Place's cash flow.  The Debtors maintain a waiting list for new Residents, but there has been insufficient turnover to allow apartments within the Campus to be reoccupied.  This problem was reported by the Trustee to Bondholders in a public online EMMA posting made in August 2019.  By May 15, 2020, Park Place had redeemed $5,018,358.00 of 2016B Bonds from the proceeds of sale of the remaining first-generation entrance fees and second-generation entrance fees.  However, the Bond Documents required the Debtors to redeem all of the 2016B Bonds on or before May 15, 2020, and the Debtors' inability to pay the remaining $15,496,392 principal balance of the 2016B Bonds triggered a payment default under the Bond Documents.  In addition to that default, in 2019, certain defaults or events of default occurred (or would likely occur) under the Bond Documents because the Debtors did not engage a Consultant pursuant to Section 424 (concerning breach of cumulative cash covenant) and 425 (concerning breach of liquidity covenant) of the Master Trust Indenture and deliver financial reporting pursuant to Section 414 Master Trust Indenture.

In addition, on or about April 23, Park Place submitted documentation to Wintrust Bank and the Small Business Administration to request a loan in the amount of $1,377,500 pursuant to the Paycheck Protection Program implemented under the Coronavirus Aid, Relief, and Economic Security Act (the "**PPP Loan**").  The PPP Loan was funded on May 7, 2020, and Park Place kept the proceeds of the PPP Loan in a separate account and used the proceeds to pay qualified payroll expenses which the Debtor incurred between May 7, 2020 and the end of June 2020.  The retention of the proceeds of the PPP Loan triggered a default under Section 428 of the Master Trust Indenture which required Park Place to transfer Gross Revenues to the Bond Trustee (for convenience, all of the defaults described in the preceding two (2) paragraphs will collectively be referred to as the "**Specified Defaults**").   On December 10, 2020, Wintrust Bank and the Small Business Administration notified Park Place that they decided to forgive the PPP Loan and release Park Place from the obligation to repay that loan.  As a result, Park Place has not listed the Small Business Administration as a creditor, and it has scheduled a contingent claim (only) for Wintrust Bank, to the extent, if any, that Wintrust Bank has a claim against Park Place which arises from the administration of the various deposit accounts which Park Place maintains with Wintrust Bank.

Effective as of May 15, 2020, the Debtors and the 2016 Master Trustee entered into a Forbearance Agreement (the "**Forbearance Agreement**") under which the 2016 Master Trustee, among other things, agreed to forbear from taking action relative to the Specified Defaults for a specified time period, and the parties agreed to take certain actions within an agreed time, which actions included the preparation and filing of the current Cases.  The Forbearance Agreement made specific reference to a "Plan Support Agreement" which was attached as an exhibit to the Forbearance Agreement.  A summary of the "Plan Support Agreement" appears in the following section of this Disclosure Statement.

## IV.    SUMMARY OF THE PLAN SUPPORT AGREEMENT

The following summary of the Plan Support Agreement and Restructuring Term Sheet is qualified in its entirety by the documents themselves. To the extent of any inconsistency, the Plan Support Agreement and Restructuring Term Sheet will govern.

The Plan Support Agreement provides for implementation of the Restructuring Term Sheet through the filing of the Cases and the Plan. Through the Plan Support Agreement, the Debtors have secured support of the Consenting Holders (as defined therein) for the Plan, which should enable the Debtors to proceed directly to confirmation of the Plan and then quickly exit bankruptcy. The Plan Support Agreement outlines certain obligations of the Debtors and the Consenting Holders, which, if not fulfilled, would cause termination of the Plan Support Agreement. Among the Debtors' obligations are certain milestones the Debtors must meet, including filing of the Bankruptcy Case within three (3) business days of the date that the PPP Loan is forgiven (which was done), obtaining confirmation of the Plan on or before the 95th day after the Petition Date, and the Effective Date for the Plan occurring on or before the 109th day after the Petition Date (subject to extension to the next business day if the 109th day is a Saturday, Sunday or legal holiday).  The Debtors expect that the Effective Date will be April 5, 2021.

### A.    Key Terms to the Restructuring.

The Restructuring Term Sheet provides that the Issuer will issue new 2021 Bonds under a new Bond Trust Indenture between the Issuer and the 2021 Bond Trustee (the "**2021 Indenture**"). On the Effective Date, the holders of the 2016A Bonds and 2016B Bonds shall exchange the then outstanding 2016A Bonds and 2016B Bonds for a pro rata share of 2021 Bonds issued in the aggregate principal amount equal to $107,269,103.00. The 2021 Bonds shall be issued as current paying bonds. The 2021 Bonds shall bear interest at the rate of 5.125% per annum and have maturities in the years and in principal amounts as set forth in Exhibit 2. The 2021 Bonds shall be amortized as set forth in Schedule 2 of the Restructuring Term Sheet. The 2021 Bonds shall pay interest only for the first three (3) years following the Effective Date and will then amortize over the following thirty-seven (37) years. Interest on the 2021 Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Schedule 2 of the Restructuring Term Sheet.

The 2021 Bonds will be secured by a first priority lien on all assets of Park Place. The Series 2021 Bond shall mature as set forth in Schedule 2 of the Restructuring Term Sheet, with a final maturity 40 years from the restructuring effective date (subject to bond counsel approval).

The 2021 Bonds will be subject to optional redemption prior to maturity commencing on the 5th year after the Effective Date, at a price equal to: in year 5, at a price of 102%, in year 6, at price of 101% and thereafter at par. The 2021 transaction will not include any 2020 cash flow notes for the balance outstanding and is expected to consist of one series of bonds.

### B.    Sponsor Contribution

In connection with the restructuring, and as consideration for its retention of its ownership interest in the Debtors, on the Effective Date the Sponsor will pay to the Debtors, and the Debtors will then forward to the 2016 Bond Trustee, the 2016C Bond Redemption Payment (in the amount of Six Hundred Fifty-Seven Thousand Five Hundred Sixty-Two and 50/100 Dollars ($657,562.50) plus 3% of the accrued but unpaid interest on the principal amount of the 2016C Bonds as of the Effective Date of the Plan. In addition, the Sponsor will deposit $3,000,000 (the "**Liquidity Fund**") with the 2016 Bond Trustee to be held and used in accordance with the terms of a certain Liquidity Support Agreement (the "**LSA**") by and among the Sponsor, the Debtors and the 2016 Bond Trustee. The Liquidity Fund shall be available to the Debtors for payment of regular operating expenses as needed, and for payment of monthly interest or principal relating to the 2021 Bonds.

To enhance the earnings on the Liquidity Fund, the LSA includes a list of permitted investments for the Liquidity Fund, which will include certain investments not customarily included in tax-exempt bond financings. For example, permitted investments are contemplated to include corporate stock and bond mutual funds. The fund balance in the Liquidity Fund will be permitted to be counted in the calculation of Days Cash on Hand for purposes of covenant testing.

The Distribution Waterfalls will include provisions which allow the Liquidity Fund to be restored to its original balance by the Debtors if draws are made to pay operating expenses or debt service. In addition, the LSA will include terms for the "burn-off" of the Liquidity Fund over time.

In connection with the issuance of the 2016 Bonds, the Sponsor received a certain promissory note ("**Sponsor Note**"), which is subordinate in security and payment to the 2016 Bonds. In further consideration of its retention of its ownership interests in the Debtors, the Sponsor will waive, as of the Effective Date, all amounts due under the Sponsor Note.

The Sponsor and Debtors understand that they will be responsible for transaction costs of the Restructuring Transaction (the "**Sponsor Contribution**"). On the Effective Date, the existing Debt Service Reserve Fund ("**DSRF**") will be used to pay (i) accrued and unpaid interest on the 2016 Bonds through but not including the Effective Date, and (ii) the costs and expenses of the 2016 Bond Trustee and its advisors; any remaining DSRF balance immediately shall be transferred to the Debt Service Reserve Fund under the 2021 Indenture.  In addition, the Sponsor shall undertake to pay the professional fees and expenses incurred by the Debtors' counsel in this case, independent from the Sponsor's other obligations under the Plan including (without limitation) its contributions to the Liquidity Fund.

## C.    The Bond Funds and Distribution Waterfall.

The Restructuring Term Sheet contemplates that the Debtors will establish and maintain certain funds in connection with the 2021 Bonds, including an entrance fee fund (the "**Entrance Fee Fund**"), a revenue fund (the "**Revenue Fund**"), an operating reserve fund (the "**Operating Reserve Fund**"), and a capital expenditures fund (the "**Capital Expenditures Fund**"). The purpose of these funds is to ensure sufficient operational liquidity and capital reserves for the Debtors and to allow the Debtors to service the 2021 Bonds. The Restructuring Term Sheet sets forth a distribution scheme for these funds on a go-forward basis.

In particular, pursuant to documents underlying the 2021 Bonds (the "**2021 Bond Documents**"), the Debtors agree to deposit all gross revenues (other than Entrance Fees) with the 2021 Bond Trustee for deposit in the Revenue Fund as established under the 2021 Bond Documents. Entrance Fees (after the required payment of any refunds) will be transferred to the Revenue Fund after any applicable rescission rights under the Residence Agreements have expired and such funds shall be available to flow through the Distribution Waterfall (as defined herein).

Upon the Effective Date, all Entrance Fees shall be deposited with the 2021 Bond Trustee in the Entrance Fee Fund.  Such amounts, together with the balances of the Operating Account, the Operating Reserve Fund and any Revenues available to the Debtors at such time, including the Sponsor Contribution, shall be applied in the following order of priority:

1.  to pay any Refunds due to Residents who no longer reside at the Campus (or their beneficiaries);

2.  to pay all professional fees and expenses incurred in connection with the Restructuring Transaction (including, without limitation, any costs associated with obtaining

opinions from bond counsel but not including the fees, expenses and costs incurred by the Debtors' general bankruptcy counsel);

3. to fund the Debt Service Reserve Fund up to the shortfall, if any, to the initial Debt Service Reserve Fund requirement;

4. to fund the Operating Account in an amount equal to 45 Days Cash on Hand (approximately $2.250 million);

5. to fund the Operating Reserve Fund in an amount equal to 75 Days Cash on Hand (approximately $3.750 million); and

6. thereafter, all post-Effective Date Entrance Fees and other Revenues of the Debtors shall be deposited in the Entrance Fee Fund or the Revenue Fund, as applicable, on a weekly basis.

Subject to the next sentence, amounts on deposit in the Revenue Fund shall be made available to Park Place on a monthly basis to satisfy ongoing operations and management costs and expenses of Park Place, including, without limitation, the Base Management Fee, and replenishment of any Unrestricted Amount (collectively, the "**Operating Expenses**").  If an Event of Default (as defined in the 2021 Indenture) shall occur, then the monthly amounts on deposit in the Revenue Fund available for withdrawal to satisfy Operating Expenses shall be made available to Park Place in an amount not to exceed the amounts set forth in an operating budget established pursuant to the terms of the 2021 Indenture.

On the first Business Day of each calendar month, monies in the Revenue Fund shall be distributed in the following order of priority (the "**Distribution Waterfall**"):

- First, to the Operating Account in the amount necessary to pay anticipated Operating Expenses for the upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month), as such amount is set forth in a certificate from the Borrower delivered to the Trustee no later than 10 Business Days prior to the first Business Day of a month;

- Second, to replenish any deficiency as of the Effective Date in the Debt Service Reserve Fund necessary to make the amount therein equal the Debt Service Reserve Fund Requirement;

- Third, to the Bond Fund, in an amount equal to 1/6th of the interest due on the next interest payment date;

- Fourth, payments to the Bond Fund in an amount equal to 1/12th of the principal due on the next principal payment date;

- Fifth, to the Capital Expenditure Fund, in an amount equal to 1/12th of such Fiscal Year's capital budget;

- Sixth, to replenish the balance of the Operating Reserve Fund and the Operating Account to a combined total of 135 Days Cash on Hand;

- Seventh, to replenish the balance of the Liquidity Fund for any draws made in order to restore the balance of the Liquidity Fund to $3 million; and

- Eighth, to pay deferred management fees which are due to the Sponsor, and

- Ninth, any remaining amounts after application of paragraphs first to eighth above (such remaining amounts referred to as "**Excess Cash**") shall be transferred to the Operating Reserve Fund

The proposed restructuring also contemplates a number of operating and financial covenants to reflect the current operating projections of Park Place, which shall become effective upon consummation of the restructuring. Other than the restructuring and redemption of the 2016 Bonds, the Plan provides for the treatment of all creditors and other parties (including Residents) in the ordinary course of business. The Debtors will continue to operate their business during chapter 11.

## V.     APPROVAL FOR THE 2021 BONDS

The 2021 Bonds must be issued by the Issuer (*i.e.*, the Illinois Finance Authority) after a notice and administrative hearing process which is independent from what occurs in these Cases. The Issuer has independent authority to review and in some cases deny or require modifications to requests for the issuance of Illinois tax exempt municipal bonds. The Debtors are confident that the Issuer will approve their request for the issuance and exchange of the 2021 Bonds, as set forth in the Plan.

## VI.    THE CASES

The purpose of these Cases is to restructure the Debtors' obligations under the 2016 Bonds on the terms outlined by the Restructuring Term Sheet (Exhibit 2 to this Disclosure Statement). As of the Petition Date, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors were stayed under section 362 of the Bankruptcy Code. The Debtors continue to operate their business and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The Debtors do not expect the Cases to be protracted. To expedite their emergence from Chapter 11, the Debtors, on the Petition Date, in addition to filing the Disclosure Statement and the Plan, sought the relief detailed below, among other relief, from the Bankruptcy Court.

### A.     **Initial Motions.**

The Debtors filed certain motions with the Bankruptcy Court on the first day of the Cases which were designed to minimize disruptions of Park Place's business operations and to facilitate the Debtors' reorganization. These motions include:

1. <u>Motion for Entry of an Order Authorizing the Debtors to Assume Plan Support Agreement</u>

This Motion asked the Bankruptcy Court to allow the Debtors to assume the Plan Support Agreement under section 365 of the Bankruptcy Code (11 U.S.C. §365), to implement a schedule for the completion of the Cases, to reconfirm the pre-bankruptcy agreement between the Debtors and the Consenting Holders relative to the restructuring or redemption of the 2016 Bonds, as well as the commitment by the Consenting Holders to support the confirmation of the Debtors' Plan, as provided by the terms set forth in the Plan Support Agreement.

2. <u>Motion (I) Scheduling Hearing And Establishing Notice And Objection Procedures For The Approval Of Disclosure Statement; (II) Approving The Disclosure Statement; and (III) Granting Related Relief</u>

The Debtors have requested that the Bankruptcy Court enter an order which: (i) sets a timetable for parties to review and object, if they so choose, to the adequacy of the disclosures made in this Disclosure Statement under 11 U.S.C. §1125; (ii) sets a hearing to consider the adequacy of the disclosures made in the Disclosure Statement; (iii) approves and sets the notice to be given to creditors and other interested parties of that hearing and the time to object to the relief sought by the Debtors; and (iv) after that hearing, approves the Disclosure Statement under the standards provided by 11 U.S.C. §1125.

3. <u>Motion for Authority to Use of Cash Collateral</u>.

Park Place, the Consenting Holders and the 2016 Bond Trustee have agreed to the use of cash based on certain conditions. Park Place has asked the Bankruptcy Court to allow it to spend a limited amount of cash pursuant to the terms of a budget to support the operations of the Campus for approximately three weeks, after which, and after an opportunity for hearing, the Debtors will ask the Bankruptcy Court to approve a four-month budget which should allow Park Place to operate the Campus through the completion of the Cases.

4. <u>Motion to Escrow Residents' Entrance Fees</u>.

As described in more detail above, when new Residents move into the Campus, they pay an Entrance Fee which is usually made in two installments: (a) a $15,000 reservation deposit when a Prospective Resident signs a reservation agreement; and (b) the balance of the Entrance Fee when the Resident moves in. Park Place has asked the Bankruptcy Court to approve its proposal to place all Entrance Fees received from Prospective Residents who sign reservation agreements or residency agreements after the Petition Date in a separate escrow account and to refund in full all Entrance Fees paid by any such new Resident who decides to exercise a right to rescind their Residency Agreement or deposit agreement before a date certain to be set by the Bankruptcy Court.

5. <u>Motion To Authorize Procedures To Protect And Maintain The Confidentiality Of Resident And Consumer Information.</u>

Bankruptcy rules and regulations normally require a company which enters bankruptcy to make a public disclosure of the identity of people and entities with whom it has done business. Through this Motion, Park Place has asked the Bankruptcy Court for permission to withhold (and not publish) the names of those people who are Residents at the Campus, or are receiving health care at Park Place, or have placed deposits for future residency at the Campus.

6. <u>Motion to Continue Using Existing Cash Management Systems</u>.

Regulations promulgated by the United States Trustee (a branch of the US Department of Justice) require Chapter 11 debtors to immediately close all of their existing bank accounts and open new ones. These regulations may be superseded by the Bankruptcy Court if there is good cause to do so. As noted in the motion, and as a part of the 2016 Loan Documents, the Debtors established a cash management system which was designed to protect and perfect the 2016 Bond Trustee's liens on the cash generated by the business conducted by Park Place. To replace this system would require, in addition to the cost of establishing replacement accounts, a redrafting of the deposit control agreements, the execution of those documents by the Debtors, the 2016 Bond Trustee and the depository institution, among other things. The Motion was filed to keep the existing cash management system in place to avoid the potentially significant cost of replacing the existing system during the anticipated short duration of the Cases.

7. <u>Motion For Entry Of Interim And Final Orders: (A) Prohibiting Utilities From altering, Refusing, or Discontinuing Services On Account Of Prepetition Invoices; (B) Establishing Procedures For Determining Requests For Additional Adequate Assurance; And (C) Granting Related Relief.</u>

The Debtors recognize that uninterrupted utility services are critical to the Debtors' ability to sustain their operations and protect the health, safety and welfare of the residents during the pendency of the Cases. In the normal conduct of its business, the Debtors use water, electric, telecommunications (including wireless), and other services provided by utility companies. The uninterrupted use of these utilities is critical to the operations of the Debtors and the health of their Residents. Through this Motion, the Debtors sought permission from the Bankruptcy Court to prohibit utilities from altering, refusing, or discontinuing their services and to establish procedures for providing the utilities with assurance that they will receive timely payment for services which they extend to the Debtors while these Cases are pending.

8. <u>Applications To Employ Professionals</u>.

The Debtors filed separate motions to employ the following people and firms in these Cases: (a) Bruce Dopke and the firm of Dopkelaw LLC to serve as general bankruptcy counsel for the Debtors; and (b) Globic Advisors, Inc., to serve as the general claims and

noticing agent for communications between the Debtors and all interested parties (including without limitation Bondholders and their agents) in these Cases.

9. <u>Motion to Motion for Determination that Appointment of Patient Care Ombudsman is Unnecessary</u>.

As permitted by Section 333(a) of the Bankruptcy Code (11 U.S.C. §333(a)), Park Place filed this Motion which sought the entry of an order by Bankruptcy Court which allows Park Place to self-report information relating to the state of resident care at the Campus to the Office of the United States Trustee for the Northern District of Illinois, the Illinois State Department of Health, the Centers For Medicare and Medicaid Services and any Residents or family members thereof who specifically request a copy of such information. Park Place believes that appointment of patient care ombudsman is unnecessary, especially in light of the expected short duration of the Cases and the Debtors' past exemplary operating history.

10. <u>Motion For Entry Of An Order (A) Establishing Bar Dates For Filing Certain Proofs of Claim, (B) Approving The Form And Manner For Filing Proofs Of Claim, (C) Approving Notice Thereof, and (D) Grants Related Relief.</u>

The Debtors filed this Motion to ask the Bankruptcy Court to set dates by which creditors must file proofs of claim against the Debtors.  All people and entities which have done business with the Debtors should have received a separate notice concerning the deadlines to file claims, the forms to be used to file claims, and the identification of certain types of claims (notably, claims of Residents under Residency Agreements) which are not required to file a proof of claim in order to have a valid and allowed claim under their Residency Agreements.

**B.     Timetable for the Cases.**

The Debtors anticipate that the Confirmation of the Plan will occur on or around mid-March of 2021.  The Debtors anticipate that the Effective Date of the Plan will be on or about April 5, 2021.  There can be no assurance, however, that the Cases will proceed as expeditiously as anticipated.

## VII.    PLAN OF REORGANIZATION

THIS   SECTION   PROVIDES   A   SUMMARY   OF   THE   STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS <u>EXHIBIT 1</u>.

**A.     Classification and Treatment of Claims Under the Plan.**

The Claims against the Debtors are divided into Classes according to their seniority and other criteria. The Classes of Claims against the Debtors and the funds and other property to be distributed under the Plan are described more fully below.

THE DEBTORS BELIEVE THAT THE PLAN AFFORDS CREDITORS THE POTENTIAL FOR THE GREATEST REALIZATION OF THE VALUE OF THE DEBTORS' ASSETS.

### B.    Treatment of Administrative Claims, Priority Tax Claims, and U.S. Trustee Fees.

1.    <u>Administrative Claims</u>.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims have not been classified and are treated as described herein. Except as otherwise provided in the Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different treatment than provided under the Plan, or by order of the Bankruptcy Court, an Entity holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim that has come due for payment under any applicable order or law, as soon as practicable after the later of: (i) the fifth (5th) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Debtors; (ii) the date on which such Entity becomes the holder of such an Allowed Administrative Claim; or (iii) the date or dates when that Allowed Administrative Claim is payable by its terms, consistent with past practice and in accordance with past practice.  Administrative Claims are defined in the Plan, and they include (and are not limited to) contract claims of individuals and entities for goods and services which they provided to the Debtors during the pendency of the Cases and claims for personal injuries which are alleged to have occurred during the pendency of the Cases.  They also include (and are not limited to) the reimbursement of the Issuer in an amount not to exceed $30,000.00 for attorneys' fees and out of pocket expenses  incurred in connection with, and for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3)(4) and (5) of the Bankruptcy Code (provided, however, that if the Plan, its associated disclosure statement or proposed confirmation order, as submitted to the Bankruptcy Court are subject to material revision or objection by a party in interest, or if the Debtors' request for approval of the disclosure statement or confirmation of the Plan is materially opposed or delayed, the Issuer may obtain relief from the $30,000 limitation on its professional fee and expense claim from the Court after notice and a hearing.  Unless otherwise stipulated to by the Debtors, holders of Administrative Claims must file a motion for the allowance of such claims under 11 U.S.C. §503(a) no later than sixty (60) days after the Effective Date. Objections to any motion for allowance of administrative claims must be filed and served on the Debtors, the Office of the U.S. Trustee, the 2016 Bond Trustee, and the requesting party no later than 25 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable motion for allowance of administrative claim was served.

2.    <u>Professional Compensation</u>.  Professionals or other Entities asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the Debtors (or, after the Effective Date, the Reorganized Debtors), the 2016 Bond Trustee, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of such Claim for Accrued Professional Compensation no later than sixty (60) days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtors, the Office of the U.S. Trustee, the 2016 Bond Trustee, and the requesting

party no later than 25 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for final allowance of such Claim for Accrued Professional Compensation was served.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and section 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

3.    Priority Tax Claims.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims have not been classified and are treated as described in Section 2 of the Plan. Unless otherwise agreed by the holder of an Allowed Priority Tax Claim, any Entity holding an Allowed Priority Tax Claim will receive, as determined by the Reorganized Debtors in their sole discretion and in full satisfaction of such Claim, payment in Cash in full on the later of (i) the Effective Date, or as soon as reasonably practicable thereafter as determined by the Debtors, or (ii) the date such Claim becomes an Allowed Claim.

4.    U.S. Trustee Fees.    All U.S. Trustee Fees will be paid in full by the Reorganized Debtors as they become due and owing.

**C.    Classification and Treatment of Claims and Interests**

1.    Classification and Specification of Treatment of Claims.    All Claims, except those described in Section VII(B) above, are placed in the following impaired or unimpaired Classes of Claims pursuant to sections 1123(a)(1), 1123(a)(2), and 1123(a)(3) of the Bankruptcy Code, which sections require the Plan to designate such Classes and to specify their impaired or unimpaired status. A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of the Class and is classified in a different Class to the extent that the Claim qualifies within the description of that different Class. A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released, withdrawn, waived, or otherwise satisfied under the Plan. Unless the Plan expressly provides otherwise, when a Class includes a subclass, each subclass is a separate Class for all purposes under the Bankruptcy Code, including, without limitation, voting and distribution.

Subject to all other applicable provisions of the Plan (including its distribution provisions), classified Claims shall receive the treatment set forth below. The Plan will not provide any distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, through payment by a third party. Except as specifically provided in the Plan, the Plan will not provide any distributions on account of a Claim for which the obligation to pay has been assumed by a third party.

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |

| 2 | 2016A and 2016B Bond Claims | Impaired | Entitled to Vote |
|---|---|---|---|
| 3 | 2016 C Bond Claims | Impaired | Entitled to Vote |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Interests in Debtors | Unimpaired | Deemed to Accept |

2.      Class 1 – Other Priority Claims.  This Class is unimpaired and consists of all Allowed Other Priority Claims, if any such Claims still exist as of the Effective Date. Each Allowed Other Priority Claim shall be in a separate subclass. Except to the extent that the holder of an Allowed Other Priority Claim agrees to less favorable treatment, each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim: (i) deferred Cash payments of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim, or (ii) payment in Cash in full on the later of: (a) the fifth (5th) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Debtors; and (b) the fifth (5th) Business Day after the date on which such Other Priority Claim becomes an Allowed Claim.

3.      Class 2 – 2016A/B Bond Claims.      This Class is impaired and consists of all 2016A and 2016B Bond Claims and includes all Claims of the holders of (i) the 2016A Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $119,187,892.00, (ii) the 2016B Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $15,496,392.00, plus (iii) accrued and unpaid interest on the principal amount of the 2016A/B Bonds through and including the Effective Date, which interest shall be paid by the 2016 Bond Trustee from the Debt Service Reserve Fund administered by the 2016 Bond Trustee.  On the Effective Date, the holders of the 2016A Bonds and 2016B Bonds shall exchange the then outstanding 2016A Bonds and 2016B Bonds for a pro rata share of 2021 Bonds issued in the aggregate original principal amount of $107,269,103.  The 2021 Bonds shall be issued as current paying bonds.  The 2021 Bonds shall bear interest at the rate of 5.125% per annum and have maturities in the years and in principal amounts as set forth on Schedule 1 to the "Restructuring Term Sheet" attached to the Disclosure Statement as Exhibit 2.  The 2021 Bonds shall be amortized as set forth in Exhibit 2 to the Disclosure Statement. The 2021 Bonds shall pay interest only for the first three (3) years following the Effective Date, and then amortize over the following thirty-seven (37) years.  Interest on the 2021 Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Exhibit 2.  The 2021 Bonds will be secured by a first priority lien on all assets of Park Place. The Series 2021 Bond shall mature as set forth in Exhibit 2 with a final maturity of forty (40) years from the restructuring effective date (subject to bond counsel approval).  The 2021 Bonds will be subject to optional redemption prior to maturity commencing on the 5th year after the Effective Date, at a price equal to: in year 5, at a price of 102%, in year 6, at price of 101% and thereafter at par.  The 2021 transaction will not include any 2021 cash flow notes for the balance outstanding and is expected to consist of one series of bonds.

Class 3 – 2016C Bond Claims.  This Class is impaired and consists of all 2016C Bond Claims which shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $21,918,750.00 plus any accrued and unpaid interest due on the 2016C Bonds through and including the Effective Date.  Upon the terms and subject to the conditions set forth in the Plan,

on or after the Effective Date, each holder of an allowed 2016C Bond Claim shall receive from the 2016 Bond Trustee a pro rata share of the "2016C Bond Redemption Payment" which is defined in the Plan as a payment made by the Sponsor to the 2016 Bond Trustee in the amount of  3% of the current principal amount of the 2016C Bonds plus 3% of the accrued but unpaid interest on the principal amount of the 2016C Bonds as of the Effective Date of the Plan.  Upon the receipt of this payment by the Bond Trustee, the Series C Bonds will be cancelled and deemed to no longer be outstanding, except to the extent needed to facilitate the distribution of the 2016C Bond Redemption Payment to the holders of record of the 2016C Bonds.  The Debtors estimate that the amount of the 2016 Bond Redemption Payment will be the sum of $657,562.50 (which is 3% of the principal 2016C Bond Debt) plus 3% of the accrued interest on that claim, which the Debtors estimate will be $68,179.45 if the Effective Date occurs on April 5, 2021, in which case, the total principal and interest which will be paid to holders of 2016C Bonds would total $725,741.95.


4.      Class 4 – Other Secured Claims.      This Class is unimpaired and consists of all Other Secured Claims. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, on the later of the Effective Date and the date such Other Secured Claim becomes Allowed, or as soon as practicable thereafter, each holder of an Allowed Other Secured Claim shall have its Other Secured Claim reinstated and the legal, equitable, and contractual rights to which the holder of such Claim is entitled shall otherwise be unaltered in accordance with section 1124 of the Bankruptcy Code.


5.      Class 5 – General Unsecured Claims.   This Class is impaired and consists of all General Unsecured Claims. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive payment in full in Cash of three percent (3%) of the unpaid portion of such Allowed General Unsecured Claim on the latest of: (i) the fifth (5th) Business Day after the Effective Date or as soon as practicable thereafter as determined by the Debtors, (ii) the fifth (5th) Business Day after the date on which such General Unsecured Claim becomes an Allowed Claim, (iii) the date such Allowed General Unsecured Claim becomes due and payable in the ordinary course of business, or (iv) as otherwise agreed to by the Debtors and the holder of such General Unsecured Claim, and the Plan shall otherwise leave unaltered the legal, equitable, and contractual rights to which the holder of such General Unsecured Claim is entitled. The Debtors reserve their right, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.


6.      Class 6 – Interests In the Debtors.      This Class is unimpaired and consists of all Interests in the Debtors. On the Effective Date, the Sponsor, the sole member of Park Place and the Foundation will retain all membership interests in the Debtors.

**D.**     **Acceptance or Rejection of the Plan.**

1.     <u>Acceptance by an Impaired Class</u>.   In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

2.     <u>Presumed Acceptance of the Plan</u>.   Classes 1, 4 and 6 are not impaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.     <u>Voting Class</u>. Classes 2, 3 and 5 are impaired under the Plan and are entitled to vote to accept or reject the Plan.

**E.**     **Means for Implementation of the Plan.**

1.     <u>Sources of Consideration</u>.   Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the cash derived from the Reorganized Debtors' business operations, those certain funds established pursuant to the Restructuring Term Sheet and 2021 Bond Documents, and the Sponsor Contribution. A schedule of the source and uses of cash is attached as Exhibit 4 to this Disclosure Statement.

2.     <u>Cancellation of 2016 Bonds</u>.  Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the 2016 Bonds shall be cancelled, and the 2016 Bonds and related 2016 Bond Documents shall continue in effect solely to the extent they relate to and are necessary to: (i) allow for the applicable distributions pursuant to the Plan, (ii) permit the 2016 Bond Trustee and the Issuer to be compensated for fees and reimbursed for expenses including expenses of its professionals, assert its charging lien, enforce its indemnity and other rights and protections with respect to and pursuant to the 2016 Bond Documents, (iii) permit the 2016 Bond Trustee to set one or more record dates and distributions dates with respect to the distribution of funds to beneficial holders of the 2016 Bonds, as applicable, (iv) permit the 2016 Bond Trustee to appear in the Cases, and (v) permit the 2016 Bond Trustee and the Issuer to perform any functions that are necessary in connection with the foregoing clauses (i) through (iv).

3.     <u>Issuance of 2021 Bonds</u>. On the Effective Date, the Issuer will issue the 2021 Bonds in accordance with the terms of the Plan and pursuant to the 2021 Indenture. On the Effective Date, the holders of the 2016A Bonds and 2016B Bonds shall exchange those bonds for a pro rata share of the 2021 Bonds which shall be in the aggregate original principal amount of $107,269,103.00. The 2021 Bonds shall bear interest at the rate of 5.125% per annum and have maturities in the years and in principal amounts as set forth on Schedule 1 to the "Restructuring Term Sheet" attached to this Disclosure Statement as Exhibit 2. The 2021 Bonds shall be amortized as set forth in Exhibit 2 hereto. The 2021 Bonds shall pay interest only for the first three (3) years following the Effective Date, and then amortize over the following thirty-seven (37) years. Interest on the 2021 Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Exhibit 2. The 2021 Bonds will be secured by a

first priority lien on all assets of Park Place. The Series 2021 Bond shall mature as set forth in Schedule 2, with a final maturity 40 years from the restructuring effective date (subject to bond counsel approval).  The 2021 Bonds will be subject to optional redemption prior to maturity commencing on the 5th year after the Effective Date, at a price equal to: in year 5, at a price of 102%, in year 6, at price of 101% and thereafter at par.  The 2021 transaction will not include any 2021 cash flow notes for the balance outstanding and is expected to consist of one series of bonds.

4.     2021 Bond Documents.   In connection with the foregoing matters described in Section 4.3 of the Plan, on the Effective Date, the Issuer, the Debtors, and the 2021 Bond Trustee, as applicable, will enter into the 2021 Bond Documents, including the 2021 Indenture, the 2021 Master Indenture, and the 2021 Mortgage. The 2016 Bond Trustee shall transfer to the 2021 Bond Trustee substantially all funds and accounts created or maintained under or pursuant to the 2016 Indenture in accordance with the Plan.

5.     Effective Date Transactions.   Upon the Effective Date, the Debtors shall establish and/or maintain the accounts and funds described in the 2021 Bond Documents and the Restructuring Term Sheet.  Upon the Effective Date, all Entrance Fees, including any Entrance Fees received and escrowed by the Debtor after the Petition Date pursuant to the Entrance Fee Escrow Agreement, shall be deposited with the 2021 Master Trustee in the Entrance Fee Fund. The deposits in the Entrance Fee Fund, together with the balances of the Debtors' operating accounts and the Operating Reserve Fund, as of the Effective Date, the revenues and other income of the Debtors available on the Effective Date, and the Sponsor shall be applied in the following order of priority to the extent of available funds: (i) to pay any Refunds due and owing; (ii) to pay the professional fees and expenses incurred in connection with the transactions contemplated under the Plan (including, without limitation, any costs associated with obtaining opinions from bond counsel) subject to the Budget (but not including the professional fees, expenses and costs payable to Dopkelaw LLC in its capacity as general bankruptcy counsel to the Debtors, which the Sponsor agreed to pay pursuant to the Plan Support Agreement and the exhibits thereto); (iii) to fund the Debt Service Reserve Fund up to any shortfall, if any, to the initial Debt Service Reserve Fund requirement; (iv) to fund the Operating Account in  an amount equal to approximately 45 Days Cash on Hand; and (v) to fund the Operating Reserve Fund in an amount equal to 75 Days Cash on Hand.

6.     Additional Terms of 2021 Bonds.  Additional terms and conditions with respect to the 2021 Bonds are set forth in the Restructuring Term Sheet and in the 2021 Bond Documents. To the extent of any inconsistencies between the Restructuring Term Sheet and the 2021 Bond Documents, the 2021 Bond Documents shall govern the respective rights and obligations of the parties.

7.     Section 1145 Exemption.  Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the 2021 Bonds shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act of 1933 (as now in effect or hereafter amended) and any other applicable state or federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities. Any Entity who solicits or participates in the offer, issuance, sale, or purchase of the 2021 Bonds issued under, or in accordance with, the Plan, in good faith and in compliance with

the applicable provisions of the Bankruptcy Code, is not liable, on account of such solicitation or participation, for violation of an applicable law, rule, or regulation governing solicitation of acceptance or rejection of the Plan or the offer, issuance, sale, or purchase of securities pursuant thereto.

8.    <u>Sponsor Management Agreement</u>.    On or before the Effective Date, the Management Agreement will be assumed (either by operation of the Plan or by order of Court) provided that such management agreement shall provide for an annual management fee no greater than 4.25% of gross operating revenues; provided further that no more than $30,000 shall be paid each month as an operating expense with the balance payable from Excess Cash (as described in the Plan).

9.    <u>Reorganized Debtors' Board of Directors</u>.  The existing members of Park Place and Foundation Board of Directors shall continue to serve as the board of their respective companies. The following individuals serve on the Board of Directors of the boards of both Park Place and the Foundation:  Tim Breems, of Palos Heights, IL, Al Diepstra of Oak Brook, IL, Ken Hoving, of Oak Brook, IL, Arnold Koldenhoven, of Burr Ridge, IL, Richard Schutt (staff) of Palos Heights, IL, Cal Tameling, of Elmhurst, IL, Don Van Dyk, of Tinley Park, IL, and Rich Van Hattem, of Beecher, IL.

10.    <u>Officers of the Reorganized Debtors</u>.  The existing officers of the Debtors shall continue to be officers of the Reorganized Debtors. Such officers shall serve in accordance with applicable non-bankruptcy law. The existing officers of the Debtors include Richard C. Schutt (President), Ray Hemphill (Executive Vice President of Project Development), William DeYoung (Chief Executive Officer), and Barry VanderGenugten (Chief Financial Officer).

11.    <u>Employee Benefits</u>.  Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtors may: (i) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity at any time, and (ii) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; provided, however, that the Debtors' or the Reorganized Debtors' performance under any employment agreement will not entitle any Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing herein shall limit, diminish, or otherwise alter the Reorganized Debtors' or the Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.

12.    <u>Vesting of Assets in the Reorganized Debtors</u>.  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, or as soon as practicable thereafter, all property of the Debtors' Estate and all Causes of Action of the Debtors (except those released pursuant to the Releases by the Debtors) shall vest in the

Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing the 2021 Bonds). On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

13.    <u>Restructuring Transactions</u>.   On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

14.    <u>Corporate Action</u>.   Upon the Effective Date, all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, and all matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors  or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors or the Reorganized Debtors, as the case may be, and any and all other agreements, documents, securities, and instruments relating to the foregoing.

15.    <u>Section 1146 Exemption from Certain Taxes and Fees</u>.   Pursuant to section 1146(a) of the Bankruptcy Code, any transfer of property and any issuance, transfer, or exchange of a security in connection with or pursuant to the Plan shall not be subject to any stamp, mortgage recording, or other similar tax, charge, or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax, charge, or governmental assessment and, as applicable, to accept for filing and recordation instruments or other documents pursuant to such

transfer of property or to permit the issuance, transfer, or exchange of a security without the payment of any such tax, charge, or governmental assessment. Such exemption specifically applies, without limitation, to (i) the creation and recordation of any mortgage, deed of trust, lien, or other security interest; (ii) the making or assignment of any lease or sublease; (iii) any restructuring transaction authorized by the Plan, including, without limitation, the issuance by the Issuer of the 2016 Bonds; or (iv) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

16.    <u>Preservation of Causes of Actions of the Debtors</u>.    In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, the Exculpated Claims against the Exculpated Parties and the Debtor Released Claims against the Debtor Released Parties), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including those Causes of Action listed in the Plan Supplement, whether arising before or after the Petition Date, and the Reorganized Debtors' right to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan Supplement, the Plan, or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such Entity. Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Entity on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or the Reorganized Debtors, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by an order of the Bankruptcy Court, the Reorganized Debtors expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan. For the avoidance of doubt, nothing in Section 4.16 of the Plan shall affect the "Release by the Debtor" provided in Section 8.2 of the Plan.

**F.    <u>Treatment of Executory Contracts and Unexpired Leases.</u>**

1.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>.    Except as otherwise provided in the Plan or in an order of the Bankruptcy Court, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by the Debtors; (ii) expired or terminated pursuant to its own terms before the Effective Date; (iii) is the subject of a motion to reject filed on or before the Effective

Date; or (iv) is identified as an Executory Contract or Unexpired Lease to be rejected in the Plan Supplement filed on or before the Effective Date.

Notwithstanding anything contained in the Plan to the contrary, each Residency Agreement, and all obligations arising thereunder, including the payment of Refunds and all other entrance deposits and fees, will be assumed by the Reorganized Debtors, as of the Effective Date, pursuant to the Plan.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumption or rejection of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revert in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date. After the Effective Date, the Reorganized Debtors shall have the right to terminate, amend, or modify any contracts, leases, or other agreements without approval of the Bankruptcy Court, subject to the terms thereof.

     2.     <u>Claims Based on Rejection of Executory Contracts or Unexpired Leases</u>.  All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; provided, that any such Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by section 502(b)(6) of the Bankruptcy Code. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, action by, or order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Class 5 General Unsecured Claims and shall be treated in accordance with the Plan.

     3.     <u>Cure of Defaults for Assumed Executory Contracts and Unexpired Leases</u>.  Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Plan is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full waiver, release, and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting change in control or ownership interest composition and other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

4.      Insurance Policies.  Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the Insurance Policies in full force) all of their Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption and assignment of each of the Insurance Policies.

5.      Modifications, Amendments, Supplements, Restatements, or Other Agreements. Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated under the Plan.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, unless such Executory Contract or Unexpired Lease has been previously assumed by the Debtors.

6.      Centers For Medicare and Medicaid Services.  Section 5.6 of the Plan contains a special section which applies only to the assumption of Park Place's executory contracts with the Centers For Medicare And Medicaid Services ("**CMS**") including without limitation the provider agreement between Park Place and CMS for providing services to Residents for a cost which may be reimbursed by CMS to Park Place.

7.      Reservation of Rights.  Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

**G.      Contracts and Leases Entered Into After the Petition Date.**  Notwithstanding any other provision in the Plan, contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### H.   **Provisions Governing Distributions.**

1.   <u>Timing and Calculation of Amounts to Be Distributed</u>.  Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the Plan. Except as otherwise provided for in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

2.   <u>Distributions</u>.  Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors. With respect to the issuance of the 2021 Bonds, such bonds shall be deemed issued and exchanged as of the Effective Date without presentment by the beneficial owners. The Distribution Record Date in connection with the holders of the 2016 Bonds shall be as early as practicable so as to enable the Debtors, the Issuer, and their respective agents to comply with the customary practices and procedures of the Depository Trust Company. All Cash distributions to be made to beneficial holders of the 2016 Bonds shall be made to the 2016 Bond Trustee, which shall make such distributions to the beneficial holders of the 2016 Bonds in accordance with the terms of the 2016 Indenture.

3.   <u>Payments and Distributions on Disputed Claims</u>.  Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but that later become Allowed Claims shall be deemed to have been made on the Effective Date.

4.   <u>Special Rules for Distributions to Holders of Disputed Claims</u>.  Notwithstanding any other provision of the Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

5.   <u>Delivery of Distributions in General</u>.  Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Reorganized Debtors. Distributions to holders of Allowed Claims will be made at the address of each such holder as set forth in the Debtors' books and records, except that, in the case of holders of the 2016 Bonds, distributions will be made by means of book-entry exchange through the facilities of the Depository Trust Company in accordance with the customary practices of the Depository Trust Company, as and to the extent practicable. Distributions under the Plan on

account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. Neither the Debtors, nor the Reorganized Debtors, shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct, or fraud.

6.  Undeliverable Distributions and Unclaimed Property.  In the event that any distribution to any holder is returned as undeliverable, the Reorganized Debtors shall use reasonable efforts to determine the current address of such holder. No distribution to such holder shall be made unless and until the Reorganized Debtors have determined such holder's then current address, at which time such distribution shall be made as soon as practicable; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat or abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property shall be discharged and forever barred.

7.  Withholding and Reporting Requirements.  In connection with the Plan and all instruments issued in connection therewith, the Reorganized Debtors shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

8.  Setoffs.  Except as otherwise provided in Section 6.8 of the Plan and subject to applicable law, the Debtors and the Reorganized Debtors as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, setoff against any Allowed Claim (which setoff shall be made against the Allowed Claim, not against any distributions to be made under the Plan with respect to such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such holder have not been otherwise released, waived, relinquished, exculpated, compromised, or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), and any distribution to which a holder is entitled under the Plan shall be made on account of the Claim, as reduced after application of the setoff described above. In no event shall any holder of a Claim be entitled to setoff any Claim against any claim, right, or Cause of Action of the Debtors or Reorganized Debtors unless such holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtors and a holder of a Claim; provided, that, where there is no written agreement between the Debtors or Reorganized Debtors, as applicable, and a holder of a Claim authorizing such setoff, nothing herein shall prejudice or be deemed to have prejudiced the right of the Debtors or the Reorganized Debtors, as applicable, to assert that any holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date. This Section shall not be applicable to the distributions to be made to or for the benefit of the beneficial holders of the 2016 Bonds.

41

9.     Insurance Claims.  No distributions under the Plan shall be made on account of an Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to the Debtors' Insurance Policies. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim, then immediately upon such agreement, such Claim may be expunged without an objection to such Claim having to be filed and without any further notice to, action by, or order or approval of the Bankruptcy Court.  This Section shall not be applicable to the distributions to be made to or for the benefit of the beneficial holders of the 2016 Bonds.

10.     Applicability of Insurance Policies.  Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Except as expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

11.     Allocation of Distributions Between Principal and Unpaid Interest.  With the exception of distributions on account of the 2016 Bonds, which shall be treated as provided in Classes 2 and 3 herein, to the extent that any Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for U.S. federal income tax purposes, be allocated on the Debtors' books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest.

12.     Interest on Claims.  Unless otherwise specifically provided for in the Plan (including interest payable under the 2016 Bonds), postpetition interest will not accrue or be paid on Claims, and no Claim holder will be entitled to interest accruing on or after the Petition Date on any Claim. Similarly, unless otherwise specifically provided for in the Plan, postpetition interest will not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

### I.     Procedures for Resolving Contingent, Unliquidated, and Disputed Claims.

1.     Prosecution of Objections to Claims.  The Debtors or the Reorganized Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; provided, however, the Reorganized Debtors shall provide the Bond Trustee notice of any settlements in excess of $10,000.00. The Reorganized Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

2.     Retention of Debtors' Rights and Defenses.  Except as expressly provided in Section 7.2 of the Plan or in any order entered in the Cases before the Effective Date (including the Confirmation Order), the Reorganized Debtors after the Effective Date will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition

Date. This section shall not be applicable to the 2016 Bond Trustee or the beneficial holders of the 2016 Bonds.

3.      Distributions After Allowance.  As soon as practicable following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Debtors shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan, without any interest to be paid on account of such Claim.

4.      Estimation of Claims.  The Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**J.      Conditions Precedent to the Effective Date.**

1.      Conditions Precedent to the Effective Date.  It shall be a condition precedent to the Effective Date that each of the following provisions, terms, and conditions shall have been satisfied or waived pursuant to the provisions of the Plan.

a.      The Bankruptcy Court shall have entered the Confirmation Order containing findings of fact and conclusions of law satisfactory to the Debtors and the 2016 Bond Trustee, which Confirmation Order shall not be subject to any stay and shall be a Final Order, and which Confirmation Order shall include or provide, among other things:

(i)  a finding by the Bankruptcy Court that the 2021 Bonds to be issued on the Effective Date will be authorized and exempt from taxation under the applicable securities law, pursuant to section 1145 of the Bankruptcy Code;

(ii)  all provisions, terms and conditions of the Plan and related documents are approved; and

b.      all Executory Contracts or Unexpired Leases assumed by the Debtors during the Cases including under the Plan shall remain in full force and effect for the benefit of the Reorganized Debtors or their assignee(s) notwithstanding any provision in such contract or lease

43

(including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables, permits, or requires termination of such contract or lease;

c.      The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

d.      The Issuer shall consent to the issuance of the 2021 Bonds;

e.      The 2021 Bonds shall be issued by the Issuer;

f.      In connection with issuance of the 2021 Bonds, the 2021 Bond Trustee shall have received a satisfactory opinion of bond counsel that the interest on the 2021 Bonds will be excluded from gross income for federal tax purposes;

g.      The Trigger Date (as defined in the Entrance Fee Escrow Agreement) shall have occurred;

h.      The Plan and all Plan Supplement documents, including any amendments, modifications, or supplements thereto, shall be in form and substance acceptable to the 2016 Bond Trustee;

i.      All payments and transfers to be made on the Effective Date shall be made or duly provided for, and the Debtors or the Sponsor, as applicable, shall have sufficient Cash on such date to make such payments;

j.      All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained; and

k.      All other actions, documents and agreements necessary to implement the Plan shall be in form and substance acceptable to the 2016 Bond Trustee and shall have been effected or executed; and the Effective Date shall be on or before April 5, 2021.

2.      <u>Waiver of Conditions</u>.  The conditions to the Effective Date set forth in the Plan may be waived at any time by the Debtors (except for: (i) the Confirmation Order being satisfactory to the 2016 Bond Trustee, (ii) the issuance of the 2021 Bonds, (iii) the bond counsel opinion referred to in Section VII(J)(1)(f) above, (iv) the condition that the aforementioned documents and orders be reasonably acceptable to the 2016 Bond Trustee, and (v) the Effective Date shall be on or before April 5, 2021; provided, however, that the Debtors may not waive entry of an order or orders approving the Disclosure Statement and confirming the Plan.

3.      <u>Effect of Failure of Conditions</u>.  If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against the Debtors; (ii) prejudice in any manner the rights of the Debtors, any holders of Claims, or any other Entity; or (iii) constitute

an admission, acknowledgment, offer, or undertaking by the Debtors, any holders, or any other Entity in any respect.

## K.     Modification, Revocation or Withdrawal of the Plan.

1.     <u>Modification and Amendments</u>.  Except as otherwise specifically provided in section 10.1 of the Plan, the Debtors reserve the right to modify the Plan as to material terms and seek confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their right to alter, amend, or modify materially the Plan one or more times, after confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, provided, however, that, except with the prior written consent of each of the 2016 Bond Trustee and the Consenting Holders, the Debtors may not alter, amend, or modify the Plan in any manner that: (i) alters or affects the rights or interests of the 2016 Bond Trustee or the holders of the 2016 Bonds, (ii) alters or affects the treatment of the 2016A/B Bond Claims or the 2016C Bond Claims under the Plan, (iii) alters or affects the terms or characteristics of the 2016 Bonds as set forth in the Plan prior to such alteration, amendment, or modification, or (iv) is inconsistent with the terms of the Plan Support Agreement. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with the Plan. For the avoidance of doubt, nothing in this Section shall be deemed to supplant or supersede the requirements of Bankruptcy Rule 3019.

2.     <u>Effect of Confirmation on Modifications</u>.  Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

3.     <u>Revocation or Withdrawal of the Plan</u>.  The Debtors reserve the right to, consistent with their fiduciary duties, revoke or withdraw the Plan before the Effective Date. If the Debtors revoke or withdraws the Plan, or if confirmation does not occur, then: (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of any Executory Contract or Unexpired Lease effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

### L.  **Retention of Jurisdiction,**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Cases and all matters arising out of or related to the Cases and the Plan, including jurisdiction to:

a.        allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

b.        decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

c.        resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtors are parties or with respect to which the Debtors may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including rejection Claims, cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease, (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, (iii) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, any Executory Contracts or Unexpired Leases on the list of Executory Contracts and Unexpired Leases to be assumed or rejected, and (iv) any dispute regarding whether a contract or lease is or was executory or unexpired;

d.        ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e.        adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

f.        adjudicate, decide, or resolve any and all matters related to any Cause of Action;

g.        adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

h.        enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

i.        resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551, and 553 of the Bankruptcy Code;

j.        resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation of the Plan or any Entities' obligations incurred in connection with the Plan (exclusive of the obligations arising under the 2016 Bonds);

k.        issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

l.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

m.        enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

n.        adjudicate any and all disputes arising from or relating to distributions under the Plan;

o.        consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

p.        determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

q.        hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan (exclusive of those documents relating to the 2021 Bonds);

r.        hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

s.        hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

t.        enforce all orders previously entered by the Bankruptcy Court;

u.        hear any other matter not inconsistent with the Bankruptcy Code; and

v.        enter an order concluding or closing the Cases.

### M.   Miscellaneous Provisions.

1.   <u>Immediate Binding Effect</u>.   Notwithstanding   Bankruptcy   Rules   3020(e), 6004(h), or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, exculpation, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

2.   <u>Additional Documents</u>.   On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, subject to the consent of the 2016 Bond Trustee. The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.   <u>Reservation of Rights</u>.   Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Plan, any statement or provision contained in the Plan, or any action taken or not taken by the Debtors or other Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or other Entity with respect to the holders of Claims or Interests before the Effective Date.

4.   <u>Successors and Assigns</u>.   The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of such Entity.

5.   <u>Votes Solicited in Good Faith</u>.   Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the 2016 Bonds offered under the Plan.

6.   <u>Closing of Cases</u>. The Debtors or the Reorganized Debtors shall, promptly after the full administration of the Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Cases.

## VIII. STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF REORGANIZATION

In order to become effective, the Plan must be approved by the Bankruptcy Court after a confirmation hearing.

### A.   Elements of Confirmation.

In order for the Plan to be confirmed, the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code. Among other things, the Bankruptcy Code requires that: (i) the Plan be in the "best interests" of Creditors under section 1129(a)(7) of the Bankruptcy Code (that is, impaired Creditors will receive at least as much under the Plan as they would receive in a hypothetical liquidation case under chapter 7 of the Bankruptcy Code); (ii) the Plan be feasible (that is, there is a reasonable probability that the Debtors will be able to perform its obligations under the Plan without needing further financial reorganization not contemplated by the Plan); and (iii) the Plan be accepted by a sufficient number of Classes.

### B.   Best Interests of Creditors.

With respect to each impaired Class of Claims, confirmation of the Plan requires that each holder of a Claim either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To calculate the probable distribution to holders of each impaired Class of Claims if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Cases were converted to a case under chapter 7 of the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral, and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both a chapter 7 liquidation and the Cases. Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the 2016 Bond Trustee; asset disposition expenses; all unpaid expenses incurred by the Debtors in their Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 case; litigation costs; and claims arising from the operations of the Debtors during the pendency of the Cases. The liquidation itself could trigger certain Tax and Other Priority Claims (collectively, "**Priority Claims**"). Those Priority Claims would be paid in full from the liquidation proceeds before the balance would be made available to pay General Unsecured Claims. The liquidation would also prompt the rejection of most, if not all, of the Debtors' Executory Contracts and Unexpired Leases, thereby creating a significant increase in General Unsecured Claims.

The Debtors believe that the Plan meets the "best interests of creditors" test of section 1129(a)(7) of the Bankruptcy Code. The Debtors believe that the members of impaired Classes 2, 3 and 5 will receive as much or more under the Plan as they would receive in a liquidation. The liquidation analysis (the "**Liquidation Analysis**") for a potential chapter 7 liquidation scenario is attached hereto as Exhibit 5.

## C.      Feasibility of the Plan.

The Bankruptcy Code requires the Bankruptcy Court to determine that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. For purposes of showing that the Plan meets this feasibility requirement, the Debtors have analyzed the ability of the Reorganized Debtors to: (i) meet their obligations under the Plan; and (ii) retain sufficient liquidity and capital resources to conduct their business.

The Debtors believe that they will be able to support the financial projections set forth in Exhibit 6 to this Disclosure Statement (the "**Projections**"). Holders of Claims against the Debtors are advised, however, that the Projections were not prepared with a view toward compliance with the published guidelines of the American Institute of Certified Public Accountants or any other regulatory or professional agency or body or generally accepted accounting principles.

In addition to the assumptions footnoted in the Projections themselves, the Projections also assume that: (i) the Plan will be confirmed and consummated in accordance with its terms, (ii) there will be no material adverse change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Reorganized Debtors, (iii) there will be no change in United States generally accepted accounting principles that will have a material effect on the reported financial results of the Reorganized Debtors, (iv) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors; and (v) the coronavirus pandemic will not have a significant impact on the health of the Residents at Park Place or the financial viability of Park Place in general. To the extent the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and considered reasonable by the Debtors when taken as a whole, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtors.

Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized, and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. The Projections should therefore not be regarded as a representation by the Debtors or any other Entity that the results set forth in the Projections will be achieved. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections.

The Debtors do not intend to update or otherwise revise the Projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition. Furthermore, the Debtors do not intend to update or revise

the Projections to reflect changes in general economic or industry conditions. Whether actual results will conform to the Projections is subject to a number of risks and uncertainties, including: the Debtors' ability to improve profitability and generate positive operating cash flow; the Debtors' ability to sustain sales increases; the Debtors' ability to increase capital expenditures in the future; the Debtors' ability to implement effective pricing and promotional programs; the Debtors' ability to successfully implement effective business continuity; changes in federal, state, or local laws or regulations; general economic conditions in the Debtors' operating region; stability of product costs; increases in labor and employee benefit costs, such as health care and pension expenses; or changes in accounting standards and taxation requirements.

### D.    <u>Sufficient Acceptances.</u>

Under section 1129(a) of the Bankruptcy Code, a plan of reorganization may be confirmed only if all impaired classes of claims accept the plan. Section 1129(b) of the Bankruptcy Code provides that a plan of reorganization may be confirmed even if such plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan and a number of other requirements have been met. These additional requirements under section 1129(b) include (i) the requirement that the plan "not discriminate unfairly" and (ii) the requirement that the plan be "fair and equitable" with respect to each impaired class that has not accepted the plan.

Generally, a plan does not discriminate unfairly with respect to a dissenting class if the dissenting class does not receive treatment less favorable than the treatment afforded to other classes of equal rank. The Debtors believe that the classification of Claims under the Plan does not discriminate unfairly against any Class.

In order for a plan to be "fair and equitable" with respect to a class of secured claims, the plan must provide: (i) that the holders of such claims shall retain the liens securing their claims to the extent of the allowed amount of such claims, and must further provide (ii) either (a) that each holder of a claim of such class shall receive on account of its claim deferred cash payments totaling at least the allowed amount of its claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in the property securing the holder's claim, or (b) for the realization by such holders of the "indubitable equivalent" of their claims.  In order for a plan to be "fair and equitable" with respect to a class of unsecured claims, the plan must provide (i) for each holder of a claim in that class to receive or retain on account of that claim property that has a value, as of the Effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property on account of such junior claim or interest. The Debtors believe that the Plan is fair and equitable with respect to all impaired Classes under the plan.

## IX.    EFFECTS OF PLAN CONFIRMATION

A confirmed plan leaves the holders of Claims with new rights as set forth in the confirmed plan. Therefore, in the event of a default after confirmation, a holder of a Claim may pursue its

remedies under the Plan. Some rights may remain with holders of Claims after the provisions of the confirmed Plan (and the applicable documents evidencing obligations issued in connection with the Plan) have been carried out. The automatic stay imposed by section 362(a) of the Bankruptcy Code as to actions against the Debtors and the Debtors' assets will remain in effect until the Effective Date. Thereafter, all parties in interest will be enjoined from taking any action inconsistent with the Plan.

A.      **Compromise and Settlement of Claims, Interests, and Controversies.**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to, action by, or order or approval of the Bankruptcy Court.  Upon and after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

B.      **Releases by the Debtors.**

1.1      Pursuant to section 1123(b) of the Bankruptcy Code, and except as specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Debtor Released Party is deemed released by the Debtors, the Estates, and the Reorganized Debtors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertible by behalf of the Debtors or the Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively), by or on behalf of the Holder of any Claim or Interest or other entity, based on or related to, or in any manner arising from, in whole or in part, the Debtors, the 2016 Bond Documents, the Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Cases, the negotiation, formulation, or preparation of the any agreement or other document formalizing the transactions contemplated by the Plan, or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction,

agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence or any breach of the Plan Support Agreement by a Released Party The Plan defines the term "Debtor Released Parties" to mean (i) each member of the Debtors; (ii) each  Consenting Holder in any capacity, (iii) the Issuer, (iv) the 2016 Bond Trustee in any capacity, (v) the 2016 Master Trustee in any capacity, (vi) the 2021 Bond Trustee in any capacity, (vii) the 2021 Master Trustee in any capacity, and (viii) the current and former affiliates, subsidiaries, officers, directors, members, managers, principals, employees, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacities as such, of each of the parties described in clauses (i) through (vii).

### C.    <u>Limited Releases by Holders of Claims.</u>

As of the Effective Date and except as set forth in the Plan (including but not limited to all obligations of the Debtors and Reorganized Debtors under the Plan which shall not be deemed released), each holder of a Claim or Interest (including Bondholders) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims assertible on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the preparation, negotiation, Court approval or confirmation of the Plan, the Disclosure Statement or related agreements, documents or instruments, or the filing of any motion or document (or the failure to take action) in the Debtor's Cases (collectively, "**<u>Released Claims</u>**"), provided, however, the Released Claims shall not include any Claim (i) which arises out of or relates to any Executory Contract which is assumed by the Debtor through the Plan, including all Residency Agreements which are assumed by the Debtor through the Plan; (ii) which arises out of or relates to any act or omission of that party constituting willful misconduct or gross negligence; or any Claim that arises from facts and circumstances other than those which are specifically enumerated above in this section of the Plan, or (iii) which relates to the Sponsor's ownership interest or involvement in any facilities other than the Debtor.  Further, nothing contained in the Plan or this Disclosure Statement, or any other document filed in connection with such documents, shall release or be deemed to release the Released Parties from any Cause of Action held by a governmental entity existing as of the Effective Date based on  any law, rule or regulation related to the Center for Medicare Services or the Department of Health and Human Services with respect to Medicare reimbursement or recoupment of amounts paid by the Center for Medicare Services which may be subject to a recoupment claim of such agencies or entities made either before or after the Effective Date.

For purposes of the foregoing release, the term "Releasing Party" means each holder of a Claim who has voted to accept the Plan and who has not chosen, by marking the appropriate box on the Ballot, to opt out of the "Release by Holders of Claims and Interests" provided for in Section 8.3 of the Plan (and set forth above).  The releases described above and set forth above in the Plan

do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement, including the 2021 Bond Documents) executed to implement the Plan, including, without limitation, any legal opinion requested or required by an entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan (inclusive of the tax opinion). The parties who will be released pursuant to the Limited Release are those parties who are defined by Section 1.84 of the Plan, as follows: each of the following: (i) the Debtors and their member or members, (ii) the Reorganized Debtors and their member or members, (iii) each member of a Consenting Holder in any capacity, (iv) the Issuer, (v) the 2016 Bond Trustee in any capacity, (vi) the 2016 Master Trustee in any capacity, (vii) the 2021 Bond Trustee in any capacity, (viii) the 2021 Master Trustee in any capacity, and (ix) the current and former affiliates, subsidiaries, officers, directors, members, managers, principals, employees, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacities as such, of each of the parties described in clauses (i) through (ix).

D.    **Exculpation.**

Except as otherwise specifically provided in the Plan, each Debtor, each Reorganized Debtor, the Estates, and each Released Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any Exculpated Claim, except to the extent such claim, obligation, Cause of Action, or liability arises from actual fraud, willful misconduct, or gross negligence or the breach of the Plan Support Agreement (notwithstanding advice of counsel), but in all respect such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors, the Reorganized Debtors, the Estates, and the Released Parties have, and upon completing of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the restructuring of the Claims and Interests in the Cases and in connection with the transactions contemplated by the Plan, the negotiation, formulation, or preparing any agreement or other document formalizing the transactions contemplated by the Plan, or any related agreements, instruments, or other documents (including the 2021 Bond Documents and documents and instruments related thereto and any legal opinion requested by an entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) in connection with the Plan, and the solicitation and distribution of the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

"Exculpated Party" means each of: (i) the Debtors and their member or members, (ii) the Reorganized Debtors and their member or members, (iii) each member of a Consenting Holder in any capacity, (iv) the Issuer, (v) the 2016 Bond Trustee in any capacity; (vi) the 2016 Master Trustee in any capacity; (vii) the 2021 Bond Trustee in any capacity, (viii) the 2021 Master Trustee in any capacity, and (ix) the current and former officers, directors, members, managers, employees, attorneys, and advisors, each in their respective capacities as such, of each of the foregoing.

### E.    <u>Discharge of Claims.</u>

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Bar Date Order, in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan (including, but not limited to, the 2016 Bond Documents), the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against liabilities of, Liens on, obligations of, and rights against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such Claim, debt, or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such Claim, debt, or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim has accepted the Plan. Except as otherwise provided herein, any default by the Debtors with respect to any Claim that existed before or on account of the filing of the Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### F.    <u>Injunction.</u>

FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE PLAN, ALL RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE OBLIGATIONS RELATING TO THE 2021 BONDS), ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE

SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED, OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN).

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE OBLIGATIONS RELATING TO THE 2016 BONDS) FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS, APART FROM THE INTERESTS OF THE SPONSOR IN THE DEBTORS, SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(g) OF THE BANKRUPTCY CODE.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

### G.    Term of Injunctions or Stays.

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the

Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. Upon the Effective Date, all injunctions or stays contained in the Plan or the Confirmation Order shall be in full force and effect in accordance with their terms.

### H.    Protection Against Discriminatory Treatment.

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including governmental units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been a debtors under Chapter 11, have been insolvent before the commencement of the Cases (or during the Cases but before such Debtors is granted or denied a discharge), or have not paid a debt that is dischargeable in the Cases.

### I.    Release of Liens.

Except as otherwise provided in the Plan, the 2021 Bond Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. For the avoidance of doubt, except as otherwise provided in the Plan (including the Plan Supplement, inclusive of the 2021 Bond Documents), all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

## X.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors, they should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.

### A.    Classification of Claims and Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims in such class. The Debtors believe that the classification of Claims under the Plan complies with the requirements set forth in

the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### B.     Insufficient Acceptances.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan under section 1129(a) of the Bankruptcy Code, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.

If votes are not received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan under section 1129(a) of the Bankruptcy Code, the Debtors may nevertheless seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, as explained above in Article VIII. However, there can be no assurance that the Debtors will be able to utilize section 1129(b) of the Bankruptcy Code for confirmation of the Plan. Any modification of the Plan necessary to effect a confirmation of the Plan pursuant to section 1129(b) may result in a different treatment of Claims than that currently afforded in the Plan, which treatment, as to any Claim, may be less favorable. Furthermore, distributions to holders of Claims may be delayed if the Debtors must seek confirmation under section 1129(b) rather than under section 1129(a).

### C.     Confirmation Risks.

Even if the requisite acceptances are received, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  If the Plan is not confirmed by the Bankruptcy Court: (i) the Debtors may not be able to reorganize their business; (ii) the distributions that holders of Claims ultimately would receive, if any, with respect to their Claims would likely decline substantially; and (iii) there is no assurance that the Debtors would be able to successfully develop, prosecute, confirm, and consummate an alternative plan that would be acceptable to the Bankruptcy Court and the holders of Claims. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization.

### D.     Conditions Precedent May Not Occur.

As more fully set forth in the Plan and as described in Section VII(J) above, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are neither met nor waived, the Effective Date will not take place.

The conditions precedent to the Effective Date include that the 2021 Bonds be issued and that all authorizations, consents, and regulatory approvals required in connection with the consummation of the Plan be obtained. The issuance of the 2021 Bonds must be approved by the Issuer. While the Debtors are currently seeking the necessary approvals for the issuance of the 2021 Bonds, there can be no assurance that such approvals will be obtained.

The conditions precedent to the Effective Date also include that all payments and transfers to be made on the Effective Date shall be made or duly provided for, and the Debtors and the

Sponsor, as applicable, shall have sufficient Cash on such date to make such payments. Additional costs could arise in connection with the transfers to take place on the Effective Date, including the issuance of the 2016 Bonds that could materially impact the Debtors' ability to satisfy this condition precedent.

### E.      Uncertainty of Financial Projections.

The Projections set forth on Exhibit 6 to this Disclosure Statement represent the Debtors' best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations.  The projections are consistent with the Debtor's recent financial performance, as shown in the Debtors' unaudited financial statements for the period ending October 31, 2020 which are attached hereto as Exhibit 7. The Debtors' actual financial results ay differ significantly from the Projections. As explained above, whether actual results will conform to the Projections is subject to a number of risks and uncertainties, including but not limited to: the Debtors' ability to improve profitability and generate positive operating cash flow; the Debtors' ability to sustain sales increases; the Debtors' ability to increase capital expenditures in the future; the Debtors' ability to implement effective pricing and promotional programs; the Debtors' ability to successfully implement effective business continuity; changes in federal, state, or local laws or regulations; general economic conditions in the Debtors' operating region; stability of product costs; increases in labor and employee benefit costs, such as health care and pension expenses; or changes in accounting standards and taxation requirements.

If the Debtors do not achieve their projected financial results, the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### F.      Adverse Publicity.

Adverse publicity or news coverage relating to the Debtors, including publicity or news coverage in connection with the Cases, may negatively impact the Debtors' efforts to market their facilities and services to Prospective Residents and, in turn, negatively impact the Debtors' and Reorganized Debtors' financial performance.

### G.      Coronavirus

The worldwide pandemic caused by the Coronavirus (or Covid-19) has created uncertainties for every individual and entity, domestic and foreign.  It is not possible to predict what effect, if any, the pandemic might have on Park Place.  However, as of the time of the filing of this Disclosure Statement, the Coronavirus has not had a material effect on operations at Park Place or the health and well-being of the Residents who live there.

## XI.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.   Liquidation Under Chapter 7.

If no chapter 11 plan can be confirmed, the Cases may be converted to a case under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtors. The Debtors believe that liquidation under chapter 7 would result in smaller distributions, if any, being made to Creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals during such liquidation. Further, distributions in a case under chapter 7 would not reflect the concessions agreed to by the Debtors' bondholders under the Plan.

The Debtors, with the assistance of their professionals, have prepared a Liquidation Analysis, attached hereto as Exhibit 5. The Liquidation Analysis is based upon a hypothetical liquidation in a Chapter 7 case. The Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of their assets, and the extent to which such assets are subject to liens and security interests.

The likely form of any liquidation would be the sale of the Debtors' assets. Based on this analysis, it is likely that a chapter 7 liquidation of the Debtors' assets would produce less value for distribution to Creditors than that recoverable under the Plan. In the opinion of the Debtors, the recoveries projected to be available in a chapter 7 liquidation are not likely to afford the holders of Claims as great a realization potential as does the Plan.

### B.   Alternative Plan of Reorganization.

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization. In the course of negotiating the Plan, the Debtors explored various other alternatives and concluded that the Plan represented the best alternative to protect the interests of Creditors, Park Place's Residents, and other parties in interest. The Debtors have not changed their conclusions.

## XII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A GENERAL DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE ("*IRS*"), NO OPINION HAS BEEN REQUESTED FROM THE DEBTORS' COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED BELOW, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.

THE FOLLOWING SUMMARY OF CERTAIN POTENTIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A

SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL, ESTATE, GIFT, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.

THE OCCURRENCE OF THE EFFECTIVE DATE IS CONDITIONED ON THE 2021 BOND TRUSTEE RECEIVING AN OPINION OF A NATIONALLY RECOGNIZED BOND COUNSEL, IN FORM AND SUBSTANCE REASONABLY ACCEPTABLE TO THE 2021 BOND TRUSTEE, THAT INTEREST ON THE 2021 BONDS IS EXCLUDABLE FROM THE GROSS INCOME OF THE HOLDERS THEREOF FOR PURPOSES OF U.S. FEDERAL INCOME TAXATION AND INCOME TAXATION UNDER THE LAWS OF THE STATE OF ILLINOIS.

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to certain holders of Claims. The following summary is based on the Tax Code, Treasury Regulations ("Regulations") promulgated thereunder, judicial decisions and published administrative rules and pronouncements of the Internal Revenue Service as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below.

This summary does not address the U.S. federal income tax consequences of the Plan to taxpayers subject to special treatment under the Tax Code (including, but not limited to, Entities who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, S corporations, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, partnerships and other pass-through entities (and their beneficial holders), holders of Claims who are themselves in bankruptcy, and agents). Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim. Furthermore, this discussion assumes that a holder of a Claim only holds Claims of a single Class. This summary assumes that the 2016 Bonds and the 2016 Bonds are treated as "debt" for U.S. federal income tax purposes.

This summary also assumes that each holder of a Claim is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. Entities have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. Entity.

THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCES TO EACH BONDHOLDER. FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN. THEREFORE, IT IS IMPORTANT THAT EACH BONDHOLDER OBTAIN HIS, HER, OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH BONDHOLDER OF THE PLAN.

### A.     U.S. Federal Income Tax Consequences to the Debtors.

Generally, when a debtor discharges its debt obligation for an amount less than the adjusted issue price of the debt obligation, the debtor must include such difference in its gross income as cancellation of debt ("COD") income. Due to their status as non-profit corporations that are exempt from federal income tax pursuant to Section 501(a) of the Code, the Debtors do not expect that the Plan will result in any significant federal income tax consequences to the Debtors.

Although the Debtors expect to maintain their exempt status, and Debtors do not believe that any COD income triggered by the Plan would be treated as unrelated business taxable income ("UBTI"), if exempt status were not maintained or the COD income were treated as UBTI, the Plan, if approved, would most likely allow the Debtors to qualify for a bankruptcy exclusion rule by which the Debtors would not recognize COD income if the discharge were granted by the Bankruptcy Court or occurred pursuant to a plan of reorganization approved by the Bankruptcy Court.

### B.     U.S. Federal Income Tax Consequences to Holders Under a Bond Exchange.

In accordance with the Plan, and as described in more detail in this Disclosure Statement, holders of 2016 Bonds will exchange such bonds for 2021 Bonds (each, a "Bond Exchange"). The U.S. Federal income tax consequences to holders of 2016 Bonds arising from the Bond Exchange may vary, depending upon, among other things: (a) whether the 2016 Bonds and 2021 Bonds constitute securities; (b) whether the holder of 2016 Bonds or 2021 Bonds is a citizen or resident of the United States for tax purposes, or subject to U.S. Federal income tax on a net income basis; (c) whether the Bond Exchange qualifies as a recapitalization as described below; and (d) whether the holder of 2016 Bonds reports income on the accrual or cash basis. For tax purposes, if gain or loss is recognized by a holder of 2016 Bonds, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the 2016 Bonds constitute a capital asset in the hands of the holder and how long the 2016 Bonds have been held or is treated as having been held, whether the 2016 Bonds were acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt or worthless stock or securities deduction with respect to the 2016 Bonds. A holder who purchased 2016 Bonds from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.

The Bond Exchange may qualify as a recapitalization in which the holders realize but do not recognize gain or loss with respect to the 2016 Bonds. If the Bond Exchange qualifies as a recapitalization, a holder's tax basis in the 2016 Bonds would equal the holder's basis in the 2021 Bonds. If the Bond Exchange does not qualify as a recapitalization, holders of 2016 Bonds may be entitled to claim a loss for U.S. federal income tax purposes as a result of the Bond Exchange. The amount of such loss generally would be determined as the excess of the holder's adjusted basis in its 2016 Bonds over the issue price (as determined under the Code) of the 2016 Bonds. Whether a holder can take a loss at all, and the character of such loss and the holder's ability to claim a deduction of such loss may be affected by a number of factors, including whether the 2016 Bonds and 2021 Bonds are treated as securities for U.S. Federal income tax purposes and the holder's particular circumstances, such as the business activities of the holder and its status as a bank. As a result, each holder of 2016 Bonds and 2021 Bonds should consult its own tax advisor regarding the consequences of the Bond Exchange.

The tax consequences of the Bond Exchange to a particular holder will vary depending on each holder's circumstances. Accordingly, each holder should consult with their tax advisors as to any potential tax consequences to such holder, including as to: (i) whether the Bond Exchange could result in a taxable disposition to a particular holder, and (ii) the treatment and tax consequences of the cash received by a holder in exchange for its allocable share of accrued and unpaid interest on its 2016 Bonds.

### C.      U.S. Federal Income Tax Consequences of Holding 2021 Bonds.

The federal income tax consequences of holding the 2021 Bonds will depend on the terms, structure and composition of the 2021 Bonds. The 2021 Bonds will bear interest at the rate of 5.125% per annum and have varying maturities in the years and in principal amounts as described in this Disclosure Statement above.

It is intended that the return of principal will not result in a taxable event to the holders of the 2021 Bonds. However the federal income tax consequences of receiving the principal payments to a particular holder will vary depending on each holder's circumstances. Accordingly, each holder should consult with their tax advisors as to any potential income tax consequences to such holder.

It is further intended that the interest paid on the 2021 Bonds will be exempt from U.S. federal income taxes.  As a condition precedent to the Effective Date, the 2021 Bond Trustee will receive a satisfactory opinion of bond counsel that the interest on the 2021 Bonds will be excluded from gross income for federal tax purposes. Notwithstanding this opinion, ownership of the 2021 Bonds may result in additional federal income tax consequences to certain taxpayers. Each holder should consult with their tax advisors as to the tax consequences of their ownership of the 2021 Bonds.

The opinion of bond counsel is based on current legal authority, may cover matters not directly addressed by such authorities, and represents the bond counsel's judgment as to the proper treatment of the 2021 Bonds. It is not binding on the IRS or the courts. Furthermore, bond counsel

cannot give, and will not give, any opinion or assurance about the further activities of the Debtors, or about the effect of future changes in the Internal Revenue Code of 1986 (the "Tax Code"), as amended, the applicable regulations promulgated thereunder, or the interpretation or enforcement thereof by the IRS. The Debtors, however, have agreed to act in a manner consistent with the requirements of the Tax Code.

### D. <u>Information Reporting and Backup Withholding.</u>

Payments of interest (including accruals of original issue discount) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the 2016 Bonds, may be subject to "backup withholding" (currently at a rate of 28%) if a holder fails to furnish to the payor certain identifying information, and, in some cases, a certification that the holder is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against the holder's U.S. federal income tax liability. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. A holder may also be required to provide additional information to the IRS concerning payments, unless an exemption applies, holders should consult their own tax advisors regarding their qualifications for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN POTENTIAL U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX ADVISOR. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT CONSTITUTE TAX ADVICE.

THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON THE PARTICULAR CIRCUMSTANCES OF A HOLDER OF A CLAIM. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

[Intentionally Blank]

## XIII.   CONCLUSION AND RECOMMENDATIONS

The Debtors urge all creditors entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by immediately returning their properly completed Ballots to the appropriate voting agent as set forth on the Ballots within the time stated in the notice served with this Disclosure Statement.

Dated:  December 15, 2020                    Respectfully Submitted,


_____
Barry VanderGenugten, Chief Financial Officer
Timothy Place, NFP d/b/a Park Place of Elmhurst


Dated:  December 15, 2020                    Respectfully Submitted,


_____
Barry VanderGenugten, Chief Financial Officer
Christian Healthcare Foundation, NFP.

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TIMOTHY PLACE, NFP, *et al.,* | ) | Case No. 16-0336 (JPC) |
| | ) | |
| Debtors. | ) | Hon. |

## <u>DEBTORS' JOINT PLAN OF REORGANIZATION DATED DECEMBER 15, 2020</u>

Bruce Dopke, Member (ARDC # 3127052)

Dopkelaw LLC

1535 W. Schaumburg Road, Suite 204

Schaumburg, IL  60194

Tel: 847-524-4811

bd@dopkelaw.com

PROPOSED COUNSEL FOR
THE DEBTORS

Exhibit 1 To Debtors' Disclosure Statement Dated Dec. 15, 2020

## TABLE OF CONTENTS

**SECTION 1.** ..................................................................................................................... **01**

  **A.**   **Definitions.** ................................................................................................................ **01**

  **B.**   **Interpretation: Application of Definitions and Rules of Construction.** .................................. **11**

**SECTION 2.** ..................................................................................................................... **11**

  **2.1**   **Administrative Claims.** ........................................................................................... **11**

  **2.2**   **Professional Compensation.** .................................................................................. **12**

  **2.3**   **Priority Tax Claims..** ............................................................................................. **12**

  **2.4**   **U.S. Trustee Fees.** ................................................................................................ **12**

**SECTION 3**   **Classification And Treatment Of Claims And Interests.** ....................................... **13**

  **3.1**   **Classification and Specification of Treatment of Claims..** ........................................ **13**

  **3.2**   **Classes of Claims and Interests.** ............................................................................ **13**

  **3.3**   **Acceptance or Rejection of this Plan.** .................................................................... **15**

**SECTION 4**   **Means For Implementation of this Plan.** ............................................................ **15**

  **4.1**   **Sources of Consideration..** ..................................................................................... **15**

  **4.2**   **Cancellation of 2016 Bonds..** ................................................................................ **15**

  **4.3**   **Issuance of 2021 Bonds.** ....................................................................................... **16**

  **4.4**   **Sponsor Contribution.** .......................................................................................... **16**

  **4.5**   **Series 2016C Bonds..** ............................................................................................ **17**

  **4.6**   **2021 Bond Documents.** ......................................................................................... **17**

  **4.7**   **Effective Date Transactions.** ................................................................................. **17**

  **4.8**   **The Bond Funds and Distribution Waterfall** ......................................................... **18**

  **4.9**   **Additional Terms of 2021 Bonds..** ........................................................................ **19**

  **4.10**   **Sponsor Management Agreement.** ........................................................................ **20**

  **4.11**   **Section 1145 Exemption.** ...................................................................................... **20**

  **4.12**   **Assumption of Residency Agreements** .................................................................. **20**

  **4.13**   **Reorganized Debtors' Board of Directors.** ............................................................ **20**

  **4.14**   **Officers of the Reorganzied Debtors** .................................................................... **20**

  **4.15**   **Employee Benefits.** ............................................................................................... **20**

  **4.16**   **Vesting of Assets in the Reorganized Debtors..** ..................................................... **21**

  **4.17**   **Restructuring Transactions.** ................................................................................. **21**

**4.18    Corporate Action** ...................................................................................... **21**

**4.19    Section 1146 Exemption from Certain Taxes and Fees**.................................. **21**

**4.20    Preservation of Causes of Action of the Debtors**........................................ **22**

**SECTION 5    Treatment of Executory Contracts and Unexpired Leases** . ...................................... **23**

**5.1    Assumption and Rejection of Executory Contracts and Unexpired Leases.**.................. **23**

**5.2    Claims Based on Rejection of Executory Contracts or Unexpired Leases.**..................... **23**

**5.3    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.. ............... **23**

**5.4    Insurance Policies.. ........................................................................................ **24**

**5.5    Modifications, Amendments, Supplements, Restatements, or Other Agreements**........ **24**

**5.6    Centers For Medicare and Medicaid Services.** .............................................. **24**

**5.7    Contracts and Leases Entered Into After the Petition Date**........................... **26**

**5.8    Reservation of Rights.** ................................................................................... **26**

SECTION 6  Provisions Governing Distributions ...…………………………………………26

**6.1    Timing and Calculation of Amounts to Be Distributed.** ................................ **26**

**6.2    Distributions.** ................................................................................................. **26**

**6.3    Payments and Distributions on Disputed Claims**.......................................... **27**

**6.4    Special Rules for Distributions to Holders of Disputed Claims.** .................. **27**

**6.5    Delivery of Distributions in General.** ........................................................... **27**

**6.6    Undeliverable Distributions and Unclaimed Property**.................................. **27**

**6.7    Withholding and Reporting Requirements.**................................................... **27**

**6.8    Setoffs**............................................................................................................. **28**

**6.9    Insurance Claims.. ......................................................................................... **28**

**6.10    Applicability of Insurance Policies**.............................................................. **28**

**6.11    Allocation of Distributions Between Principal and Unpaid Interest**............. **28**

**6.12    Interest on Claims.**........................................................................................ **29**

**SECTION 7  Procedures For Resolving Contingent, Unliquidated and Disputed Claims** . ............. **29**

**7.1    Prosecution of Objections to Claims.** ........................................................... **29**

**7.2    Retention of Debtors' Rights and Defenses.**................................................. **29**

**7.3    Distributions After Allowance.** .................................................................... **29**

**7.4    Estimation of Claims.**.................................................................................... **29**

**SECTION 8  Settlement, Release, Injunction and Related Provisions** . .......................................... **30**

8.1      **Compromise and Settlement of Claims, Interests and Controversies.**..........................30

8.2      **Releases by the Debtors** ................................................................................30

8.3      **Limited Releases by Holders of Claims** ....................................................31

8.4      **Limitation on the Scope of the Releases In Sections 8.2 and 8.3 of the Plan.** .................32

8.5      **Exculpation.** ................................................................................32

8.6      **Discharge of Claims.** ................................................................................33

8.7      **Injunction.** ................................................................................33

8.8      **Term of Injunctions or Stays..** ................................................................35

8.9      **Protection Against Discriminatory Treatment.** ................................35

8.10     **Release of Liens.** ................................................................................35

**SECTION 9  Conditions Precedent To The Effective Date** . ................................36

9.1      **Conditions Precedent to the Effective Date.** ................................36

9.2      **Waiver of Conditions.** ................................................................37

9.3      **Effect of Failure of Conditions** ................................................37

**SECTION 10  Modification, Revocation or Withdrawal of the Plan** ................37

10.1     **Modification and Amendments.** ................................................37

10.2     **Effect of Confirmation on Modifications.** ................................38

10.3     **Revocation or Withdrawal of the Plan.** ................................38

**SECTION 11. Retention of Jurisdiction** ................................................................38

11.1     **Retention of Jurisdiction** ................................................................38

**SECTION 12  Miscellaneous Provisions** ................................................................40

12.1     **Immediate Binding Effect.** ................................................................40

12.2     **Additional Documents** ................................................................40

12.3     **Reservation of Rights.** ................................................................41

12.4     **Successors and Assigns..** ................................................................41

12.5     **Votes Solicited in Good Faith.** ................................................41

12.6     **Closing of Cases..** ................................................................41

12.7     **Notices.** ................................................................................41

12.8     **Headings.** ................................................................................42

12.9     **Severability.** ................................................................................42

12.10    **Validity and Enforceability..** ................................................43

iii

**12.11**    **Plan Supplement** ....................................................................................................... **43**

**12.12**    **Governing Law**............................................................................................................. **43**

**12.13**    **Request for Confirmation Pursuant to Sections 1129(a) and 1129(b) of the
Bankruptcy Code.** ................................................................................................................ **43**

Timothy Place, NFP d/b/a Park Place Christian Community of Elmhurst ("**Park Place**") and Christian Healthcare Foundation, NFP d/b/a Providence Healthcare Foundation (the "**Foundation**") (collectively, the "**Debtors**") propose this Plan of Reorganization Under Chapter 11 of the Bankruptcy Code.

# SECTION 1.
# DEFINITIONS AND INTERPRETATION

## A.    Definitions.

The following terms used herein shall have the respective meanings below:

1.1    *2016 Bond Documents* means the 2016 Indenture and any bonds, loan agreement, mortgage, security agreement, document, agreement, or instrument executed or delivered in connection with the issuance of the 2016 Bonds.

1.2    *2016 Bond Trustee* means UMB Bank, N.A., in its capacity as trustee under the 2016 Indenture, and any successor trustee in such capacity.

1.3    *2016 Bonds* means, collectively, the 2016A Bonds, the 2016B Bonds and the 2016C Bonds.

1.4    *2016 Bond Redemption Payment* means a payment made by the Sponsor to the 2016 Bond Trustee in the amount of 3% of the current principal amount of the 2016C Bonds (Six Hundred Fifty-Seven Thousand Five Hundred Sixty-Two and 50/100 Dollars ($657,562.50)) plus 3% of the accrued but unpaid interest on the principal amount of the 2016C Bonds as of the Effective Date of the Plan, which the Debtors estimate will be $68,326.49 if the Effective Date occurs on April 5, 2021, in which case, the total principal and interest which will be paid to holders of 2016C Bonds would total $725,888.99.

1.5    *2016 Indenture* means that certain Bond Trust Indenture, dated as of April 1, 2016, as may have been amended, modified, and/or supplemented, by and between the Issuer and the 2016 Bond Trustee, pursuant to which the 2016 Bonds were issued.

1.6    *2016 Master Trust Indenture* means that certain Master Trust Indenture, dated as of April 1, 2016, as may have been amended, modified, and/or supplemented, by and between the among the Debtors and the 2016 Bond Trustee as the 2016 Master Trustee thereunder.

1.7    *2016 Master Trustee* means UMB Bank, N.A., in its capacity as master trustee under the 2016 Master Trust Indenture, and any successor trustee in such capacity.

1.8    *2021 Bond Documents* means the 2021 Indenture, and any bonds, loan agreement, mortgage, security agreement, document, agreement, or instrument executed or delivered in connection with the issuance of the 2021 Bonds, including but not limited to the 2021 Master Trust Indenture and the 2021 Mortgage.

1.9    ***2021 Bond Trustee*** means UMB Bank, N.A., in its capacity as bond trustee under the 2021 Indenture, and any successor trustee in such capacity.

1.10    ***2021 Bonds*** means that series of bonds to be issued by the Issuer and exchanged by the holders of the 2016A and 2016B Bonds under the terms of this Plan.

1.11    ***2021 Indenture*** means that certain Bond Trust Indenture (as such indenture may be further amended, supplemented, or modified from time to time) to be entered into by and between the Issuer and the 2021 Bond Trustee pursuant to this Plan on or after the Effective Date, including all notes and instruments delivered pursuant thereto or in connection therewith in connection with the issuance of the 2021 Bonds, and which shall be in form and substance acceptable to the Debtors, the Issuer and the 2021 Bond Trustee.

1.12    ***2021 Master Trust Indenture*** means that certain Master Trust Indenture (as such indenture may be further amended, supplemented, or modified from time to time) to be entered into by and between the Reorganized Debtors and the 2021 Bond Trustee, as the 2021 Master Trustee thereunder, pursuant to this Plan on or after the Effective Date and which shall be in form and substance acceptable to the Debtors and the 2021 Bond Trustee.

1.13    ***2021 Master Trustee*** means UMB Bank, N.A., in its capacity as master trustee under the 2021 Master Trust Indenture, and any successor trustee in such capacity.

1.14    ***2021 Mortgage*** means, collectively, any mortgage amendment agreement or agreements whereby the Debtors, directly or by way of assignment, grant one or more mortgages or other liens to the 2021 Master Trustee to secure the Debtors' obligations under the 2021 Bond Documents.

1.15    ***Accrued Professional Compensation*** means, at any given moment, all accrued, contingent and/or unpaid fees for legal, financial advisory, accounting, and other services, along with all obligations for reimbursement of expenses rendered or incurred before the Effective Date under sections 327, 328, 329, 330, 331, or 1103 of the Bankruptcy Code by any retained Professional in the Cases, or under section 503 of the Bankruptcy Code, that the Bankruptcy Court has not been denied by a Final Order, all to the extent that any such fees and expenses have not been previously paid.

1.16    ***Administrative Claim*** means any Claim for payment of costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), and 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estate and operating the business of either of the Debtors; (ii) compensation for Accrued Professional Compensation; (iii) all fees and charges assessed against the Estate pursuant to Chapter 123 of Title 28 of the United States Code; (iv) the reimbursement of the Issuer in an amount not to exceed $30,000.00 for attorneys' fees and out of pocket expenses  incurred in connection with, and for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3)(4) and (5) of the Bankruptcy Code (provided, however, that if the Plan, its associated disclosure statement or proposed confirmation order, as submitted to the Bankruptcy Court are subject to material revision or objection by a party in

interest, or if the Debtors' request for approval of the disclosure statement or confirmation of the Plan is materially opposed or delayed, the Issuer may obtain relief from the $30,000 limitation on its professional fee and expense claim from the Court after notice and a hearing}; and (v) all requests for compensation or expense reimbursement for making a substantial contribution in the Cases pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code.

1.17   ***Allowed*** means with respect to Claims (a) any Claim, proof of which is timely filed by the applicable bar date; (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) any Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided, that* with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that, with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period of time, as may be extended by the Bankruptcy Court from time to time, fixed by the Plan, the Bankruptcy Code the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. An Allowed Claim (i) includes a Disputed Claim to the extent such Disputed Claim becomes Allowed after the Effective Date and (ii) shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law. Unless otherwise specified in this Plan, in section 506(b) of the Bankruptcy Code, or by Final Order of the Bankruptcy Court, "Allowed" Claims shall not, for purposes of distributions under this Plan, include interest on such Claim accruing from and after the Petition Date. For the avoidance of doubt, the 2016 Bond Trustee shall hold an Allowed Claim in the amount of (i) $103,691,500 on account of the Series 2016A Bonds, (ii) $15,496,392 on account of the Series 2016B Bonds and (iii) $21,918,750 on account of the Series 2016C Bonds, plus unliquidated, accrued, and unpaid fees and expenses of the 2016 Bond Trustee and its professionals incurred through the Effective Date.

1.18   ***Assets*** means all assets of the Debtors of any nature whatsoever, including, without limitation, all property of the Estate pursuant to section 541 of the Bankruptcy Code, Cash, Avoidance and Other Actions, equipment, inventory, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and proceeds of any of the foregoing.

1.19   ***Avoidance and Other Actions*** means all actions, causes of action, suits, choses in action, and claims of the Debtors and/or the Estate against any entity or Person, whether direct, indirect, derivative, or otherwise arising under section 510 of the Bankruptcy Code or seeking to avoid a transfer of property or recover property pursuant to sections 542 through 550 of the Bankruptcy Code or applicable non-bankruptcy law.

1.20   ***Bankruptcy Code*** means title 11 of the United States Code, as now in effect or hereafter applicable to this Cases.

1.21   ***Bankruptcy Court*** means the United States Bankruptcy Court for the Northern District of Illinois, having jurisdiction over the Cases.

1.22   **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended, and the Local Rules of the Bankruptcy Court, as applicable to this Cases.

1.23   **Bar Date Order** means, collectively, any order or orders entered by the Bankruptcy Court establishing a bar date by which a Proof of Claim must be filed in the Cases.

1.24   **Base Management Fee** means an amount no greater than 4.25% of gross operating revenues; provided that no more than $30,000 shall be paid each month as an operating expense, with the balance payable from Excess Cash.

1.25   **Business Day** means any day of the calendar week, except Saturday, Sunday, a "legal holiday," as defined in Federal Bankruptcy Rule 9006(a), or any day on which commercial banks are authorized or required by law to close in Chicago, Illinois.

1.26   **Cash** means cash and cash equivalents of the Debtors, including, without limitation, deposits in transit whether in the form of check or electronic transfer.

1.27   **Cash Collateral Order** means any order, whether interim or final, allowing the use by the Debtors during the Cases of the cash collateral of the 2016 Bond Trustee.

1.28   **Causes of Action** means any claim, cause of action, controversy, demand, agreement, right (including to legal or equitable remedies), action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Cause of Action includes, without limitation: (a) any right of setoff, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or Chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any claim listed in the Plan Supplement.

1.29   **Chapter 11** means chapter 11 of the Bankruptcy Code.

1.30   **Cases** means the above-captioned cases.

1.31   **Claim** means a claim, as defined by section 101(5) of the Bankruptcy Code, against either of the Debtors or their Assets, whether or not asserted.

1.32   **Class** means a class or category of Claims as classified and described in Section 3 of this Plan.

4

1.33    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the Bankruptcy Court's docket.

1.34    ***Confirmation Hearing*** means the hearing on confirmation of this Plan pursuant to section 1129 of the Bankruptcy Code.

1.35    ***Confirmation Order*** means the order entered by the Bankruptcy Court confirming this Plan in accordance with Chapter 11 of the Bankruptcy Code.

1.36    ***Consenting Holders*** means parties holding all rights with respect to voting the Series 2016 Bonds that are party to the Plan Support Agreement.

1.37    ***Park Place*** means Debtor Timothy Place, NFP d/b/a Park Place of Elmhurst.

1.38    ***Creditor*** means a holder of a Claim.

1.39    ***Cure*** means the payment of Cash by the Reorganized Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Reorganized Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.40    ***Days Cash on Hand*** shall have the meaning set forth in the 2021 Master Indenture.

1.41    ***Debtor Released Party*** or ***Debtor Released Parties*** means each of the following: (i) each member of the Debtors; (ii) each  Consenting Holder in any capacity, (iii) the Issuer, (iv) the 2016 Bond Trustee in any capacity, (v) the 2016 Master Trustee in any capacity, (vi) the 2021 Bond Trustee in any capacity, (vii) the 2021 Master Trustee in any capacity, and (viii) the current and former affiliates, subsidiaries, officers, directors, members, managers, principals, employees, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacities as such, of each of the parties described in clauses (i) through (vii).

1.42    ***Debtors*** means, collectively, Timothy Place, NFP d/b/a Park Place of Elmhurst and Christian Healthcare Foundation, NFP, as debtors and debtors in possession, and includes their respective Estates, where appropriate.

1.43    ***Debt Service Reserve Fund*** means a fund that the Debtors will establish on the Effective Date under the 2021 Indenture, as defined in the Restructuring Term Sheet and as more fully set forth in the 2021 Indenture.

1.44    ***Disclosure Statement*** means the disclosure statement in respect of the Plan, as the same may be altered, modified, or amended.

1.45    ***Disputed*** means, with respect to any Claim, any Claim that is not yet Allowed and is subject to a claims objection filed before any deadline set by the Bankruptcy Court.

1.46    ***Distribution Date*** means the date, occurring on or as soon as reasonably practicable after the Effective Date, but no later than five (5) days after the Effective Date, on which the Debtors first make the required distributions to holders of Allowed Claims as provided in this Plan.

1.47    ***Distribution Record Date*** means the Effective Date or such other date as may be designated in the Confirmation Order.

1.48    ***Distribution Waterfall*** means the waterfall described in the Restructuring Term Sheet and as more fully set forth in the 2021 Master Trust Indenture.

1.49    ***Effective Date*** means a Business Day selected by the Debtors with the consent of the 2016 Bond Trustee, which is, unless the Confirmation Order directs otherwise, no earlier than the date on which each of the conditions to this Plan's Effective Date set forth herein has either been satisfied or waived in accordance with this Plan and no later than 109 days after the Petition Date (unless that day falls on a Saturday, Sunday or a legal holiday, in which case the Effective Date would be the next day which is not a Saturday, Sunday or legal holiday. The 109th day after the Petition Date falls on Saturday, April 3, 2021. Accordingly, the latest day that the Effective Date may occur is Monday, April 5, 2021.

1.50    ***Entrance Fee Escrow Agreement*** means that certain escrow agreement entered into by and between MB Financial Bank and the Debtors pursuant to which the Debtors shall deposit all Entrance Fees received by the Debtors between the Petition Date and the Effective Date as approved by the Bankruptcy Court.

1.51    ***Entrance Fee Fund*** means the existing Entrance Fee Fund held by the 2016 Bond Trustee pursuant to the 2016 Master Trust Indenture, which the Debtors will maintain as more fully set forth in the 2021 Master Trust Indenture.

1.52    ***Entrance Fees*** means fees, other than security deposits, monthly rentals, or monthly services charges, paid to a Debtor by residents of living units for the purpose of obtaining the right to reside in those living units or to obtain a parking space including any refundable resident deposits described in any lease, Residency Agreement, or similar agreement with respect to those living units or parking spaces, but shall not include any such amounts held in escrow or otherwise set aside pursuant to the requirements of any such agreement or a reservation agreement prior to the occupancy of the living unit or parking space covered by such lease, Residency Agreement, or similar agreement (which amounts shall be included if an when occupancy occurs).

1.53    ***Estate*** means the estates of the Debtors created by the Debtors' Cases pursuant to section 541 of the Bankruptcy Code.

1.54    ***Excess Cash*** shall have the meaning set forth in the Restructuring Term Sheet, as more fully set forth in the 2021 Master Trust Indenture.

1.55    ***Exculpated Claims*** means any Claim related to any act or omission in connection with, related to, or arising out of the filing or administration of the Cases, the Plan, or the

transactions contemplated by the Plan, the formulation, preparation, dissemination, negotiation of any document in connection with the Plan, any agreement or other document formalizing the transactions contemplated by the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or the distribution of property pursuant to the Plan.

1.56    ***Exculpated Party*** or ***Exculpated Parties*** means each of the following: (i) the Debtors and their member or members, (ii) the Reorganized Debtors and their member or members, (iii) each member of a Consenting Holder in any capacity, (iv) the Issuer, (v) the 2016 Bond Trustee in any capacity, (vi) the 2016 Master Trustee in any capacity, (vii) the 2021 Bond Trustee in any capacity, (viii) the 2021 Master Trustee in any capacity, and (ix) the current and former officers, directors, members, managers, employees, attorneys, and advisors, each in their respective capacities as such, of each of the foregoing.

1.57    ***Executory Contract*** means a contract to which a Debtor is a party that is capable of assumption or rejection under section 365 of the Bankruptcy Code.

1.58    ***Campus*** means the continuing care retirement community known as "Park Place Elmhurst" and owned by Park Place, located in Elmhurst, Illinois.

1.59    ***Federal Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as amended.

1.60    ***Final Order*** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Cases that has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, to petition for certiorari, or to move for a new trial, reargument, or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure, or Federal Bankruptcy Rules 9023 or 9024, may be filed relating to such order shall not cause such order to not be a Final Order.

1.61    ***Foundation*** means Debtor Christian Healthcare Foundation, NFP.

1.62    ***General Unsecured Claim*** means any unsecured Claim against either of the Debtors, including, without limitation, any Resident Claim, that is not an Administrative Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim or 2016 A/B/C Bond Claim.

1.63    ***Insurance Policies*** means, collectively, all of the Debtors' insurance policies.

1.64    *Interest* means any membership, or other ownership, interest in either of the Debtors, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest.

1.65    *Interest Payment Date* shall have the meaning provided in the 2021 Indenture.

1.66    *Issuer* means the Illinois Finance Authority, a self-financed authority of the State of Illinois.

1.67    *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.68    *Liquidity Support Agreement* means that certain Liquidity Support Agreement pursuant to which on the Effective Date, the Sponsor will deposit $3,000,000 (the "*Liquidity Fund*") with the 2021 Bond Trustee to be held and used in accordance with such agreement for the payment by the Debtors of regular operating expenses, monthly interest or principal relating to the Series 2021 Bonds.

1.69    *Management Agreement* means that certain Management Agreement entered into by and between Park Place and the Sponsor, dated as of April 1, 2016, as may have been amended, modified, and/or supplemented.

1.70    *MB Financial Bank* shall mean MB Financial Bank, N.A. or Fifth Third Bank, N.A.

1.71    *Office of the U.S. Trustee* means the Office of The United States Trustee, 219 S. Dearborn Street, Room 873, Chicago, IL 60604.

1.72    *Other Priority Claim* means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.73    *Other Secured Claim* means any Secured Claim other than a Series 2016 A/B/C Bond Claims.

1.74    *Operating Reserve Fund* means the existing Operating Reserve Fund held by the 2016 Master Trustee pursuant the 2016 Master Trust Indenture, which the Debtors will maintain as more fully set forth in the 2021 Master Trust Indenture.

1.75    *Person* means an individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust, estate, unincorporated organization, governmental unit, government (or agency or political subdivision thereof), or other entity, including, without limitation, the Debtors.

1.76    *Petition Date* means the date on which the Debtors filed petitions commencing the Cases.

1.77   **Plan** means this Plan, as altered, modified, or amended in accordance with the Bankruptcy Code and the Bankruptcy Rules.

1.78   **Plan Supplement** means the compilation of documents and forms of documents, schedules, and exhibits to this Plan, to be filed prior to the Confirmation Hearing, as amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules. The Plan Supplement shall include, among other documents, the 2021 Bond Documents and a schedule of the Reorganized Debtors' retained Causes of Action.

1.79   **Plan Support Agreement** means that certain Plan Support Agreement, dated as of May 14, 2021 (including, without limitation, the exhibits, attachments, and appendices thereto), entered into by and among the Debtors and the Consenting Holders on the date thereof, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms thereof. A copy of the Plan Support Agreement is attached as **Exhibit A** to the Plan.

1.80   **Priority Tax Claim** means any Claim of a governmental unit of a kind entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.81   **Professionals** means all professionals employed in this Cases pursuant to sections 327, 328, and 1103 of the Bankruptcy Code.

1.82   **Proof of Claim** means a proof of Claim filed against either of the Debtors in the Cases.

1.83   **Refunds** means any resident refund obligations under the terms of the Residency Agreements.

1.84   **Released Party** or **Released Parties** means each of the following: (i) the Debtors and their member or members, (ii) the Reorganized Debtors and their member or members, (iii) each member of a Consenting Holder in any capacity, (iv) the Issuer, (v) the 2016 Bond Trustee in any capacity, (vi) the 2016 Master Trustee in any capacity, (vii) the 2021 Bond Trustee in any capacity, (viii) the 2021 Master Trustee in any capacity, and (ix) the current and former affiliates, subsidiaries, officers, directors, members, managers, principals, employees, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacities as such, of each of the parties described in clauses (i) through (ix).

1.85   **Releasing Party** means each holder of a Claim who has voted to accept the Plan and who has not chosen, by marking the appropriate box on the ballot, to opt out of the "Release by Holders of Claims" provided for in Section 8.3 of this Plan.

1.86   **Reorganized Debtors** means, collectively, the reorganized Timothy Place, NFP d/b/a Park Place of Elmhurst and the reorganized Christian Healthcare Foundation, NFP, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, after giving effect to the restructuring transactions occurring on the Effective Date in accordance with this Plan.

1.87    ***Residency Agreements*** means those certain residency agreements entered into by and between the residents of the Campus and Park Place and any additional documents related thereto, including any amendments, supplements, or addendums.

1.88    ***Resident*** means a Person who resides or has contracted with Park Place to reside at the Campus.

1.89    ***Resident Claim*** means any Claim which sounds in contract that a Resident may hold or assert against either of the Debtors, their Estate, or their Assets, including, without limitation, any Claim arising under, related to, or in connection with a Residency Agreement, but does not include a tort claim based in whole or in part on the breach of a tort duty which arose from or related to the Debtors' performance of duties described in a Residency Agreement.

1.90    ***Restructuring Term Sheet*** means that certain Restructuring Term Sheet, dated as of May 14, 2021, setting forth the principal terms and conditions of a financial restructuring of the outstanding indebtedness of the Debtors.  A copy of the Restructured Term Sheet is attached as **Exhibit 1** to the Plan Support Agreement.

1.91    ***Schedules*** mean, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs, if any, filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

1.92    ***Secured Claim*** means any Claim of a Creditor that is (i) secured by property of the Estate, to the extent of the value of the Creditor's interest in the Estate's interest in such property, as provided in section 506(a) of the Bankruptcy Code or (ii) subject to setoff under section 553 of the Bankruptcy Code, to the extent of the amount subject to setoff, as provided in section 506(a) of the Bankruptcy Code.

1.93    ***Series 2016 A/B/C Bond Claims*** means any and all Claims in respect of the 2010A Bonds, the 2010B Bonds, or the 2010C Bonds.

1.94    ***Series 2016A Bonds*** means the Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2010A in the original aggregate principal amount of $103,691,500 issued pursuant to the 2016 Indenture.

1.95    ***Series 2016B Bonds*** means the Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2016B in the original aggregate principal amount of $15,496,392 issued pursuant to the 2016 Indenture.

1.96    ***Series 2016C Bonds*** means the Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2016C in the original aggregate principal amount of $21,918,750 issued pursuant to the 2016 Indenture.

1.97    ***Series 2021 Bonds*** means the Illinois Finance Authority Revenue Bonds, Series 2021 (Park Place of Elmhurst Project) to be issued by the Issuer pursuant to this Plan under the 2021 Indenture and as more fully described in Section 4.3.1 of this Plan.

1.98    ***Sponsor*** means Rest Haven Illiana Christian Convalescent Home d/b/a Providence Life Services, an Illinois not-for-profit corporation which is the sole member of each of the Debtors.

1.99    ***Sponsor Note*** means that certain promissory note in the amount of Five Million Dollars ($5,000,000) issued by the Debtors to the Sponsor on or about April 1, 2016.

1.100    ***Unexpired Lease*** means a lease to which a Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.101    ***U.S. Trustee Fees*** means all fees and charges assessed against the Estate of the Debtors under 28 U.S.C. § 1930.

1.102    ***Voting Deadline*** means the deadline to vote to accept or reject this Plan set forth in the Disclosure Statement or an order of the Bankruptcy Court, as such deadline may be extended or modified from time to time.

**B.    Interpretation: Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein. A term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to this Plan. The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Unless otherwise provided, any reference in this Plan to an existing document, exhibit, or schedule means such document, exhibit, or schedule as it may have been amended, restated, revised, supplemented, or otherwise modified. If a time or date is specified for any payments or other distribution under this Plan, it shall mean on or as soon as reasonably practicable thereafter. Further, where appropriate from a contextual reading of a term, each term includes the singular and plural form of the term regardless of how the term is stated and each stated pronoun is gender neutral.

## SECTION 2.
## TREATMENT OF ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES

2.1    **Administrative Claims**.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims have not been classified and are treated as described herein. Except as otherwise provided in the Plan, by written agreement of the holder of an Allowed Administrative Claim to accept different treatment than provided under the Plan, or by order of the Bankruptcy

Court, an Entity holding an Allowed Administrative Claim will receive Cash equal to the unpaid portion of such Allowed Administrative Claim that has come due for payment under any applicable order or law, as soon as practicable after the later of: (i) the fifth (5th) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Debtors; (ii) the date on which such Entity becomes the holder of such an Allowed Administrative Claim; or (iii) the date or dates when that Allowed Administrative Claim is payable by its terms, consistent with past practice and in accordance with past terms. Administrative Claims include (and are not limited to) contract claims of individuals and entities for goods and services which they provided to the Debtors during the pendency of the Cases and claims for personal injuries which are alleged to have occurred during the pendency of the Cases. Unless otherwise provided in the Plan or stipulated to by the Debtors, holders of Administrative Claims must file a motion for the allowance of such claims under 11 U.S.C. §503(a) no later than sixty (60) days after the Effective Date. Objections to any motion for allowance of administrative claims must be filed and served on the Debtors, the Office of the U.S. Trustee, the 2016 Bond Trustee, and the requesting party no later than 25 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable motion for allowance of administrative claim was served.

2.2 **Professional Compensation**. Professionals or other Entities asserting a Claim for Accrued Professional Compensation for services rendered before the Effective Date must file and serve on the Debtors (or, after the Effective Date, the Reorganized Debtors), the 2016 Bond Trustee, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, an application for final allowance of such Claim for Accrued Professional Compensation no later than sixty (60) days after the Effective Date. Objections to any Claim for Accrued Professional Compensation must be filed and served on the Reorganized Debtors, the Office of the U.S. Trustee, the 2016 Bond Trustee, and the requesting party no later than 25 days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application for final allowance of such Claim for Accrued Professional Compensation was served. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and section 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to any party or action, order, or approval of the Bankruptcy Court.

2.3 **Priority Tax Claims.** In accordance with section 1123(a)(1) of the Bankruptcy Code, Priority Tax Claims have not been classified and are treated as described in Section 2.3 of the Plan. Unless otherwise agreed by the holder of an Allowed Priority Tax Claim, any Entity holding an Allowed Priority Tax Claim will receive, as determined by the Reorganized Debtors in their sole discretion and in full satisfaction of such Claim, payment in Cash in full on the later of (i) the Effective Date, or as soon as reasonably practicable thereafter as determined by the Debtors, or (ii) the date such Claim becomes an Allowed Claim.

2.4 **U.S. Trustee Fees.** All U.S. Trustee Fees will be paid in full by the Reorganized Debtors as they become due and owing.

# SECTION 3.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**3.1    Classification and Specification of Treatment of Claims.** All Claims, except those described in Section VII(B) above, are placed in the following impaired or unimpaired Classes of Claims pursuant to sections 1123(a)(1), 1123(a)(2), and 1123(a)(3) of the Bankruptcy Code, which sections require the Plan to designate such Classes and to specify their impaired or unimpaired status. A Claim is classified in a particular Class only to the extent that the Claim qualifies within the description of the Class and is classified in a different Class to the extent that the Claim qualifies within the description of that different Class. A Claim is in a particular Class only to the extent that the Claim is an Allowed Claim in that Class and has not been paid, released, withdrawn, waived, or otherwise satisfied under the Plan. Unless the Plan expressly provides otherwise, when a Class includes a subclass, each subclass is a separate Class for all purposes under the Bankruptcy Code, including, without limitation, voting and distribution.  Subject to all other applicable provisions of the Plan (including its distribution provisions), classified Claims shall receive the treatment set forth below. The Plan will not provide any distributions on account of a Claim to the extent that such Claim has been disallowed, released, withdrawn, waived, or otherwise satisfied or paid as of the Effective Date, including, without limitation, through payment by a third party. Except as specifically provided in the Plan, the Plan will not provide any distributions on account of a Claim for which the obligation to pay has been assumed by a third party.

**3.2    Classes of Claims and Interests.**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Series 2016A/B Bond Claims | Impaired | Entitled to Vote |
| 3 | Series 2016C Bond Claims | Impaired | Entitled to Vote |
| 4 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Interests in Debtors | Unimpaired | Deemed to Accept |

3.2.1    **Class 1—Other Priority Claims**. This Class is unimpaired and consists of all Allowed Other Priority Claims, if any such Claims still exist as of the Effective Date. Each Allowed Other Priority Claim shall be in a separate subclass. Except to the extent that the holder of an Allowed Other Priority Claim agrees to less favorable treatment, each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction and discharge of and in exchange for each Allowed Other Priority Claim: (i) deferred Cash payments of a value, as of the Effective Date, equal to the holder's Allowed Other Priority Claim, or (ii) payment in Cash in full on the later of: (a) the fifth (5th) Business Day after the Effective Date or as soon as reasonably practicable thereafter as determined by the Debtors; and (b) the fifth (5th) Business Day after the date on which such Other Priority Claim becomes an Allowed Claim.

3.2.2    **Class 2—2016A and 2016B Bond Claims**. This Class is impaired and consists of all 2016A and 2016B Bond Claims and includes all Claims of the holders of (i) the 2016A Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $103,691,500, (ii) the 2016B Bonds, which Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $15,496,392, plus (iii) accrued and unpaid interest on the principal amount of the 2016A/B Bonds through and including the Effective Date, which interest shall be paid by the 2016 Bond Trustee from the Debt Service Reserve Fund administered by the 2016 Bond Trustee.  On the Effective Date, the holders of the 2016A Bonds and 2016B Bonds shall exchange the then outstanding 2016A Bonds and 2016B Bonds for a pro rata share of 2021 Bonds issued in the aggregate original principal amount of $107,269,103.  The 2021 Bonds shall be issued as current paying bonds.  The 2021 Bonds shall bear interest at the rate of 5.125% per annum and have maturities in the years and in principal amounts as set forth on Schedule 1 to the "Restructuring Term Sheet" attached to the Disclosure Statement as Exhibit 2.  The 2021 Bonds shall be amortized as set forth in Exhibit 2 to the Disclosure Statement. The 2021 Bonds shall pay interest only for the first three (3) years following the Effective Date, and then amortize over the following thirty-seven (37) years.  Interest on the 2021 Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Exhibit 2 to the Disclosure Statement.  The 2021 Bonds will be secured by a first priority lien on all assets of Park Place. The Series 2021 Bond shall mature as set forth in Exhibit 2 to the Disclosure Statement with a final maturity of forty (40) years from the restructuring effective date (subject to bond counsel approval).  The 2021 Bonds will be subject to optional redemption prior to maturity commencing on the 5th year after the Effective Date, at a price equal to: in year 5, at a price of 102%, in year 6, at price of 101% and thereafter at par.  The 2021 transaction will not include any 2021 cash flow notes for the balance outstanding and is expected to consist of one series of bonds.

3.2.3    **Class 3 – 2016C Bond Claims**.  This Class is impaired and consists of all 2016C Bond Claims which shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $21,918,750 plus any accrued and unpaid interest due on the 2016C Bonds through and including the Effective Date.  On the Effective Date, the Sponsor will pay the 2016C Bond Redemption Payment to the 2016 Bond Trustee, who will distribute such payment pro rata to the holders of record of the 2016C Bonds in full satisfaction of the 2016C Bonds.  Upon the making of the 2016C Bond Redemption Payment, the 2016C Bonds will be cancelled and deemed to no longer be outstanding, except to the extent necessary to complete the distribution of such payment to the holders of record of the 2016C Bonds.

3.2.4    **Class 4 – Other Secured Claims**. This Class is unimpaired and consists of all Other Secured Claims. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each Allowed Other Secured Claim, on the later of the Effective Date and the date such Other Secured Claim becomes Allowed, or as soon as practicable thereafter, each holder of an Allowed Other Secured Claim shall have its Other Secured Claim reinstated and the legal, equitable, and contractual rights to which the holder of such Claim is entitled shall otherwise be unaltered in accordance with section 1124 of the Bankruptcy Code.

3.2.5    **Class 5 – General Unsecured Claims**. This Class is impaired and consists of all General Unsecured Claims. Except to the extent that a holder of an Allowed General Unsecured

Claim agrees to a less favorable treatment, in full and final satisfaction and discharge of and in exchange for each General Unsecured Claim, each holder of an Allowed General Unsecured Claim will receive payment in Cash of three percent (3%) of the unpaid portion of such Allowed General Unsecured Claim on the latest of (i) the fifth (5th) Business Day after the Effective Date or as soon as practicable thereafter as determined by the Debtors, (ii) the fifth (5th) Business Day after the date on which such Allowed General Unsecured Claim becomes an Allowed Claim, (iii) the date such Allowed General Unsecured Claim becomes due and payable in the ordinary course of business, or (iv) as otherwise agreed to by the Debtors and the holder of such General Unsecured Claim, and this Plan shall otherwise leave unaltered the legal, equitable, and contractual rights to which the holder of such General Unsecured Claim is entitled; *provided, however,* that the Debtors may seek authority from the Bankruptcy Court to pay certain General Unsecured Claims in advance of the Effective Date in the ordinary course of business. The Debtors reserve their right, however, to dispute the validity of any General Unsecured Claim, whether or not objected to prior to the Effective Date.

3.2.6    **Class 6 – Interests in Debtors**. This Class is unimpaired and consists of all Interests in the Debtors. On the Effective Date, the Sponsor, the sole member of each of the Debtors, will retain all membership interests in the Reorganized Debtors.

**3.3      Acceptance or Rejection of this Plan.**

3.3.1    **Acceptance by an Impaired Class**. In accordance with section 1126(c) of the Bankruptcy Code and except as provided in section 1126(e) of the Bankruptcy Code, an impaired Class of Claims shall have accepted this Plan if this Plan is accepted by the holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

3.3.2    **Presumed Acceptance of this Plan**. Classes 1, 4, and 6 are not impaired under this Plan and are, therefore, conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.

3.3.3    **Voting Class**. Classes 2, 3 and 5 are impaired under this Plan and are entitled to vote to accept or reject this Plan.

**SECTION 4.**
**MEANS FOR IMPLEMENTATION OF THIS PLAN**

4.1      **Sources of Consideration.** Cash consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the cash derived from the Reorganized Debtors' business operations, those certain funds established pursuant to the Restructuring Term Sheet and 2021 Bond Documents, and the Sponsor Contribution (which includes the 2016C Bond Redemption Payment).  A schedule of the source and uses of cash is attached as **Exhibit 4** to the Disclosure Statement.

4.2      **Cancellation of 2016 Bonds.** Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, the 2016 Bonds shall be cancelled, and the 2016 Bonds

and related 2016 Bond Documents shall continue in effect solely to the extent they relate to and are necessary to (i) allow for the applicable distributions pursuant to the Plan, (ii) permit the 2016 Bond Trustee and the Issuer to be compensated for fees and reimbursed for expenses including expenses of its professionals, assert its charging lien, enforce its indemnity and other rights and protections with respect to and pursuant to the 2016 Bond Documents, (iii) permit the 2016 Bond Trustee to set one or more record dates and distributions dates with respect to the distribution of funds to beneficial holders of the 2016 Bonds, as applicable, (iv) permit the 2016 Bond Trustee to appear in the Cases, and (v) permit the 2016 Bond Trustee and the Issuer to perform any functions that are necessary in connection with the foregoing clauses (i) through (iv). Before or after the Effective Date, the Debtors are authorized to take all actions and execute and deliver all documents requested by the Issuer, and the Issuer is authorized to perform all functions that are necessary in connection with the foregoing clauses (i) through (iv) of the preceding sentence.

4.3     **Issuance of 2021 Bonds.** On the Effective Date, the Issuer will, subject to its procedures, practices and discretion, issue new 2021 Bonds under the 2021 Indenture between the Issuer and the 2021 Bond Trustee. On the Effective Date, the holders of the 2016A Bonds and 2016B Bonds shall exchange the then outstanding 2016A Bonds and 2016B Bonds for a pro rata share of 2021 Bonds issued in the aggregate principal amount equal to $107,269,103.00. The 2021 Bonds shall be issued as current paying bonds. The 2021 Bonds shall bear interest at the rate of 5.125% per annum and have maturities in the years and in principal amounts as set forth in Exhibit 2 to the Disclosure Statement. The 2021 Bonds shall be amortized as set forth in Schedule 2 of the Restructuring Term Sheet. The 2021 Bonds shall pay interest only for the first three (3) years following the Effective Date and will then amortize over the following thirty-seven (37) years. Interest on the 2021 Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Schedule 2 of the Restructuring Term Sheet. The 2021 Bonds will be secured by a first priority lien on all assets of Park Place. The Series 2021 Bond shall mature as set forth in Schedule 2 of the Restructuring Term Sheet, with a final maturity 40 years from the restructuring effective date (subject to bond counsel approval). The 2021 Bonds will be subject to optional redemption prior to maturity commencing on the 5th year after the Effective Date, at a price equal to: in year 5, at a price of 102%, in year 6, at price of 101% and thereafter at par. The 2021 transaction will not include any 2021 cash flow notes for the balance outstanding and is expected to consist of one series of bonds. Before or after the Effective Date, the Debtors are authorized to take all actions and execute and deliver all documents requested by the Issuer, and the Issuer is authorized to perform all functions that are necessary in connection with the approval and issuance of the 2021 Bonds.

4.4     **Sponsor Contribution**. In connection with the restructuring, and as consideration for its retention of its ownership interest in the Debtors, on the Effective Date the Sponsor will pay to the Debtors, and the Debtors will then forward to the 2016 Bond Trustee, the 2016C Bond Redemption Payment (in the amount of Six Hundred Fifty-Seven Thousand Five Hundred Sixty-Two and 50/100 Dollars ($657,562.50)) plus 3% of the accrued but unpaid interest on the principal amount of the 2016C Bonds as of the Effective Date of the Plan. In addition, the Sponsor will deposit $3,000,000 (the "**Liquidity Fund**") with the 2021 Bond Trustee to be held and used in accordance with the terms of a certain Liquidity Support Agreement (the "**LSA**") by and among the Sponsor, the Debtors and the 2021 Bond Trustee. The Liquidity Fund shall be available to the Debtors for payment of regular operating expenses as needed, and for payment of monthly interest

or principal relating to the 2021 Bonds.  To enhance the earnings on the Liquidity Fund, the LSA includes a list of permitted investments for the Liquidity Fund, which will include certain investments not customarily included in tax-exempt bond financings. For example, permitted investments are contemplated to include corporate stock and bond mutual funds.  The fund balance in the Liquidity Fund will be permitted to be counted in the calculation of Days Cash on Hand for purposes of covenant testing.  The Distribution Waterfalls will include provisions which allow the Liquidity Fund to be restored to its original balance by the Debtors if draws are made to pay operating expenses or debt service. In addition, the LSA will include terms for the "burn-off" of the Liquidity Fund over time.  In connection with the issuance of the 2016 Bonds, the Sponsor received a certain promissory note ("**Sponsor Note**"), which is subordinate in security and payment to the 2016 Bonds. In further consideration of its retention of its ownership interests in the Debtors, the Sponsor will waive, as of the Effective Date, all amounts due under the Sponsor Note.  The Sponsor and Debtors understand that they will be responsible for transaction costs of the Restructuring Transaction (the "**Sponsor Contribution**"). On the Effective Date, the existing Debt Service Reserve Fund ("**DSRF**") will be used to pay (i) accrued and unpaid interest on the 2016 Bonds through but not including the Effective Date, and (ii) the costs and expenses of the 2016 Bond Trustee and its advisors; any remaining DSRF balance immediately shall be transferred to the Debt Service Reserve Fund under the 2021 Indenture.  In addition, the Sponsor shall undertake to pay the professional fees and expenses incurred by the Debtors' counsel in this case, independent from the Sponsor's other obligations under the Plan including (without limitation) its contributions to the Liquidity Fund.

4.5    **Series 2016C Bonds**.  The 2016C Bond Claims shall be deemed Allowed pursuant to the Plan in the aggregate principal amount of $21,918,750.00 plus any accrued and unpaid interest due on the 2016C Bonds through and including the Effective Date.  The 2016C Bonds shall be redeemed in full when the Sponsor pays the 2016C Bond Redemption Payment to the 2016 Bond Trustee, who will thereafter distribute the 2016 Bond Redemption Payment pro rata to the holders of record of the 2016 Bonds.

4.6    **2021 Bond Documents**.   In connection with the foregoing matters described in Section 4.3 of the Plan, on the Effective Date, the Issuer, the Debtors, and the 2021 Bond Trustee, as applicable, will enter into the 2021 Bond Documents, including the 2021 Indenture, the 2021 Master Indenture, and the 2021 Mortgage. Except as provided for and consistent with the Restructuring Term Sheet, the 2016 Bond Trustee shall transfer to the 2021 Bond Trustee substantially all funds and accounts created or maintained under or pursuant to the 2016 Indenture in accordance with the Plan.

4.7    **Effective Date Transactions**.  Upon the Effective Date, the Debtors shall establish and/or maintain the accounts and funds described in the 2021 Bond Documents and the Restructuring Term Sheet.  Upon the Effective Date, all Entrance Fees, including any Entrance Fees received and escrowed by the Debtor after the Petition Date pursuant to the Entrance Fee Escrow Agreement, shall be deposited with the 2021 Master Trustee in the Entrance Fee Fund.  The deposits in the Entrance Fee Fund, together with the balances of the Debtors' operating accounts and the Operating Reserve Fund, as of the Effective Date, the revenues and other income of the Debtors available on the Effective Date, and the Sponsor shall be applied in the following order of priority to the extent of available funds: (i) to pay any Refunds due and owing; (ii) to pay

the professional fees and expenses incurred in connection with the transactions contemplated under the Plan (including, without limitation, any costs associated with obtaining opinions from bond counsel) subject to the Budget (but not including the professional fees, expenses and costs payable to Dopkelaw LLC in its capacity as general bankruptcy counsel to the Debtors, which the Sponsor agreed to pay pursuant to the Plan Support Agreement and the exhibits thereto); (iii) to fund the Debt Service Reserve Fund up to any shortfall, if any, to the initial Debt Service Reserve Fund requirement; (iv) to fund the Operating Account in  an amount equal to approximately 45 Days Cash on Hand; and (v) to fund the Operating Reserve Fund in an amount equal to 75 Days Cash on Hand.

4.8    **The Bond Funds and Distribution Waterfall.**  The Debtors will establish and maintain certain funds in connection with the 2021 Bonds, including an entrance fee fund (the "**Entrance Fee Fund**"), a revenue fund (the "**Revenue Fund**"), an operating reserve fund (the "**Operating Reserve Fund**"), and a capital expenditures fund (the "**Capital Expenditures Fund**"). The purpose of these funds is to ensure sufficient operational liquidity and capital reserves for the Debtors and to allow the Debtors to service the 2021 Bonds.  Pursuant to the 2021 Bond Documents, the Debtors shall deposit all gross revenues (other than Entrance Fees) with the 2021 Bond Trustee for deposit in the Revenue Fund as established under the 2021 Bond Documents. Entrance Fees (after the required payment of any refunds) will be transferred to the Revenue Fund after any applicable rescission rights under the Residence Agreements have expired and such funds shall be available to flow through the Distribution Waterfall (as defined herein).   Upon the Effective Date, all Entrance Fees shall be deposited with the 2021 Bond Trustee in the Entrance Fee Fund.  Such amounts, together with the balances of the Operating Account, the Operating Reserve Fund and any Revenues available to the Debtors at such time, including the Sponsor Contribution, shall be applied in the following order of priority:

1.  to pay any Refunds due to Residents who no longer reside at the Campus (or their beneficiaries);

2.  to pay all professional fees and expenses incurred in connection with the Restructuring Transaction (including, without limitation, any costs associated with obtaining opinions from bond counsel but not including the fees, expenses and costs incurred by the Debtors' general bankruptcy counsel);

3.  to fund the Debt Service Reserve Fund up to the shortfall, if any, to the initial Debt Service Reserve Fund requirement;

4.  to fund the Operating Account in an amount equal to 45 Days Cash on Hand (approximately $2.250 million);

5.  to fund the Operating Reserve Fund in an amount equal to 75 Days Cash on Hand (approximately $3.750 million); and

6.  thereafter, all post-Effective Date Entrance Fees and other Revenues of the Debtors shall be deposited in the Entrance Fee Fund or the Revenue Fund, as applicable, on a weekly basis.

18

Subject to the next sentence, amounts on deposit in the Revenue Fund shall be made available to Park Place on a monthly basis to satisfy ongoing operations and management costs and expenses of Park Place, including, without limitation, the Base Management Fee, and replenishment of any Unrestricted Amount (collectively, the "**Operating Expenses**").  If an Event of Default (as defined in the 2021 Indenture) shall occur, then the monthly amounts on deposit in the Revenue Fund available for withdrawal to satisfy Operating Expenses shall be made available to Park Place in an amount not to exceed the amounts set forth in an operating budget established pursuant to the terms of the 2021 Indenture.

On the first Business Day of each calendar month, monies in the Revenue Fund shall be distributed in the following order of priority (the "**Distribution Waterfall**"):

- First, to the Operating Account in the amount necessary to pay anticipated Operating Expenses for the upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month), as such amount is set forth in a certificate from the Borrower delivered to the Trustee no later than 10 Business Days prior to the first Business Day of a month;

- Second, to replenish any deficiency as of the Effective Date in the Debt Service Reserve Fund necessary to make the amount therein equal the Debt Service Reserve Fund Requirement;

- Third, to the Bond Fund, in an amount equal to $1/6^{th}$ of the interest due on the next interest payment date;

- Fourth, payments to the Bond Fund in an amount equal to $1/12^{th}$ of the principal due on the next principal payment date;

- Fifth, to the Capital Expenditure Fund, in an amount equal to $1/12^{th}$ of such Fiscal Year's capital budget;

- Sixth, to replenish the balance of the Operating Reserve Fund and the Operating Account to a combined total of 135 Days Cash on Hand;

- Seventh, to replenish the balance of the Liquidity Fund for any draws made in order to restore the balance of the Liquidity Fund to $3 million; and

- Eighth, to pay deferred management fees which are due to the Sponsor, and

- Ninth, any remaining amounts after application of paragraphs first to eighth above (such remaining amounts referred to as "**Excess Cash**") shall be transferred to the Operating Reserve Fund.

4.9    **Additional Terms of 2021 Bonds**.  Additional terms and conditions with respect to the 2021 Bonds are set forth in the Restructuring Term Sheet and in the 2021 Bond Documents. To the extent of any inconsistencies between the Restructuring Term Sheet and the 2021 Bond

Documents, the 2021 Bond Documents shall govern the respective rights and obligations of the parties.

4.10 **Sponsor Management Agreement**. On or before the Effective Date, the Management Agreement will be assumed (either by operation of the Plan or by order of Court) provided that such management agreement shall provide for an annual management fee no greater than 4.25% of gross operating revenues; provided further that no more than $30,000 shall be paid each month as an operating expense with the balance payable from Excess Cash (as described in the Plan).

4.11 **Section 1145 Exemption.** Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the 2021 Bonds shall be exempt from, among other things, the registration and prospectus delivery requirements of Section 5 of the Securities Act of 1933 (as now in effect or hereafter amended) and any other applicable state or federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities. Any Entity who solicits or participates in the offer, issuance, sale, or purchase of the 2021 Bonds issued under, or in accordance with, the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, is not liable, on account of such solicitation or participation, for violation of an applicable law, rule, or regulation governing solicitation of acceptance or rejection of the Plan or the offer, issuance, sale, or purchase of securities pursuant thereto.

4.12 **Assumption of Residency Agreements.** On the Effective Date, the Reorganized Debtors shall assume all of the Residency Agreements in their entirety.

4.13 **Reorganized Debtors' Board of Directors.** The existing members of the Boards of Directors of the Debtors shall continue to be members of the Boards of Directors of the Reorganized Debtors.

4.14 **Officers of the Reorganized Debtors.** The existing officers of the Debtors shall continue to be officers of the Reorganized Debtors.

4.15 **Employee Benefits.** Except as otherwise provided herein, on and after the Effective Date, the Reorganized Debtors may: (i) honor, in the ordinary course of business, any contracts, agreements, policies, programs, and plans for, among other things, compensation, health care benefits, disability benefits, deferred compensation benefits, travel benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of the Debtors who served in such capacity at any time, and (ii) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising before the Petition Date; provided, however, that the Debtors' or the Reorganized Debtors' performance under any employment agreement will not entitle any Entity to any benefit or alleged entitlement under any policy, program, or plan that has expired or been terminated before the Effective Date, or restore, reinstate, or revive any such benefit or alleged entitlement under any such policy, program, or plan. Nothing herein shall limit, diminish, or otherwise alter the Reorganized Debtors' or the Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.

4.16    **Vesting of Assets in the Reorganized Debtors.** Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, or as soon as practicable thereafter, all property of the Debtors' Estate and all Causes of Action of the Debtors (except those released pursuant to the Releases by the Debtors) shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing the 2021 Bonds). On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

4.17    **Restructuring Transactions.** On the Effective Date or as soon as reasonably practicable thereafter, the Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

4.18    **Corporate Action.** Upon the Effective Date, all actions contemplated by the Plan (whether to occur before, on, or after the Effective Date) shall be deemed authorized and approved in all respects, and all matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors or officers of the Debtors  or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, certificates of incorporation, operating agreements, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors or the Reorganized Debtors, as the case may be, and any and all other agreements, documents, securities, and instruments relating to the foregoing.

4.19    **Section 1146 Exemption from Certain Taxes and Fees.** Pursuant to section 1146(a) of the Bankruptcy Code, any transfer of property and any issuance, transfer, or exchange of a security in connection with or pursuant to the Plan shall not be subject to any stamp, mortgage recording, or other similar tax, charge, or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental

officials or agents to forgo the collection of any such tax, charge, or governmental assessment and, as applicable, to accept for filing and recordation instruments or other documents pursuant to such transfer of property or to permit the issuance, transfer, or exchange of a security without the payment of any such tax, charge, or governmental assessment. Such exemption specifically applies, without limitation, to (i) the creation and recordation of any mortgage, deed of trust, lien, or other security interest; (ii) the making or assignment of any lease or sublease; (iii) any restructuring transaction authorized by the Plan, including, without limitation, any actions by Issuer in connection with the cancellation of the 2016 Bonds and the issuance of the 2021 Bonds; or (iv) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation, or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

4.20    **Preservation of Causes of Action of the Debtors.** In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released (including, for the avoidance of doubt, the Exculpated Claims against the Exculpated Parties and the Debtor Released Claims against the Released Parties), the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including those Causes of Action listed in the Plan Supplement, whether arising before or after the Petition Date, and the Reorganized Debtors' right to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan Supplement, the Plan, or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against such Entity. Except with respect to Causes of Action as to which the Debtors or the Reorganized Debtors have released any Entity on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or the Reorganized Debtors, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by an order of the Bankruptcy Court, the Reorganized Debtors expressly reserves all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan. For the avoidance of doubt, nothing in this Section 4.20 of the Plan shall affect the "Release by the Debtor" provided in Section 8.2 of the Plan.

## SECTION 5.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

5.1 **Assumption and Rejection of Executory Contracts and Unexpired Leases.** Except as otherwise provided in the Plan or in an order of the Bankruptcy Court, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases of the Debtors will be deemed assumed as of the Effective Date, unless such Executory Contract or Unexpired Lease: (i) was assumed or rejected previously by the Debtors; (ii) expired or terminated pursuant to its own terms before the Effective Date; (iii) is the subject of a motion to reject filed on or before the Effective Date; or (iv) is identified as an Executory Contract or Unexpired Lease to be rejected in the Plan Supplement filed on or before the Effective Date. **Notwithstanding anything contained in this Plan to the contrary, each Residency Agreement, and all obligations arising thereunder, including the payment of Refunds and all other entrance deposits and fees, will be assumed by the Reorganized Debtors, as of the Effective Date, pursuant to this Plan.** Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumption or rejection of such Executory Contracts or Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall revert in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms may have been modified by such order. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the list of Executory Contracts and Unexpired Leases identified in the Plan Supplement at any time before the Effective Date. After the Effective Date, the Reorganized Debtors shall have the right to terminate, amend, or modify any contracts, leases, or other agreements without approval of the Bankruptcy Court, subject to the terms thereof.

5.2 **Claims Based on Rejection of Executory Contracts or Unexpired Leases.** All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection; provided, that any such Claims arising from the rejection of an Unexpired Lease shall be subject to the cap on rejection damages imposed by section 502(b)(6) of the Bankruptcy Code. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed and forever barred from assertion and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, action by, or order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Class 5 General Unsecured Claims and shall be treated in accordance with the Plan.

5.3 **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.** Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed under the Plan is in default shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by

Cure. If there is a dispute regarding (i) the nature or amount of any Cure; (ii) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption. Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full waiver, release, and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting change in control or ownership interest composition and other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of the assumption.

5.4    **Insurance Policies**.  Notwithstanding anything herein to the contrary, as of the Effective Date, the Debtors shall assume (and assign to the Reorganized Debtors if necessary to continue the Insurance Policies in full force) all of their Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption and assignment of each of the Insurance Policies.

5.5    **Modifications, Amendments, Supplements, Restatements, or Other Agreements**.  Unless otherwise provided, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated under the Plan.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, unless such Executory Contract or Unexpired Lease has been previously assumed by the Debtors.

5.6    **Centers For Medicare and Medicaid Services**.  In addition to the provisions of section 5.1 of the Plan, the following special provisions shall apply to the assumption and cure of the Debtor's Medicare Provider Agreement.  In the event of an inconsistency between sections 5.1 and 5.6, the provisions of this section 5.6 shall govern.

A.    *Medicare Assumption Date*.  Provided that all issues regarding Debtor's cure of any defaults under its Medicare provider agreement on the Confirmation Date are addressed to the satisfaction of Centers for Medicare & Medicaid Services ("CMS"), the Debtor shall assume the Medicare provider agreement on the Effective Date ("Medicare Assumption Date").

**B.  *Cure Prior to the Medicare Assumption Date.***  Prior to the Medicare Assumption Date:

(1) Compliance with Program Requirements.  Debtor will comply with all applicable Medicare program requirements as set forth in Title XVIII the Social Security Act, 42 U.S.C. § 1395 et seq. ("Medicare Act"), and all relevant regulations, rules and CMS manual provisions.

(2) Cure.  Apart from the provision for identified monetary defaults below, nothing withstanding anything to the contrary in the Plan and any exhibits thereto (now or as amended), or Order of Confirmation of a Plan, the term "cure," for purposes of Debtor's assumption of the Medicare provider agreement, means being governed by, and subject to, the terms and conditions of its Medicare provider agreement and the incorporated statutes, regulations, policies and procedures; and to remain liable for any debt to CMS as if the bankruptcy case had not occurred.

(3) Cure of Specific Monetary Defaults Identified Prior to the Assumption Date.  Except as otherwise provided by mutual agreement between CMS and Debtor in a separate written agreement, compromise and/or extended liquidation schedule that Debtor and CMS may (but are not obligated to) enter into prior to the Medicare Assumption Date, Debtor must cure all monetary defaults due under the Medicare provider agreement that CMS has identified to the Debtor in writing before the Medicare Assumption Date.

CMS's right to cure of such identified monetary defaults will be in addition to and without limitation upon its right to recoup of Medicare debts or its other rights and authorities under the Medicare Act.  If Debtor and/or CMS propose a separate agreement, compromise and/or extended liquidation schedule, the process for consideration of any such proposal will remain governed by the Medicare Act, as well as all relevant regulations, rules, and CMS manual provisions, as if Debtor were not in bankruptcy.

**C.  *CMS Claims Unimpaired.***  Without limiting CMS's right to payment of specific identified monetary defaults under the Medicare provider agreement that must be cured prior to assumption as set forth above, all of CMS's claims shall be unimpaired under 11 U.S.C. § 1124 and no court order entered in the Chapter 11 Case, including without limitation an order confirming a plan of reorganization in this case, shall alter, modify or impair or be deemed to alter,  modify or impair any right, term or provision in the Debtor's agreements with CMS.

(1)  Any amounts due on such claims shall be collected in the ordinary course of business, and the United States, on behalf of CMS, shall not be required to file any separate claim in the bankruptcy to collect any amounts due to CMS under the Medicare program, whether via proof of claim, claim for cure, or administrative claim.

(2)  Nothing contained in the Plan and any exhibits thereto (now or as amended) or Order of Confirmation of a Plan shall release or operate to enjoin any claim of the United States, on behalf of CMS, against the Debtor or any non-debtor.

(3) Notwithstanding any provision of the Plan and any exhibits thereto (now or as amended), or Order of Confirmation of a Plan, all agreements, issues, and disputes arising under the Medicare Act, 42 U.S.C. § 1395, et seq., shall be governed exclusively by Medicare statutes, regulations, policies and procedures, without regard to the Bankruptcy Code or Bankruptcy Rules.  Judicial review of any final Medicare determinations after exhaustion of jurisdictionally required administrative remedies would lie in the statutorily designated federal court in accordance with the Medicare Act.   42 U.S.C. §§ 405(h) & 1395ii; see, e.g., 42 U.S.C. §§ 405(g), 1395ff, 1395oo.

5.7     **Contracts and Leases Entered Into After the Petition Date**.  Notwithstanding any other provision in the Plan, contracts and leases entered into after the Petition Date by the Debtors, including any Executory Contracts and Unexpired Leases assumed by the Debtors, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

5.8     **Reservation of Rights.** Nothing contained in this Plan or the Plan Supplement shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## SECTION 6.
## PROVISIONS GOVERNING DISTRIBUTIONS

6.1     **Timing and Calculation of Amounts to Be Distributed.** Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such a Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that Plan provides for Allowed Claims in the applicable Class and in the manner provided herein. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the Plan. Except as otherwise provided for in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

6.2     **Distributions**.  Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Reorganized Debtors. With respect to the issuance of the 2021 Bonds, such bonds shall be deemed issued and exchanged as of the Effective Date without presentment by the beneficial owners. The Distribution Record Date in connection with the holders of the 2016

Bonds shall be as early as practicable so as to enable the Debtors, the Issuer, and their respective agents to comply with the customary practices and procedures of the Depository Trust Company. All Cash distributions to be made to beneficial holders of the 2016 Bonds shall be made to the 2016 Bond Trustee, which shall make such distributions to the beneficial holders of the 2016 Bonds in accordance with the terms of the 2016 Indenture.

6.3    **Payments and Distributions on Disputed Claims**.  Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but that later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.4    **Special Rules for Distributions to Holders of Disputed Claims**. Notwithstanding any other provision of the Plan and except as may be agreed to by the Debtors or the Reorganized Debtors, on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

6.5    **Delivery of Distributions in General**.  Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made to holders of record as of the Distribution Record Date by the Reorganized Debtors. Distributions to holders of Allowed Claims will be made at the address of each such holder as set forth in the Debtors' books and records, except that, in the case of holders of the 2016 Bonds, distributions will be made by means of book-entry exchange through the facilities of the Depository Trust Company in accordance with the customary practices of the Depository Trust Company, as and to the extent practicable. Distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan. Neither the Debtors, nor the Reorganized Debtors, shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct, or fraud.

6.6    **Undeliverable Distributions and Unclaimed Property**.  In the event that any distribution to any holder is returned as undeliverable, the Reorganized Debtors shall use reasonable efforts to determine the current address of such holder. No distribution to such holder shall be made unless and until the Reorganized Debtors have determined such holder's then current address, at which time such distribution shall be made as soon as practicable; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the Distribution Date. After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtors (notwithstanding any applicable federal or state escheat or abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property shall be discharged and forever barred.

6.7    **Withholding and Reporting Requirements**.  In connection with the Plan and all instruments issued in connection therewith, the Reorganized Debtors shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing

authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

6.8 **Setoffs**. Except as otherwise provided in this Plan and subject to applicable law, the Debtors and the Reorganized Debtors as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the holder of a Claim, setoff against any Allowed Claim (which setoff shall be made against the Allowed Claim, not against any distributions to be made under the Plan with respect to such Allowed Claim), any claims, rights, and Causes of Action of any nature that the Debtors may hold against the holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such holder have not been otherwise released, waived, relinquished, exculpated, compromised, or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), and any distribution to which a holder is entitled under the Plan shall be made on account of the Claim, as reduced after application of the setoff described above. In no event shall any holder of a Claim be entitled to setoff any Claim against any claim, right, or Cause of Action of the Debtors or Reorganized Debtors unless such holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtors and a holder of a Claim; provided, that, where there is no written agreement between the Debtors or Reorganized Debtors, as applicable, and a holder of a Claim authorizing such setoff, nothing herein shall prejudice or be deemed to have prejudiced the right of the Debtors or the Reorganized Debtors, as applicable, to assert that any holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date. This Section shall not be applicable to the distributions to be made to or for the benefit of the beneficial holders of the 2016 Bonds.

6.9 **Insurance Claims**. No distributions under the Plan shall be made on account of an Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to the Debtors' Insurance Policies. To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim, then immediately upon such agreement, such Claim may be expunged without an objection to such Claim having to be filed and without any further notice to, action by, or order or approval of the Bankruptcy Court.

6.10 **Applicability of Insurance Policies**. Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made in accordance with the provisions of any applicable Insurance Policy. Except as expressly provided in the Plan, nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any Insurance Policies, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

6.11 **Allocation of Distributions Between Principal and Unpaid Interest**. With the exception of distributions on account of the 2016 Bonds, which shall be treated as provided in Classes 2 and 3 herein, to the extent that any Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for U.S. federal income tax purposes, be allocated on the Debtors' books and records to the principal

amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest.

6.12   **Interest on Claims**.   Unless otherwise specifically provided for in the Plan (including interest payable under the 2016 Bonds), postpetition interest will not accrue or be paid on Claims, and no Claim holder will be entitled to interest accruing on or after the Petition Date on any Claim. Similarly, unless otherwise specifically provided for in the Plan, postpetition interest will not accrue or be paid on any Disputed Claim in respect of the period from the Petition Date to the date a final distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

# SECTION 7.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

7.1   **Prosecution of Objections to Claims.**   The Debtors or the Reorganized Debtors, as applicable, shall have the exclusive authority to file, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Reorganized Debtors reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

7.2   **Retention of Debtors' Rights and Defenses**.   Except as expressly provided in this Plan or in any order entered in the Cases before the Effective Date (including the Confirmation Order), the Reorganized Debtors after the Effective Date will have and retain any and all rights and defenses held by the Debtors with respect to any Claim as of the Petition Date. This section shall not be applicable to the 2016 Bond Trustee or the beneficial holders of the 2016 Bonds.

7.3   **Distributions After Allowance**.   As soon as practicable following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Debtors shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan, without any interest to be paid on account of such Claim.

7.4   **Estimation of Claims**.   The Debtors (before the Effective Date) or the Reorganized Debtors (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in

the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**SECTION 8.**
**SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS**

8.1     **Compromise and Settlement of Claims, Interests and Controversies.** Pursuant to section 1123 of the Bankruptcy Code and Federal Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estate, and holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of this Plan, pursuant to section 363 of the Bankruptcy Code and Federal Bankruptcy Rule 9019(a), without any further notice to, action by, or order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against it and Causes of Action against other Persons. The Reorganized Debtors shall provide the Bond Trustee notice of any settlements in excess of $10,000.00.

8.2     **Releases by the Debtors.** Pursuant to section 1123(b) of the Bankruptcy Code, and except as specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, each Debtor Released Party is deemed released by the Debtors, the Estates, and the Reorganized Debtors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertible by behalf of the Debtors or the Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively), by or on behalf of the Holder of any Claim or Interest or other entity, based on or related to, or in any manner arising from, in whole or in part, the Debtors, the 2016 Bond Documents, the Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Cases, the negotiation, formulation, or preparation of the any agreement or other document formalizing the transactions contemplated by the Plan, or related agreements, instruments, or other documents (including, for the avoidance of doubt, providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that

30

constitutes actual fraud, willful misconduct, or gross negligence or any breach of the Plan Support Agreement by a Released Party (collectively, the "**Debtor Released Claims**").

8.3 **Limited Releases by Holders of Claims. As of the Effective Date and except as set forth in the Plan (including but not limited to all obligations of the Debtors and Reorganized Debtors under the Plan which shall not be deemed released), each holder of a Claim or Interest (including Bondholders) shall be deemed to have conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims assertible on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the preparation, negotiation, Court approval or confirmation of the Plan, the Disclosure Statement or related agreements, documents or instruments, or the filing of any motion or document (or the failure to take action) in the Debtor's Cases (collectively, "<u>Released Claims</u>"), provided, however, the Released Claims shall not include any Claim (i) which arises out of or relates to any Executory Contract which is assumed by the Debtor through the Plan, including all Residency Agreements which are assumed by the Debtor through the Plan; (ii) which arises out of or relates to any act or omission of that party constituting willful misconduct or gross negligence; or any Claim that arises from facts and circumstances other than those which are specifically enumerated above in this section of the Plan, or (iii) which relates to the Sponsor's ownership interest or involvement in any facilities other than the Debtor. Further, nothing contained in this Plan or the Disclosure Statement, or any other document filed in connection with such documents, shall release or be deemed to release the Released Parties from any Cause of Action held by a governmental entity existing as of the Effective Date based on  any**

31

**law, rule or regulation related to the Center for Medicare Services or the Department of Health and Human Services with respect to Medicare reimbursement or recoupment of amounts paid by the Center for Medicare Services which may be subject to a recoupment claim of such agencies or entities made either before or after the Effective Date.  The releases described above and set forth above in the Plan do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement, including the 2021 Bond Documents) executed to implement the Plan, including, without limitation, any legal opinion requested or required by an entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan (inclusive of the tax opinion). For purposes of the Plan and this section of the Plan, the term "Released Party or Released Parties means each of the following: (i) the Debtors and their member or members, (ii) the Reorganized Debtors and their member or members, (iii) each member of a Consenting Holder in any capacity, (iv) the Issuer, (v) the 2016 Bond Trustee in any capacity, (vi) the 2016 Master Trustee in any capacity, (vii) the 2021 Bond Trustee in any capacity, (viii) the 2021 Master Trustee in any capacity, and (ix) the current and former affiliates, subsidiaries, officers, directors, members, managers, principals, employees, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, each in their respective capacities as such, of each of the parties described in clauses (i) through (ix).**

8.4      **Limitation on the Scope of the Releases In Sections 8.2 and 8.3 of the Plan.** Notwithstanding anything to the contrary, the releases set forth above in sections 8.2 and 8.3 of this Plan do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement, including the 2021 Bond Documents) executed to implement the Plan, including, without limitation, any legal opinion requested or required by an entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan (inclusive of a tax opinion).

8.5      **Exculpation**. Except as otherwise specifically provided in the Plan, each Debtor, each Reorganized Debtor, the Estates, and each Released Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any Exculpated Claim, except to the

extent such claim, obligation, Cause of Action, or liability arises from actual fraud, willful misconduct, or gross negligence or the breach of the Plan Support Agreement (notwithstanding advice of counsel), but in all respect such entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors, the Reorganized Debtors, the Estates, and the Released Parties have, and upon completing of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the restructuring of the Claims and Interests in the Cases and in connection with the transactions contemplated by the Plan, the negotiation, formulation, or preparing any agreement or other document formalizing the transactions contemplated by the Plan, or any related agreements, instruments, or other documents (including the 2021 Bond Documents and documents and instruments related thereto and any legal opinion requested by an entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) in connection with the Plan, and the solicitation and distribution of the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

8.6    **Discharge of Claims.** Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Bar Date Order, in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan (including, but not limited to, the 2016 Bond Documents), the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against liabilities of, Liens on, obligations of, and rights against the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such Claim, debt, or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim based upon such Claim, debt, or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim has accepted the Plan. Except as otherwise provided herein, any default by the Debtors with respect to any Claim that existed before or on account of the filing of the Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

8.7    **Injunction.**

**FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER, ANY SUIT, ACTION, OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION,**

**INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.**

**FROM AND AFTER THE EFFECTIVE DATE, TO THE EXTENT OF THE RELEASES AND EXCULPATION GRANTED IN THE PLAN, ALL RELEASING PARTIES SHALL BE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE RELEASED PARTIES AND THE EXCULPATED PARTIES AND THEIR ASSETS AND PROPERTIES, AS THE CASE MAY BE, ANY SUIT, ACTION, OR OTHER PROCEEDING ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST, OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE OBLIGATIONS RELATING TO THE 2021 BONDS), ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS: (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATE OF SUCH ENTITIES ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (IV) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF, IN CONNECTION WITH, OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, SETTLED, OR DISCHARGED PURSUANT TO THE PLAN.**

**THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS AND INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTORS OR ANY OF THEIR ASSETS, PROPERTY, OR ESTATES. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND THE INTERESTS SHALL BE CANCELLED (EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN).**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN (INCLUDING, BUT NOT LIMITED TO, THE OBLIGATIONS RELATING TO THE 2021 BONDS) FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTORS SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS, APART FROM THE INTERESTS OF THE SPONSOR IN THE DEBTORS, SHALL BE CANCELLED, AND THE DEBTORS' LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(g) OF THE BANKRUPTCY CODE.**

**ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTORS, THE DEBTORS' ESTATES, THE REORGANIZED DEBTORS, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.**

8.8     **Term of Injunctions or Stays.**  Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. Upon the Effective Date, all injunctions or stays contained in the Plan or the Confirmation Order shall be in full force and effect in accordance with their terms.

8.9     **Protection Against Discriminatory Treatment.**  Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including governmental units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Reorganized Debtors or another Entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been a debtors under Chapter 11, have been insolvent before the commencement of the Cases (or during the Cases but before such Debtors is granted or denied a discharge), or have not paid a debt that is dischargeable in the Cases.

8.10    **Release of Liens.  Except as otherwise provided in the Plan, the 2021 Bond Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. For the avoidance of doubt, except as otherwise provided in the Plan (including the Plan Supplement, inclusive of the 2021 Bond**

Documents), all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged on the Effective Date without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code.

### SECTION 9.
### CONDITIONS PRECEDENT TO THE EFFECTVE DATE

9.1    **Conditions Precedent to the Effective Date.** It shall be a condition precedent to the Effective Date that each of the following provisions, terms, and conditions shall have been satisfied or waived pursuant to the provisions of this Plan.

a.    The Bankruptcy Court shall have entered the Confirmation Order containing findings of fact and conclusions of law satisfactory to the Debtors and the 2016 Bond Trustee, which Confirmation Order shall not be subject to any stay and shall be a Final Order, and which Confirmation Order shall include or provide, among other things:

(i)  a finding by the Bankruptcy Court that the 2021 Bonds to be issued on the Effective Date will be authorized and exempt from taxation under the applicable securities law, pursuant to section 1145 of the Bankruptcy Code;

(ii)  all provisions, terms and conditions of the Plan and related documents are approved; and

b.    all Executory Contracts or Unexpired Leases assumed by the Debtors during the Cases including under the Plan shall remain in full force and effect for the benefit of the Reorganized Debtors or their assignee(s) notwithstanding any provision in such contract or lease (including those described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits such assignment or transfer or that enables, permits, or requires termination of such contract or lease;

c.    The Bankruptcy Court shall have entered a Final Order approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code;

d.    The Issuer shall have approved the issuance the 2021 Bonds;

e.    The 2021 Bonds shall have been issued by the Issuer;

f.    In connection with issuance of the 2021 Bonds, the 2021 Bond Trustee shall have received a satisfactory opinion of bond counsel that the interest on the 2021 Bonds will be excluded from gross income for federal tax purposes;

g.    The Trigger Date (as defined in the Entrance Fee Escrow Agreement) shall have occurred;

h.      The Plan and all Plan Supplement documents, including any amendments, modifications, or supplements thereto, shall be in form and substance acceptable to the 2016 Bond Trustee;

i.      All payments and transfers to be made on the Effective Date shall be made or duly provided for, and the Debtors or the Sponsor as applicable shall have sufficient Cash on such date to make such payments;

j.      All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained;

k.      All other actions, documents and agreements necessary to implement the Plan shall be in form and substance acceptable to the 2016 Bond Trustee and shall have been effected or executed; and

l.      The Effective Date shall be on or before the date that is 109 days following the Petition Date.

9.2    **Waiver of Conditions.**  The conditions to the Effective Date set forth in the Plan may be waived at any time by the Debtors (except for: (i) the Confirmation Order being satisfactory to the 2016 Bond Trustee, (ii) the issuance of the 2021 Bonds, (iii) the bond counsel opinion referred to in Section VII(J)(1)(f) above, (iv) the condition that the aforementioned documents and orders be reasonably acceptable to the 2016 Bond Trustee, and (v) the Effective Date shall be on or before the date that is 109 days following the Petition Date; provided, however, that the Debtors may not waive entry of an order or orders approving the Disclosure Statement and confirming the Plan.

9.3    <u>**Effect of Failure of Conditions**</u>.  If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any claims by or Claims against the Debtors; (ii) prejudice in any manner the rights of the Debtors, any holders of Claims, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders, or any other Entity in any respect.

## SECTION 10.
## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

10.1    **Modification and Amendments.**  Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan as to material terms and seek confirmation consistent with the Bankruptcy Code and, as appropriate, not re-solicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their right to alter, amend, or modify materially the Plan one or more times, after confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan or remedy any defect or omission, or reconcile any

inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan, provided, however, that, except with the prior written consent of each of the 2016 Bond Trustee and the Consenting Holders, the Debtors may not alter, amend, or modify the Plan in any manner that: (i) alters or affects the rights or interests of the 2016 Bond Trustee or the holders of the 2016 Bonds, (ii) alters or affects the treatment of the 2016A/B Bond Claims or the 2016C Bond Claims under the Plan, (iii) alters or affects the terms or characteristics of the 2021 Bonds as set forth in the Plan prior to such alteration, amendment, or modification, or (iv) is inconsistent with the terms of the Plan Support Agreement. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with the Plan. For the avoidance of doubt, nothing in this Section shall be deemed to supplant or supersede the requirements of Bankruptcy Rule 3019.

10.2    **Effect of Confirmation on Modifications**.  Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

10.3    **Revocation or Withdrawal of the Plan**.  The Debtors reserve the right to, consistent with their fiduciary duties, revoke or withdraw the Plan before the Effective Date. If the Debtors revoke or withdraws the Plan, or if confirmation does not occur, then: (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of any Executory Contract or Unexpired Lease effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (iii) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Debtors or any other Entity.

## SECTION 11.
## RETENTION OF JURISDICTION

11.1    **Retention of Jurisdiction**.  Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Cases and all matters arising out of or related to the Cases and this Plan, including jurisdiction to:

a.  allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

b.  decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

c.  resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtors are parties or with respect to which the Debtors may be liable in any manner and to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including rejection Claims, cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease, (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, (iii) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, any Executory Contracts or Unexpired Leases on the list of Executory Contracts and Unexpired Leases to be assumed or rejected, and (iv) any dispute regarding whether a contract or lease is or was executory or unexpired;

d.  ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e.  adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

f.  adjudicate, decide, or resolve any and all matters related to any Cause of Action;

g.  adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

h.  enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

i.  resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551, and 553 of the Bankruptcy Code;

j.  resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the consummation of the Plan or any Entities' obligations incurred in connection with the Plan (exclusive of the obligations arising under the 2021 Bonds);

k.  issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan;

l.  resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

m.  enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

39

n.  adjudicate any and all disputes arising from or relating to distributions under the Plan;

o.  consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

p.  determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

q.  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan (exclusive of those documents relating to the 2021 Bonds);

r.  hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

s.  hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

t.  enforce all orders previously entered by the Bankruptcy Court;

u.  hear any other matter not inconsistent with the Bankruptcy Code; and

v.  enter an order concluding or closing the Cases.

## SECTION 12.
## MISCELLANEOUS PROVISIONS

12.1  **Immediate Binding Effect.**  Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such holders of Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, exculpation, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

12.2  **Additional Documents**.  On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, subject to the consent of the 2016 Bond Trustee. The Debtors or the Reorganized Debtors, as applicable, and all holders of

Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

12.3    **Reservation of Rights**.  Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Plan, any statement or provision contained in the Plan, or any action taken or not taken by the Debtors or other Entity with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or other Entity with respect to the holders of Claims or Interests before the Effective Date.

12.4    **Successors and Assigns**.  The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of such Entity.

12.5    **Votes Solicited in Good Faith**.  Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan, and, therefore, will have no liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the 2016 Bonds offered under the Plan.

12.6    **Closing of Cases**.  The Debtors or the Reorganized Debtors shall, promptly after the full administration of the Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Cases.

12.7    **Notices.**  All notices, demands, requests, consents, approvals, and other communications ("Notice" or "Notices") hereunder shall be in writing and delivered by (i) courier or messenger service, (ii) express or overnight mail, (iii) electronic mail (with a contemporaneous telephone message at the phone number(s) listed below), or (iv) by registered or certified mail, return receipt requested and postage prepaid, addressed to the respective parties as follows:

If to Borrowers:

Timothy Place, NFP.
18601 North Creek Drive, Suite A
Tinley Park, Illinois  60477
Attention: Chief Executive Officer
Telephone: (708) 342-8100
Telecopier: (708) 342-8000

Copy to:

      Dopkelaw LLC
      Attn: Bruce Dopke, Esq.
      1535 W. Schaumburg Road
      Suite 204
      Schaumburg, IL  60194
      Telephone: 847-524-4811
      e-mail: bd@dopkelaw.com

If to Trustee:

      UMB Bank, N.A.,
      Attn:  Virginia A. Housum, Senior Vice President
      120 South 6th Street, Suite 1400
      Minneapolis, MN  55403
      Telephone: 612-308-9775
      e-mail: Virginia.Housum@umb.com


Copy to:

      Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
      Attn:   Daniel S. Bleck, Esq. and Charles W. Azano, Esq.
      One Financial Center
      Boston, MA 02111
      Telephone:  617-542-6000
      e-mail:  dsbleck@mintz.com
      kjwalsh@mintz.com

or to such other addresses as any Party may hereafter designate.  Notice by courier or messenger service or by express or overnight mail shall be effective upon receipt.  Notice by electronic mail shall be effective upon delivery by the sender of a confirming telephone message.  Notice by mail shall be complete at the time of deposit in the United States mail system, but any right or duty to do any act or make any response within any prescribed period or on a date certain after the service of such Notice given by mail shall be, without further action by any Party, automatically extended three (3) days.

      12.8   **Headings.** The headings used in this Plan are inserted for convenience only and neither constitute a portion of this Plan nor in any manner affect the construction of the provisions of this Plan.

      12.9   **Severability.** If, prior to confirmation, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision, and such term or

provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

12.10   **Validity and Enforceability.** The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms. Should any provision in this Plan be determined by the Bankruptcy Court or any appellate court to be unenforceable following the Effective Date, such determination shall in no way limit the enforceability and operative effect of any and all other provisions of this Plan.

12.11   **Plan Supplement.** Any exhibits or schedules not filed with this Plan may be contained in the Plan Supplement, if any, and the Debtors hereby reserve the right to file such a Plan Supplement.

12.12   **Governing Law.** Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Illinois, without giving effect to the principles of conflicts of laws, shall govern the rights, obligations, construction, and implementation of this Plan and the restructuring transactions consummated or to be consummated in connection therewith.

12.13   **Request for Confirmation Pursuant to Sections 1129(a) and 1129(b) of the Bankruptcy Code.** The Debtors request entry of a Confirmation Order under Bankruptcy Code section 1129(a) and, to the extent necessary, Bankruptcy Code section 1129(b).

Dated:  December 15, 2020                    Respectfully Submitted,

_____
Barry VanderGenugten, Chief Financial Officer
Timothy Place, NFP d/b/a Park Place of Elmhurst

Dated:  December 15, 2020                    Respectfully Submitted,

_____
Barry VanderGenugten, Chief Financial Officer
Christian Healthcare Foundation, NFP.

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "<u>Plan Support Agreement</u>") is made and entered into as of May 14, 2020 (the "<u>Effective Date</u>") by and between Timothy Place, NFP (the "<u>Corporation</u>"), Christian Healthcare Foundation NFP (the "<u>Foundation</u>" and together with the Corporation, the "<u>Borrowers</u>") and each of the undersigned holders of Bonds (as defined herein) (the "<u>Consenting Holders</u>", and together with the Borrowers, each a "<u>Party</u>" and collectively the "<u>Parties</u>").

## RECITALS

A.     The Illinois Finance Authority (the "<u>Authority</u>") issued its: (i) $103,691,500 Revenue Bonds (Park Place of Elmhurst Project) Series 2016A (the "<u>Series A Bonds</u>"), (ii) $15,496,392 Revenue Bonds (Park Place of Elmhurst Project) Series 2016B (the "<u>Series B Bonds</u>"), and (iii) $21,918,750 Revenue Bonds (Park Place of Elmhurst Project) Series 2016C (the "<u>Series C Bonds</u>" and together with the Series A Bonds and Series B Bonds, the "<u>Series 2016 Bonds</u>") in exchange (the "<u>2016 Exchange</u>") for bonds the Authority previously issued in 2010: (A) $109,115,000 Revenue Bonds, Series 2010A (Park Place of Elmhurst Project); (B) $7,875,000 Revenue Bonds, Series 2010B (Park Place of Elmhurst Project); (C) $5,000,000 Revenue Bonds, Series 2010C (Park Place of Elmhurst Project) (Accelerated Redemption Reset Option Securities (ARROS); (D) $10,275,000 Revenue Bonds, Series 2010D-1 (Park Place of Elmhurst Project) (Tax-Exempt Mandatory Paydown Securities (TEMPS-75); and (E) $15,350,000 Revenue Bonds, Series 2010D-2 (Park Place of Elmhurst Project) (Tax-Exempt Mandatory Paydown Securities (TEMPS-65) (all such bonds issued in 2010, the "<u>Original Bonds</u>").

B.     The Original Bonds were issued primarily to (i) pay or reimburse the Corporation for the payment of all or a portion of the costs of acquiring, constructing, renovating, remodeling and equipping certain heath facilities owned by the Borrowers, and all necessary and attendant facilities, equipment, site work, zoning, entitlements and utilities related thereto, including, but not limited to, the acquisition, construction and equipping of a continuing care retirement community consisting of approximately 173 independent living units, 10 catered living units, 46 assisted living units, 20 memory support assisted living units and 37 nursing beds, related common areas and parking, all known as Park Place Christian Community of Elmhurst ("<u>Park Place</u>"); (ii) provide working capital; (iii) fund debt service reserve funds; (iv) pay a portion of the interest on the Original Bonds; and (v) pay certain expenses incurred in connection with the issuance of the Original Bonds.

C.     On January 17, 2016, the Borrowers filed voluntary bankruptcy petitions under Chapter 11 of Title 11 of the United States Code.  Such filings commenced a bankruptcy case in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, styled "In re TIMOTHY PLACE, NFP, *et als.*, Case No. 16-01336 (JPC)."  Pursuant to such petitions and the plan of reorganization confirmed by the bankruptcy court in this bankruptcy proceeding, the 2016 Exchange was approved and effectuated.

D.      UMB Bank, N.A., is the trustee (the "Bond Trustee") under that certain Bond Trust Indenture, dated as of May 1, 2016, by and between the Bond Trustee and the Authority (the "2016 Indenture"), pursuant to which the Series 2016 Bonds were issued.

E.      Pursuant to a Loan Agreement dated as of May 1, 2016 between Authority and the Borrowers, the Authority loaned the proceeds of the 2016 Bonds to the Borrowers. The rights of the Authority under the Loan Agreement were assigned to the Bond Trustee under the terms of the 2016 Indenture.

F.      As security for the obligations owing on the Series 2016 Bonds, the Corporation granted the Bond Trustee, inter alia: (i) a first mortgage lien on the real property on which Park Place was constructed, and (ii) a first priority security interest in the personal property and fixtures located in Park Place (collectively, the "Mortgaged Property"), pursuant to a Mortgage and Security Agreement, dated as of May 1, 2016, between the Corporation and the Bond Trustee.  Pursuant to a Master Trustee Indenture, dated as of May 1, 2016, among the Borrowers and the Bond Trustee, as Master Trustee thereunder (the "Master Trust Indenture"), the Borrowers granted a security interest in its Gross Revenues (as defined in the Master Trust Indenture) as security for the payment of the Series 2016 Bonds.  The Authority also granted the Bond Trustee certain collateral under the 2016 Indenture. The 2016 Indenture, the Mortgage, the Loan Agreement and any other document or agreement delivered as security for, or in respect to, the Series 2016 Bonds or the Borrowers' obligations under any of such documents are collectively referred to herein as the "Bond Documents." In addition, repayment of the Series 2016 Bonds is secured by moneys deposited to the credit of the accounts in the related respective Debt Service Reserve Funds, established under the Bond Documents.

G.      Each Consenting Holder holds debt arising out of, or related to, the Series 2016 Bonds and the Consenting Holders hold debt, in aggregate, arising out of or related to the Series 2016 Bonds equal to at least ninety-three and 79/100 (93.79%) of the principal amount of the Series 2016 Bonds outstanding, comprised of: (i) ninety-seven and 31/100 percent (97.31%) of the Series 2016A Bonds, (ii) ninety-five and 98/100 percent (95.98%) of the Series 2016B Bonds, and (iii) seventy-four and 57/100 percent (74.57%) of the Series 2016C Bonds.

H.      Defaults, potential defaults or events of default have occurred (or will occur) under the Bond Documents.

I.      The Borrowers desire to implement a restructuring (the "Restructuring") of its financial obligations with respect to the Series 2016 Bonds on the terms and conditions set forth in the restructuring term sheet (including all exhibits therein, the "Term Sheet") attached hereto as **Exhibit 1**.

J.      The Consenting Holders have agreed to the Restructuring, solely on the terms and conditions outlined in the Term Sheet.

K.      Each of the Borrowers intend to implement the Restructuring by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the

"Bankruptcy Code") commencing cases (the "Chapter 11 Cases"), which Chapter 11 Cases the Borrowers will seek to have jointly administered, in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court") no later than September 15, 2020 (the "Outside Petition Date").

L.     Each Party has reviewed, or has had the opportunity to review, this Plan Support Agreement and the Term Sheet with the assistance of professional legal advisors of its own choosing.

## STATEMENT OF AGREEMENT

In consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.     Preliminary Statements.   The statements set forth in the recitals are incorporated herein and form an integrated part of this Plan Support Agreement, subject to such modifications and amendments as may be permitted pursuant to Section 11 hereof.

2.     Effectiveness of Plan Support Agreement. Upon the execution of this Plan Support Agreement by the Parties, this Plan Support Agreement will constitute the legally binding and enforceable agreement of the Parties, effective as of the Effective Date.

3.     Agreements of the Borrowers.   Consistent with the Borrowers' business judgment and the exercise of their fiduciary duties, the following are material covenants and conditions to the agreements contained herein:

(a)     The Borrowers shall take all reasonable efforts to provide drafts of the following documents (collectively, the "Bankruptcy Documents") in form and substance reasonably satisfactory to the Consenting Holders and the Bond Trustee no later than five (5) business days prior to the Outside Petition Date:

i)     Chapter 11 Petitions with required documents, including: (i) board resolutions, (ii) disclosure of related cases, (iii) top 20 unsecured creditors list, (iv) declaration verifying top 20 unsecured creditors list, (v) list of creditors, (vi) declaration verifying list of creditors, (vii) statement regarding equity security holders and corporate disclosure statement, (viii) declaration verifying statement regarding equity security holders and corporate disclosure statement;

ii)     Declaration in Support of First Day Pleadings;

iii)     Motion to Jointly Administer the Chapter 11 Cases;

iv)     Motion to Approve Disclosure Statement and proposed Order;

v)  Joint Plan of Reorganization;

vi)  Disclosure Statement with respect to the Joint Plan of Reorganization;

vii)  Motion Authorizing Use of Cash Collateral and proposed Interim Order;

viii)  Motion to Assume Plan Support Agreement and proposed Order;

ix)  Motion to Self-Report in Lieu of an Ombudsman and proposed Order;

x)  Motion to Escrow Entrance Fees and Honor Resident Entrance Fees in the Ordinary Course and proposed Order;

xi)  Motion to Utilize Existing Cash Management System and proposed Order;

xii)  Motion Prohibiting Utilities From Discontinuing Service and proposed Order;

xiii)  Motion to Protect Confidentiality of Residents' Information and proposed Order;

xiv)  Motion to Retain General Docketing and Claims Noticing and Solicitation Agent and Proposed Order;

xv)  Motion to Retain Bondholder Notice and Solicitation Agent and proposed Order;

xvi)  Motion to Establish Bar Date and proposed Order; and

xvii)  Motion Extending Time to File Schedules and Statements and proposed Order, if needed.

(b)  The Borrowers shall take all commercially reasonable steps to obtain approvals for the Restructuring as expeditiously as is reasonably practicable under applicable law, including the solicitation of requisite acceptances by means of the Disclosure Statement.

(c)  The Borrowers shall take all commercially reasonable steps to obtain any and all requisite regulatory or third party approvals necessary to consummate the Restructuring as is reasonably practicable.

(d)  The Borrowers will take all commercially reasonable efforts to file the Chapter 11 Cases, contemporaneously with the Bankruptcy Documents, no later

than the Outside Petition Date (the date on which the Chapter 11 Cases and Bankruptcy Documents are actually filed shall be referred to herein as the "Petition Date").

(e)     The Borrowers shall take all reasonably necessary steps in seeking to obtain from the Bankruptcy Court an order confirming the Plan  (as defined herein) reasonably acceptable in form and substance to the Consenting Holders and the Bond Trustee (the "Confirmation Order") on or before the date that is 95 days after the Petition Date.

(f)     The Plan effective date occurs on or before the date that is 109 days after the Petition Date (the "Effective Date").

(g)     The Borrowers shall take no action inconsistent with the Restructuring, the transactions contemplated thereby, or the expeditious confirmation and consummation of such transactions, except as otherwise permitted under this Plan Support Agreement.

(h)     Subject to the exercise of their fiduciary duties, the Borrowers shall not file a petition under the Bankruptcy Code or seek any similar relief without providing the Bond Trustee and the Consenting Holders at least five (5) business days' written notice thereof.

(i)     In the event the Borrowers propose a plan of reorganization that does not comply with this Plan Support Agreement or that constitutes a Support Agreement Termination Event, the Borrowers will not assert that the Consenting Holders or the Bond Trustee have expressly or impliedly supported, endorsed, or otherwise agreed to any financial information, including any projections or liquidation analysis, included in the Bankruptcy Documents.

(j)     The Borrowers will not:

i)     incur any further indebtedness with priority over the Bonds;

ii)     transfer any assets other than in the ordinary course of its business other than miscellaneous assets not necessary for the operations of Park Place; and

iii)     take any action that would result in entry of an order terminating, whether in whole or in part, the Borrowers' exclusive right to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code.

4.     Agreements of Consenting Holders.

(a)     Ownership. Each Consenting Holder represents and warrants that, as of the date hereof, such Consenting Holder either (i) is the sole legal or beneficial

owner of a principal amount of the Series 2016 Bonds outstanding as set forth on
**Schedule 1** hereto, and all related claims, rights, powers, and causes of action
arising out of or in connection with or otherwise relating to such Series 2016 Bonds
or the Bond Documents (collectively, the "Claims"), or (ii) has the power and
authority to bind the legal and beneficial owner(s) of such Series 2016 Bonds and
Claims to the terms of this Plan Support Agreement and, in either case, such
Consenting Holder has full power and authority to vote on and consent to such
matters concerning such Series 2016 Bonds outstanding and such Claims and to
exchange, assign and transfer such Series 2016 Bonds and Claims.

(b)     Restrictions on Transfers. Until this Plan Support Agreement has
been terminated in accordance with Section 8, each Consenting Holder shall not
voluntarily sell, transfer, or assign any of its Series 2016 Bonds or Claims or any
option thereon or any right or interest (voting or otherwise) therein unless the
transferee thereof (i) has already executed this Plan Support Agreement or (ii)
agrees in writing by executing the form of Joinder attached hereto as **Exhibit 2** to
be bound, for the benefit of the Parties, by all of the terms of this Plan Support
Agreement.  Subject to applicable securities and bankruptcy law, this Plan Support
Agreement shall in no way be construed to preclude any Consenting Holder or any
of its respective subsidiaries or affiliates from acquiring additional Series 2016
Bonds; _provided_, _however_, that any such additional Series 2016 Bonds acquired by
such Consenting Holder or any subsidiary or affiliate thereof shall automatically be
deemed to be subject to the terms of this Plan Support Agreement.

(c)     Voting on the Plan.  Subject to the terms and conditions of this Plan
Support Agreement, and so long as this Plan Support Agreement has not been
terminated, and further provided that the Disclosure Statement approved by the
Bankruptcy Court contains information substantially similar to that set forth in the
Disclosure Statement filed as part of the Bankruptcy Documents, each Consenting
Holder will vote all claims that it holds or as to which it has voting authority with
respect to the Series 2016 Bonds outstanding, the Claims, and all other claims,
rights, or interests that exist against the Borrowers to accept a plan of reorganization
proposed as part of the Chapter 11 Cases that reflects the Restructuring outlined in
the Term Sheet (such plan, the "Plan") and that is filed by the Outside Petition Date.

(d)     Support.  So long as this Plan Support Agreement has not been
terminated, absent the consent of the Borrowers, each Consenting Holder will not:

  i) support or encourage, directly or indirectly, any financial
restructuring or sale of assets concerning the Borrowers or
their assets, other than the Restructuring;

  ii) take any action inconsistent with the Term Sheet, the
transactions contemplated hereby or thereby, or the
expeditious confirmation and consummation of such
transactions;

iii)    vote against the Plan or otherwise agree, consent, or provide any support, to any other chapter 11 plan or other restructuring or sale or liquidation of assets concerning the Borrowers or their assets, other than the Restructuring;

iv)    object to or otherwise commence any proceeding to oppose or alter the Plan or any of the terms of the Restructuring (or any other document filed in furtherance of, and that is consistent with the Restructuring);

v)    make (and will not direct the Bond Trustee to make) any election under Section 1111(b) of the Bankruptcy Code, and will vote against and/or direct the Bond Trustee to object to any action or motion to make such an election; or

vi)    direct the Bond Trustee to take any action or otherwise act in a manner contrary to the terms of this Plan Support Agreement.

(e)    Adequate Information; Compliance with Section 1125(g) of the Bankruptcy Code.  Each Consenting Holder has obtained "adequate information" (within the meaning of that phrase for purposes of 11 U.S.C. Section 1125(a)(1)) regarding the Restructuring and that the Borrowers have provided all material, relevant information that the Consenting Holder has requested in advance of executing this Plan Support Agreement. Additionally, for purposes of this Plan Support Agreement, the solicitation of its support of the Plan in accordance with the terms and conditions hereof complies with applicable law and that each Consenting Holder was solicited in a manner complying with applicable law.

(f)    Appearing in the Bankruptcy Court.  Notwithstanding any provision in this Plan Support Agreement to the contrary, nothing in this Plan Support Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Bankruptcy Court so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Plan Support Agreement and the Restructuring and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring.

(g)    Direct the Bond Trustee.  To the extent necessary, each Consenting Holder will direct the Bond Trustee to take actions consistent with this Plan Support Agreement.

(h)    Documents.  The Consenting Holders shall direct the Bond Trustee to take all reasonable efforts to draft or cause to be drafted the following documents in form and substance satisfactory to the Consenting Holders no later than the Outside Petition Date:

i)    Cash Collateral Order;

ii)     2020 Bond Indenture;

iii)    2020 Second Amended and Restated Master Trust
Indenture; and

iv)     2020 Loan Agreement (collectively with the documents
listed in (i) through (iii) above, the "<u>Plan Support
Documents</u>").

5.    <u>Representations and Warranties of the Borrowers</u>. Each of the Borrowers
represent and warrant to the Consenting Holders that the following statements are true,
correct, and complete as of the date hereof:

(a)    it has all requisite corporate or similar authority to enter into this
Plan Support Agreement and, subject to any necessary Bankruptcy Court approval,
carry out the transactions contemplated hereby and perform its obligations
contemplated hereunder, and the execution and delivery of this Plan Support
Agreement and the performance of the Borrowers' obligations hereunder have been
duly authorized by all necessary corporate, limited liability, partnership, or other
similar action on its part;

(b)    the execution, delivery, and, subject to any necessary Bankruptcy
Court approval, performance by such Borrowers of this Plan Support Agreement
does not and shall not violate any provision of law, rule, or regulation applicable to
it or any of its subsidiaries or its charter or bylaws (or other similar governing
documents) or those of any of its subsidiaries;

(c)    the execution, delivery, and performance by such Borrowers of this
Plan Support Agreement does not and shall not require any registration or filing
with, consent or approval of, notice to, or other action to, with or by, any federal,
state, or governmental authority or regulatory body;

(d)    to the best of its knowledge, after reasonable diligence, the
information provided in connection with the Restructuring and this Plan Support
Agreement did not and does not contain any untrue statement of a material fact or
omit to state a material fact necessary to make the statements made therein, in light
of the circumstances under which they were made, not misleading; and

(e)    this Plan Support Agreement is, and after the Petition Date but
subject to the assumption of this Plan Support Agreement pursuant to 11 U.S.C. §
365, shall be, a legally valid and binding obligation of such Borrower, enforceable
in accordance with its terms.

6.    <u>Representations and Warranties of the Consenting Holders</u>. Each
Consenting Holder represents and warrants to the Borrowers that the following statements
are true, correct, and complete as of the date hereof:

(a)     it has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Plan Support Agreement and perform its obligations contemplated hereunder, and the execution and delivery of this Plan Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, limited liability, partnership, or other similar action on its part;

(b)     the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries;

(c)     the execution, delivery, and performance by the undersigned of and under this Plan Support Agreement does not and shall not require any registration or filing with, consent or approval of, notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body; and

(d)     this Plan Support Agreement is the legally valid and binding obligation of such Consenting Holder, enforceable in accordance with its terms.

7.     <u>Alternative Transactions</u>.  From and after execution of this Plan Support Agreement until it is terminated pursuant to Section 8 hereof, neither of the Borrowers, nor any of their respective officers, directors, employees, agents, representatives, or affiliates (including any investment banker or financial advisor retained by the Borrowers or any of the foregoing) shall, directly or indirectly, encourage, solicit, or initiate any inquiry or proposal from, or encourage, solicit, or initiate any negotiations with, or solicit or initiate any discussions with any person or entity (other than the Consenting Holders and the Bond Trustee or an affiliate, associate, representative or agent of the Consenting Holders) concerning any potential sale of the Borrowers or restructuring of the Borrowers or a transaction that is similar to, in conflict with or in substitution of the Restructuring pursuant to the terms hereof (each, an "<u>Alternative Transaction</u>"), or agree to endorse or take any other action to facilitate any Alternative Transaction, unless the Borrowers have obtained the prior written consent of the Consenting Holders holding all rights related to or otherwise having voting authority with respect to 75% of the principal amount of the Series 2016 Bonds held collectively by the Consenting Holders who are signatory hereto (the "<u>Requisite Consenting Holders</u>").

8.     <u>Termination of Support Agreement</u>. Upon the occurrence of any Support Agreement Termination Event, this Plan Support Agreement shall be deemed terminated upon written notice from the non-breaching Party to the breaching Party.  In the event of any such termination, all Parties shall be immediately relieved of any obligations hereunder.  If the Chapter 11 Cases have been filed prior to such occurrence, such notice may be provided as part of a motion for relief from the automatic stay; <u>*provided*</u> that nothing herein shall be deemed to require a motion for relief from the automatic stay to effect such termination *provided further*, in the Chapter 11 Cases, the Borrowers shall have two (2) business days to seek a Bankruptcy Court determination that no Support Agreement Termination Event has occurred.  Notwithstanding the above or anything else in this Plan

Support Agreement to the contrary, upon termination of this Plan Support Agreement, any Consenting Holder shall be entitled as of right to change or withdraw its vote in favor of the Plan and be relieved from all obligations of a Consenting Holder under this Plan Support Agreement (collectively, a "Withdrawal"), with prior written notice thereof to the Borrowers and, if applicable, compliance with Rule 3018 of the Federal Rules of Bankruptcy Procedure. The occurrence of any one or more the following shall constitute a "Support Agreement Termination Event":

> (a)    Failure by the Parties hereto to agree to the form and substance of any of the Plan Support Documents or the Bankruptcy Documents by the earlier of the Petition Date or the Outside Petition Date;

> (b)    Any of the Bankruptcy Documents is withdrawn, materially modified or amended (except in the case of a document which is an interim order, by replacement with a final order that would otherwise meet the requirements of a Bankruptcy Document, or with the consent of the Consenting Holders and/or the Bond Trustee);

> (c)    The Borrowers fail to file the Bankruptcy Documents on the Petition Date;

> (d)    The Petition Date does not occur on or before the Outside Petition Date;

> (e)    Either of the Borrowers:

>> i)    files or supports confirmation of, or fails to actively oppose confirmation of, a plan of reorganization that requests or would result in a withdrawal, modification, or amendment of the Plan, or that, as to any provision of the Plan, materially adversely affects the Consenting Holders;

>> ii)    files a motion, pleading, objection, lawsuit, or administrative or adversary proceeding (or takes any action in support of such a motion or pleading filed by another party) in the Bankruptcy Court or other court, or otherwise assists in any of the foregoing, that requests or would result in a withdrawal, modification, or amendment (including in the case of document which is an interim order, by replacement with a final order) of the Restructuring; or

>> iii)    files a motion, complaint, application, or other request seeking to disallow, subordinate, or limit in any way the Series 2016 Bonds held by the Consenting Holders, the Claims, or the liens of the Consenting Holders and/or the Bond Trustee, or seeking entry of an order by the Bankruptcy Court disallowing, subordinating, or limiting in

any way the Bonds, Claims, or liens of the Consenting Holders and/or the Bond Trustee, or asserting a claim against any Consenting Holder and/or the Bond Trustee to avoid any transfer or obligation, or seeking any other monetary or equitable relief from or against any Consenting Holder and/or the Bond Trustee, in its capacity as such.

(f)   Following the Petition Date, the Bankruptcy Court has:

i)   not entered an order authorizing the assumption of this Plan Support Agreement under Section 365 of the Bankruptcy Code within thirty (30) days of the Petition Date or such later date as is agreed to in writing by the Requisite Consenting Holders;

ii)   entered an order materially staying, reversing, vacating, materially amending or modifying the Cash Collateral Order (which for purposes hereof shall include any interim or final cash collateral order) without the prior written approval of the Bond Trustee, or fails to enter an order approving the use of Cash Collateral on an interim basis on or before the date that is 4 days after the Petition Date, and on a final basis on or before the date that is 40 days after the Petition Date on such terms as set out in the Cash Collateral Order;

iii)   not approved the Disclosure Statement on or before the date that is 40 days after the Petition Date, or by such later date as is agreed to in writing by the Requisite Consenting Holders;

iv)   not entered the Confirmation Order on or before the date that is 95 days after the Petition Date, or by such later date as is agreed to in writing by the Requisite Consenting Holders;

v)   entered an order denying confirmation of the Plan;

vi)   entered an order pursuant to Section 1104 of the Bankruptcy Code appointing a trustee or appointing an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code), including, without limitation, to operate and manage the Borrowers' business (unless the motion resulting in such order was filed or supported by the Bond Trustee), or the Borrowers file a motion, application or other pleading consenting to or acquiescing in any such appointment;

vii)    entered an order dismissing any of the Chapter 11 Cases or an order pursuant to Section 1112 of the Bankruptcy Code converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

viii)    enters an order suspending any of the Chapter 11 Cases under Section 305 of the Bankruptcy Code;

ix)    enters an order in any of the Chapter 11 Case, over the objection of the Bond Trustee, approving financing pursuant to Section 364 of the Bankruptcy Code that (i) would grant an additional security interest or a lien that is equal or senior to that of the Bond Trustee on any collateral, or (ii) would grant to any party other than the Bond Trustee a super priority administrative claim that is senior or equal to that granted to the Bond Trustee under the Cash Collateral Order; or

x)    granted relief that is inconsistent with this Plan Support Agreement or the Plan or that would result in a withdrawal, modification, or amendment of the Restructuring that is contrary to the Term Sheet and that has a material adverse effect on the Consenting Holders; *provided* that such relief has not resulted from any action or inaction by any of the Consenting Holders or the Bond Trustee.

(g)    The Effective Date of the Plan shall not have occurred by the date that is 109 days after the Petition Date or by such later date as is agreed to by the Requisite Consenting Holders;

(h)    An injunction, judgment, order, decree, ruling, or charge shall have been entered that prevents consummation of the Restructuring and that remains in effect for longer than 30 days;

(i)    There is a mutual written agreement to terminate this Plan Support Agreement by the Parties;

(j)    Failure by the Borrowers to comply with any obligations under this Plan Support Agreement, other than those set forth in this Section 8, and such failure is not cured within five (5) business days after written notice thereof has been given to the Borrowers;

(k)    Failure by the Borrowers to comply with any obligations under this Section 8; and

(l)    Failure by any of the Consenting Holders to comply with any of their obligations under this Plan Support Agreement, and such failure is not cured

within five (5) business days after written notice thereof has been given by the Borrowers to such Consenting Holder and the Bond Trustee.

A Support Agreement Termination Event may be waived in writing by the Requisite Consenting Holders and/or the Borrowers, as applicable.

9.      Effect of Termination.  Upon termination of this Plan Support Agreement, all obligations hereunder, shall terminate and shall be of no force and effect.

10.      Cooperation; Further Assurances; Acknowledgment; Definitive Documents.  The Parties shall cooperate with each other and shall coordinate their activities (to the extent practicable) in respect of all commercially reasonable actions necessary to consummate the Restructuring.  The Parties further agree to execute and deliver such other instruments and to perform such commercially reasonable acts, in addition to the matters herein specified, as may be appropriate or necessary, from time to time, to effectuate the Restructuring.

11.      Amendments. This Plan Support Agreement may not be modified, amended or supplemented except in a writing signed by the Parties.

12.      GOVERNING LAW; JURISDICTION.      THIS PLAN SUPPORT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO ANY CONFLICT OF LAWS PROVISIONS THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. BY ITS EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT, OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER, OR ARISING OUT OF OR IN CONNECTION WITH, THIS PLAN SUPPORT AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT, OR PROCEEDING, SHALL BE BROUGHT IN ANY FEDERAL OR STATE COURT IN THE STATE OF ILLINOIS HAVING JURISDICTION, AND BY EXECUTION AND DELIVERY OF THIS PLAN SUPPORT AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE EXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING; PROVIDED, THAT AFTER THE PETITION DATE THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ISSUES RELATING TO THIS PLAN SUPPORT AGREEMENT PROVIDED THAT THE BANKRUPTCY COURT SHALL FOLLOW APPLICABLE CHOICE OF LAW RULES.

13.      Specific Performance. It is understood and agreed by the Parties that the exact nature and extent of damages resulting from a breach of this Plan Support Agreement are uncertain at the time of entering into this Plan Support Agreement and that breach of this Plan Support Agreement would result in damages that would be difficult to determine

with certainty.  It is understood that money damages would not be a sufficient remedy for any breach of this Plan Support Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach.  Such remedies shall be deemed the exclusive remedies for breach of this Plan Support Agreement by any Party or its representatives.

14.    <u>Survival</u>. Notwithstanding any sale of the Series 2016 Bonds outstanding or Claims in accordance with Section 4(b) of this Plan Support Agreement, the agreements and obligations herein shall survive such sale and shall continue in full force and effect for the benefit of the Borrowers and the Consenting Holders in accordance with the terms hereof, and any purchaser of such Series 2016 Bonds and/or Claims shall be bound by and subject to the terms of this Plan Support Agreement.

15.    <u>Headings</u>. The headings of the Sections, paragraphs, and subsections of this Plan Support Agreement are inserted for convenience only, and shall not affect the interpretation hereof.

16.    <u>Successors and Assigns; Severability; Several Obligations.</u> This Plan Support Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives. The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof. The agreements, representations, and obligations of the Consenting Holders under this Plan Support Agreement are, in all respects, several and not joint.

17.    <u>No Third-Party Beneficiaries</u>. Unless expressly stated herein, this Plan Support Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third party beneficiary hereof.

18.    <u>Consideration</u>. No consideration shall be due or paid to the Consenting Holders and the Bond Trustee for agreement of the Consenting Holders to support the Restructuring and to vote in favor of the Plan in accordance with the terms and conditions of this Plan Support Agreement, other than the Borrowers' agreement to pursue the Restructuring and to file, pursue confirmation of, and implement the Plan in accordance with the terms and conditions of this Plan Support Agreement, which the Parties acknowledge is fair and sufficient consideration to support the Parties' respective agreements hereunder.

19.    <u>Prior Negotiations; Entire Agreement</u>. This Plan Support Agreement constitutes the entire agreement of the Parties related to the Restructuring, and supersedes all other prior negotiations with respect to the subject matter hereof, except that the Parties acknowledge that all Bond Documents shall continue in full force and effect.

20.    <u>Counterparts</u>. This Plan Support Agreement and any amendments, joinders (including the joinder in the form of **Exhibit 2** hereto), consents, or supplements hereto, may be executed in one or more counterparts, each of which shall be deemed an original

and all of which shall constitute one and the same agreement.  Facsimile or scanned signatures on this Plan Support Agreement shall be treated as originals for all purposes.

21.     <u>Construction</u>.  This Plan Support Agreement shall be deemed to have been negotiated and prepared at the joint request, direction, and construction of the Parties, and at arm's length and shall be interpreted without favor to any Party.

22.     <u>Time of the Essence</u>.  Time shall be of the essence with respect to each and every of the various undertakings and obligations set forth in this Plan Support Agreement.

23.     <u>Notices</u>.  All notices, demands, requests, consents, approvals, and other communications ("<u>Notice</u>" or "<u>Notices</u>") hereunder shall be in writing and delivered by (i) courier or messenger service, (ii) express or overnight mail, (iii) electronic mail (with a contemporaneous telephone message at the phone number(s) listed below), or (iv) by registered or certified mail, return receipt requested and postage prepaid, addressed to the respective parties as follows:

      A.

If to Borrowers:

      Timothy Place, NFP.
      18601 North Creek Drive, Suite A
      Tinley Park, Illinois  60477
      Attention: Chief Executive Officer
      Telephone: (708) 342-8100
      Telecopier: (708) 342-8000

Copy to:

      Stahl Cowen Crowley Addis LLC
      Attn: Bruce Dopke, Esq.
      55 West Monroe Street, Suite 1200
      Telephone: 312-377-7870
      e-mail: bdobke@stahlcowen.com

If to Trustee:

      UMB Bank, N.A.,
      Attn:  Virginia A. Housum, Senior Vice President
      120 South 6th Street, Suite 1400
      Minneapolis, MN  55403
      Telephone: 612-308-9775
      e-mail: Virginia.Housum@umb.com

Copy to:

      Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.

Attn: Daniel S. Bleck, Esq.
        Kevin J. Walsh, Esq.
One Financial Center
Boston, MA 02111
Telephone:  617-542-6000
e-mail:  dsbleck@mintz.com
            kjwalsh@mintz.com

Copy to: Consenting Bondholders
[See Schedule 1 Attached Hereto]

or to such other addresses as any Party may hereafter designate.  Notice by courier or messenger service or by express or overnight mail shall be effective upon receipt.  Notice by electronic mail shall be effective upon delivery by the sender of a confirming telephone message.  Notice by mail shall be complete at the time of deposit in the United States mail system, but any right or duty to do any act or make any response within any prescribed period or on a date certain after the service of such Notice given by mail shall be, without further action by any Party, automatically extended three (3) days.

24.    Reservation of Rights. Except as expressly provided in this Plan Support Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies, and interests, including its Claims.  Nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated, or this Plan Support Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights.  Except as required by the Bankruptcy Code to assume, perform, or disclose this Plan Support Agreement, pursuant to Rule 408 of the Federal Rule of Evidence, any applicable state rules of evidence, and any other applicable law, foreign or domestic, this Plan Support Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

25.    Nature of Consenting Holder Obligations.    The obligations of each Consenting Holder hereunder shall be several, and not joint with the obligations of any other Consenting Holder herein, and no Consenting Holder shall be responsible in any way for the performance of the obligations of any other Consenting Holder hereunder.  Nothing herein or in any other agreement or document, and no action taken by any Consenting Holder pursuant hereto or thereto, shall be deemed to constitute the Consenting Holders as a group, a partnership, an association, a joint venture or any other kind of entity, or to create a presumption that the Consenting Holders are in any way acting in concert or as a group with respect to such obligations or the transaction contemplated by this Plan Support Agreement.  Each Consenting Holder shall be entitled to protect and enforce its rights, including without limitation, the rights arising out of this Plan Support Agreement, and it shall not be necessary for any other Consenting Holder to be joined as an additional party in the proceeding for such purpose.

26.    <u>Automatic Stay</u>.    The Borrowers acknowledge that after any commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Plan Support Agreement or a Withdrawal shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code.

27.    <u>Support Agreement Not a Plan</u>. This Plan Support Agreement does not constitute a plan of reorganization or confirmation thereof under the Bankruptcy Code. The Plan will not become effective unless and until the Bankruptcy Court enters an order confirming the Plan and the Plan becomes effective in accordance with its terms.  This Plan Support Agreement is not intended to constitute a solicitation or acceptance of the Plan.

BORROWERS:

**Timothy Place, NFP**

By: _Barry Vandenberg_____

Print Name: _Barry VanderGenugten_

Title: _CFO_

**Christian Healthcare Foundation NFP**

By: _Barry Vandenberg_____

Print Name: _Barry VanderGenugten_

Title: _CFO_

CONSENTING HOLDERS:



By:_____



Its Authorized Representative
and not individually

Aggregate principal amount of Bonds held on
execution date hereof: $89,739,000

CUSIP                    Amount



Its Authorized Representative
and not individually

Aggregate principal amount of Bonds held on effective
date hereof: $24,227,000

CUSIP                    Amount



## SCHEDULE 1

"CONSENTING HOLDERS"

| Consenting Bondholder | Principal Amount of Series 2016 Bonds Owned |
|---|---|
| ██ ████████ ██████████ ███████ █████████████████ | ████████████ ████████████ ████████████ |
| ██████████████ ████████████ ████████████ ██████████████ | ████████████ █████████ █ ████ ████████████ |

# **EXHIBIT 1**

TERM SHEET

## RESTRUCTURING TERM SHEET

This Restructuring Term Sheet (this "***Term Sheet***"), dated as of May 14, 2020, sets forth certain of the principal terms and conditions of a financial restructuring (the "***Restructuring Transaction***") of the outstanding indebtedness of Timothy Place, NFP (the "***Corporation***"), and Christian Healthcare Foundation, NFP (the "***Foundation***" and together with the Corporation, the "***Borrowers***"), including, without limitation, (i) $103,691,500 Illinois Finance Authority (the "***Issuer***") Revenue Bonds (Park Place of Elmhurst Project) Series 2016A (the "***Series A Bonds***"), (ii) $15,496,392 Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2016B (the "***Series B Bonds***"), and (iii) $21,918,750 Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2016C (the "***Series C Bonds***" and together with the Series A Bonds and Series B Bonds, the "***Series 2016 Bonds***") pursuant to that certain Bond Trust Indenture (the "***Indenture***") dated as of May 1, 2016, between the Issuer and UMB Bank, n.a., as trustee (the "***Trustee***").

The Restructuring Transaction contemplates, among other things, an exchange (the "***Proposed Exchange***") of the outstanding Series 2016 Bonds in the aggregate principal amount of approximately $141,106,642, plus any accrued and unpaid interest thereon, as provided for herein, for new Series 2020 Bonds (as hereinafter defined). This Term Sheet contemplates the consummation of the Restructuring Transaction through a Plan of Reorganization (the "***Plan***") in a Chapter 11 proceeding of the Borrowers (the "***Anticipated Bankruptcy Proceeding***") pending before a court of a competent jurisdiction (the "***Bankruptcy Court***") as more fully described below.

This Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of mutually acceptable definitive documentation between the Borrowers, the Issuer and the Trustee acting at the direction of a majority of the holders of the Series 2016 Bonds (such majority holders of the Series 2016 Bonds, the "***Majority Holders***"). This Term Sheet is not and shall not be deemed to be a solicitation of votes for the acceptance of any plan of reorganization, including without limitation, the Plan, or the Proposed Exchange.

**THE TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE SERIES 2016 BONDS. THE TERM SHEET IS SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND COMPARABLE STATE STATUTES. NOTHING IN THE TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES AND DEFENSES OF THE BORROWERS, THE TRUSTEE, THE MAJORITY HOLDERS, AND ALL OTHER PARTIES.**

Capitalized terms not otherwise defined herein shall have the meanings given to them in the Indenture.

A.      **Implementation of Restructuring Transaction**

| | |
|---|---|
| **Proposed Exchange Process** | The Restructuring Transaction will be implemented through the Plan.  The Series 2020 Bonds (as described herein, the "***Series 2020 Bonds***") will be issued on the effective date of the Plan (the "***Effective Date***").  The Series 2020 Bonds will be issued pursuant to an Indenture of Trust ("***2020 Indenture***" and together with all related documents necessary for the issuance of the Series 2020 Bonds, the "***2020 Bond Documents***") between the Issuer and the Trustee.<br><br>The Borrowers will commence the Anticipated Bankruptcy Proceedings and will file the Plan and 2020 Bond Documents and a disclosure statement to the Plan (the "***Disclosure*** |

| | |
|---|---|
| | *Statement*"), that is acceptable to the Trustee and the Majority Holders, which contains the terms and conditions outlined in this Term Sheet, on the timeline set forth below.  Prior to the commencement of the Anticipated Bankruptcy Proceeding, the Borrowers shall provide copies of drafts of the Plan, Disclosure Statement and other pleadings, and documents, including the 2020 Bond Documents (collectively, the "*Solicitation Documents*") to the Trustee and the Majority Holders for their review and consent.  Any substantive amendments, modifications or supplements to the Solicitation Documents shall be reviewed by, and acceptable to, the Trustee and the Majority Holders; <u>provided</u>, <u>however</u>, that no amendment, modification, or supplement shall be materially different from the Term Sheet. |
| **Majority Bondholder Support** | Prior to the commencement of the Anticipated Bankruptcy Proceeding, and subject to the timeline set forth herein, the Majority Holders agree to take all necessary steps to enter into a binding support agreement (the "*Support Agreement*") concerning the Majority Holders' commitment to and support of the Plan and the Proposed Exchange.<br><br>The Majority Holders agree to not take any actions inconsistent with this Term Sheet, and to direct the Trustee not to take any actions inconsistent with this Term Sheet.  The Majority Holders agree to consent to the Restructuring Transaction as set forth in the Plan and the Proposed Exchange by delivering duly executed and completed consents on a timely basis pursuant to the ongoing solicitation of votes for the Proposed Exchange and shall not change such consents; <u>provided</u>, <u>however</u>, such consents shall only be binding to the extent set out in the Support Agreement.  The Majority Holders agree not to otherwise commence any proceeding to oppose the Plan and the Proposed Exchange or object to the Restructuring Transaction during the term of the Support Agreement.  All such actions by the Majority Holders are subject to the terms of the Support Agreement. |
| **Majority Holders Retention of Bonds and Claims** | The Majority Holders agree that they shall not sell, transfer, assign, or otherwise dispose of, directly or indirectly, any of the Series 2016 Bonds, or any right, claim, or interest (voting or otherwise) related to or arising from the Series 2016 Bonds, subject to the terms and conditions of the Support Agreement. |

**B.     Terms of Restructuring**

| | |
|---|---|
| **Exchange** | On the Effective Date, the holders of the Series A Bonds and Series B Bonds shall exchange the then outstanding Series A Bonds and Series B Bonds for a pro rata share of Series 2020 Bonds issued in the aggregate principal amount equal to approximately $107,269,103. |
| **Series 2020 Bonds** | The Series 2020 Bonds shall be issued as current paying bonds with an aggregate principal amount equal to 90% of the outstanding Series A Bonds and Series B Bonds.  The Series 2020 Bonds shall bear interest at the rate of 5.125% per annum and have maturities in the years and in principal amounts as set forth on Schedule 1 hereto.  The Series 2020 Bonds shall further be subject to mandatory redemption/amortization as set forth in Schedule 2 hereto. The Series 2020 Bonds shall pay interest only for the first three (3) years following the Effective Date, and then amortize over the following thirty-seven (37) years.  Interest on the Series 2020 Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Schedule 2. |

2

| | |
|---|---|
| | The Series 2020 Bonds will be secured by a first priority lien on all assets of the Corporation. The Series 2020 Bond shall mature as set forth in Schedule 2, with a final maturity approximately 40 years from the restructuring effective date (subject to bond counsel approval).<br><br>The Series 2020 Bonds will be subject to optional redemption prior to maturity commencing on the 5th year after the Effective Date, at a price equal to: in year 5, at a price of 102%, in year 6, at price of 101% and thereafter at par.<br><br>The 2020 transaction will not include any 2020 cash flow notes for the balance outstanding and is expected to consist of one series of bonds. |
| **Series C Bonds** | On the Effective Date, the Sponsor will provide sufficient cash to the Borrower to redeem 100% of the Series C Bonds for a cash payment of 3% of the accreted value of the outstanding Series C Bonds as of the closing of the Proposed Exchange. Upon payment, the Series C Bonds will be cancelled and deemed to no longer be outstanding. |
| **Liquidity Support Agreement and Sponsor Contribution** | On the Effective Date, Providence Life Services (the "***Sponsor***") will deposit $3,000,000 (the "***Liquidity Fund***") with the Trustee to be held and used in accordance with the terms of a certain Liquidity Support Agreement, by and among the Sponsor, the Borrowers and the Trustee. The Liquidity Fund shall be available to the Borrowers for payment of regular operating expenses as needed, for payment of monthly interest or principal relating to the Series 2020 Bonds.<br><br>To enhance the earnings on the Liquidity Fund, the Borrowers and Sponsor propose that the LSA include a list of permitted investments for the Liquidity Fund, which will include certain investments not customarily included in tax-exempt bond financings. For example, permitted investments are contemplated to include corporate stock and bond mutual funds.<br><br>The fund balance in the Liquidity Fund will be permitted to be counted in the calculation of Days Cash on Hand for purposes of covenant testing.<br><br>The Distribution Waterfalls will include provisions that allow the Liquidity Fund to be restored to its original balance by the Borrowers if draws are made to pay operating expenses or debt service. In addition, the LSA will include terms for the "burn-off" of the Liquidity Fund over time. ["burn-off" TBD] .<br><br>In connection with the issuance of the Series 2016 Bonds, the Sponsor received a certain promissory note ("***Sponsor Note***"), which is subordinate in security and payment to the Series 2016 Bonds. In further consideration of the Proposed Exchange, Sponsor will waive, as of the Effective Date, all amounts due under the Sponsor Note.<br><br>The Sponsor and Borrowers understand that they will be responsible for transaction costs of the Restructuring Transaction (the "***Sponsor Contribution***"). On the Effective Date, the existing Debt Service Reserve Fund ("***DSRF***") will be used pay (i) accrued and unpaid interest on the Series 2016 Bonds through but not including the Effective Date, and (ii) the costs and expenses of the Trustee and its advisors; any remaining DSRF balance immediately shall be transferred to the Debt Service Reserve Fund under the 2020 Indenture. |
| **Priority/Security** | The Series 2020 Bonds will be secured by a first priority lien on all assets of the Corporation. |

3

| Management Fees | The existing management agreement with the Sponsor shall be assumed in the Anticipated Bankruptcy Proceeding, provided that such management agreement shall provide for an annual management fee no greater than 4.25% of gross operating revenues; provided further that no more than $30,000 shall be paid each month as an operating expense ("***Base Management Fee***"), with the balance payable from Excess Cash (as described herein). |
|---|---|
| Entrance Fees | The Borrowers shall not reduce the amount of any current Entrance Fees or monthly fees or offer any new discounts to Entrance Fee pricing or create any further benefit programs which reduces current amounts by greater than five percent (5%), without consent of the holders of a majority of principal amount of the Series 2020 Bonds. |

| **Indenture Held/Debtor Held Funds** | |
|---|---|
| Operating Account | Upon the Effective Date, Borrowers shall maintain the existing Operating Account, which shall be subject to the lien of the Trustee under the 2020 Indenture pursuant to a deposit account control agreement reasonably acceptable to the Trustee. The Operating Account shall contain 45 Days Cash on Hand as an unrestricted amount as of the Effective Date (the "***Unrestricted Amount***"). |
| Entrance Fee Fund | Upon the Effective Date, the Borrowers shall maintain the existing Entrance Fee Fund under the 2020 Indenture. After the Effective Date, pursuant to the 2020 Indenture, all Entrance Fees of the Corporation shall be required to be deposited in the Entrance Fee Fund. Entrance Fees (after the required payment of any refunds) will be transferred to the Revenue Fund after any applicable rescission rights under the Residence Agreements have expired and such funds shall be available to flow through the Distribution Waterfall (as defined herein). |
| Revenue Fund | Upon the Effective Date, the Corporation shall maintain the existing Revenue Fund with the Trustee, subject to the lien of the 2020 Indenture, pursuant to which all revenues and other income of the Corporation (the "***Revenues***") shall, on and after the Effective Date, be deposited. Funds from the Revenue Fund shall be withdrawn pursuant to the Distribution Waterfall below. |
| Operating Reserve Fund | Upon the Effective Date, the Corporation shall maintain the existing Operating Reserve Fund with the Trustee, subject to the lien of the 2020 Indenture, and fund such Operating Reserve Fund with an amount such that the balance therein shall have 75 Days Cash on Hand as of the Effective Date. The amounts in the Operating Reserve Fund shall be available to the Corporation for Operating Expenses (as defined herein). |
| Capital Expenditures Fund | Upon the Effective Date, the Borrowers shall maintain the existing Capital Expenditures Fund with the Trustee, subject to the lien of the 2020 Indenture. The Capital Expenditures Fund will be funded on a monthly basis from the Revenue Fund (in such order and priority as set forth in the Distribution Waterfall) in an amount equal to one-twelfth of each fiscal year's capital expenditures budget, as set forth in the 10-year projections in the Disclosure Statement, and increased by CPI Index each year thereafter. The Capital Expenditures Fund will be available to fund the Borrower's capital expenditures and will not be included in |

| | |
|---|---|
| | calculations of Days Cash on Hand. Any balance in the Capital Expenditures Fund at the end of a fiscal year will remain in said fund; provided that the balance of the amount on deposit in the Capital Expenditures Fund will at no time exceed $3,000,000. In the event amounts in the Operating Account and Operating Reserve Fund are insufficient to fund operating expenses, the amounts in the Capital Expenditure Fund may be applied to such purpose. |
| **Bond Fund** | Upon the Effective Date, the Borrowers shall maintain the existing Bond Fund with the Trustee, subject to the lien of the 2020 Indenture. In accordance with the Distribution Waterfall below, the Bond Fund will receive (i) the monthly payments of principal and interest due and payable under the Series 2020 Bonds. |
| **Debt Service Reserve Fund** | Upon the Effective Date, the Borrowers shall maintain the existing Debt Service Reserve Fund with the Trustee, subject to the lien of the 2020 Indenture. Upon the Effective Date, amounts in the Debt Service Reserve Fund shall be applied in the following order of priority: (i) to pay accrued and unpaid interest on the Series 2016 Bonds through but not including the Effective Date, then (ii) fees and expenses of the Trustee and its advisors (to the extent not covered by the Sponsor Contribution), and (iii) the remaining balance shall be transferred to the Debt Service Reserve Fund under the 2020 Indenture. The Debt Service Reserve Fund shall not become an asset of the Borrowers, but shall remain funds held by the Trustee for the benefit of the holders of the Series 2020 Bonds. The Debt Service Reserve Fund Requirement shall equal the Maximum Annual Debt Service (for purposes of calculating Maximum Annual Debt Service for the Debt Service Reserve Fund Requirement, the anticipated final payment in year 40 of the bond debt service shall not be included in such calculation). Any draw on the Debt Service Reserve Fund shall be an event of default under the Series 2020 Indenture. |
| **Distribution Waterfall** | Upon the Effective Date, all Entrance Fees shall be deposited with the Trustee in the Entrance Fee Fund. Such amounts, together with the balances of the Operating Account, the Operating Reserve Fund, as of the Effective Date and any Revenues available to the Borrowers at such time, including the Sponsor Contribution, shall be applied in the following order of priority: |

Distribution Waterfall cell continued:

1. to pay any Refunds;
2. to pay all professional fees and expenses incurred in connection with the Restructuring Transaction (including, without limitation, any costs associated with obtaining opinions from bond counsel);
3. to fund the Debt Service Reserve Fund up to the shortfall, if any, to the initial Debt Service Reserve Fund requirement;
4. to fund the Operating Account in an amount equal to 45 Days Cash on Hand (approximately $2.250 million);
5. to fund the Operating Reserve Fund in an amount equal to 75 Days Cash on Hand (approximately $3.750 million); and

Thereafter, all post-Effective Date Entrance Fees and other Revenues of the Borrowers shall be deposited in the Entrance Fee Fund or the Revenue Fund, as applicable, on a weekly basis.

Subject to the next sentence, amounts on deposit in the Revenue Fund shall be made available to the Corporation on a monthly basis to satisfy ongoing operations and management costs and expenses of the Corporation, including, without limitation, the Base Management Fee, and replenishment of any Unrestricted Amount (collectively, the "**Operating Expenses**"). If an Event of Default (as defined in the 2020 Indenture) shall occur, then the monthly amounts on deposit in the Revenue Fund available for withdrawal to satisfy Operating Expenses shall

be made available to the Corporation in an amount not to exceed the amounts set forth in an operating budget established pursuant to the terms of the 2020 Indenture.

On the first Business Day of each calendar month, monies in the Revenue Fund shall be distributed in the following order of priority (the "***Distribution Waterfall***"):

- First, to the Operating Account the amount necessary to pay anticipated Operating Expenses for the upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month), as such amount is set forth in a certificate from the Borrower delivered to the Trustee no later than 10 Business Days prior to the first Business Day of a month;

- Second, to replenish any deficiency as of the Effective Date in the Debt Service Reserve Fund necessary to make the amount therein equal the Debt Service Reserve Fund Requirement;

- Third, to the Bond Fund, in an amount equal to $1/6^{th}$ of the interest due on the next interest payment date;

- Fourth, to the Bond Fund, in an amount equal to $1/12^{th}$ of the principal due on the next principal payment date;

- Fifth, to the Capital Expenditure Fund, in an amount equal to $1/12^{th}$ of such Fiscal Year's capital budget;

- Sixth, to replenish the balance of the Operating Reserve Fund and the Operating Account to a combined total of 135 Days Cash on Hand;

- Seventh, to replenish the balance of the Liquidity Fund for any draws made in order to restore the balance of the Liquidity Fund to $3 million; and

- Eighth, any remaining amounts after application of paragraphs first to seventh above (such remaining amounts referred to as "***Excess Cash***") shall be transferred to the Operating Reserve Fund.

## Operating/Financial Covenants

**Days Cash on Hand Covenant**

The Corporation shall provide reporting of Days Cash on Hand semiannually commencing six (6) months after the Effective Date (each such date being a "***Testing Date***").   In addition, the Corporation covenants to maintain not less than the amounts shown below on each Testing Date:

First Testing Date: 100
Second Testing Date: 100
Third Testing Date: 110
Fourth Testing Date: 110
Fifth Testing Date and thereafter: 120

Note: Projections will be updated with the Restructured Bonds so that projected ratios can be compared with covenant levels. The levels above may need further refinement if surplus cushion exists.

| | |
|---|---|
| **Debt Service Coverage Ratio Covenant** | Commencing the fiscal year ending December 31, 2020 (the "***Initial Testing Date***"), the Corporation shall achieve a DSCR of not less than 1.10x. The ratio shall be tested quarterly on a rolling four quarter basis, commencing on the Initial Testing Date.  The required DSCR will increase to 1.15x for the Testing Dates that occur on December 31, 2021 and thereafter.<br><br>The numerator of the DSCR will include net Entrance Fees (i.e., Entrance Fees, [but not Initial Entrance Fees], received during such period minus Entrance Fees refunded during such period) and the denominator will be Maximum Annual Debt Service on the Series 2020 Bonds.<br><br>If the Debt Service Coverage Ratio on a testing date is below 1.10x for the Initial Testing Date or below 1.15x for the Testing Dates that occur on December 31, 2021 and thereafter, but above 1.0x, and the Days Cash on Hand Ratio is equal to or above 150 for the same time period, then the Borrowers can avoid an Event of Default. However, an Event of Default will be triggered if the Debt Service Coverage Ratio is below 1.0x.<br><br>To the extent the Liquidity Fund is drawn upon for any reason, such amounts will be taken into account in calculating the numerator to the Debt Service Coverage Ratio.<br><br>Any additional indebtedness for Phase II will not be counted for purpose of the DSCR until the earlier of (i) stabilization (90% occupancy of the Phase II independent living units) or (ii) the forty ninth (49th) month following issuance of the Phase II indebtedness. |
| **Additional Indebtedness (parity with Series 2020 Bonds)** | The Borrowers shall not be permitted to issue any additional indebtedness that would be *pari passu* in priority of payment and security with the Series 2020 Bonds except for (i) Capitalized Leases not to exceed $1,000,000 in the aggregate; (ii) refunding indebtedness which demonstrates annual debt service savings, pursuant to the terms and conditions acceptable to the majority in principal amount of Series 2020 Bondholders and simultaneously with the refunding of any Series 2020 Bonds, with the applicable discounts; and (iii) indebtedness relating to the financing of additional construction of independent living units not to exceed 70 units ("***Phase II***"), provided that prior to the incurrence of such indebtedness (A) there is a guaranteed maximum price or stipulated contract for construction; (B) no default has occurred under the Bond Documents; (C) certification from the Corporation that (w) at least 92% of the independent living units in the existing Facility are occupied and (x) at least 70% of the independent living units in Phase II have been reserved with deposits equal to 10% of the Entrance Fees; (D) the Days Cash on Hand and DSCR covenants have all been met as of the most recent testing date; and (E) a Consultant forecast shows that the DSCR from and after the third fiscal year following completion of Phase II will be at least 1.25 and the Days Cash on Hand at the end of the first Fiscal Year in which the average occupancy of such Independent Living Units is forecasted to reach eighty-five percent (85%) will be at least 200, upon closing of such additional indebtedness.<br><br>Additional Indebtedness related to Phase II shall only be permitted if no more than 70% of such Additional Indebtedness is fixed rate long term indebtedness or as otherwise agreed to by a majority of bondholders and may have priority rights in a waterfall to entrance fees from Phase II.<br><br>No additional indebtedness shall be secured on a senior basis to the Series 2020 Bonds. |

| | |
|---|---|
| | No additional subordinate indebtedness or non-recourse indebtedness may be incurred until the Series 2020 Bonds are paid in full. |
| **IL Occupancy Covenants** | Commencing with the first fiscal quarter following the Effective Date, the Corporation shall maintain an occupancy level of no less than 85% for the independent living units (the "*IL Occupancy Covenant*"). |
| **Assisted Living and Nursing Center Occupancy Covenants** | Commencing with the first fiscal quarter following the Effective Date, the Corporation shall maintain (i) an 82% occupancy level for Assisted Living ("*AL*") units and (ii) an 82% occupancy level for Nursing Center ("*NC*") units, which shall be measured as the average occupancy of the AL and NC units, as applicable, on a rolling four quarter basis (the "*AL/NC Occupancy Covenant*"). |
| **Failure to meet covenants** | (i)   If the Corporation fails to meet the Days Cash on Hand Covenant, the AL/NC Occupancy Covenant, or the DSCR Covenant as of any testing date, then upon the first occurrence of such non-compliance, the Borrowers shall be required to retain a management consultant acceptable (which approval shall not be unreasonably withheld) to the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2020 Bonds, to provide a report and improvement plan to the Trustee.  The proposed management consultant will be deemed **not** acceptable unless a majority has consented to the proposed management consultant within 14 days.<br><br>(ii)   If the Borrowers fail to meet the Days Cash on Hand Covenant, the AL/NC Occupancy Covenant or the DSCR Covenant by the end of the fourth quarter after the report and improvement plan are provided, the Borrowers shall, *if so directed by the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2020 Bonds*, appoint an independent third party manager acceptable to such holders or if a third party manager is then managing the facility, replace the manager with a manager acceptable to such holders; provided however that if at the end of such fourth quarter, a Consultant certifies that the Borrowers have complied with all of their recommendations (except any recommendation to replace the Sponsor, as manager), then the period for compliance with such covenants shall be extended by four additional quarters; provided that if the manager fails to comply with such recommendations at any time during such extended four quarter period (other than a replacement of the Sponsor, as a manager) then at any such time, a majority of bondholders may cause replacement of manager.  In the event the Consultant recommends a replacement of the Sponsor, as manager, failure to comply with such recommendation will not result in a change in the Sponsor, as manager unless the Borrowers fail to meet the covenants within eight quarters of the first violation. For avoidance of doubt, failure to comply with such covenants after the extended period (if applicable) may result in a change of management if directed by the majority of bondholders.<br><br>(iii)   If on any testing date, the DSCR is 1.0x or below or the Days Cash on Hand is less than the applicable covenant amount by 20 or more Days Cash on Hand on each Testing Date, it shall constitute an Event of Default under the 2020 Indenture.<br><br>(iv)   Same remedies in (i) above will apply for failure to meet the IL Occupancy Covenant, provided that the Borrower shall be required to hire a marketing consultant in lieu of a management consultant.  If the Borrowers fail to meet the IL Occupancy Covenant by the end of the fourth quarter after the report and improvement plan are provided, the Borrowers shall, at the direction of the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2020 Bonds, replace the marketing agent, or if there is no acting marketing |

| | agent, the Borrowers shall be required to hire a marketing agent acceptable to the Trustee. |
|---|---|
| **Reporting Requirements** | |
| Reporting | The Borrowers shall deliver monthly financial statements (including a balance sheet, an income statement, an escrow statement and a cash flow statement) and a monthly report on marketing, occupancy and sales within 45 days following the prior month end comparing actual results to budget and shall include an explanation of variances of more than 10% from budgeted amounts. Such financial statements shall also include an Entrance Fee analysis. Monthly reporting will be replaced by quarterly reporting after year 3 if, and for so long as, the Borrowers are in compliance with all of their covenants under 2020 Bond Documents; *provided* that quarterly reporting shall revert to monthly reporting in the event that the Borrowers go out of compliance with any of their covenants under the 2020 Bond Documents.<br><br>The Borrowers shall enter into a new Continuing Disclosure Agreement providing for the same reporting as required by the existing Continuing Disclosure Agreement (in addition to the information required above), except for any amendments thereto required to reflect changes to Rules 15c2-12. |
| Update Calls | For the first year from the Effective Date, the Corporation shall hold monthly calls for holders of the Series 2020 Bonds. After such time, the Corporation shall hold quarterly calls, unless a majority of bondholders requests monthly calls. |
| **General Provisions** | |
| New 2020 Bond Documents | The 2020 Bond Documents shall be prepared or, as applicable, amended and modified in a manner necessary to effectuate the Restructuring Transaction. The 2020 Bond Documents and other agreements governing the Restructuring Transaction shall, except as provided herein, contain all of the existing covenants, defaults and provisions contained in the Indenture and such additional provisions as acceptable to the Majority Holders and consistent with the Term Sheet. |
| Release/Exculpation | The Restructuring Transaction contemplated by the Term Sheet shall contain customary release, injunction and exculpation provisions for all Parties to the Restructuring Transaction to the extent available under applicable law. The Parties hereby agree that they will use respective best efforts to obtain approval of such release, injunction and exculpatory provisions, which by way of example only shall include opposing any effort by any person or entity that is not a Party to this Term Sheet to eliminate or reduce the scope of such release, injunction and exculpation provisions. |
| Binding Effect | The obligation of each of the undersigned parties to pursue the Restructuring Transaction in accordance with the terms hereof is subject to (i) the negotiation, execution and delivery of mutually acceptable final documentation, (ii) receipt of all necessary consents, including any consent of any party's credit or other committee or board of directors and any regulatory approvals, (iii) receipt of a satisfactory tax opinion confirming that the interest on the 2020 Bonds will be excluded from gross income for federal income tax purposes under the |

| | |
|---|---|
| | Internal Revenue Code, and (iv) the Effective Date occurring on or before that date that is 109 days after the Petition Date. |
| **Miscellaneous** | This Term Sheet shall be governed by the laws of the State of Illinois.<br><br>This Term Sheet may be executed in one or more counterparts, and when all counterparts have been executed, each executed counterpart will have the force and effect of the original. |
| **Timeline** | The following timeline will be applicable:<br><br>(1) Petition Date – The date on which the Borrowers file the Anticipated Bankruptcy Proceeding with the Bankruptcy Court.<br><br>(2) Petition Date + 4 days – Entry of Interim Cash Collateral Order;<br><br>(3) Petition Date + 40 days – Entry of Final Cash Collateral Order, and approval of Disclosure Statement and Solicitation Procedures;<br><br>(4) Petition Date + 50 days – Solicitation of Plan;<br><br>(5) Petition Date + 95 days – Confirmation of Plan; and<br><br>(6) Petition Date + 109 days – Effective Date of Plan. |

Schedule 1

Series 2020 Bond Maturities

| Series 2016 A&B Par: | $119,187,892 | |
|---|---|---|
| Series 2020 Par: | $107,269,103 | 90% |
| Coupon: | 5.125% | |

| Year | Principal | Interest | Debt Service |
|---|---|---|---|
| 5/15/2021[1/] | - | 4,123,156.14 | 4,123,156.14 |
| 5/15/2022 | - | 5,497,541.52 | 5,497,541.52 |
| 5/15/2023 | - | 5,497,541.52 | 5,497,541.52 |
| 5/15/2024 | 767,889 | 5,497,541.52 | 6,265,430.52 |
| 5/15/2025 | 807,244 | 5,458,187.22 | 6,265,431.22 |
| 5/15/2026 | 848,615 | 5,416,815.96 | 6,265,430.96 |
| 5/15/2027 | 892,106 | 5,373,324.44 | 6,265,430.44 |
| 5/15/2028 | 937,827 | 5,327,604.02 | 6,265,431.02 |
| 5/15/2029 | 985,890 | 5,279,540.38 | 6,265,430.38 |
| 5/15/2030 | 1,036,417 | 5,229,013.52 | 6,265,430.52 |
| 5/15/2031 | 1,089,534 | 5,175,897.14 | 6,265,431.14 |
| 5/15/2032 | 1,145,372 | 5,120,058.52 | 6,265,430.52 |
| 5/15/2033 | 1,204,073 | 5,061,358.22 | 6,265,431.22 |
| 5/15/2034 | 1,265,781 | 4,999,649.48 | 6,265,430.48 |
| 5/15/2035 | 1,330,653 | 4,934,778.20 | 6,265,431.20 |
| 5/15/2036 | 1,398,848 | 4,866,582.22 | 6,265,430.22 |
| 5/15/2037 | 1,470,539 | 4,794,891.26 | 6,265,430.26 |
| 5/15/2038 | 1,545,905 | 4,719,526.14 | 6,265,431.14 |
| 5/15/2039 | 1,625,132 | 4,640,298.52 | 6,265,430.52 |
| 5/15/2040 | 1,708,420 | 4,557,010.50 | 6,265,430.50 |
| 5/15/2041 | 1,795,977 | 4,469,453.98 | 6,265,430.98 |
| 5/15/2042 | 1,888,021 | 4,377,410.16 | 6,265,431.16 |
| 5/15/2043 | 1,984,782 | 4,280,649.08 | 6,265,431.08 |
| 5/15/2044 | 2,086,502 | 4,178,929.00 | 6,265,431.00 |
| 5/15/2045 | 2,193,435 | 4,071,995.78 | 6,265,430.78 |
| 5/15/2046 | 2,305,848 | 3,959,582.22 | 6,265,430.22 |
| 5/15/2047 | 2,424,023 | 3,841,407.52 | 6,265,430.52 |
| 5/15/2048 | 2,548,254 | 3,717,176.34 | 6,265,430.34 |
| 5/15/2049 | 2,678,852 | 3,586,578.32 | 6,265,430.32 |
| 5/15/2050 | 2,816,144 | 3,449,287.16 | 6,265,431.16 |
| 5/15/2051 | 2,960,471 | 3,304,959.78 | 6,265,430.78 |
| 5/15/2052 | 3,112,195 | 3,153,235.64 | 6,265,430.64 |
| 5/15/2053 | 3,271,695 | 2,993,735.64 | 6,265,430.64 |
| 5/15/2054 | 3,439,369 | 2,826,061.28 | 6,265,430.28 |
| 5/15/2055 | 3,615,637 | 2,649,793.62 | 6,265,430.62 |
| 5/15/2056 | 3,800,938 | 2,464,492.22 | 6,265,430.22 |
| 5/15/2057 | 3,995,737 | 2,269,694.14 | 6,265,431.14 |
| 5/15/2058 | 4,200,518 | 2,064,912.62 | 6,265,430.62 |
| 5/15/2059 | 4,415,795 | 1,849,636.08 | 6,265,431.08 |
| 5/15/2060 | 31,674,665 | 1,623,326.58 | 33,297,991.58 |

[1/] The amount of interest payable for the first year is subject to change based on the final determination of the Effective Date.

| | 107,269,103 | 166,702,633.60 | 273,971,736.60 |
|---|---|---|---|

Schedule 2

Series 2020 Mandatory Sinking Fund Schedule

**<u>EXHIBIT 2</u>**

JOINDER

## FORM OF JOINDER

This Joinder to the Plan Support Agreement, dated as of [_____] [___], 2020, by and among the Borrowers and the Consenting Holders (the "**Support Agreement**"), is executed and delivered by _____ (the "**Joining Party**") as of _____, 2020.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Support Agreement.

1.  <u>Agreement to be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Plan Support Agreement (and all exhibits and annexes thereto), attached to this Joinder as **Annex I** (as such Plan Support Agreement, exhibits and annexes may be hereafter amended, restated, or otherwise modified from time to time).  The Joining Party shall hereafter be deemed to be a "Consenting Holder" and a "Party" for all purposes under the Plan Support Agreement.

2.  <u>Representations and Warranties</u>. With respect to the Series 2016 Bonds set forth below its name on the signature page hereof and all related claims, rights, and causes of action arising out of or in connection with or otherwise relating to such Series 2016 Bonds, the Joining Party hereby makes to the Borrowers the representations and warranties of the Consenting Holders set forth in the Plan Support Agreement.

3.  <u>Notices</u>. For purposes of notices and other communications to be delivered to the Joining Party the relevant addresses and facsimile numbers are set forth below.

4.  <u>Governing Law</u>. This Joinder shall be governed by and construed in accordance with the laws of The State of Illinois, without regard to any conflict of laws provisions that would require the application of the law of any other jurisdiction.

\* \* \* \* \*

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**EXHIBIT 3**

Budget

# Monthly Cash Flow
## Timothy Place, Inc. d/b/a Park Place of Elmhurst

**Month 1 Begins:**                                       5/18/20

| Month 1 Ends | 5/31/20 | 6/30/20 | 7/31/20 | 8/31/20 | 9/30/20 |
|---|---|---|---|---|---|
| **Cash on Hand (beginning of month)** | 2,937,207 | 2,186,144 | 1,901,980 | 1,994,343 | 1,839,032 |
| | | | | | |
| **CASH RECEIPTS** | | | | | |
| Transfer from Trustee- operating & capital | - | 1,905,554 | 2,216,231 | 2,123,868 | 2,244,584 |
| Transfer from Trustee - EF refunds | | 323,190 | 730,910 | - | - |
| Fire settlement | | | | 100,000 | |
| Collections- PPP Fund | 539,782 | 837,718 | | | |
| Collections - A/R | 705,000 | 1,560,000 | 1,572,000 | 1,607,000 | 1,560,000 |
| Entrance Fees | 344,500 | 240,150 | 749,000 | 360,000 | 1,030,750 |
| Transfer to Trustee cash deposits | (1,589,282) | (2,637,868) | (2,321,000) | (2,067,000) | (2,590,750) |
| **TOTAL CASH RECEIPTS** | - | 2,228,744 | 2,947,141 | 2,123,868 | 2,244,584 |
| **Total Cash Available (before cash out)** | 2,937,207 | 4,414,888 | 4,849,121 | 4,118,211 | 4,083,616 |
| | | | | | |
| **CASH PAID OUT** | | | | | |
| Purchased Services & Supplies | 281,000 | 431,000 | 431,000 | 431,000 | 431,000 |
| Payroll  & payroll related | 340,000 | 665,500 | 681,500 | 868,811 | 681,500 |
| Marketing | 25,000 | 55,600 | 55,600 | 55,600 | 55,600 |
| Accounting & legal (non-bankruptcy) | - | 3,650 | 19,500 | - | - |
| Utilities | 39,500 | 80,500 | 80,500 | 80,500 | 80,500 |
| Insurance | 600 | 6,730 | 44,230 | 6,730 | 6,730 |
| Taxes (real estate, etc.) | - | - | - | - | 80,517 |
| **SUBTOTAL** | 686,100 | 1,242,980 | 1,312,330 | 1,442,641 | 1,335,847 |
| Capital escrow payment | - | 96,342 | 96,342 | 96,342 | 96,342 |
| Interest escrow payment | | 621,196 | 621,196 | 621,196 | 621,196 |
| Fire mitigation costs (To be reimbursed) | | 100,000 | | | |
| Capital purchase | 20,040 | 129,200 | 94,000 | 119,000 | 124,000 |
| Entrance Fee Refunds | 44,923 | 323,190 | 730,910 | - | - |
| **TOTAL CASH PAID OUT** | 751,063 | 2,512,908 | 2,854,778 | 2,279,179 | 2,177,385 |
| **Cash Position (End of Month)** | 2,186,144 | 1,901,980 | 1,994,343 | 1,839,032 | 1,906,231 |

**Payroll Protection Program loan in separate account:**

| | | |
|---|---|---|
| Loan proceeds - May 6, 2020 | 1,377,500 | 837,718 |
| Draw for Eligible Payroll and Eligible nonpayroll costs | (539,782) | (837,718) |
| Balance | 837,718 | - |

Note: Notwithstanding anything to the contrary herein, shortly before the commencement of the Chapter 11 Cases, Park Place (a) will make an additional payment to its employees in the amount of their accrued earnings as of the Petition Date, and (b) place deposits with essential non-insider trade creditors in the amount of such vendor's estimated claims against Park Place which have accrued but are not yet payable as of the Petition Date. The intent of these payments and deposits is to help insure that employees and trade creditors will not have unsecured claims against Park Place in its Chapter 11 Case.

## EXHIBIT 4

Milestones if Borrowers receive PPP Loan

In the event the Borrowers receive the PPP Loan, the following Milestones shall apply:

(1)     On or before May 29, 2020, each of the Borrowers will execute the Term Sheet in form and substance as attached to this Agreement as **Exhibit 1**;

(2)     On or before May 29, 2020, each of the Borrowers will execute the Plan Support Agreement in form and substance as attached to this Agreement as **Exhibit 2**;

(3)     On or before June 12, 2020, the Borrowers will provide to the Trustee with final drafts of all Bankruptcy Documents (as defined in the Plan Support Agreement);

(4)     The Borrowers shall review and provide their comments on the 2020 Bond Documents (as defined in the Term Sheet) no later than two (2) weeks after receiving the drafts of the 2020 Bond Documents from the Trustee;

(5)     On or before June 26, 2020, the Parties to agree on the form and substance of the Bankruptcy Documents and the 2020 Bond Documents; and

(6)     Each of the Borrowers shall file petitions commencing the Chapter 11 Cases no later than two (2) Business Days after they Borrowers receive notice concerning the determination of forgiveness of the PPP Loan; and

(7)     Notwithstanding Milestones (1) through (6) above, the Borrowers shall file petitions commencing the Chapter 11 Cases no later than September 15, 2020.

15

## RESTRUCTURING TERM SHEET

This Restructuring Term Sheet (this "***Term Sheet***"), dated as of May 14, 2020, sets forth certain of the principal terms and conditions of a financial restructuring (the "***Restructuring Transaction***") of the outstanding indebtedness of Timothy Place, NFP (the "***Corporation***"), and Christian Healthcare Foundation, NFP (the "***Foundation***" and together with the Corporation, the "***Borrowers***"), including, without limitation, (i) $103,691,500 Illinois Finance Authority (the "***Issuer***") Revenue Bonds (Park Place of Elmhurst Project) Series 2016A (the "***Series A Bonds***"), (ii) $15,496,392 Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2016B (the "***Series B Bonds***"), and (iii) $21,918,750 Illinois Finance Authority Revenue Bonds (Park Place of Elmhurst Project) Series 2016C (the "***Series C Bonds***" and together with the Series A Bonds and Series B Bonds, the "***Series 2016 Bonds***") pursuant to that certain Bond Trust Indenture (the "***Indenture***") dated as of May 1, 2016, between the Issuer and UMB Bank, n.a., as trustee (the "***Trustee***").

The Restructuring Transaction contemplates, among other things, an exchange (the "***Proposed Exchange***") of the outstanding Series 2016 Bonds in the aggregate principal amount of approximately $141,106,642, plus any accrued and unpaid interest thereon, as provided for herein, for new Series 2020 Bonds (as hereinafter defined). This Term Sheet contemplates the consummation of the Restructuring Transaction through a Plan of Reorganization (the "***Plan***") in a Chapter 11 proceeding of the Borrowers (the "***Anticipated Bankruptcy Proceeding***") pending before a court of a competent jurisdiction (the "***Bankruptcy Court***") as more fully described below.

This Term Sheet and the undertakings contemplated herein are subject in all respects to the negotiation, execution and delivery of mutually acceptable definitive documentation between the Borrowers, the Issuer and the Trustee acting at the direction of a majority of the holders of the Series 2016 Bonds (such majority holders of the Series 2016 Bonds, the "***Majority Holders***"). This Term Sheet is not and shall not be deemed to be a solicitation of votes for the acceptance of any plan of reorganization, including without limitation, the Plan, or the Proposed Exchange.

**THE TERM SHEET IS BEING PROVIDED AS PART OF A COMPREHENSIVE COMPROMISE AND SETTLEMENT, EACH ELEMENT OF WHICH IS CONSIDERATION FOR THE OTHER ELEMENTS AND AN INTEGRAL ASPECT OF THE PROPOSED RESTRUCTURING OF THE SERIES 2016 BONDS. THE TERM SHEET IS SUBJECT TO FEDERAL RULE OF EVIDENCE 408 AND COMPARABLE STATE STATUTES. NOTHING IN THE TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE, SOLELY FOR SETTLEMENT PURPOSES, WITH A FULL RESERVATION AS TO ALL RIGHTS, REMEDIES AND DEFENSES OF THE BORROWERS, THE TRUSTEE, THE MAJORITY HOLDERS, AND ALL OTHER PARTIES.**

Capitalized terms not otherwise defined herein shall have the meanings given to them in the Indenture.

**A.     Implementation of Restructuring Transaction**

| | |
|---|---|
| **Proposed Exchange Process** | The Restructuring Transaction will be implemented through the Plan.  The Series 2020 Bonds (as described herein, the "***Series 2020 Bonds***") will be issued on the effective date of the Plan (the "***Effective Date***").  The Series 2020 Bonds will be issued pursuant to an Indenture of Trust ("***2020 Indenture***" and together with all related documents necessary for the issuance of the Series 2020 Bonds, the "***2020 Bond Documents***") between the Issuer and the Trustee. |
| | The Borrowers will commence the Anticipated Bankruptcy Proceedings and will file the Plan and 2020 Bond Documents and a disclosure statement to the Plan (the "***Disclosure*** |

Exhibit 2 To Debtors' Joint Disclosure Statement Dated Dec. 15, 2020

| | |
|---|---|
| | *Statement*"), that is acceptable to the Trustee and the Majority Holders, which contains the terms and conditions outlined in this Term Sheet, on the timeline set forth below.  Prior to the commencement of the Anticipated Bankruptcy Proceeding, the Borrowers shall provide copies of drafts of the Plan, Disclosure Statement and other pleadings, and documents, including the 2020 Bond Documents (collectively, the "*Solicitation Documents*") to the Trustee and the Majority Holders for their review and consent.  Any substantive amendments, modifications or supplements to the Solicitation Documents shall be reviewed by, and acceptable to, the Trustee and the Majority Holders; provided, however, that no amendment, modification, or supplement shall be materially different from the Term Sheet. |
| **Majority Bondholder Support** | Prior to the commencement of the Anticipated Bankruptcy Proceeding, and subject to the timeline set forth herein, the Majority Holders agree to take all necessary steps to enter into a binding support agreement (the "*Support Agreement*") concerning the Majority Holders' commitment to and support of the Plan and the Proposed Exchange.<br><br>The Majority Holders agree to not take any actions inconsistent with this Term Sheet, and to direct the Trustee not to take any actions inconsistent with this Term Sheet.  The Majority Holders agree to consent to the Restructuring Transaction as set forth in the Plan and the Proposed Exchange by delivering duly executed and completed consents on a timely basis pursuant to the ongoing solicitation of votes for the Proposed Exchange and shall not change such consents; provided, however, such consents shall only be binding to the extent set out in the Support Agreement.  The Majority Holders agree not to otherwise commence any proceeding to oppose the Plan and the Proposed Exchange or object to the Restructuring Transaction during the term of the Support Agreement.  All such actions by the Majority Holders are subject to the terms of the Support Agreement. |
| **Majority Holders Retention of Bonds and Claims** | The Majority Holders agree that they shall not sell, transfer, assign, or otherwise dispose of, directly or indirectly, any of the Series 2016 Bonds, or any right, claim, or interest (voting or otherwise) related to or arising from the Series 2016 Bonds, subject to the terms and conditions of the Support Agreement. |

**B.    Terms of Restructuring**

| | |
|---|---|
| **Exchange** | On the Effective Date, the holders of the Series A Bonds and Series B Bonds shall exchange the then outstanding Series A Bonds and Series B Bonds for a pro rata share of Series 2020 Bonds issued in the aggregate principal amount equal to approximately $107,269,103. |
| **Series 2020 Bonds** | The Series 2020 Bonds shall be issued as current paying bonds with an aggregate principal amount equal to 90% of the outstanding Series A Bonds and Series B Bonds.  The Series 2020 Bonds shall bear interest at the rate of 5.125% per annum and have maturities in the years and in principal amounts as set forth on Schedule 1 hereto.  The Series 2020 Bonds shall further be subject to mandatory redemption/amortization as set forth in Schedule 2 hereto. The Series 2020 Bonds shall pay interest only for the first three (3) years following the Effective Date, and then amortize over the following thirty-seven (37) years.  Interest on the Series 2020 Bonds shall be payable semiannually following the Effective Date and principal shall be paid annually as set forth in Schedule 2. |

| | |
|---|---|
| | The Series 2020 Bonds will be secured by a first priority lien on all assets of the Corporation. The Series 2020 Bond shall mature as set forth in Schedule 2, with a final maturity approximately 40 years from the restructuring effective date (subject to bond counsel approval).<br><br>The Series 2020 Bonds will be subject to optional redemption prior to maturity commencing on the 5th year after the Effective Date, at a price equal to: in year 5, at a price of 102%, in year 6, at price of 101% and thereafter at par.<br><br>The 2020 transaction will not include any 2020 cash flow notes for the balance outstanding and is expected to consist of one series of bonds. |
| **Series C Bonds** | On the Effective Date, the Sponsor will provide sufficient cash to the Borrower to redeem 100% of the Series C Bonds for a cash payment of 3% of the accreted value of the outstanding Series C Bonds as of the closing of the Proposed Exchange. Upon payment, the Series C Bonds will be cancelled and deemed to no longer be outstanding. |
| **Liquidity Support Agreement and Sponsor Contribution** | On the Effective Date, Providence Life Services (the "***Sponsor***") will deposit $3,000,000 (the "***Liquidity Fund***") with the Trustee to be held and used in accordance with the terms of a certain Liquidity Support Agreement, by and among the Sponsor, the Borrowers and the Trustee. The Liquidity Fund shall be available to the Borrowers for payment of regular operating expenses as needed, for payment of monthly interest or principal relating to the Series 2020 Bonds.<br><br>To enhance the earnings on the Liquidity Fund, the Borrowers and Sponsor propose that the LSA include a list of permitted investments for the Liquidity Fund, which will include certain investments not customarily included in tax-exempt bond financings. For example, permitted investments are contemplated to include corporate stock and bond mutual funds.<br><br>The fund balance in the Liquidity Fund will be permitted to be counted in the calculation of Days Cash on Hand for purposes of covenant testing.<br><br>The Distribution Waterfalls will include provisions that allow the Liquidity Fund to be restored to its original balance by the Borrowers if draws are made to pay operating expenses or debt service. In addition, the LSA will include terms for the "burn-off" of the Liquidity Fund over time. ["burn-off" TBD] .<br><br>In connection with the issuance of the Series 2016 Bonds, the Sponsor received a certain promissory note ("***Sponsor Note***"), which is subordinate in security and payment to the Series 2016 Bonds. In further consideration of the Proposed Exchange, Sponsor will waive, as of the Effective Date, all amounts due under the Sponsor Note.<br><br>The Sponsor and Borrowers understand that they will be responsible for transaction costs of the Restructuring Transaction (the "***Sponsor Contribution***"). On the Effective Date, the existing Debt Service Reserve Fund ("***DSRF***") will be used pay (i) accrued and unpaid interest on the Series 2016 Bonds through but not including the Effective Date, and (ii) the costs and expenses of the Trustee and its advisors; any remaining DSRF balance immediately shall be transferred to the Debt Service Reserve Fund under the 2020 Indenture. |
| **Priority/Security** | The Series 2020 Bonds will be secured by a first priority lien on all assets of the Corporation. |

| | |
|---|---|
| **Management Fees** | The existing management agreement with the Sponsor shall be assumed in the Anticipated Bankruptcy Proceeding, provided that such management agreement shall provide for an annual management fee no greater than 4.25% of gross operating revenues; provided further that no more than $30,000 shall be paid each month as an operating expense ("***Base Management Fee***"), with the balance payable from Excess Cash (as described herein). |
| **Entrance Fees** | The Borrowers shall not reduce the amount of any current Entrance Fees or monthly fees or offer any new discounts to Entrance Fee pricing or create any further benefit programs which reduces current amounts by greater than five percent (5%), without consent of the holders of a majority of principal amount of the Series 2020 Bonds. |

| | |
|---|---|
| **Indenture Held/Debtor Held Funds** | |
| **Operating Account** | Upon the Effective Date, Borrowers shall maintain the existing Operating Account, which shall be subject to the lien of the Trustee under the 2020 Indenture pursuant to a deposit account control agreement reasonably acceptable to the Trustee.  The Operating Account shall contain 45 Days Cash on Hand as an unrestricted amount as of the Effective Date (the "***Unrestricted Amount***"). |
| **Entrance Fee Fund** | Upon the Effective Date, the Borrowers shall maintain the existing Entrance Fee Fund under the 2020 Indenture.  After the Effective Date, pursuant to the 2020 Indenture, all Entrance Fees of the Corporation shall be required to be deposited in the Entrance Fee Fund.<br><br>Entrance Fees (after the required payment of any refunds) will be transferred to the Revenue Fund after any applicable rescission rights under the Residence Agreements have expired and such funds shall be available to flow through the Distribution Waterfall (as defined herein). |
| **Revenue Fund** | Upon the Effective Date, the Corporation shall maintain the existing Revenue Fund with the Trustee, subject to the lien of the 2020 Indenture, pursuant to which all revenues and other income of the Corporation (the "***Revenues***") shall, on and after the Effective Date, be deposited.  Funds from the Revenue Fund shall be withdrawn pursuant to the Distribution Waterfall below. |
| **Operating Reserve Fund** | Upon the Effective Date, the Corporation shall maintain the existing Operating Reserve Fund with the Trustee, subject to the lien of the 2020 Indenture, and fund such Operating Reserve Fund with an amount such that the balance therein shall have 75 Days Cash on Hand as of the Effective Date.  The amounts in the Operating Reserve Fund shall be available to the Corporation for Operating Expenses (as defined herein). |
| **Capital Expenditures Fund** | Upon the Effective Date, the Borrowers shall maintain the existing Capital Expenditures Fund with the Trustee, subject to the lien of the 2020 Indenture.  The Capital Expenditures Fund will be funded on a monthly basis from the Revenue Fund (in such order and priority as set forth in the Distribution Waterfall) in an amount equal to one-twelfth of each fiscal year's capital expenditures budget, as set forth in the 10-year projections in the Disclosure Statement, and increased by CPI Index each year thereafter.  The Capital Expenditures Fund will be available to fund the Borrower's capital expenditures and will not be included in |

4

| | |
|---|---|
| | calculations of Days Cash on Hand. Any balance in the Capital Expenditures Fund at the end of a fiscal year will remain in said fund; provided that the balance of the amount on deposit in the Capital Expenditures Fund will at no time exceed $3,000,000. In the event amounts in the Operating Account and Operating Reserve Fund are insufficient to fund operating expenses, the amounts in the Capital Expenditure Fund may be applied to such purpose. |
| **Bond Fund** | Upon the Effective Date, the Borrowers shall maintain the existing Bond Fund with the Trustee, subject to the lien of the 2020 Indenture. In accordance with the Distribution Waterfall below, the Bond Fund will receive (i) the monthly payments of principal and interest due and payable under the Series 2020 Bonds. |
| **Debt Service Reserve Fund** | Upon the Effective Date, the Borrowers shall maintain the existing Debt Service Reserve Fund with the Trustee, subject to the lien of the 2020 Indenture. Upon the Effective Date, amounts in the Debt Service Reserve Fund shall be applied in the following order of priority: (i) to pay accrued and unpaid interest on the Series 2016 Bonds through but not including the Effective Date, then (ii) fees and expenses of the Trustee and its advisors (to the extent not covered by the Sponsor Contribution), and (iii) the remaining balance shall be transferred to the Debt Service Reserve Fund under the 2020 Indenture. The Debt Service Reserve Fund shall not become an asset of the Borrowers, but shall remain funds held by the Trustee for the benefit of the holders of the Series 2020 Bonds. The Debt Service Reserve Fund Requirement shall equal the Maximum Annual Debt Service (for purposes of calculating Maximum Annual Debt Service for the Debt Service Reserve Fund Requirement, the anticipated final payment in year 40 of the bond debt service shall not be included in such calculation). Any draw on the Debt Service Reserve Fund shall be an event of default under the Series 2020 Indenture. |
| **Distribution Waterfall** | Upon the Effective Date, all Entrance Fees shall be deposited with the Trustee in the Entrance Fee Fund. Such amounts, together with the balances of the Operating Account, the Operating Reserve Fund, as of the Effective Date and any Revenues available to the Borrowers at such time, including the Sponsor Contribution, shall be applied in the following order of priority:<br><br>1. to pay any Refunds;<br>2. to pay all professional fees and expenses incurred in connection with the Restructuring Transaction (including, without limitation, any costs associated with obtaining opinions from bond counsel);<br>3. to fund the Debt Service Reserve Fund up to the shortfall, if any, to the initial Debt Service Reserve Fund requirement;<br>4. to fund the Operating Account in an amount equal to 45 Days Cash on Hand (approximately $2.250 million);<br>5. to fund the Operating Reserve Fund in an amount equal to 75 Days Cash on Hand (approximately $3.750 million); and<br><br>Thereafter, all post-Effective Date Entrance Fees and other Revenues of the Borrowers shall be deposited in the Entrance Fee Fund or the Revenue Fund, as applicable, on a weekly basis.<br><br>Subject to the next sentence, amounts on deposit in the Revenue Fund shall be made available to the Corporation on a monthly basis to satisfy ongoing operations and management costs and expenses of the Corporation, including, without limitation, the Base Management Fee, and replenishment of any Unrestricted Amount (collectively, the "***Operating Expenses***"). If an Event of Default (as defined in the 2020 Indenture) shall occur, then the monthly amounts on deposit in the Revenue Fund available for withdrawal to satisfy Operating Expenses shall |

be made available to the Corporation in an amount not to exceed the amounts set forth in an operating budget established pursuant to the terms of the 2020 Indenture.

On the first Business Day of each calendar month, monies in the Revenue Fund shall be distributed in the following order of priority (the "***Distribution Waterfall***"):

- First, to the Operating Account the amount necessary to pay anticipated Operating Expenses for the upcoming month (taking into account any unapplied amount withdrawn for such purpose in a prior month), as such amount is set forth in a certificate from the Borrower delivered to the Trustee no later than 10 Business Days prior to the first Business Day of a month;

- Second, to replenish any deficiency as of the Effective Date in the Debt Service Reserve Fund necessary to make the amount therein equal the Debt Service Reserve Fund Requirement;

- Third, to the Bond Fund, in an amount equal to 1/6th of the interest due on the next interest payment date;

- Fourth, to the Bond Fund, in an amount equal to 1/12th of the principal due on the next principal payment date;

- Fifth, to the Capital Expenditure Fund, in an amount equal to 1/12th of such Fiscal Year's capital budget;

- Sixth, to replenish the balance of the Operating Reserve Fund and the Operating Account to a combined total of 135 Days Cash on Hand;

- Seventh, to replenish the balance of the Liquidity Fund for any draws made in order to restore the balance of the Liquidity Fund to $3 million; and

- Eighth, any remaining amounts after application of paragraphs first to seventh above (such remaining amounts referred to as "***Excess Cash***") shall be transferred to the Operating Reserve Fund.

## Operating/Financial Covenants

| | |
|---|---|
| **Days Cash on Hand Covenant** | The Corporation shall provide reporting of Days Cash on Hand semiannually commencing six (6) months after the Effective Date (each such date being a "***Testing Date***").   In addition, the Corporation covenants to maintain not less than the amounts shown below on each Testing Date:<br><br>First Testing Date: 100<br>Second Testing Date: 100<br>Third Testing Date: 110<br>Fourth Testing Date: 110<br>Fifth Testing Date and thereafter: 120<br><br>Note: Projections will be updated with the Restructured Bonds so that projected ratios can be compared with covenant levels. The levels above may need further refinement if surplus cushion exists. |

| Debt Service Coverage Ratio Covenant | Commencing the fiscal year ending December 31, 2020 (the "***Initial Testing Date***"), the Corporation shall achieve a DSCR of not less than 1.10x. The ratio shall be tested quarterly on a rolling four quarter basis, commencing on the Initial Testing Date. The required DSCR will increase to 1.15x for the Testing Dates that occur on December 31, 2021 and thereafter.<br><br>The numerator of the DSCR will include net Entrance Fees (i.e., Entrance Fees, [but not Initial Entrance Fees], received during such period minus Entrance Fees refunded during such period) and the denominator will be Maximum Annual Debt Service on the Series 2020 Bonds.<br><br>If the Debt Service Coverage Ratio on a testing date is below 1.10x for the Initial Testing Date or below 1.15x for the Testing Dates that occur on December 31, 2021 and thereafter, but above 1.0x, and the Days Cash on Hand Ratio is equal to or above 150 for the same time period, then the Borrowers can avoid an Event of Default. However, an Event of Default will be triggered if the Debt Service Coverage Ratio is below 1.0x.<br><br>To the extent the Liquidity Fund is drawn upon for any reason, such amounts will be taken into account in calculating the numerator to the Debt Service Coverage Ratio.<br><br>Any additional indebtedness for Phase II will not be counted for purpose of the DSCR until the earlier of (i) stabilization (90% occupancy of the Phase II independent living units) or (ii) the forty ninth (49th) month following issuance of the Phase II indebtedness. |
| Additional Indebtedness (parity with Series 2020 Bonds) | The Borrowers shall not be permitted to issue any additional indebtedness that would be *pari passu* in priority of payment and security with the Series 2020 Bonds except for (i) Capitalized Leases not to exceed $1,000,000 in the aggregate; (ii) refunding indebtedness which demonstrates annual debt service savings, pursuant to the terms and conditions acceptable to the majority in principal amount of Series 2020 Bondholders and simultaneously with the refunding of any Series 2020 Bonds, with the applicable discounts; and (iii) indebtedness relating to the financing of additional construction of independent living units not to exceed 70 units ("***Phase II***"), provided that prior to the incurrence of such indebtedness (A) there is a guaranteed maximum price or stipulated contract for construction; (B) no default has occurred under the Bond Documents; (C) certification from the Corporation that (w) at least 92% of the independent living units in the existing Facility are occupied and (x) at least 70% of the independent living units in Phase II have been reserved with deposits equal to 10% of the Entrance Fees; (D) the Days Cash on Hand and DSCR covenants have all been met as of the most recent testing date; and (E) a Consultant forecast shows that the DSCR from and after the third fiscal year following completion of Phase II will be at least 1.25 and the Days Cash on Hand at the end of the first Fiscal Year in which the average occupancy of such Independent Living Units is forecasted to reach eighty-five percent (85%) will be at least 200, upon closing of such additional indebtedness.<br><br>Additional Indebtedness related to Phase II shall only be permitted if no more than 70% of such Additional Indebtedness is fixed rate long term indebtedness or as otherwise agreed to by a majority of bondholders and may have priority rights in a waterfall to entrance fees from Phase II.<br><br>No additional indebtedness shall be secured on a senior basis to the Series 2020 Bonds. |

| | No additional subordinate indebtedness or non-recourse indebtedness may be incurred until the Series 2020 Bonds are paid in full. |
|---|---|
| **IL Occupancy Covenants** | Commencing with the first fiscal quarter following the Effective Date, the Corporation shall maintain an occupancy level of no less than 85% for the independent living units (the "***IL Occupancy Covenant***"). |
| **Assisted Living and Nursing Center Occupancy Covenants** | Commencing with the first fiscal quarter following the Effective Date, the Corporation shall maintain (i) an 82% occupancy level for Assisted Living ("***AL***") units and (ii) an 82% occupancy level for Nursing Center ("***NC***") units, which shall be measured as the average occupancy of the AL and NC units, as applicable, on a rolling four quarter basis (the "***AL/NC Occupancy Covenant***"). |
| **Failure to meet covenants** | (i)   If the Corporation fails to meet the Days Cash on Hand Covenant, the AL/NC Occupancy Covenant, or the DSCR Covenant as of any testing date, then upon the first occurrence of such non-compliance, the Borrowers shall be required to retain a management consultant acceptable (which approval shall not be unreasonably withheld) to the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2020 Bonds, to provide a report and improvement plan to the Trustee.  The proposed management consultant will be deemed **not** acceptable unless a majority has consented to the proposed management consultant within 14 days.<br><br>(ii)   If the Borrowers fail to meet the Days Cash on Hand Covenant, the AL/NC Occupancy Covenant or the DSCR Covenant by the end of the fourth quarter after the report and improvement plan are provided, the Borrowers shall, *if so directed by the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2020 Bonds,* appoint an independent third party manager acceptable to such holders or if a third party manager is then managing the facility, replace the manager with a manager acceptable to such holders; <u>provided</u> <u>however</u> that if at the end of such fourth quarter, a Consultant certifies that the Borrowers have complied with all of their recommendations (except any recommendation to replace the Sponsor, as manager), then the period for compliance with such covenants shall be extended by four additional quarters; <u>provided</u> that if the manager fails to comply with such recommendations at any time during such extended four quarter period (other than a replacement of the Sponsor, as a manager) then at any such time, a majority of bondholders may cause replacement of manager.  In the event the Consultant recommends a replacement of the Sponsor, as manager, failure to comply with such recommendation will not result in a change in the Sponsor, as manager unless the Borrowers fail to meet the covenants within eight quarters of the first violation. For avoidance of doubt, failure to comply with such covenants after the extended period (if applicable) may result in a change of management if directed by the majority of bondholders.<br><br>(iii)   If on any testing date, the DSCR is 1.0x or below or the Days Cash on Hand is less than the applicable covenant amount by 20 or more Days Cash on Hand on each Testing Date, it shall constitute an Event of Default under the 2020 Indenture.<br><br>(iv)   Same remedies in (i) above will apply for failure to meet the IL Occupancy Covenant, <u>provided</u> that the Borrower shall be required to hire a marketing consultant in lieu of a management consultant.  If the Borrowers fail to meet the IL Occupancy Covenant by the end of the fourth quarter after the report and improvement plan are provided, the Borrowers shall, at the direction of the holders of not less than a majority of the outstanding aggregate principal amount of the Series 2020 Bonds, replace the marketing agent, or if there is no acting marketing |

| | agent, the Borrowers shall be required to hire a marketing agent acceptable to the Trustee. |
|---|---|

## Reporting Requirements

| | |
|---|---|
| **Reporting** | The Borrowers shall deliver monthly financial statements (including a balance sheet, an income statement, an escrow statement and a cash flow statement) and a monthly report on marketing, occupancy and sales within 45 days following the prior month end comparing actual results to budget and shall include an explanation of variances of more than 10% from budgeted amounts.  Such financial statements shall also include an Entrance Fee analysis. Monthly reporting will be replaced by quarterly reporting after year 3 if, and for so long as, the Borrowers are in compliance with all of their covenants under 2020 Bond Documents; *provided* that quarterly reporting shall revert to monthly reporting in the event that the Borrowers go out of compliance with any of their covenants under the 2020 Bond Documents. |
| | The Borrowers shall enter into a new Continuing Disclosure Agreement providing for the same reporting as required by the existing Continuing Disclosure Agreement (in addition to the information required above), except for any amendments thereto required to reflect changes to Rules 15c2-12. |
| **Update Calls** | For the first year from the Effective Date, the Corporation shall hold monthly calls for holders of the Series 2020 Bonds.  After such time, the Corporation shall hold quarterly calls, unless a majority of bondholders requests monthly calls. |

## General Provisions

| | |
|---|---|
| **New 2020 Bond Documents** | The 2020 Bond Documents shall be prepared or, as applicable, amended and modified in a manner necessary to effectuate the Restructuring Transaction.  The 2020 Bond Documents and other agreements governing the Restructuring Transaction shall, except as provided herein, contain all of the existing covenants, defaults and provisions contained in the Indenture and such additional provisions as acceptable to the Majority Holders and consistent with the Term Sheet. |
| **Release/Exculpation** | The Restructuring Transaction contemplated by the Term Sheet shall contain customary release, injunction and exculpation provisions for all Parties to the Restructuring Transaction to the extent available under applicable law. The Parties hereby agree that they will use respective best efforts to obtain approval of such release, injunction and exculpatory provisions, which by way of example only shall include opposing any effort by any person or entity that is not a Party to this Term Sheet to eliminate or reduce the scope of such release, injunction and exculpation provisions. |
| **Binding Effect** | The obligation of each of the undersigned parties to pursue the Restructuring Transaction in accordance with the terms hereof is subject to (i) the negotiation, execution and delivery of mutually acceptable final documentation, (ii) receipt of all necessary consents, including any consent of any party's credit or other committee or board of directors and any regulatory approvals, (iii) receipt of a satisfactory tax opinion confirming that the interest on the 2020 Bonds will be excluded from gross income for federal income tax purposes under the |

| | |
|---|---|
| | Internal Revenue Code, and (iv) the Effective Date occurring on or before that date that is 109 days after the Petition Date. |
| **Miscellaneous** | This Term Sheet shall be governed by the laws of the State of Illinois.<br><br>This Term Sheet may be executed in one or more counterparts, and when all counterparts have been executed, each executed counterpart will have the force and effect of the original. |
| **Timeline** | The following timeline will be applicable:<br><br>(1) Petition Date – The date on which the Borrowers file the Anticipated Bankruptcy Proceeding with the Bankruptcy Court.<br><br>(2) Petition Date + 4 days – Entry of Interim Cash Collateral Order;<br><br>(3) Petition Date + 40 days – Entry of Final Cash Collateral Order, and approval of Disclosure Statement and Solicitation Procedures;<br><br>(4) Petition Date + 50 days – Solicitation of Plan;<br><br>(5) Petition Date + 95 days – Confirmation of Plan; and<br><br>(6) Petition Date + 109 days – Effective Date of Plan. |

Schedule 1

Series 2020 Bond Maturities

| Series 2016 A&B Par: | $119,187,892 | |
|---|---|---|
| Series 2020 Par: | $107,269,103 | 90% |
| Coupon: | 5.125% | |

| Year | Principal | Interest | Debt Service |
|---|---|---|---|
| 5/15/2021[1] | - | 4,123,156.14 | 4,123,156.14 |
| 5/15/2022 | - | 5,497,541.52 | 5,497,541.52 |
| 5/15/2023 | - | 5,497,541.52 | 5,497,541.52 |
| 5/15/2024 | 767,889 | 5,497,541.52 | 6,265,430.52 |
| 5/15/2025 | 807,244 | 5,458,187.22 | 6,265,431.22 |
| 5/15/2026 | 848,615 | 5,416,815.96 | 6,265,430.96 |
| 5/15/2027 | 892,106 | 5,373,324.44 | 6,265,430.44 |
| 5/15/2028 | 937,827 | 5,327,604.02 | 6,265,431.02 |
| 5/15/2029 | 985,890 | 5,279,540.38 | 6,265,430.38 |
| 5/15/2030 | 1,036,417 | 5,229,013.52 | 6,265,430.52 |
| 5/15/2031 | 1,089,534 | 5,175,897.14 | 6,265,431.14 |
| 5/15/2032 | 1,145,372 | 5,120,058.52 | 6,265,430.52 |
| 5/15/2033 | 1,204,073 | 5,061,358.22 | 6,265,431.22 |
| 5/15/2034 | 1,265,781 | 4,999,649.48 | 6,265,430.48 |
| 5/15/2035 | 1,330,653 | 4,934,778.20 | 6,265,431.20 |
| 5/15/2036 | 1,398,848 | 4,866,582.22 | 6,265,430.22 |
| 5/15/2037 | 1,470,539 | 4,794,891.26 | 6,265,430.26 |
| 5/15/2038 | 1,545,905 | 4,719,526.14 | 6,265,431.14 |
| 5/15/2039 | 1,625,132 | 4,640,298.52 | 6,265,430.52 |
| 5/15/2040 | 1,708,420 | 4,557,010.50 | 6,265,430.50 |
| 5/15/2041 | 1,795,977 | 4,469,453.98 | 6,265,430.98 |
| 5/15/2042 | 1,888,021 | 4,377,410.16 | 6,265,431.16 |
| 5/15/2043 | 1,984,782 | 4,280,649.08 | 6,265,431.08 |
| 5/15/2044 | 2,086,502 | 4,178,929.00 | 6,265,431.00 |
| 5/15/2045 | 2,193,435 | 4,071,995.78 | 6,265,430.78 |
| 5/15/2046 | 2,305,848 | 3,959,582.22 | 6,265,430.22 |
| 5/15/2047 | 2,424,023 | 3,841,407.52 | 6,265,430.52 |
| 5/15/2048 | 2,548,254 | 3,717,176.34 | 6,265,430.34 |
| 5/15/2049 | 2,678,852 | 3,586,578.32 | 6,265,430.32 |
| 5/15/2050 | 2,816,144 | 3,449,287.16 | 6,265,431.16 |
| 5/15/2051 | 2,960,471 | 3,304,959.78 | 6,265,430.78 |
| 5/15/2052 | 3,112,195 | 3,153,235.64 | 6,265,430.64 |
| 5/15/2053 | 3,271,695 | 2,993,735.64 | 6,265,430.64 |
| 5/15/2054 | 3,439,369 | 2,826,061.28 | 6,265,430.28 |
| 5/15/2055 | 3,615,637 | 2,649,793.62 | 6,265,430.62 |
| 5/15/2056 | 3,800,938 | 2,464,492.22 | 6,265,430.22 |
| 5/15/2057 | 3,995,737 | 2,269,694.14 | 6,265,431.14 |
| 5/15/2058 | 4,200,518 | 2,064,912.62 | 6,265,430.62 |
| 5/15/2059 | 4,415,795 | 1,849,636.08 | 6,265,431.08 |
| 5/15/2060 | 31,674,665 | 1,623,326.58 | 33,297,991.58 |

[1] The amount of interest payable for the first year is subject to change based on the final determination of the Effective Date.

11

| | 107,269,103 | 166,702,633.60 | 273,971,736.60 |
|---|---|---|---|

Schedule 2

Series 2020 Mandatory Sinking Fund Schedule

## **EXHIBIT 2**

JOINDER

# FORM OF JOINDER

This Joinder to the Plan Support Agreement, dated as of [_____] [__], 2020, by and among the Borrowers and the Consenting Holders (the "**Support Agreement**"), is executed and delivered by _____ (the "**Joining Party**") as of _____, 2020.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Support Agreement.

1. <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Plan Support Agreement (and all exhibits and annexes thereto), attached to this Joinder as **Annex I** (as such Plan Support Agreement, exhibits and annexes may be hereafter amended, restated, or otherwise modified from time to time).  The Joining Party shall hereafter be deemed to be a "Consenting Holder" and a "Party" for all purposes under the Plan Support Agreement.

2. <u>Representations and Warranties</u>. With respect to the Series 2016 Bonds set forth below its name on the signature page hereof and all related claims, rights, and causes of action arising out of or in connection with or otherwise relating to such Series 2016 Bonds, the Joining Party hereby makes to the Borrowers the representations and warranties of the Consenting Holders set forth in the Plan Support Agreement.

3. <u>Notices</u>. For purposes of notices and other communications to be delivered to the Joining Party the relevant addresses and facsimile numbers are set forth below.

4. <u>Governing Law</u>. This Joinder shall be governed by and construed in accordance with the laws of The State of Illinois, without regard to any conflict of laws provisions that would require the application of the law of any other jurisdiction.

* * * * *

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

# EXHIBIT 3

Budget

# Monthly Cash Flow
## Timothy Place, Inc. d/b/a Park Place of Elmhurst

**Month 1 Begins:**                5/18/20

| Month 1 Ends | 5/31/20 | 6/30/20 | 7/31/20 | 8/31/20 | 9/30/20 |
|---|---|---|---|---|---|
| **Cash on Hand (beginning of month)** | 2,937,207 | 2,186,144 | 1,901,980 | 1,994,343 | 1,839,032 |
| | | | | | |
| **CASH RECEIPTS** | | | | | |
| Transfer from Trustee- operating & capital | - | 1,905,554 | 2,216,231 | 2,123,868 | 2,244,584 |
| Transfer from Trustee - EF refunds | | 323,190 | 730,910 | - | - |
| Fire settlement | | | | 100,000 | |
| Collections- PPP Fund | 539,782 | 837,718 | | | |
| Collections - A/R | 705,000 | 1,560,000 | 1,572,000 | 1,607,000 | 1,560,000 |
| Entrance Fees | 344,500 | 240,150 | 749,000 | 360,000 | 1,030,750 |
| Transfer to Trustee cash deposits | (1,589,282) | (2,637,868) | (2,321,000) | (2,067,000) | (2,590,750) |
| **TOTAL CASH RECEIPTS** | - | 2,228,744 | 2,947,141 | 2,123,868 | 2,244,584 |
| **Total Cash Available (before cash out)** | 2,937,207 | 4,414,888 | 4,849,121 | 4,118,211 | 4,083,616 |
| | | | | | |
| **CASH PAID OUT** | | | | | |
| Purchased Services & Supplies | 281,000 | 431,000 | 431,000 | 431,000 | 431,000 |
| | | | | | |
| Payroll  & payroll related | 340,000 | 665,500 | 681,500 | 868,811 | 681,500 |
| Marketing | 25,000 | 55,600 | 55,600 | 55,600 | 55,600 |
| Accounting & legal (non-bankruptcy) | - | 3,650 | 19,500 | - | - |
| Utilities | 39,500 | 80,500 | 80,500 | 80,500 | 80,500 |
| Insurance | 600 | 6,730 | 44,230 | 6,730 | 6,730 |
| Taxes (real estate, etc.) | - | - | - | - | 80,517 |
| **SUBTOTAL** | 686,100 | 1,242,980 | 1,312,330 | 1,442,641 | 1,335,847 |
| Capital escrow payment | - | 96,342 | 96,342 | 96,342 | 96,342 |
| Interest escrow payment | | 621,196 | 621,196 | 621,196 | 621,196 |
| Fire mitigation costs (To be reimbursed) | | 100,000 | | | |
| Capital purchase | 20,040 | 129,200 | 94,000 | 119,000 | 124,000 |
| Entrance Fee Refunds | 44,923 | 323,190 | 730,910 | - | - |
| **TOTAL CASH PAID OUT** | 751,063 | 2,512,908 | 2,854,778 | 2,279,179 | 2,177,385 |
| **Cash Position (End of Month)** | 2,186,144 | 1,901,980 | 1,994,343 | 1,839,032 | 1,906,231 |

**Payroll Protection Program loan in separate account:**

| | | |
|---|---|---|
| Loan proceeds - May 6, 2020 | 1,377,500 | 837,718 |
| Draw for Eligible Payroll and Eligible | | |
| nonpayroll costs | (539,782) | (837,718) |
| Balance | 837,718 | - |

Note: Notwithstanding anything to the contrary herein, shortly before the commencement of the Chapter 11 Cases, Park Place (a) will make an additional payment to its employees in the amount of their accrued earnings as of the Petition Date, and (b) place deposits with essential non-insider trade creditors in the amount of such vendor's estimated claims against Park Place which have accrued but are not yet payable as of the Petition Date. The intent of these payments and deposits is to help insure that employees and trade creditors will not have unsecured claims against Park Place in its Chapter 11 Case.

# EXHIBIT 4

Milestones if Borrowers receive PPP Loan

In the event the Borrowers receive the PPP Loan, the following Milestones shall apply:

(1)     On or before May 29, 2020, each of the Borrowers will execute the Term Sheet in form and substance as attached to this Agreement as **Exhibit 1**;

(2)     On or before May 29, 2020, each of the Borrowers will execute the Plan Support Agreement in form and substance as attached to this Agreement as **Exhibit 2**;

(3)     On or before June 12, 2020, the Borrowers will provide to the Trustee with final drafts of all Bankruptcy Documents (as defined in the Plan Support Agreement);

(4)     The Borrowers shall review and provide their comments on the 2020 Bond Documents (as defined in the Term Sheet) no later than two (2) weeks after receiving the drafts of the 2020 Bond Documents from the Trustee;

(5)     On or before June 26, 2020, the Parties to agree on the form and substance of the Bankruptcy Documents and the 2020 Bond Documents; and

(6)     Each of the Borrowers shall file petitions commencing the Chapter 11 Cases no later than two (2) Business Days after they Borrowers receive notice concerning the determination of forgiveness of the PPP Loan; and

(7)     Notwithstanding Milestones (1) through (6) above, the Borrowers shall file petitions commencing the Chapter 11 Cases no later than September 15, 2020.

.

# Park Place of Elmhurst and Obligated Affiliate

**Special-purpose Combined Financial Report**
**December 31, 2017**

EXHIBIT 3

DEBTORS' JOINT DISCLOSURE STATEMENT
DATED DECEMBER 15, 2020

## Park Place of Elmhurst and Obligated Affiliate

# Contents

Independent Auditor's Report                                          1-2

**Special-purpose Combined Financial Statements**

   Balance Sheet                                                     3

   Statement of Activities                                           4

   Statement of Changes in Net Assets                                5

   Statement of Cash Flows                                           6

   Notes to Special-purpose Combined Financial Statements          7-17



Plante & Moran, PLLC
Suite 900
200 N. Martingale Rd.
Schaumburg, IL 60173-2044
Tel: 847.697.6161
Fax: 847.697.8176
plantemoran.com

## Independent Auditor's Report

To the Board of Directors
Rest Haven Illiana Christian Convalescent Home
  as Parent of Park Place of Elmhurst and Obligated Affiliate

We have audited the accompanying special-purpose combined financial statements of Timothy Place, NFP d/b/a Park Place of Elmhurst, Inc. and Christian Healthcare Foundation, NFP (collectively, the "Obligated Group"), which comprise the special-purpose combined balance sheet as of December 31, 2017 and 2016 and the special-purpose combined statements of activities, changes in net assets, and cash flows for the years then ended, and the related notes to the special-purpose combined financial statements.

### Management's Responsibility for the Special-purpose Combined Financial Statements

Management is responsible for the preparation and fair presentation of these special-purpose combined financial statements in accordance with credit agreements under which they are obligated with UMB Bank, N.A., as Master Trustee and Master Trust Indenture, dated April 1, 2016 and Wells Fargo Bank, N.A., as Master Trustee and Master Trust Indenture, dated May 1, 2010 (from January 1, 2016 to March 31, 2016). Management is also responsible for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of special-purpose combined financial statements that are free from material misstatement, whether due to fraud or error.

### Auditor's Responsibility

Our responsibility is to express an opinion on these special-purpose combined financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the special-purpose combined financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the special-purpose combined financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the special-purpose combined financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the special-purpose combined financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the special-purpose combined financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinions.

### Opinion

In our opinion, the special-purpose combined financial statements referred to above present fairly, in all material respects, the financial position of Park Place of Elmhurst and Obligated Affiliate as of December 31, 2017 and 2016 and the results of their operations, changes in net deficit, and cash flows for the years then ended in accordance with the basis of accounting described in Note 2 to the special-purpose combined financial statements.

### Basis of Accounting

We draw attention to Note 2 to the special-purpose combined financial statements, which describes the basis of accounting. The special-purpose combined financial statements are prepared by the Obligated Group on the basis of the financial reporting provisions of the Master Trust Indenture, which is a basis of accounting other than accounting principles generally accepted in the United States of America, to comply with the financial reporting provisions of the Master Trust Indenture referred to above. Our opinion is not modified with respect to this matter.

1



To the Board of Directors
Rest Haven Illiana Christian Convalescent Home
 as Parent of Park Place of Elmhurst and Obligated Affiliate

Restriction on Use

This report is intended solely for the information and the use of the board of directors and management of Park Place of Elmhurst and Obligated Affiliate, the trustees under the Master Trust Indentures, and bondholders and is not intended to be and should not be used by anyone other than these specified parties.

*Plante & Moran, PLLC*

August 24, 2018

**Park Place of Elmhurst and Obligated Affiliate**

# Special-purpose Combined Balance Sheet

### December 31, 2017 and 2016

| | 2017 | 2016 |
|---|---|---|
| **Assets** | | |
| **Current Assets** | | |
| Cash and cash equivalents | $ 3,947,246 | $ 2,586,647 |
| Residents accounts receivable - Net (Note 3) | 800,284 | 686,922 |
| Assets limited as to use (Note 4) | 235,354 | 165,153 |
| Current portion of entrance fees receivable | 302,600 | 464,320 |
| Other current assets | 156,932 | 199,465 |
| **Total current assets** | 5,442,416 | 4,102,507 |
| **Property and Equipment** - Net (Note 6) | 118,268,949 | 121,019,085 |
| **Other** | | |
| Assets limited as to use - Net of current portion (Note 4) | 17,895,282 | 16,664,664 |
| Costs of acquiring initial continuing-care contracts - Net (Note 2) | 4,378,357 | 5,115,633 |
| Entrance fees receivable - Net of current portion | 2,601,700 | 4,633,398 |
| **Total assets** | $ 148,586,704 | $ 151,535,287 |
| **Liabilities and Net Deficit** | | |
| **Current Liabilities** | | |
| Accounts payable | $ 809,771 | $ 399,461 |
| Current portion of refundable entrance fees (Note 2) | 2,667,050 | 2,953,335 |
| Accrued interest payable | 1,739,727 | 1,321,663 |
| Resident notes and deposits | 218,645 | 291,238 |
| Accrued liabilities | 735,166 | 844,690 |
| **Total current liabilities** | 6,170,359 | 5,810,387 |
| **Noncurrent Liabilities** | | |
| Refundable entrance fees - Net of current portion (Note 2) | 67,719,161 | 61,065,365 |
| Deferred revenue from nonrefundable entrance fees | 10,003,245 | 9,928,349 |
| Obligation to provide future services (Note 2) | 13,668,775 | 18,863,541 |
| Long-term debt (Note 7) | 138,189,624 | 140,786,244 |
| Loan from affiliate (Note 9) | 5,000,000 | 5,000,000 |
| **Total noncurrent liabilities** | 234,580,805 | 235,643,499 |
| **Total liabilities** | 240,751,164 | 241,453,886 |
| **Net Deficit** - Unrestricted | (92,164,460) | (89,918,599) |
| **Total liabilities and net deficit** | $ 148,586,704 | $ 151,535,287 |

See notes to special-purpose combined financial
statements.                                   3

**Park Place of Elmhurst and Obligated Affiliate**

# Special-purpose Combined Statement of Activities

### Years Ended December 31, 2017 and 2016

|  | 2017 | 2016 |
|---|---|---|
| **Operating Revenue** | | |
| Net resident service revenue | $ 17,561,765 | $ 16,474,680 |
| Amortization of entrance fees | 1,445,463 | 1,136,203 |
| Other operating revenue | 369,559 | 368,504 |
| Total operating revenue | 19,376,787 | 17,979,387 |
| **Operating Expenses** | | |
| General and administrative | 1,216,038 | 1,263,652 |
| Building and maintenance | 776,722 | 857,091 |
| Security services | 149,887 | 113,021 |
| Grounds and maintenance | 158,268 | 161,547 |
| Transportation | 42,634 | 41,736 |
| Housekeeping and laundry services | 677,992 | 636,965 |
| Dining services | 2,341,486 | 2,230,431 |
| Pastoral care | 56,987 | 57,466 |
| Life enrichment | 521,952 | 494,288 |
| Marketing services | 1,223,880 | 1,260,685 |
| Resident services | 5,813,559 | 5,810,664 |
| Utilities | 639,245 | 612,626 |
| Interest | 8,316,578 | 9,371,842 |
| Depreciation and amortization | 4,224,262 | 4,213,881 |
| Insurance | 256,420 | 303,222 |
| Management fee | 360,000 | 270,000 |
| Real estate tax | 180,346 | 26,821 |
| Change in obligation to provide future services | (5,194,766) | (5,695,459) |
| Gift shop | 1,630 | 859 |
| Total operating expenses | 21,763,120 | 22,031,338 |
| **Operating Loss** | (2,386,333) | (4,051,951) |
| **Other Income (Expense)** | | |
| Investment income (Note 4) | 62,349 | 30,095 |
| Contributions | 78,123 | 2,100 |
| Write-off of financing costs (Note 7) | - | (2,000,625) |
| Total other income (expense) | 140,472 | (1,968,430) |
| **Deficiency of Revenue Over Expenses** | (2,245,861) | (6,020,381) |
| **Transfer from Affiliate (Note 9)** | - | 5,797,244 |
| **Increase in Unrestricted Net Deficit** | $ (2,245,861) | $ (223,137) |

See notes to special-purpose combined financial statements.

4

**Park Place of Elmhurst and Obligated Affiliate**

# Special-purpose Combined Statement of Changes in Net Assets

**Years Ended December 31, 2017 and 2016**

|  | 2017 | 2016 |
|---|---|---|
| **Unrestricted Net Assets** | | |
| Deficiency of revenue over expenses | $ (2,245,861) | $ (6,020,381) |
| Transfer from affiliate | - | 5,797,244 |
| Decrease in unrestricted net assets | (2,245,861) | (223,137) |
| **Net Assets - Beginning of year** | (89,918,599) | (89,695,462) |
| **Net Assets - End of year** | $ (92,164,460) | $ (89,918,599) |

**Park Place of Elmhurst and Obligated Affiliate**

# Special-purpose Combined Statement of Cash Flows

### Years Ended December 31, 2017 and 2016

|  | 2017 | 2016 |
|---|---|---|
| **Cash Flows from Operating Activities** | | |
| Change in unrestricted net assets | $ (2,245,861) | $ (223,137) |
| Adjustments to reconcile the change in net assets to net cash from operating activities: | | |
| Depreciation and amortization | 4,224,262 | 4,213,881 |
| Amortization of deferred financing costs | 214,319 | 295,962 |
| Net change in realized net losses on assets limited as to use | - | 43,729 |
| Net change in unrealized net losses on assets limited as to use | 5,204 | - |
| Amortization of entrance fees | (1,445,463) | (1,136,203) |
| Proceeds from nonrefundable entrance fees | 1,320,383 | 918,820 |
| Change in obligation to provide future services | (5,194,766) | (5,695,459) |
| Provision for bad debts | 180,363 | 45,000 |
| Gain on write-off of related party payables | - | (5,797,244) |
| Write-off of financing costs | - | 2,000,625 |
| Changes in assets and liabilities which (used) provided cash: | | |
| Accounts receivable | (293,725) | (104,559) |
| Other current assets | 42,533 | (122,745) |
| Accounts payable | 410,310 | (540,844) |
| Accrued liabilities | 308,540 | (1,178,299) |
| Due to related parties | - | 1,071,587 |
| Net cash used in operating activities | (2,473,901) | (6,208,886) |
| **Cash Flows from Investing Activities** | | |
| Purchase of property and equipment | (605,541) | (185,935) |
| Purchase of assets limited as to use | (56,214,722) | (72,230,622) |
| Proceeds from assets limited as to use | 54,908,699 | 73,028,780 |
| Collections on notes receivable | 4,782,118 | 4,100,112 |
| Net cash provided by investing activities | 2,870,554 | 4,712,335 |
| **Cash Flows from Financing Activities** | | |
| Debt issuance costs | - | (1,137,736) |
| Proceeds from issuance of debt obligations | - | 146,125,000 |
| Principal payment on long-term debt | (2,942,248) | (159,110) |
| Early termination of long-term debt | - | (146,125,000) |
| Proceeds from loan from affiliate | - | 5,000,000 |
| Proceeds from refundable entrance fees | 6,410,318 | 3,182,634 |
| Refunds on entrance fees | (2,431,531) | (3,670,507) |
| Net refunds on resident notes and deposits | (72,593) | (2,157) |
| Net cash provided by financing activities | 963,946 | 3,213,124 |
| **Net Increase in Cash and Cash Equivalents** | 1,360,599 | 1,716,573 |
| **Cash and Cash Equivalents - Beginning of year** | 2,586,647 | 870,074 |
| **Cash and Cash Equivalents - End of year** | $ 3,947,246 | $ 2,586,647 |
| **Supplemental Cash Flow Information** | | |
| Cash paid for interest | $ 7,995,306 | $ 9,202,691 |
| Entrance fees financed via notes receivable | 2,601,700 | 4,633,398 |

See notes to special-purpose combined financial statements.

6

## Park Place of Elmhurst and Obligated Affiliate

# Notes to Special-purpose Combined Financial Statements

**December 31, 2017 and 2016**

## Note 1 - Nature of Business

*The Reporting Entity - Basis of Presentation of the Special-purpose Combined Financial Statements*

The special-purpose combined financial statements include the accounts of Timothy Place, NFP d/b/a Park Place of Elmhurst, Inc. (Park Place of Elmhurst) and Christian Healthcare Foundation, NFP (the "Foundation") (collectively, the "Obligated Group").

Rest Haven Illiana Christian Convalescent Home d/b/a Providence Life Services (Providence), the parent corporation of Park Place of Elmhurst, is a not-for-profit Illinois corporation whose purpose is to provide nursing and residential living arrangements for the aged, including skilled nursing and rehabilitation services, home health care, townhome living, independent living, and assisted living. Providence is a not-for-profit corporation, as described in Section 501(c)(3) of the Internal Revenue Code (the "Code"), and is exempt from federal income taxes on related income pursuant to Section 501(a) of the Code. The accompanying special-purpose combined financial statements exclude Providence.

Park Place of Elmhurst is a wholly owned subsidiary of Providence, which is exempt from federal income taxes on related income pursuant to Section 501(a) of the Code. In February 2012, Park Place of Elmhurst, with the assistance of a developer, completed a senior living community in Elmhurst, Illinois, which consists of 181 independent living apartments with common support areas, 66 assisted living and memory support apartments, and 37 skilled nursing beds. Upon completion of construction, Park Place of Elmhurst now owns and operates the community.

The Foundation, a wholly owned subsidiary of Providence, is a not-for-profit corporation, as described in Section 501(c)(3) of the Code, and is exempt from federal income taxes on related income pursuant to Section 501(a) of the Code. The Foundation seeks to support and advance Christian care and services to the elderly and infirm by supporting health-related research, the development of a continuum of appropriate living arrangements, and programs and services to support a quality of life for those who suffer from disabilities and age-related illnesses and infirmities.

All significant intercompany balances and transactions have been eliminated in combination.

## Note 2 - Significant Accounting Policies

*Basis of Accounting*

These special-purpose combined financial statements have been prepared in accordance with the accounting requirements set forth in the Master Trust Indenture, dated as of April 1, 2016 between Park Place of Elmhurst, the Foundation, and UMB Bank, N.A., as Master Trustee from April 1, 2016 to December 31, 2016 and in accordance with the accounting requirements set forth in the Master Trust Indenture, dated as of May 1, 2010 between Park Place of Elmhurst, the Foundation, and Wells Fargo Bank, N.A., as Master Trustee from January 1, 2015 to March 31, 2016. Accordingly, the accompanying special-purpose combined financial statements are not intended to be a presentation in conformity with accounting principles generally accepted in the United States of America.

The accompanying special-purpose combined financial statements have been prepared in conformity with generally accepted accounting principles, which contemplate continuation of the Obligated Group as a going concern. The Obligated Group has sustained operating losses in recent years. These losses are primarily due to the Obligated Group not obtaining projected occupancy rates since its startup in February 2012. The Obligated Group's losses have led to deficiencies in cash flows and net assets. Management has developed a turnaround strategy, which includes diligent expense management along with implementation of a program of increased entrance fees for new residents and monthly service fees for all residents beginning in January 2018 to better align with its market. These changes are expected to further enhance operating revenue and cash flow.

## Park Place of Elmhurst and Obligated Affiliate

# Notes to Special-purpose Combined Financial Statements

**December 31, 2017 and 2016**

## Note 2 - Significant Accounting Policies (Continued)

### Use of Estimates

The preparation of the accompanying special-purpose combined financial statements requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the special-purpose combined financial statements. Estimates also affect the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

### Cash and Cash Equivalents

Cash and cash equivalents include certain investments in highly liquid instruments purchased with an original maturity of three months or less. Cash balances held in the bank exceed the federal depository insurance limit of $250,000 at each institution. The Obligated Group's cash is only insured up to the federal depository insurance limit. The Obligated Group evaluates the financial institutions with which it deposits funds; however, it is not practical to insure all cash deposits.

### Resident Accounts Receivable

Accounts receivable for residents, insurance companies, and governmental agencies are based on net charges. An allowance for uncollectible accounts is established on an aggregate basis by using historical write-off rate factors applied to unpaid accounts based on aging. Loss rate factors are based on historical loss experience and adjusted for economic conditions and other trends affecting the Obligated Group's ability to collect outstanding amounts. Uncollectible amounts are written off against the allowance for doubtful accounts in the period they are determined to be uncollectible.

### Entrance Fees Receivable

Residents are able to request a deferral of a portion of their entrance fees to be paid at the earlier of 14 days after the closing on the sale of the resident's home or 24 months from the date of occupancy. If the balance has not been paid within 12 months of occupancy, the receivable will bear interest at the prime rate plus 300 basis points per annum, until the balance is paid in full. Management believes all of the amounts to be collectible.

### Assets Limited as to Use

Assets limited as to use include assets held by a trustee and limited as to use in accordance with the requirements of bond indenture agreements and assets held restricted for resident deposits.

### Risk and Uncertainties

The Obligated Group invests in various investment securities within the assets limited as to use portfolio. Investment securities are exposed to various risks, such as interest rate, market, and credit risks. Due to the level of risk associated with certain investment securities, it is at least reasonably possible that changes in the values of investment securities will occur in the near term and that such changes could materially affect the amounts reported in the special-purpose combined balance sheet.

### Property and Equipment

Property and equipment purchases are recorded at cost. Donated property and equipment are recorded at the estimated fair market value at the time of donation. Depreciation is computed principally on the straight-line basis over the estimated useful lives of the assets. Interest cost incurred on borrowed funds during the period of construction is capitalized as a component of the cost of acquiring those assets. The costs of maintenance and repairs are charged to expense when incurred.

## Park Place of Elmhurst and Obligated Affiliate

# Notes to Special-purpose Combined Financial Statements

**December 31, 2017 and 2016**

## Note 2 - Significant Accounting Policies (Continued)

The Obligated Group evaluates long-lived assets for impairment on an annual basis. Long-lived assets are considered to be impaired whenever events or changes in circumstances indicate the carrying amount of an asset may not be recoverable from future cash flows. Recoverability of long-lived assets to be held and used is measured by a comparison of the carrying amount of an asset to future cash flows expected to be generated by the asset. When such assets are considered to be impaired, the impairment loss recognized is measured by the amount by which the carrying value of the asset exceeds the fair value of the asset. The Obligated Group does not believe that there are any factors or circumstances indicating impairment of its long-lived assets as of December 31, 2017 and 2016.

### Capitalized Advertising Costs

Costs of acquiring initial continuing-care contracts consist principally of marketing and advertising costs incurred directly in relation to the initial acquisition of continuing-care contracts. In accordance with ASC Subtopic 340-20, *Other Assets and Deferred Costs - Capitalized Advertising Costs - Capitalized Advertising Costs*, the Obligated Group capitalizes costs incurred in connection with direct response advertising, whose primary purpose is to secure deposits from residents who are shown to have responded specifically to the advertising. Such advertising costs include newspaper, magazine, television, radio, brochures, and other costs. The costs are amortized using the straight-line method over the expected stays at the respective communities of the first resident groups, beginning in the first period in which revenue associated with the costs is earned. Upon occupancy of the first resident group, additional costs are expensed as incurred. Amortization expense related to the capitalized advertising costs totaled $737,276 in 2017 and 2016.

### Deferred Financing Costs

Deferred financing costs have been amortized over the term of the bonds using the straight-line interest method. Amortization expense related to the deferred financing costs totaled $214,319 and $295,962 in 2017 and 2016, respectively, and is included in interest expense.

### Entrance Fees

In consideration for the payment of an entrance fee, the Obligated Group operates under the "Life Care" concept pursuant to which residents enter into a residency agreement. Entrance fees are refundable to the resident upon termination of residency and reoccupancy by a new resident. The amortization of deferred entrance fees is revised annually based on changes in the estimated life expectancy of residents. The effects of such changes in estimates are recognized in the period of the changes and future periods. The refundable entrance fees are calculated based on the residents' contracts.

At December 31, 2017 and 2016, the Obligated Group had life residency contracts with gross potential refund obligations totaling $70,386,211 and $64,018,700, respectively.

### Obligation to Provide Future Services

The Obligated Group annually calculates the present value of the net cost of future services and the use of facilities to be provided to current residents and compares that amount with the balance of deferred revenue from nonrefundable entrance fees. If the present value of the net cost of future services and the use of facilities exceeds the deferred revenue from nonrefundable entrance fees, a liability is recorded (obligation to provide future services and the use of facilities) with the corresponding charge to income. The obligation is discounted at 5 percent. The present value of the net cost of future services and the use of facilities was greater than deferred revenue from nonrefundable entrance fees at December 31, 2017 and 2016 and, accordingly, a future service obligation of $13,668,775 and $18,863,541 has been recognized in the accompanying special-purpose combined balance sheet for 2017 and 2016, respectively.

9

## Park Place of Elmhurst and Obligated Affiliate

# Notes to Special-purpose Combined Financial Statements

**December 31, 2017 and 2016**

## Note 2 - Significant Accounting Policies (Continued)

### Deficiency of Revenue Over Expenses

The special-purpose combined statement of activities includes deficiency of revenue over expenses. Changes in unrestricted net deficit, which are excluded from deficiency of revenue over expenses, consistent with industry practice, include activity with affiliates, such as transfers.

### Resident Service Revenue

The Obligated Group's principal activity is operating a long-term healthcare facility for the elderly. Revenue is derived from participation in the Medicare program, as well as from private-pay residents and insurance companies. Revenue is recorded at standard billing rates, and differences between billing rates and amounts paid under these programs are recorded as contractual adjustments. Amounts earned under the Medicare program make up a significant portion of revenue earned during each year as follows:

|  | 2017 | 2016 |
|---|---|---|
| Percent of revenue - Medicare | 26 % | 27 % |

The payment methodology and amounts earned related to these programs are based on cost and clinical assessments that are subject to review and final approval by Medicare. Any adjustment that is a result of this final review and approval will be recorded in the period in which the adjustment is made. In the opinion of management, adequate provision has been made for any adjustments that may result from such third-party review.

Services rendered to Medicare program beneficiaries are paid at prospectively determined rates based upon clinical assessments completed by the Obligated Group.

Laws and regulations governing the Medicare program are complex and subject to interpretation. Management believes it is in compliance with all applicable laws and regulations and is not aware of any pending or threatened investigations involving allegations of potential wrongdoings. While no such regulatory inquiries have been made, compliance with such laws and regulations can be subject to future government review and interpretation. Noncompliance with such laws and regulations may result in significant regulatory action, including fines, penalties, and exclusion from the Medicare program.

### Federal Income Tax

The Internal Revenue Service has ruled that Park Place of Elmhurst and the Foundation are exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code and, accordingly, no tax provision is reflected in the special-purpose combined financial statements.

### Upcoming Accounting Pronouncements

In May 2014, the Financial Accounting Standards Board issued Accounting Standards Update No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, which will supersede the current revenue recognition requirements in Topic 605, *Revenue Recognition*. The ASU is based on the principle that revenue is recognized to depict the transfer of goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. The ASU also requires additional disclosure about the nature, amount, timing, and uncertainty of revenue and cash flows arising from customer contracts, including significant judgments and changes in judgments and assets recognized from costs incurred to obtain or fulfill a contract. The new guidance will be effective for the Obligated Group's year ending December 31, 2018 and for interim periods. The ASU permits application of the new revenue recognition guidance to be applied using one of two retrospective application methods. The Obligated Group has not yet determined which application method it will use. The Obligated Group is in the process of evaluating the impact of the new standard on its special-purpose combined financial statements with a focus on the timing and pattern of amortization revenue recognized on the nonrefundable portion of entrance fee contracts.

10

## Park Place of Elmhurst and Obligated Affiliate

# Notes to Special-purpose Combined Financial Statements

**December 31, 2017 and 2016**

## Note 2 - Significant Accounting Policies (Continued)

In August 2016, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) No. 2016-14, *Not-for-Profit Entities (Topic 958): Presentation of Financial Statements of Not-for-Profit Entities*. ASU No. 2016-14 requires significant changes to the financial reporting model of organizations that follow FASB not-for-profit rules, including changing from three classes of net assets to two classes: net assets with donor restrictions and net assets without donor restrictions. The ASU will also require changes in the way certain information is aggregated and reported by the Obligated Group, including required disclosures about the liquidity and availability of resources. The new standard is effective for the Obligated Group's year ending December 31, 2018 and thereafter and must be applied on a retrospective basis. This standard is expected to have an impact on the presentation of net assets and to result in enhanced disclosures related to liquidity and availability.

*Subsequent Events*

The special-purpose combined financial statements and related disclosures include evaluation of events up through and including August 24, 2018, which is the date the special-purpose combined financial statements were issued.

## Note 3 - Resident Accounts Receivable

The details of resident accounts receivable at December 31, 2017 and 2016 are as follows:

|  | 2017 | 2016 |
|---|---|---|
| Resident accounts receivable | $ 986,861 | $ 724,278 |
| Less allowance for uncollectible accounts | 186,577 | 37,356 |
| Net resident accounts receivable | $ 800,284 | $ 686,922 |

The Obligated Group grants credit without collateral to residents, most of whom are local residents and are insured under third-party payor agreements. The composition of receivables from residents and third-party payors is as follows:

|  | 2017 | 2016 |
|---|---|---|
| Medicare | 32 % | 49 % |
| Private pay | 13 | 18 |
| Insurance and others | 55 | 33 |
| Total | 100 % | 100 % |

## Note 4 - Assets Limited as to Use

A summary of the composition of the Obligated Group's assets limited as to use portfolio at December 31, 2017 and 2016 is as follows:

|  | 2017 | 2016 |
|---|---|---|
| Assets limited as to use: |  |  |
| Cash and cash equivalents | $ 241,147 | $ 165,153 |
| U.S. government and U.S. agency securities | 1,325,142 | - |
| Corporate bonds | 489,571 | - |
| Money market fund | 16,074,776 | 16,664,664 |
| Total | $ 18,130,636 | $ 16,829,817 |

11

## Park Place of Elmhurst and Obligated Affiliate

# Notes to Special-purpose Combined Financial Statements

**December 31, 2017 and 2016**

### Note 4 - Assets Limited as to Use (Continued)

Assets limited as to use were composed of the following at December 31, 2017 and 2016:

|  | 2017 | 2016 |
|---|---|---|
| Assets limited as to use: |  |  |
| Held by trustee under bond indenture agreements | $ 17,895,282 | $ 16,664,664 |
| Held in escrow for resident deposits | 235,354 | 165,153 |
| Total | $ 18,130,636 | $ 16,829,817 |

The composition of investment return on the Obligated Group's portfolio for the years ended December 31, 2017 and 2016 is as follows:

|  | 2017 | 2016 |
|---|---|---|
| Income: |  |  |
| Interest income | $ 67,553 | $ 73,824 |
| Realized losses on sales of securities | - | (43,729) |
| Unrealized losses on securities | (5,204) | - |
| Total | $ 62,349 | $ 30,095 |

### Note 5 - Fair Value

Accounting standards require certain assets be reported at fair value in the special-purpose combined financial statements and provide a framework for establishing that fair value. The framework for determining fair value is based on a hierarchy that prioritizes the inputs and valuation techniques used to measure fair value.

The following table presents information about the Obligated Group's assets measured at fair value on a recurring basis at December 31, 2017 and 2016 and the valuation techniques used by the Obligated Group to determine those fair values.

Fair values determined by Level 1 inputs use quoted prices in active markets for identical assets that the Obligated Group has the ability to access.

Fair values determined by Level 2 inputs use other inputs that are observable either directly or indirectly. These Level 2 inputs include quoted prices for similar assets in active markets and other inputs, such as interest rates and yield curves, that are observable at commonly quoted intervals.

Level 3 inputs are unobservable inputs, including inputs that are available in situations where there is little, if any, market activity for the related asset. These Level 3 fair value measurements are based primarily on management's own estimates using pricing models, discounted cash flow methodologies, or similar techniques taking into account the characteristics of the asset.

In instances whereby inputs used to measure fair value fall into different levels in the above fair value hierarchy, fair value measurements in their entirety are categorized based on the lowest level input that is significant to the valuation. The Obligated Group's assessment of the significance of particular inputs to these fair value measurements requires judgment and considers factors specific to each asset.

*Restatement* - In 2017, it was determined that certain investments were previously categorized as cash and cash equivalents should have been categorized as money market funds. Accordingly, the 2016 disclosure has been updated.

12

**Park Place of Elmhurst and Obligated Affiliate**

# Notes to Special-purpose Combined Financial Statements

**December 31, 2017 and 2016**

## Note 5 - Fair Value (Continued)

| | Assets Measured at Fair Value on a Recurring Basis at December 31, 2017 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Balance at December 31, 2017 |
| Assets limited as to use: | | | | |
| U.S. government and U.S. agency securities | $        - | $   1,325,142 | $        - | $   1,325,142 |
| Corporate bonds | - | 489,571 | - | 489,571 |
| Money market funds | 16,074,776 | - | - | 16,074,776 |
| Total assets limited as to use | $  16,074,776 | $   1,814,713 | $        - | $  17,889,489 |

| | Assets Measured at Fair Value on a Recurring Basis at December 31, 2016 | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Balance at December 31, 2016 |
| Assets limited as to use - Money market funds | $  16,664,664 | $        - | $        - | $  16,664,664 |

Excluded in the above tables are cash and cash equivalents of $241,147 and $165,153 at December 31, 2017 and 2016, respectively.

The Obligated Group's policy is to recognize transfers in and transfers out of Levels 1, 2, and 3 fair value classifications as of the actual date of the event of change in circumstances that caused the transfer. There were no transfers into or out of Levels 1, 2, or 3 for the years ended December 31, 2017 and 2016.

The fair value of U.S. government and U.S. agency securities and corporate bonds at December 31, 2017 was determined primarily based on Level 2 inputs. The Obligated Group estimates the fair value of these investments using quoted market prices for similar assets in active markets.

## Note 6 - Property and Equipment

Property and equipment and depreciable lives at December 31, 2017 and 2016 are as follows:

| | 2017 | 2016 | Depreciable Life - Years |
|---|---|---|---|
| Land | $   14,600,000 | 14,600,000 | - |
| Land improvements | 376,667 | 368,167 | 10-15 |
| Buildings | 114,647,151 | 114,647,151 | 7-40 |
| Building improvements | 5,288,924 | 4,862,217 | 3-10 |
| Fixed equipment | 1,009,359 | 926,928 | 3-5 |
| Transportation equipment | 28,163 | 28,163 | 5 |
| Furniture and fixtures | 1,601,393 | 1,560,228 | 3-5 |
| Computer equipment and software | 514,812 | 477,359 | 3-5 |
| Construction in progress | 9,285 | - | - |
| Total cost | 138,075,754 | 137,470,213 | |
| Accumulated depreciation | 19,806,805 | 16,451,128 | |
| Net property and equipment | $  118,268,949 | 121,019,085 | |

**Park Place of Elmhurst and Obligated Affiliate**

# Notes to Special-purpose Combined Financial Statements

**December 31, 2017 and 2016**

## Note 6 - Property and Equipment (Continued)

Depreciation expense for 2017 and 2016 was $3,355,677 and $3,450,205, respectively.

## Note 7 - Long-term Debt

Long-term debt at December 31, 2017 and 2016 is as follows:

|  | 2017 | 2016 |
|---|---|---|
| Illinois Finance Authority Revenue Bonds, Series 2016A, fixed interest rates ranging from 6.20 percent to 6.44 percent, mandatory monthly sinking fund redemption beginning in May 2021 through May 2055 | $ 103,691,500 | $ 103,691,500 |
| Illinois Finance Authority Revenue Bonds, Series 2016B, fixed interest rate of 5.625 percent, subject the mandatory redemption from entrance fees funds transferred to the Bond Trustee, principal payment due in May 2020 | 17,413,392 | 20,355,640 |
| Illinois Finance Authority Excess Cash Revenue Bonds, Series 2016C, fixed interest rate of 2.00 percent, subject to mandatory redemption from excess cash transferred to the Bond Trustee, principal payment due in May 2055 | 21,918,750 | 21,918,750 |
| Subtotal | 143,023,642 | 145,965,890 |
| Less original issue discount and unamortized deferred financing costs - Net | 4,834,018 | 5,179,646 |
| Total | $ 138,189,624 | $ 140,786,244 |

Park Place of Elmhurst and the Foundation, collectively referred to as the "Obligated Group," entered into a Master Trust Indenture dated as of May 1, 2010. The purpose of the Master Trust Indenture was to provide a mechanism to be able to issue indebtedness in order to secure the financing or refinancing of facilities and for other lawful proper corporate purposes. The Master Trust Indenture provided for other legal entities to become members of the Obligated Group for the payment of obligations and the performance of all covenants contained therein, provided they meet certain restrictions. The Master Trust Indenture also required members to make payments on debt issued by other members of the Obligated Group if such other members are unable to satisfy their obligations under the Master Trust Indenture.

The Obligated Group pledged a security interest in the gross revenue of each member, as well as a first mortgage lien on the real property on which the Elmhurst Senior Living Community is located and a security interest in the personal property and fixtures located in said community, as collateral on borrowings under the Master Trust Indenture.

On May 27, 2010, the Illinois Finance Authority (the "Authority") issued $175,540,000 of Illinois Finance Authority Revenue Bonds, Series 2010A-E (the "Series 2010A-E bonds") on behalf of the Obligated Group. The Series 2010A-E bonds were issued under Bond Trust Indentures dated May 1, 2010 between the Authority and Wells Fargo Bank, N.A., as bond trustee. The Series 2010A-E bonds were issued pursuant to the Master Trust Indenture and contain optional and mandatory redemption provisions whereby the bonds are callable for redemption at various dates prior to their stated maturities. Series 2010E had been previously paid in a prior year.

## Park Place of Elmhurst and Obligated Affiliate

# Notes to Special-purpose Combined Financial Statements

**December 31, 2017 and 2016**

### Note 7 - Long-term Debt (Continued)

On January 17, 2016, the Obligated Group filed chapter 11 bankruptcy petitions with the United States Bankruptcy Court of the Northern District of Illinois. The bankruptcy case was prenegotiated with certain of the Obligated Group's institutional bondholders and filed to effectuate a special-purpose combined balance sheet restructuring of the Obligated Group. The provisions of the bankruptcy petition went effective April 1, 2016 via final approval of the United States Bankruptcy Court of the Northern District of Illinois. As the plan of reorganization, the Series 2010A-D bonds were exchanged for Series 2016 A-C obligations and bonds issued through the Illinois Finance Authority and UMB Bank, N.A., as trustee under a new master trust indenture, dated April 1, 2016.

Pursuant to the plan of reorganization, the Obligated Group obtained consent from the majority of the existing Series 2010 bondholders to fully replace the outstanding bonds at December 31, 2015 with new instruments (the "Series 2016 bonds"). As a result, effective April 1, 2016, the Obligated Group replaced each of the outstanding series of the 2010 bonds using an 85/15 split as presented in the following table:

| 2010 Bonds | | | | 2016 Bonds | | | |
|---|---|---|---|---|---|---|---|
| Series | Coupon | Maturity | Principal | Series | Coupon | Maturity | Principal |
| A-1 | 8.00 % | 5/15/2020 | $ 4,725,000 | A-1 | 6.20 % | 3/15/2030 | $ 4,016,250 |
|  |  |  |  | C | 2.00 | 3/15/2055 | 708,750 |
| A-2 | 8.25 | 5/15/2030 | 18,590,000 | A-2 | 6.24 | 3/15/2038 | 15,801,500 |
|  |  |  |  | C | 2.00 | 3/15/2055 | 2,788,500 |
| A-3 | 8.40 | 5/15/2040 | 40,365,000 | A-3 | 6.33 | 3/15/2048 | 34,310,250 |
|  |  |  |  | C | 2.00 | 3/15/2055 | 6,054,750 |
| A-4 | 8.45 | 5/15/2045 | 45,435,000 | A-4 | 6.44 | 3/15/2055 | 38,619,750 |
|  |  |  |  | C | 2.00 | 3/15/2055 | 6,815,250 |
| B | 7.75 | 5/15/2020 | 7,875,000 | A-1 | 6.20 | 3/15/2030 | 6,693,750 |
|  |  |  |  | C | 2.00 | 3/15/2055 | 1,181,250 |
| C | 7.50 | 11/15/2016 | 5,000,000 | A-4 | 6.44 | 3/15/2055 | 4,250,000 |
|  |  |  |  | C | 2.00 | 3/15/2055 | 750,000 |
| D-1 | 7.25 | 8/1/2016 | 10,275,000 | B | 5.63 | 3/15/2020 | 8,733,750 |
|  |  |  |  | C | 2.00 | 3/15/2055 | 1,541,250 |
| D-2 | 7.00 | 11/15/2015 | 13,860,000 | B | 5.63 | 3/15/2020 | 11,781,000 |
|  |  |  |  | C | 2.00 | 3/15/2055 | 2,079,000 |

The replacement of Series 2010 bonds resulted in a troubled debt restructuring because (i) the Obligated Group was experiencing financial difficulty and (ii) the effective interest rate paid to each bondholder decreased upon replacement. The future undiscounted cash flows on the Series 2016 bonds are higher than the Obligated Group's net carrying value of the Series 2010 bonds as of April 1, 2016. Because the replacement did not result in the extinguishment of the Obligated Group's obligation to the bondholders, the troubled debt restructuring is presented in the special-purpose combined financial statements as a modification, with no gain or loss recognized. During 2016, fees paid to third parties in connection with the replacement of approximately $2 million are presented in the write-off of financing costs line item of the special-purpose combined statement of activities. Approximately $5.4 million in unamortized deferred financing costs and original issuance discount on the Series 2010 bonds continue to be amortized using the effective interest rate from April 1, 2016.

## Park Place of Elmhurst and Obligated Affiliate

# Notes to Special-purpose Combined Financial Statements

**December 31, 2017 and 2016**

### Note 7 - Long-term Debt (Continued)

Scheduled annual principal repayments on long-term debt on the scheduled redemptions according to the April 1, 2016 Master Trust Indenture are as follows:

|  |  |  |
|---|---|---|
| 2020 | $ | 17,413,392 |
| Thereafter |  | 125,610,250 |
| Total | $ | 143,023,642 |

Under the Master Trust Indenture, the Obligated Group is subject to various financial covenants. As of December 31, 2017, the Obligated Group was in violation of the cumulative cash covenant. The bank has waived that requirement of the agreement as of December 31, 2017 and for the period ended March 31, 2018.

### Note 8 - Commitments

#### (a) Professional and General Liability Self-insurance

Providence maintains a contractual agreement with Caring Communities Insurance Program (Caring Communities), a self-insurance administrator, which, through its risk-sharing provisions, provided the Obligated Group's insurance coverage for professional and comprehensive general liability exposure. Caring Communities was a multiorganizational insurance company for long-term care organizations incorporated under the laws of the Cayman Islands that had elected to be taxed as a U.S. corporation.

Caring Communities, a reciprocal risk retention group (CCrRRG), will continue to provide Providence and the Obligated Group with claims-made insurance coverage for claims reported before January 1, 2008. Effective January 1, 2008, CCrRRG now provides Providence and the Obligated Group with claims-made insurance coverage using a combination of self-insured retentions and excess commercial insurance coverage. CCrRRG engages a professional actuarial consultant for the determination of premiums to be assessed to participants under the plan of coverage. As a self-insurance administrator, CCrRRG enables risk-sharing among participating long-term care organizations. Providence and the Obligated Group are required to pay assessed premiums and are subject to a per-claim self-insured retention of $150,000 in 2017 and 2016. Based upon the Obligated Group's historical claims experience and exposure to date with Caring Communities and CCrRRG, no reserves have been established at December 31, 2017 or 2016 for either retroactive premium assessments or tail exposures.

#### (b) Regulatory Investigations

The U.S. Department of Justice and other federal agencies routinely conduct regulatory investigations and compliance audits of long-term care providers. The Obligated Group is subject to these regulatory efforts. Management is currently unaware of any regulatory matters that may have a material adverse effect on the Obligated Group's special-purpose combined financial position or results of operations.

#### (c) Medicare Reimbursement

The Obligated Group participates as a provider under the Medicare program. The laws and regulations governing the Medicare programs are extremely complex and subject to interpretation, making compliance an ongoing challenge for long-term care organizations. Recently, the federal government has increased its enforcement activity, including audits and investigations related to billing practices, clinical documentation, and related matters. The Obligated Group maintains a compliance program designed to educate employees and to detect and correct possible violations.

## Park Place of Elmhurst and Obligated Affiliate

# Notes to Special-purpose Combined Financial Statements

**December 31, 2017 and 2016**

## Note 8 - Commitments (Continued)

### (d) Employee Health Insurance

The Obligated Group maintains a self-insurance program for employee healthcare coverage, combining various levels of self-insured retentions and excess coverage. The Obligated Group's provision for employee health insurance expenses includes estimates of known claims as well as claims incurred but not reported as of fiscal year end.

### (e) Litigation

The Obligated Group is involved in litigation arising in the ordinary course of business. The ultimate outcome of this litigation is unknown at the present time and, accordingly, no provision for any liability that might result has been made in the accompanying special-purpose combined financial statements. In the opinion of management, any liability not covered by insurance resulting from such litigation would not be material in relationship to the Obligated Group's financial position.

## Note 9 - Transactions with Related Parties

The Obligated Group entered into a management agreement dated October 27, 2009 between the Obligated Group and Providence Management and Development Company, Inc. (PMDC), an affiliate of the Obligated Group, whereby PMDC provides management and related support services to the Obligated Group. The agreement is for a term of five years beginning 180 days prior to opening and requires the Obligated Group to pay an annual management fee equal to $38,000 per month from operations, with annual increases substantially equivalent to the federal Consumer Price Index's Cost of Living Adjustment. Effective in fiscal year 2013, the management contract was transferred from PMDC to Providence, which now provides the management and related support services to the Obligated Group. Effective 2016, as a result of the bankruptcy, a new revised management agreement was signed with Providence limiting the management fee to 3.25 percent of gross operating revenue, with no more than $30,000 paid each month as operating expense. The Obligated Group incurred management fee expense of $360,000 and $270,000 for the years ended December 31, 2017 and 2016, respectively.

Premiums due under the employee health insurance program, which are payable to Providence (see Note 8), in the amount of $68,552 and $47,993 at December 31, 2017 and 2016, respectively, are included in accrued liabilities in the accompanying special-purpose combined balance sheet.

During 2016, the Obligated Group was relieved of the balance due as of December 31, 2015 to PMDC and Providence as part of the debt restructuring, and this is shown within the accompanying special-purpose combined statement of activities as a transfer from affiliate.

In 2016, Providence loaned the Obligated Group $5,000,000 as part of the debt restructuring at 0 percent interest. The repayment of the loan will be subordinated in security and payment to the Series 2016 bonds. The loan matures in 2055.

## Note 10 - Retirement Plans

Providence sponsors a 403(b) plan for its employees. The plan covers substantially all of the Obligated Group's full-time employees who have met certain eligibility qualifications. For 2017 and 2016, the Obligated Group matched the employees' contributions, dollar-for-dollar, up to the first 3 percent, then 50 cents on the dollar, up to a maximum of 5 percent. The Obligated Group's employer contributions of $79,237 and $66,877 in 2017 and 2016, respectively, have been recognized as employee benefits expense in the accompanying special-purpose combined statement of activities. The Obligated Group funds its contributions on a current basis.

Park Place Restructuring
Estimated Sources & Uses of Funds as of Effective Date (4/5/2021)
Prepared on 12/15/2020

*Conversion of Existing Series 2016A and Series 2016B Bonds ------>>> Series 2021 Bonds:*

| Series 2016A Par Amount (as of 4/5/21) | + | Series 2016B Par Amount (as of 4/5/21) | = | Total | ---->> | (Rounded up to closest $1.00) Series 2021 Par Amount |
|---|---|---|---|---|---|---|
| $103,691,500.00 | | $15,496,392.00 | | $119,187,892.00 | 90%--->> | $107,269,103.00 |

**Series C Calculations**

$ 24,191,398.48  Estimated Accreted Value
(See detailed schedule)

$ 725,741.95  3% of Accreted Value

*Sources and Uses of Funds (excluding par amounts above) on the Effective Date:*

| | Cash from Sponsor | Series 2016 DSRF | Series 2016 Bond Funds | Operating Reserve Fund (Existing) | Capital Reserve Fund (Existing) | Other Cash [1] From Park Place | TOTAL | | |
|---|---|---|---|---|---|---|---|---|---|
| **Sources of Funds:** | $4,663,862.18 | $8,610,767.53 | $1,316,166.37 | $2,141,566.93 | $982,090.94 | $4,976,233.07 | $22,690,687.02 | | |
| | | (11/30/20 balance)[2] | (Est. 4/5/21 balance) | (12/20/20 balance) | (12/20/20 balance) | | | | |
| **Uses of Funds:** | | | | | | | | | |
| Deposit to Liquidity Support Fund | $3,000,000.00 | | | | | | $3,000,000.00 | | |
| Payoff of Series 2016C Bonds | 725,741.95 | | | | | | 725,741.95 | | |
| Series 2021 Debt Service Reserve (MADS) | | 6,265,431.22 | | | | | 6,265,431.22 | | |
| Series 2021 DSRF - Excess (stays in DSRF) | | | | | | | 0.00 | | |
|   After accrued/unpaid interest) | | | | | | | 0.00 | | |
| Accrued and Unpaid interest | | 1,603,456.54 | 1,316,166.37 | | | | 2,919,622.91 | | |
| Costs of Issuance - See Breakout | | | | | | | 0.00 | | |
|   - Costs of Issuance - Paid from 2016 DSRF | | 741,879.77 | | | | | 741,879.77 | Total COI | 1,680,000.00 |
|   - Costs of Issuance - Paid by Sponsor | 938,120.23 | | | | | | 938,120.23 | **Target** | |
| Operating Account - NEW (45 DCOH) | | | | | | 2,669,175.00 | 2,669,175.00 | $2,669,175 (45 DCOH) | |
| Operating Reserve Fund - NEW (75 DCOH) | | | | 2,141,566.93 | | 2,307,058.07 | 4,448,625.00 | 4,448,625 (75 DCOH) | |
| Capital Expenditures Fund - NEW | | | | | 982,090.94 | | 982,090.94 | $7,117,800 | |
| **Total Uses of Funds:** | $4,663,862.18 | $8,610,767.53 | $1,316,166.37 | $2,141,566.93 | $982,090.94 | $4,976,233.07 | $22,690,687.02 | | |

[1]  Sources include the existing Revenue Fund and other existing operating cash as needed to provide the needed balances on the Effective Date for the Operating Account and the Operating Reserve Fund.
If needed, the Liquidity Support Agreement funding of $3.0 million is permitted to be counted towards such Days Cash on Hand levels outlined in the term sheet (45 Days for the Operating Account and 75 Days for the Operating Reserve Fund).

[2]  DSRF amount shown above includes balance as of 11/30/20 *PLUS* amounts paid in July 2020 from the DSRF to bondholder advisor and bondholder counsel (both costs of issuance) in July 2020.

*Note:  All figures are estimates and subject to change.  As shown above, it may be necessary to include LSA funds in the calculations of initial balances in the Operating Account (45 Days Cash on Hand) and the Operating Reserve Fund (75 Days Cash on Hand).  Cash available from Park Place may be materially different on the Effective Date (estimated to be 4/5/21), as compared to the balances on hand as of December 7,  2020 (approximately $3.65 million of Operating Cash).*

Exhibit 4 to Debtors' Joint Disclosure Statement Dated December 15, 2020

**EXHIBIT 5**

**Hypothetical Liquidation Analysis as of April 5, 2021**

*Capitalized Terms in this Liquidation Analysis will have the meaning defined in the Plan.*

The purpose of this document is to compare the distributions which creditors may receive under the Plan to the amount that they would likely receive if the Plan is not confirmed and the Cases were  converted to cases under Chapter 7 of the Bankruptcy Code.  The Debtors have prepared this document because the Bankruptcy Code requires a showing to be made that the distributions which creditors and interest holders will likely receive under the Plan exceed the amounts that those same creditors and interest holders would receive if the Plan was not confirmed and the Cases were converted to cases under Chapter 7 of the Bankruptcy Code.  The Debtors have no intention of converting their present Chapter 11 reorganization Cases to Chapter 7 bankruptcy cases. The comparisons of returns (in Chapter 11 under the Plan versus Chapter 7) are therefore hypothetical.

**Treatment of creditors under the Plan**

**Effect on Residents**

If the Plan is confirmed the Residency Agreements of Residents who live or have lived in the Campus and the Deposit Agreements which Prospective Residents signed with Park Place would be fully honored.  As noted in the Disclosure Statement, the Residency Agreements signed by Residents who live in independent living, assisted living or assisted living – memory care apartments in the Campus entitle them to receive refunds of all or a specified portion of the Entrance Fee which they paid to Park Place when they moved into the Campus.  If the Plan is confirmed, Residents will continue to receive all of the benefits and services which they currently receive.  Further, under the Plan, any Former Resident or other depositor that is qualified to receive a refund of all or a portion of an Entrance Fee or other deposit will receive that refund either directly from the Debtor or from a cash fund held by the Bond Trustee.  However, the same cannot not be said if the Debtors' Cases were converted to Chapter 7 liquidation cases.

If the Cases were converted to Chapter 7, a trustee (the "Trustee") would be appointed to oversee the Debtor's business and property.  The Trustee would decide, among other things, whether the Campus should continue to operate or whether it should be closed.  If the Trustee decides to liquidate the Debtors' businesses and close the Campus, the approximately 300 current Residents would not only face the loss of their right to a refund of their Entrance Fees; they would also likely lose their right to continue to live in the Campus and would be put to the task of finding new places to live without material assistance from the Trustee.

**Effect of a decision by the Trustee to conduct an orderly liquidation of the Campus**

If the Trustee is willing to assume the risks of operating the Campus in Chapter 7, it is highly unlikely that the Trustee would attempt to run the Campus by him or herself.  Instead, the Trustee would likely hire a management firm which specializes in the operation of CCRC properties like the Campus, including the provision of residency services and the administration of health care in the assisted living,

assisted living memory care and skilled nursing units of the Campus.  This assistance would come at a price which the Debtors estimate to be approximately five percent (5%) of the revenue generated by the Campus, or $975,000 per year.  This amount would likely be paid to the Trustee's property manager before any distributions are made to creditors.  There is no assurance for current Residents that the replacement management firm would operate the Campus to the same high standard which is applied by the current management.

If the Trustee is willing to operate the Campus, the Trustee's likely and sole purpose for doing so would be to keep the Campus operating until it can be sold.  There is no realistic chance that a Trustee would operate a complex business like the Campus in Chapter 7 indefinitely.  The process of selling a property like the Campus in Chapter 7 would typically begin with an effort (which usually takes three to four months to conclude) during which time the Trustee would, with the approval of the bankruptcy court, hire investment bankers or brokers who would attempt to market the Campus to prospects, most of whom would be organizations which currently operate CCRCs and lifecare communities.  Given the effect which the Covid-19 pandemic has had on CCRCs and lifecare communities across the United States, it may be more difficult for some if not all of the potential CCRCs and lifecare communities to obtain the capital needed to make a bid for the Campus.  When (or if) a high bidder is identified, a second phase of the process (which typically requires an additional three to four months to run its course) will begin.  In this second phase, the Campus would be put up for a public auction, with the high bid considered as the opening bid of that auction.  The party which submits the highest and best bid for the Campus made at the auction, as determined by the bankruptcy court after a hearing, would then complete its due diligence and ultimately, close its sale.

As noted above, the Campus would likely be marketed by an investment banking or a real estate brokerage firm which specializes in the sale of CCRC properties, at negotiated rates which typically require a minimum fee to be paid to the investment banker or broker, with additional amounts payable if the sales price reaches or surpasses pre-negotiated amounts.  Given the value of the campus, the Debtors would expect that the minimum fee payable to the type of investment banker or broker who would be involved with the sale would be at least $400,000.00.

The successful bidder in the sale process may or may not be willing to "assume" (in plain terms, continue to honor) the Residency Agreements which are now in place with Residents and Former Residents under Section 365 of the Bankruptcy Code.  In other recent bankruptcy cases (not this one), successful bidders have conditioned their "assumption" of residency agreements on the willingness of residents of those other properties to make concessions to the buyer (meaning, to make the terms of the residency agreement more favorable to the buyer and less favorable to the resident).  Should this occur, the Residents would not likely receive help from the Trustee, or even the Bankruptcy Court, because the buyer cannot be forced to assume any of the Residency Agreements in effect at the Campus.  If a Resident refuses to grant contract concessions to the buyer, and if the buyer chooses to not "assume" the Residency Agreements of such Residents or Former Residents, then the rights of the Residents or Former Residents will be reduced to the right to assert a claim of nominal value against the chapter 7 estate of the Debtors, combined with the loss of the Resident's rights to receive a return of their Entrance Fee and their right to continue to live in the Campus.

The Debtors submit that all Residents and Former Residents would likely fare at least as well, and probably much better under the Plan, than would likely be the case if the Plan was denied confirmation and the Cases were converted to Chapter 7.

**Vendor and other unsecured claims**

Prior to the commencement of the Cases, Park Place made advance payments to its current vendors to cover unbilled amounts which were due to them but were not yet payable.  Because of this, the Debtors estimate that there are no vendors who hold non-priority unsecured claims against the Debtors.  If such creditors do exist, the Plan provides that they will be paid a dividend in the amount of three percent (3%) of their claims, from funds provided by the Sponsor (in addition to all other commitments and expenditures of the Sponsor) which payment shall be made shortly after the Effective Date of the Plan.

In a Chapter 7 case, such vendors would be placed in the second lowest category for distribution (immediately above owners).  If the Debtors' Cases were converted to Chapter 7 cases, there is very little reason to expect that unsecured creditors would receive any payments from the Trustee.  Although there are many reasons for this, the primary reason is that the 2016 Bond debt is secured by liens and mortgages which the Debtors granted to the Bond Trustee as a part of the 2016 Bond transaction.  Indeed, the only possible way for unsecured creditors to receive any meaningful dividend in a Chapter 7 case involving the Debtors would be if the Campus were to sell to a bidder at a price which exceeded the amount of the outstanding 2016 Bonds, which is $141,106,642 principal plus interest and other costs.  The Debtors believe that this is extremely unlikely to occur, for the reasons stated below.  The Debtors submit that vendors and other unsecured, non-priority creditors will likely receive an amount under the Plan which is at least equal to (or greater) than they would receive if were converted to Chapter 7 and the Debtors' assets were disposed of in the manner required by Chapter 7.

**Unsecured Priority Claimants**

Section 726 of the Bankruptcy Code sets priorities for the payment of certain kinds of claims, which are generally referred to as "priority claims" in bankruptcy cases.  Section 1129(a)(9) of the Bankruptcy Code provides that the bankruptcy court must deny confirmation to any plan of reorganization or liquidation which fails to pay priority claims in full, unless the holder of such claims agree to lesser treatment.  The Plan, in accord with the foregoing provisions of the Bankruptcy Code, requires all "priority claims" to be paid in full, in cash, shortly after the Effective Date of the Plan.  Thus, the distributions to the holders of "priority claims" under the Plan will likely be at least as good as the distribution that those holders would receive in Chapter 7.

However, for the same reason noted above with respect to vendor and other unsecured claims, if the Debtors Cases were to be converted to Chapter 7, and the Campus were to be sold for less than the amount due to the holders of the 2016 Bonds, there is little chance that there would be funds available to pay any of the unsecured priority claimants of the Debtors' estates, with the exception of those claimants (including the Trustee) who provided goods or services to the Debtors' estates in connection with the sale of the Campus. For this reason, the Debtors submit that the holders of unsecured priority claimants would likely receive more under the Plan than they would likely receive if the Cases were converted to Chapter 7.

**Bondholders**

The holders of the 2016A, 2016B and 2016C Bonds are beneficiaries of a trust indenture which is secured by a first priority perfected lien on substantially all of the Debtors' assets.  The Bond Trustee's secured claim is held by the Bond Trustee for the benefit of the holders of the 2016 Bonds.

Under the Plan, as noted at pp. 20 – 21 of the Disclosure Statement, the holders of 2016A and 2016B Bonds will exchange those bonds for a pro rata share of new 2020 Bonds in the initial principal amount of $107,269,103.00.  The 2020 Bonds shall bear interest at the rate of 5.125% per annum, which interest is intended to be exempt from federal income taxes.  In addition, the holders of the 2016A and 2016B Bonds will receive interest on those bonds which accrues between the filing date of the Cases and the Effective Date of the Plan.

Under the Plan, as noted at pp. 11 and 30 of the Disclosure Statement, the Holders of 2016C Bonds will receive, in exchange for the redemption of their 2016C Bonds, a pro rata share of Six Hundred Fifty-Seven Thousand Five Hundred Sixty-Two and 50/100 Dollars ($657,562.50)) plus 3% of the accrued but unpaid interest on the 2016C Bonds as of the Effective Date of the Plan which the Debtors estimate will be $68,179.45 if the Effective Date occurs on April 5, 2021, in which case, the total principal and interest which will be paid to holders of 2016C Bonds would total $725,741.95.  If the Debtors' Cases proceed as the Debtors' managers currently expect, the Effective Date of the Plan will likely be April 5, 2021.  The redemption amount of the proposed payment to be made to holders of 2016C Bonds was intended to approximate the market discount which applied to the 2016C Bonds, which were trading for approximately 3% of par earlier in 2020.

As the Debtors believe that most of its bondholders are holders of 2016A, 2016B and 2016C Bonds, the Debtors assume that most of its bondholders will receive under the Plan, in cash or in the form of the 2020 Bonds, property which is worth no less than $ 107,994,844.95.

**Effect of liquidation on the Bondholders**

In a liquidation under Chapter 7 of the Bankruptcy Code, the holders of the 2016 Bonds would likely have claims equal to the principal amounts due on the bonds, in the amounts shown below:

| | |
|---|---|
| 2016 A Bonds: | $ 103,691,500.00 |
| 2016 B Bonds: | $   15,496,392.00 |
| 2016 C Bonds: | $   21,918,750.00 |
| Total: | $ 141,106,642.00 |

Under the 2016 Bond Indenture, the 2016 A and 2016 B bonds were given a liquidation preference over the 2016 C Bonds (Bankruptcy Case 16-1336, Plan of Reorganization, Doc. 149, p. 22 of 45, § 4.3.5).  This means that in a liquidation of Park Place, the first available dollars would be paid, pro rata, to the holders of the 2016 A and 2016 Bonds.  If there was a surplus left after the 2016 A and 2016 B Bonds were fully paid, that amount would be paid to the holders of the 2016 C Bonds.

In its bankruptcy schedules, Park Place valued its assets at their depreciated book value on the Petition Date, in the following amounts:

| | |
|---|---|
| Cash (estimated): | $   3,400,000.00 |
| Accounts Receivable: | $   4,450,000.00 |
| Prepaid expenses and insurance: | $      222,453.00 |
| Land, building and tangible personal property: | $ 111,120,123.00 |
| | |
| Total: | $ 117,192,576.00 |

The value of the Debtor's assets at depreciated book value is just under $2 Million less than the combined value of the 2016 A and B Bonds. Therefore, if the Debtors' assets could be sold for their depreciated book values, the claims of holders of the 2016 C bonds would likely be unsecured, and like other unsecured creditors, those 2016 C bond holders would likely receive no dividends if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code.

However, if the Debtor's Cases were converted to Chapter 7 and the Campus was put up for sale, it is highly unlikely that the Trustee would receive bids for the Debtors' assets based on their book value. Instead, it is most likely that prospective bidders for the Campus would base their bids on the discounted net income generated by the Campus. This method is generally referred to by appraisers as the "Income Method."

The Debtors believe that bidders who might submit bids for the Campus at a Chapter 7 sale would submit bids based on the "Income Method" which bid would likely be substantially less than the depreciated book value of the Debtors' assets. In this situation, the dividends paid to holders of the 2016 A and B Bonds would be far less than the amounts currently proposed in the Debtors' Plan. In addition, the 2016 A and B Bondholders would receive their diminished return after the Chapter 7 Trustee has completed the liquidation of the Debtors' assets (which could occur eight months or more after creditors would receive their dividends under the present plan). In addition, the dividends payable to the 2016 A and B bondholders could be reduced by the significant costs outlined above for the costs of administering the sale of the Debtors' assets, including the cost of the Trustees' property managers, investment bankers, legal counsel, accountants and brokers. For all of these reasons outlined above, including the very positive effects of Plan confirmation on all creditors, the Debtors are certain that the return payable to creditors under the Plan is far greater than creditors could reasonably hope to receive in a Chapter 7 liquidation. This is the basis for the Debtors' recommendation that the bankruptcy court should confirm the Plan, and that creditors who are eligible to vote on the Plan should vote to accept it.

106351781v.2

**Timothy Place, NFP dba Park Place of Elmhurst**
Post Petition Projection

| | 5/1/2021 12/31/2021 | 12/31/2022 | 12/31/2023 | 12/31/2024 |
|---|---|---|---|---|
| **Operating Revenue** | | | | |
| IL Monthly Service Fees | $ 6,583,123 | $ 10,474,924 | $ 10,864,185 | $ 11,260,402 |
| AL/MS Monthly Service Fees | 2,845,324 | 4,449,825 | 4,615,846 | 4,787,851 |
| SN Monthly Service Fees | 3,177,251 | 4,699,376 | 4,193,820 | 3,530,592 |
| Campus Care (same as expense) | 33,600 | 52,416 | 53,988 | 55,608 |
| Other Revenue | 259,713 | 385,549 | 397,115 | 409,029 |
| Bad Debt Expense | ( 40,532 ) | ( 60,815 ) | ( 61,213 ) | ( 61,597 ) |
| **Total Operating Revenues** | 12,858,479 | 20,001,275 | 20,063,741 | 19,981,884 |
| | | | | |
| **Departmental Expenses** | | | | |
| General & Administrative | 1,317,891 | 2,014,687 | 2,075,128 | 2,137,382 |
| Building & Maintenance | 529,082 | 814,336 | 838,766 | 863,929 |
| Security Services | 75,333 | 116,390 | 119,882 | 123,478 |
| Grounds & Maintenance | 104,488 | 145,050 | 149,401 | 153,883 |
| Transportation | 22,188 | 34,115 | 35,138 | 36,192 |
| Housekeeping & Laundry Services | 528,807 | 812,109 | 836,472 | 861,566 |
| Dining Services | 1,702,069 | 2,611,667 | 2,690,017 | 2,770,718 |
| Pastoral Care | 39,101 | 60,004 | 61,804 | 63,658 |
| Life Enrichment- IL | 206,169 | 320,397 | 330,009 | 339,909 |
| Life Enrichment- HC | 127,982 | 207,854 | 214,090 | 220,513 |
| Marketing Services | 714,602 | 1,087,720 | 1,120,352 | 1,153,962 |
| Resident Services - IL & CL | 38,343 | 47,689 | 49,120 | 50,593 |
| Campus Care | 103,613 | 159,000 | 163,770 | 168,683 |
| Assisted Living/Memory Support | 988,382 | 1,500,011 | 1,545,012 | 1,591,362 |
| Skilled Nursing | 2,539,481 | 3,910,540 | 3,854,926 | 3,757,566 |
| Gift Shop | 2,667 | 4,120 | 4,244 | 4,371 |
| **Total Departmental Expenses** | 9,040,197 | 13,845,690 | 14,088,130 | 14,297,766 |
| | | | | |
| **Other Operating Expenses** | | | | |
| Utilities | 528,360 | 773,942 | 797,160 | 821,075 |
| Insurance | 253,431 | 391,550 | 403,297 | 415,396 |
| Management Fees | 548,208 | 850,054 | 852,709 | 849,230 |
| Real Estate Tax | 116,667 | 180,250 | 185,658 | 191,227 |
| **Total Other Operating Expenses** | 1,446,665 | 2,195,797 | 2,238,824 | 2,276,928 |
| | | | | |
| **Total Operating Expenses** | 10,486,862 | 16,041,487 | 16,326,953 | 16,574,694 |
| | | | | |
| **Net Operating Income (Loss) Before Debt Service** | 2,371,617 | 3,959,788 | 3,736,788 | 3,407,191 |
| | | | | |
| **Investment Income** | 121,875 | 195,000 | 195,000 | 195,000 |
| | | | | |
| **Turnover entrance fees:** | | | | |
| Receipt of entrance fees from move-ins | 4,293,923 | 5,635,773 | 5,528,425 | 5,694,278 |
| Receipt of deferred entrance fees receivable | 3,488,812 | 5,904,144 | 5,764,591 | 5,661,108 |
| Total turnover entrance fee receipts | 7,782,735 | 11,539,917 | 11,293,017 | 11,355,386 |
| Second Person $25,000 non-refundable EF | 100,000 | 250,000 | 225,000 | 225,000 |
| Entrance Fee Refunds | ( 3,673,764 ) | ( 5,770,685 ) | ( 6,181,400 ) | ( 6,713,856 ) |
| **Net Entrance Fee Turnover** | 4,208,971 | 6,019,232 | 5,336,617 | 4,866,530 |
| | | | | |
| **Net cash flow before debt service** | **6,702,463** | **10,174,020** | **9,268,405** | **8,468,720** |

Exhibit 6 to Debtors' Joint Disclosure Statement Dated Dec. 15, 2020

**Timothy Place, NFP dba Park Place of Elmhurst**
Post Petition Projection

| | 5/1/2021 12/31/2021 | 12/31/2022 | 12/31/2023 | 12/31/2024 |
|---|---|---|---|---|
| **Debt Service** | | | | |
| Principal Payments | - | - | ( 511,926 ) | ( 794,126 ) |
| Interest Expense - Bonds A& B | ( 3,665,028 ) | ( 5,497,542 ) | ( 5,497,542 ) | ( 5,471,305 ) |
| **Total Debt Service** | ( 3,665,028 ) | ( 5,497,542 ) | ( 6,009,468 ) | ( 6,265,431 ) |
| | | | | |
| **Capital Expenditures** | ( 500,000 ) | ( 1,000,000 ) | ( 1,000,000 ) | ( 1,000,000 ) |
| | | | | |
| **Cash Surplus (Deficit) after Debt Service and Capx** | $ 2,537,435 | $ 3,676,479 | $ 2,258,937 | $ 1,203,289 |
| | | | | |
| **Debt Service Coverage Ratio** | | | | |
| Net Income Available for Debt Service | $ 6,702,463 | $ 10,174,020 | $ 9,268,405 | $ 8,468,720 |
| Total Debt Service | $ 3,665,028 | $ 5,497,542 | $ 6,009,468 | $ 6,265,431 |
| **Debt Service Coverage Ratio (1.15 compliance)** | **1.83** | **1.85** | **1.54** | **1.35** |
| | | | | |
| **Days Cash on Hand** | | | | |
| Cash | $ 7,982,000 | $ 10,519,435 | $ 14,195,914 | $ 16,454,851 |
| Change in Cash | 2,537,435 | 3,676,479 | 2,258,937 | 1,203,289 |
| Ending Cash | $ 10,519,435 | $ 14,195,914 | $ 16,454,851 | $ 17,658,140 |
| | | | | |
| Operating Expenses plus Interest Expense | $ 14,151,890 | $ 21,539,028 | $ 21,824,495 | $ 22,045,999 |
| Expenses per day | 57,763 | 59,011 | 59,793 | 60,400 |
| **Days Cash on Hand (100 days compliance)** | 182 | 241 | 275 | 292 |

**Park Place of Elmhurst**
Statement of Financial Position
October 31, 2020
UNAUDITED

Exhibit 7

| | Current YTD | Prior Month |
|---|---|---|
| **ASSETS** | | |
| CURRENT ASSETS | | |
| Cash | $2,443,177 | $3,978,576 |
| Petty Cash / Gift Shop | 1,700 | 1,700 |
| TOTAL CASH | 2,444,877 | 3,980,276 |
| | | |
| ACCOUNTS RECEIVABLE | | |
| A/R Third Party Insurance/HMO/Managed Care | 252,372 | 323,176 |
| A/R Private | 187,607 | 104,626 |
| A/R Medicare | 320,533 | 339,977 |
| A/R Misc. | 10,542 | 0 |
| Entrance Fee Receivable | 918,250 | 1,646,750 |
| Due From Related Entities (net) | (22,410) | (18,839) |
| TOTAL ACCOUNTS RECEIVABLE | 1,666,894 | 2,395,690 |
| | | |
| PREPAID EXPENSES | | |
| Prepaid Expenses | 170,093 | 193,406 |
| Prepaid Insurance | 39,416 | 27,200 |
| TOTAL PREPAID EXPENSES | 209,509 | 220,606 |
| | | |
| FIXED ASSETS | | |
| Land | 14,600,000 | 14,600,000 |
| Land Improvements | 443,322 | 418,322 |
| Building | 120,964,405 | 120,943,629 |
| Equipment | 3,051,372 | 2,971,821 |
| Vehicle | 72,163 | 72,163 |
| CIP | 98,022 | 92,600 |
| Phase II CIP | 9,285 | 9,285 |
| Less, Accumulated Depreciation | (28,809,877) | (28,523,533) |
| TOTAL FIXED ASSETS | 110,428,692 | 110,584,287 |
| | | |
| OTHER ASSETS | | |
| Bond Restructuring Costs - 2020 | 309,600 | 252,038 |
| Bond Issuance Costs, Net | 2,291,790 | 2,309,649 |
| TOTAL OTHER ASSETS | 2,601,390 | 2,561,687 |
| | | |
| ASSETS LIMITED TO USE | | |
| Entrance Fee Deposits | 95,126 | 60,124 |
| Entrance Fee Fund | 1,148,503 | 1,176,096 |
| Operating Reserve Fund | 2,753,007 | 2,508,809 |
| Optional Redemption Fund | 1,810 | 1,810 |
| 2016 Series A, B & C DSR Fund | 8,358,900 | 8,416,393 |
| Revenue Fund | 1,550,368 | 1,651,298 |
| 2016 Series Capital Expenditure Fund | 1,071,869 | 1,051,996 |
| 2016 Series A & B Accrued Interest Fund | 3,106,063 | 2,484,850 |
| TOTAL ASSETS LIMITED TO USE | 18,085,646 | 17,351,376 |
| | | |
| **TOTAL ASSETS** | **$135,437,008** | **$137,093,922** |

|  | Current YTD | Prior Month |
|---|---|---|
| **LIABILITIES** | | |
| CURRENT LIABILITIES | | |
| Accounts Payable | $414,509 | $454,878 |
| Resident Deposits | 135,000 | 135,000 |
| Entrance Fee Deposits | 15,000 | 0 |
| Accrued Expenses | 126,879 | 113,316 |
| Accrued Real Estate Tax | 149,800 | 135,217 |
| Accrued Interest 2016 Series A & B Bonds | 3,416,580 | 2,795,383 |
| Accrued Interest 2016 Series C Bonds | 2,159,492 | 2,122,961 |
| Accrued Legal Liability | 164,824 | 148,157 |
| Other Current Liabilities | 545,042 | 691,380 |
| TOTAL CURRENT LIABILITIES | 7,127,126 | 6,596,292 |
| | | |
| LONG TERM LIABILITIES | | |
| Bonds Payable | 141,106,642 | 141,106,642 |
| Original Issue Discount (Net) | (1,562,951) | (1,573,893) |
| Long term loans | 10,272 | 10,272 |
| Refund Liability | 9,429,060 | 10,659,340 |
| Obligation to Provide Future Services | 11,285,463 | 11,285,463 |
| Unamortized Entrance Fees (Net) | 73,210,072 | 73,623,004 |
| TOTAL LONG TERM LIABILITIES | 233,478,558 | 235,110,828 |
| | | |
| **TOTAL LIABILITIES** | **240,605,684** | **241,707,120** |
| | | |
| **NET ASSETS** | | |
| Unrestricted | (101,337,721) | (101,337,721) |
| Current Year Change in Net Assets | (3,830,955) | (3,275,477) |
| | | |
| **TOTAL NET ASSETS** | **(105,168,676)** | **(104,613,198)** |
| | | |
| **TOTAL LIABILITIES & NET ASSETS** | **$135,437,008** | **$137,093,922** |

Park Place of Elmhurst
Actual vs. Budget Summary Income Statement
For the Ten Months Ending October 31, 2020

| | Current Month Actual | Current Month Budget | Variance | YTD Actual | YTD Budget | Variance |
|---|---|---|---|---|---|---|
| **Operating Revenue** | | | | | | |
| IL Monthly Service Fees | $815,170 | $859,751 | ($44,581) | $8,343,986 | $8,597,510 | ($253,525) |
| IL Monthly Service Fee Credits | (38,583) | (46,097) | 7,514 | (443,875) | (449,723) | 5,848 |
| Campus Care | 3,374 | 8,750 | (5,376) | 40,338 | 87,500 | (47,162) |
| AL Monthly Service Fees | 285,383 | 290,911 | (5,528) | 2,808,744 | 2,890,966 | (82,222) |
| AL Monthly Service Fee Credits | (40,708) | (29,560) | (11,148) | (388,589) | (284,482) | (104,107) |
| MS Monthly Service Fees | 190,761 | 171,020 | 19,741 | 1,642,282 | 1,710,200 | (67,918) |
| MS Monthly Service Fee Credits | (66,359) | (66,981) | 622 | (645,058) | (669,810) | 24,752 |
| SN Room & Board | 454,455 | 533,169 | (78,714) | 4,905,206 | 5,375,010 | (469,804) |
| SN Room & Board Credits | (76,863) | (127,926) | 51,063 | (868,630) | (1,220,806) | 352,176 |
| SN Ancillary & Therapy Revenue | 197,223 | 3,917 | 193,306 | 1,958,758 | 39,170 | 1,919,588 |
| SN Ancillary & Therapy Credits | (192,045) | (1,208) | (190,837) | (1,937,023) | (12,080) | (1,924,943) |
| Other Revenue | 29,138 | 30,913 | (1,775) | 270,845 | 308,892 | (38,047) |
| Total Operating Revenues | 1,560,946 | 1,626,659 | (65,713) | 15,686,984 | 16,372,347 | (685,364) |
| | | | | | | |
| **Departmental Expenses** | | | | | | |
| General & Administrative | 179,426 | 166,862 | 12,564 | 1,648,639 | 1,622,710 | 25,926 |
| Building & Maintenance | 79,766 | 70,994 | 8,772 | 609,674 | 704,836 | (95,162) |
| Security Services | 8,409 | 9,091 | (682) | 89,604 | 90,910 | (1,306) |
| Grounds & Maintenance | 12,258 | 11,683 | 575 | 106,723 | 120,580 | (13,857) |
| Transportation | 5,507 | 3,640 | 1,867 | 22,526 | 36,037 | (13,511) |
| Housekeeping & Laundry Services | 59,274 | 62,944 | (3,670) | 612,003 | 621,305 | (9,302) |
| Dining Services | 205,072 | 214,916 | (9,844) | 1,947,473 | 2,118,553 | (171,080) |
| Pastoral Care | 5,219 | 4,701 | 518 | 47,115 | 46,254 | 861 |
| Life Enrichment- IL | 26,605 | 23,984 | 2,621 | 215,036 | 245,935 | (30,899) |
| Life Enrichment- AL, MS, SNF | 15,411 | 16,816 | (1,405) | 141,047 | 165,740 | (24,693) |
| Marketing Services | 99,814 | 95,568 | 4,246 | 863,018 | 998,245 | (135,227) |
| Resident Services - IL & CL | 5,250 | 5,467 | (217) | 46,526 | 54,670 | (8,144) |
| Campus Care | 10,459 | 13,394 | (2,935) | 115,984 | 131,786 | (15,802) |
| Assisted Living/Memory Support | 146,452 | 129,213 | 17,239 | 1,348,571 | 1,267,603 | 80,968 |
| Skilled Nursing | 365,743 | 333,662 | 32,081 | 3,445,745 | 3,365,184 | 80,561 |
| Gift Shop | 1,178 | 333 | 845 | 6,969 | 3,330 | 3,639 |
| Total Departmental Expenses | 1,225,843 | 1,163,268 | 62,573 | 11,266,653 | 11,593,678 | (327,026) |
| | | | | | | |
| **Other Operating Expenses** | | | | | | |
| Utilities | 59,725 | 64,113 | (4,389) | 619,763 | 661,781 | (42,018) |
| Insurance | 39,077 | 37,520 | 1,557 | 392,376 | 375,200 | 17,176 |
| Management Fees | 30,000 | 30,000 | 0 | 300,000 | 300,000 | 0 |
| Real Estate Tax | 14,583 | 15,867 | (1,284) | 145,833 | 158,670 | (12,837) |
| **Total Other Operating Expenses** | **143,385** | **147,500** | **(4,115)** | **1,457,972** | **1,495,651** | **(37,679)** |
| | | | | | | |
| **Total Operating Expenses** | **1,369,228** | **1,310,768** | **58,459** | **12,724,625** | **13,089,329** | **(364,705)** |
| | | | | | | |
| **Net Operating Income (Loss)** | **191,718** | **315,891** | **(124,171)** | **2,962,359** | **3,283,018** | **(320,659)** |
| | | | | | | |
| Investment Income | 134 | 20,833 | (20,699) | 50,285 | 208,330 | (158,045) |
| Contributions | 320 | 0 | 320 | 65,073 | 0 | 65,073 |
| Medicare Stimulus Revenue | 0 | 0 | 0 | 390,910 | 0 | 390,910 |
| Nursing Home Infection Control Revenue | 0 | 0 | 0 | 63,650 | 0 | 63,650 |
| Quality Incentives Revenue | 10,542 | 0 | 10,542 | 10,542 | 0 | 10,542 |
| Paycheck Protection Program Revenue | 0 | 0 | 0 | 1,377,500 | 0 | 1,377,500 |
| Mission Fund Payroll | 0 | 0 | 0 | (169,581) | 0 | (169,581) |
| Accrued PTO - Salaried Employee | 0 | 0 | 0 | (26,711) | 0 | (26,711) |
| | 10,996 | 20,833 | (9,837) | 1,761,668 | 208,330 | 1,553,338 |
| **Net Income (Loss) Before Debt Service** | **$202,714** | **$336,724** | **($134,008)** | **$4,724,027** | **$3,491,348** | **$1,232,679** |
| | | | | | | |
| Interest Expense Series 2016 A & B Bonds | 621,196 | 621,196 | 0 | 6,212,420 | 6,211,960 | 460 |
| Interest Expense Series 2016 C Bonds | 36,531 | 36,531 | 0 | 404,074 | 365,310 | 38,764 |
| **Long Term Debt Expenses** | **657,727** | **657,727** | **1** | **6,616,494** | **6,577,270** | **39,224** |
| | | | | | | |
| **Net Income (Loss) Before Noncash Items** | **($455,013)** | **($321,003)** | **($134,009)** | **($1,892,467)** | **($3,085,922)** | **$1,193,455** |
| | | | | | | |
| **Non-Cash Items** | | | | | | |
| Unrealized Gain (Loss) on Investments | 0 | 0 | 0 | (21,781) | 0 | (21,781) |
| Earned Entrance Fees | 214,680 | 100,000 | 114,680 | 1,232,769 | 1,000,000 | 232,769 |
| Depreciation/Amortization Expense | (315,146) | (320,789) | 5,643 | (3,149,476) | (3,207,890) | 58,414 |
| **Total Noncash Items** | **(100,466)** | **(220,789)** | **120,323** | **(1,938,488)** | **(2,207,890)** | **269,402** |
| | | | | | | |
| **Total Change in Net Assets** | **($555,479)** | **($541,792)** | **($13,686)** | **($3,830,955)** | **($5,293,812)** | **$1,462,857** |