**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| TIMOTHY PLACE, NFP, | § | Case No. 20-21554 |
| d/b/a Park Place of Elmhurst | § | |
| | § | |
| FEIN: 20-1835089, | § | |
| | § | |
| Debtors. | § | Hon. Jacqueline P. Cox |

**DECLARATION OF BARRY VANDERGENUGTEN, CHIEF FINANCIAL
OFFICER OF THE DEBTORS, IN SUPPORT OF FIRST DAY MOTIONS**

The undersigned, Barry VanderGenugten, affirms under penalty of perjury that the following statements are true and complete to the best of his knowledge.

1.      My name is Barry VanderGenugten.  I reside in Mokena, Illinois.  I currently serve as the Chief Financial Officer of Timothy Place, NFP d/b/a Park Place of Elmhurst ("Park Place") and Christian Healthcare Foundation, NFP (the "Foundation") (and Park Place and the Foundation will sometimes be collectively referred to as the "Debtors").  I submit this Declaration based on my personal knowledge and under penalty of perjury under Federal Rule of Bankruptcy Procedure 9012(b), and in support of certain of the motions filed by Park Place, some of which have been joined in by the Foundation.

**Motion For Joint Administration (Doc. 5)**

2.      Park Place owns and operates a continuing care retirement community ("CCRC") located in Elmhurst, Illinois known as Park Place of Elmhurst (the "Campus"). The Campus is improved with a building which includes (i) 181 independent living apartments, (ii) 46 assisted

-1-

living apartments, (iii) 20 memory care apartments, (iv) 37 nursing beds, and (v) related common areas and parking. Approximately 299 senior citizens reside at the Campus.

3.      The Foundation's only asset is a deposit account which contains approximately $16,500.00.

4.      The Foundation currently does not conduct business.

5.      Park Place and the Foundation are Illinois not-for-profit limited liability companies.

6.       Rest Haven Illiana Christian Convalescent Home, d/b/a Providence Life Services, is an Illinois not-for-profit corporation (the "**Sponsor**").

7.      The Sponsor is the sole Member of both Park Place and the Foundation.

8.      The only creditor of the Foundation is the bond trustee (the "**Bond Trustee**") who serves for the benefit of the holders of approximately $141,106,642 of principal Illinois municipal bond debt (the "Bond Debt") which encumbers the Campus and substantially all assets owned by Park Place.

9.      The Debtors are joint obligors of the Bond Debt.

10.     The Debtors filed their chapter 11 cases (the "**Cases**") in this Court on December 15, 2020 (the "**Petition Date**").

11.     The Debtors have filed a joint plan of reorganization in these cases (the "Plan") which provides for the restructuring and partial redemption of the Bond Debt.

12.     To the best of my knowledge, the participation by the Foundation in these bankruptcy proceedings and in the Plan is deemed to be beneficial to the interests of creditors by the Debtors as well as the Bond Trustee.

13.     There are no creditors who would be harmed by the joint administration of the Cases, within the meaning of the provisions of Federal Rule of Bankruptcy Procedure 1015(b).

**Motion To Retain and Employ Globic Advisors, Inc. As Noticing, Solicitation and Claims Agent Pursuant To 28 U.S.C. §156(c)**

14.     For information concerning the Debtor's bond debt (as presented in the Motion) please see paragraphs 17 through 24 *infra*.

15.     After the 2016 Bonds were initially sold, they were publicly traded.  I was informed by one of the brokerage firms which underwrote the sale of the 2016 Bonds that as much as twenty five percent (25%) of the 2016 Bonds were sold to non-institutional customers of the investment houses which made markets for the Bonds.  Although it is not possible for the Debtors to know who the current holders of the 2016 Bonds are, it is likely that a significant percentage of those bonds are still held by non-institutional holders.  However, the Debtors do not know, and have no means to ascertain how many individuals hold the 2016 Bonds, or their names and addresses. Moreover, the Bondholders are a continually evolving group (as the Bonds continue to publicly trade). For these reasons, the Debtors have determined that they need to retain the services of a professional noticing, solicitation and claims agent with experience in publicly traded bond issues to identify the Bondholders. The Debtors have selected Globic to perform these services.

16.     For information concerning the qualifications and disinterested status of Globic Advisors, Inc., please see the Declaration of Robert Stevens attached as Exhibit A to the Debtors' motion to retain Globic.

**Motion For Entry of Interim and Final Orders (I) Authorizing the Debtors To Use Cash Collateral; (II) Granting Adequate Protection; (III) Scheduling A Final Hearing; and (IV) Granting Related Relief (the "Cash Collateral Motion") (Doc. 9)**

17.    The Debtors are obligated to the Bond Trustee for the benefit of the beneficial holders of certain tax-exempt 2016 Bonds (the "Bondholders") authorized and issued by the Illinois Finance Authority (the "Authority") for the benefit of the Debtors.

18.    The Authority issued its: (i) $103,691,500 Revenue Bonds (Park Place of Elmhurst Project) Series 2016A (the "Series A Bonds"), (ii) $20,514,750 Revenue Bonds (Park Place of Elmhurst Project) Series 2016B (the "Series B Bonds"), and (iii) $21,918,750 Revenue Bonds (Park Place of Elmhurst Project) Series 2016C (the "Series C Bonds" and together with the Series A Bonds and Series B Bonds, the "2016 Bonds") in exchange (the "2016 Bond Exchange") for bonds the Authority previously issued in 2010: (A) $109,115,000 Revenue Bonds, Series 2010A (Park Place of Elmhurst Project); (B) $7,875,000 Revenue Bonds, Series 2010B (Park Place of Elmhurst Project); (C) $5,000,000 Revenue Bonds, Series 2010C (Park Place of Elmhurst Project) (Accelerated Redemption Reset Option Securities (ARROS); (D) $10,275,000 Revenue Bonds, Series 2010D-1 (Park Place of Elmhurst Project) (Tax-Exempt Mandatory Paydown Securities (TEMPS-75); and (E) $15,350,000 Revenue Bonds, Series 2010D-2 (Park Place of Elmhurst Project) (Tax-Exempt Mandatory Paydown Securities (TEMPS-65) (all such bonds issued in 2010, the "Original Bonds").

19.    The Original Bonds were issued primarily to (i) pay or reimburse the Debtors for the payment of all or a portion of the costs of acquiring, constructing, renovating, remodeling and equipping certain health facilities owned by the Debtors, and all necessary and attendant facilities, equipment, site work, zoning, entitlements and utilities related thereto, including, but not limited

to, the acquisition, construction and equipping of the Campus; (ii) provide working capital; (iii) fund debt service reserve funds; (iv) pay a portion of the interest on the Original Bonds; and (v) pay certain expenses incurred in connection with the issuance of the Original Bonds.

20.    The 2016 Bond Exchange was approved and effectuated pursuant to a plan of reorganization confirmed on or about March 29, 2016 in the bankruptcy case styled "In re TIMOTHY PLACE, NFP, *et als.*, Case No. 16-01336 (JPC) that was filed in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division.

21.    The 2016 Bonds were issued pursuant to that certain (i) Amended and Restated Master Trust Indenture, dated as of April 1, 2016 (the "Master Indenture") between the Debtors and the Bond Trustee as the master trustee thereunder; and (ii) Bond Trust Indenture, dated as of April 1, 2016 by and between the Bond Trustee and the Authority (the "2016 Indenture" and with the Master Indenture, the "2016 Indentures").  Proceeds from the sale of the 2016 Bonds were loaned to the Debtors pursuant to that certain Loan Agreement, dated as of April 1, 2016 (the "Loan Agreement"), between the Authority and the Debtors.  The rights of the Authority under the Loan Agreement were assigned to the Bond Trustee under the terms of the 2016 Indenture.

22.    The 2016 The Bond Indenture established various funds to be held by the Bond Trustee, including a "Debt Service Reserve Fund" and an "Entrance Fee Fund" (each as defined in the 2016 Indenture and the Master Indenture, respectively) (the Debt Service Reserve Fund, the Entrance Fee Fund and all other funds held by the Bond Trustee other than the "Revenue Fund" are collectively referred to herein as the "Bond Trustee Funds").

23.    As of the Petition Date, the aggregate balance of the Bond Trustee Funds was approximately $4,069,031.77 (which figure does not include funds held in the Revenue Fund).

24.    The Debtors acknowledge that the Bond Trustee Funds (which does not include the Revenue Fund) are held in trust for the benefit of the Bondholders and that the Bond Trustee is entitled to use the Bond Trustee Funds in accordance with the terms of the Bond Documents (as defined below). The Debtors agree not to contest that the Bond Trustee Funds are held in trust for the Bondholders and are a part of the Prepetition Bond Collateral (as defined below) and the Debtors further consent to a lift of the stay imposed under section 362 of the Bankruptcy Code so as to permit the Bond Trustee to exercise all of its rights in and with respect to the Bond Trustee Funds, pursuant to the Bond Documents (as defined below) and the Bankruptcy Code.

25.    As of the Petition Date, the amounts due and owing by the Debtors with respect to the 2016 Bonds are as follows (collectively, the "Bond Claim"):

(i)    Unpaid principal on the 2016 Bonds in the amount of $141,106,642.00;

(ii)    Accrued but unpaid interest on the 2016 Bonds in the amount $606,234.70 as of December 14, 2020; and

(iii)    unliquidated, accrued and unpaid fees and expenses of the Bond Trustee and its professionals incurred through the Petition Date.  Such amounts, when liquidated, shall be added to the aggregate amount of the Bond Claim.

26.    The Debtors have granted the Bond Trustee (i) a first priority security interest in Gross Revenues (as defined in the Master Trust), and (ii) a first priority mortgage and other liens on certain real and personal property pursuant to a Mortgage and Security Agreement, dated as of April 1, 2016, by and between the Debtors and the Bond Trustee (the "Mortgage" and together with the 2016 Indenture, the Master Indenture, the Loan Agreement and any other document or agreement delivered as security for, or in respect to, the 2016 Bonds or the Debtors' obligations

-6-

under any of such documents are collectively referred to herein as the "Bond Documents"). Pursuant to these grants, the Bond Trustee holds first priority liens and security interests in substantially all of the Debtors' real and personal property as security for the obligations associated with the 2016 Bonds including, but not limited to, Gross Revenues generated by the Debtors (the "Revenues" and together with the other collateral described in the Bond Documents, the "Prepetition Bond Collateral").

27.    The Debtors propose to use a total of $356,531 during the Interim Period between December 15 – 30, 2020, and propose to make a total of $7,554,338 in expenditures between the Petition Date and April 30, 2021, which, after taking into account the Debtor's revenues, will result in a reduction in the Debtors' cash position between the Petition Date and the period ending April 30, 2021 of $180,687.

28.    The Debtors have requested the use of Cash Collateral (as defined below) in connection with the Chapter 11 Cases to preserve the value of their business.  The Debtor would use these funds to pay the categories of expenses described in, during the time periods stated in the Cash Collateral Budget attached hereto as **Schedule A** (the "Cash Collateral Budget").  The Bond Trustee has informed the Debtors and this Court that the Bond Trustee does not consent to the use of Cash Collateral except upon the terms and conditions of this Interim Order.

29.    Without the use of Cash Collateral on an interim basis, the Debtors would suffer immediate and irreparable harm pending a final hearing on the Motion and would likely be required to cease operations immediately.  At a minimum, the Debtors' inability to use Cash Collateral would disrupt the Debtors' operations as a going concern, would eliminate or significantly decrease the likelihood of confirmation of the Plan of Reorganization, and would

otherwise not be in the best interests of the Debtors, their estates, or creditors, including the Bondholders and residents of the Campus.  In lieu of giving the Bond Trustee relief from stay or attempting to obtain this Court's approval for use of Cash Collateral on a non-consensual basis, the Debtors wish to provide adequate protection of the liens and security interests of the Bond Trustee in Cash Collateral and other Prepetition Bond Collateral on the terms set forth in this Interim Order, reflecting the agreement of the Debtors and the Bond Trustee.

30.    The Debtors agree that they shall not take any action to assert that: (i) the Bond Claim is not a valid, binding, and allowed claim against the Debtors' estates; (ii) the Bond Claim is not secured by valid, enforceable, duly perfected first priority liens on and security interests in the Prepetition Bond Collateral pursuant to the Bond Documents, and (iii) either the Bond Claim or the liens or security interests securing the Bond Claim, are subject to avoidance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

**Motion For Entry Of Order Authorizing Debtor To (I) Maintain Escrow Account To Hold All Deposits And Entrance Fees Received From New Residents And (II) Establish Procedures For The Use Of the Escrow Account (the "Escrow Motion") (Doc. 11)**

31.    Park Place operates the Campus under licensing received by the Illinois Department of Public Health.

32.    Residents who live in the independent living apartments at the Campus receive housing, meals, physical security, programming and services from Park Place, all of which are designed to foster the Residents' independence and help them, if they so choose, to remain engaged in the broader community.

33.     Prospective Residents who are interested in living at the Campus ("Prospective Residents") typically place deposits on their Entrance Fee with Park Place in several ways. Prospective Residents who wish to go on a wait list for a type of apartment that is currently unavailable can do so with a $5,000.00 deposit (the "**Wait List Deposit**"). A copy of the agreement which Park Place uses when it accepts a Wait List Deposit from a Prospective Resident is attached to the Escrow Motion as **Exhibit A**.

34.     When a Prospective Resident has selected an apartment at the Campus that is (or will shortly) be available for occupancy, Park Place and the Prospective Resident enter into a second agreement (the "Reservation Agreement"). Under the Reservation Agreement, the Prospective Resident agrees to give Park Place a $15,000.00 deposit (the "Reservation Deposit"), although the Prospective Resident will receive a $5,000.00 credit against that Reservation Deposit if the Prospective Resident previously paid a $5,000.00 Wait List Deposit to Park Place.  Pursuant to the terms of the Reservation Agreement, if the Prospective Resident does not occupy an independent living unit at the Campus, Park Places are obligated to refund the Reservation Deposit in full.  A copy of the Reservation Agreement which is currently used at the Campus is attached to the Escrow Motion as **Exhibit B**.

35.     Before occupying an independent living unit at the Campus, Prospective Residents are required to execute a residency agreement ("Residency Agreement"). The Residency Agreement provides the terms and conditions for the Prospective Resident while residing at the Campus, and also outlines the Prospective Resident's obligations regarding, among other things, the payment of an entrance fee (an "Entrance Fee") to Park Place as well as the Resident's rights to refund of such Entrance Fees.  A sample copy of a Residency Agreement which is currently

used for new Residents who move into independent living apartments at the Campus is attached to the Escrow Motion as **Exhibit C**.

36.     The full Entrance Fee is due to Park Place when a Prospective Resident completes a move into the Campus. Unless otherwise requested by the Prospective Resident, the funds previously comprising the $10,000.00 Reservation Deposit and the $5,000.00 Wait List Deposit (if one is made) become part of the required Entrance Fee, and the Prospective Resident funds the difference between the amounts previously deposited and the amount of the required Entrance Fee.

37.     The size of the Entrance Fee is determined based on the size of the unit occupied. Larger units generally require larger Entrance Fees than smaller units. The Entrance Fee collected by Park Place from new Residents currently ranges between $325,000.00 and $950,000.00 (for a 90% refundable Residency Agreement). Often, Residents use the proceeds of the sale of their former homes to fund the Entrance Fees. Park Place, for its part, has agreed to refund a portion of those Entrance Fees (an "Entrance Fee Refund") when the Resident either passes on or moves out of the Campus and their apartment is re-occupied by a new Resident (whose new Entrance Fee is used to pay the Entrance Fee Refund owed to the former occupant of that apartment).

38.     An Entrance Fee Refund is available under four plans:

a.   90% Refundable Plan: This plan offers residents a 90% refundable contract (without interest). Residents are repaid 90% of the Entrance Fee within 30 days of the resale of their unit.[1]

b.   75% Refundable Plan: This plan offers residents a 75% refundable contract (without interest). The Entrance Fee under the Plan is 10% lower than the Entrance Fee for the 90% Refundable Plan.

---

[1] There are some residents that are part of a 100% Refundable Plan that was available prior to the completion of the construction of the Campus.

     c.   50% Refundable Plan: This plan offers residents a 50% refundable contract (without interest). The Monthly Service Fees under the Plan are 20% lower than the Monthly Service Fees for the 90% Refundable Plan.

     d.   0% Refundable Plan: This plan offers residents Entrance Fees that are 30% lower than the Entrance Fee for the 90% Refundable Plan. Residents under the Plan will not receive any portion of a refund of the Entrance Fee upon termination of the Residency Agreement.

39.     If the Escrow Motion is granted, Park Place would have authority (and assume an obligation) to place all Wait List Deposits and Reservation Deposits which it has received from Prospective Residents prior to or following the Petition Date, and all Entrance Fees which it receives from Residents or Prospective Residents on or after the Petition Date (collectively, "Deposits"), into escrow (the "Escrow Account").  Park Place maintains a trust account with the trust department of the Fifth Third Bank, N.A. f/k/a MB Financial Bank.  The Debtor proposes to use this account as the Escrow Account in which it will hold the Deposits.

40.     As an officer of Park Place, I believe that Prospective Residents will likely become hesitant to enter into Reservation Agreements or Residency Agreements due to Park Place's Bankruptcy Case, and the uncertainties which may be perceived by Prospective Residents as a result of the filing of the Cases.  In an effort to ease such concerns, Park Place has made the business decision to add an addendum (the "Addendum") to each Reservation Agreement and/or Residency Agreement which it enters into with Prospective Residents from and after the commencement date of this Case.  A true copy of the Addendum is attached to the Escrow Motion as **Exhibit D**.

41.     The Addendum is intended by Park Place to allow Residents who move (or are thinking about moving) into the Campus during the pendency of this Case the security of knowing they will have the option of continuing to reside in the Campus or the ability to move out of the

Campus, depending on, among other things, the outcome of the Bankruptcy.  If an incoming

Resident is not satisfied with the results of the bankruptcy process, such that they would like to

move elsewhere, they may do so (provided that they follow the procedures of the Escrow Motion

and formally elect, before the "Trigger Date" to exit from the Campus  and receive a full and

prompt refund of the deposits which they have placed with Park Place including without limitation

any Wait List Deposit, Resident Deposit or Entrance Fee.  The "Trigger Date" is the 5th day before

the scheduled hearing on confirmation of the Debtors' Plan

42.    Currently, Park Place's contract with Residents and Prospective Residents provide

that all Entrance Fees and other deposits paid to Park Place will be deposited in Park Place's non-

escrow accounts, at which time the deposits would become subject to the first priority and

perfected liens of secured parties of Park Place's estate, including the Bond Trustee.


**Motion For Entry Of Interim And Final Orders (a) Prohibiting Utilities From Altering, Refusing, or Discontinuing Services On Account Of Prepetition Invoices; (b) Establishing Procedures For Determining Requests For Additional Adequate Assurance; And (c) Granting Related Relief (the "Utility Motion") (Doc. 12)**

43.    In connection with the operation of their business, the Debtor incurs utility expenses

for water, sewer service, electricity, gas, cable, internet, telephone, waste disposal and other similar

utility services (collectively, the "Utility Services") provided by various Utility Providers (as such

term is used in section 366 of the Bankruptcy Code).  The cost of the Utility Services, by category,

is as follows:

| Category | Current Estimated Monthly Cost |
|---|---|
| Sanitation | $  1,801 |
| Gas | 2,938 |

| | |
|---|---|
| Electric | 39,132 |
| Water | 20,715 |
| Cable TV | 9,081 |
| Internet | 917 |
| | |
| Total: | $ 74,584 |

44.    The Utility Services are provided to the Debtor by the Utility Providers identified in **Exhibit 1** to the Interim Order and the Final Order (the "Utility Service List"), in the estimated monthly amounts listed in that exhibit.[2/] The Debtor estimates that its postpetition use of the Utility Companies' services will remain approximately at the same levels, although seasonal effects and variations in the prices of such services may result in variations in the Debtor's average monthly utility expenses.

45.    Uninterrupted Utility Services are critical to Park Place's ability to sustain its operations during the pendency of this chapter 11 case. Any interruption in the Utility Services, however slight, would jeopardize Park Place's ability to operate its business and the safety and comfort of the residents of the Campus, as well as Park Place's efforts in this case to restructure its business through chapter 11.

46.     As of the Petition Date, Park Place is current in its payments to all Utility Companies which provide Utility Services to Park Place.

47.    Park Place has not placed any deposits with any of the Utility Companies.

---

[2/]    Although the Debtor believes that the Utility Service List includes all of their Utility Providers, the Debtor reserves the right to supplement the Utility Service List, without the need for further order of the Court, if any Utility Provider has been omitted. The relief requested herein is applicable to all Utility Providers and is not limited to those Utility Providers listed on the Utility Service List. Additionally, the listing of an entity on the Utility Service List is not an admission that such entity is a utility within the meaning of section 366 of the Bankruptcy Code, and the Debtor reserves the right to contest any such characterization in the future.

48.    Prior to the commencement of the Cases, Park Place made payments to all of its trade vendors, including those vendors who are Utility Providers, which Park Place believes were sufficient in amount to pay all vendors the amounts due to them for billed and unbilled pre-petition services which they had provided to Park Place.  Park Place expects that its vendors (including the Utility Providers) will apply these payments to the cost of pre-petition services which they provided to Park Place.  These payments should reduce or eliminate any potential pre-petition claims which the Utility Providers may have against Park Place.

**Motion For Entry of an Order (a) Determining That Appointment of a Patient Care Ombudsman Is Not Necessary Under 11 U.S.C. §333 and (b) Allowing the Debtor To Self Report (the "Ombudsman Motion") (Doc. 13).**

49.    This Case was not filed as a result of care-based issues. Instead, this case was filed by the Debtor because the secured bond debt, unless restructured or otherwise addressed in Chapter 11, would lead to a cash crisis.  Now that is Case has commenced, the Debtor is confident that it has ample financial resources to fund operations with the consent of the Bond Trustee and pursuant to the terms of an agreed-upon cash collateral order without any need to reduce the exceedingly high level of care which the Debtor has traditionally, and intends to continue to provide, to its Residents. Moreover, this Case was commenced with a plan support agreement and agreed-upon plan in place with entities which hold substantial majorities of the outstanding 2016 Bonds, who are likely to be the only creditors who are impacted by the bankruptcy in a significant way.  With the support of the majority holders of the 2016 Bonds, and the Debtor's determination to vigorously prosecute this case, the Debtor's time in bankruptcy is likely to be short, with a

proposed plan confirmed in March and an effective date of that plan occurring by no later than early-April of 2021.

50.     The Debtor is licensed and subject to oversight by several State authorities, including IDPH, and is the subject of regular inspections by those authorities. The Debtor passed its most recent inspection of assisted living and assisted living-memory care apartments with no violations (on December 4, 2020).   On April 1, 2020, IDPH completed its annual survey and found 2 very minor deficiencies which has been corrected, and no licensure violations.

51.     The Debtor has a superb record when it comes to resident care. There have been no reportable incidents involving residents of assisted living apartments, memory care apartments or skilled nursing units in the past twelve months that have resulted in licensure violations. Since 2018, there have been only been 7 minor inspection survey deficiencies and no licensure deficiencies (which was immediately addressed and corrected). The quality of care offered to the residents of the Campus is notable by several accomplishments. Debtor's skilled nursing operation has a 5-Star rating by the Centers for Medicare and Medicaid Services for the past several years.  The Debtor has received accreditation from the Joint Commission for the Nursing Care Center Accreditation Program.

52.     One of the great advantages of living in a CCRC is the sense of community which develops among the Residents. This is true at the Campus, where there are ties of friendship between the Residents, who tend to look out after one another and would be in a position to know if the care which the Debtor affords to any Resident has fallen below the Debtor's typically high standards. Further, and with the exception of the Residents of the memory care apartments, the

residents in the Campus tend to be quite aware of their own individual conditions, and quite capable of initiating steps to correct any perceived deficiencies in their own care.

53.      The majority of the Campus's Residents are not dependent on the Debtor for healthcare. The services and programs that the Debtor provides to all of its Residents (including those in independent living) are designed to maximize the independence of every Resident and minimize their dependency on the Debtor.

54.      There is no likelihood or indication of tension between Residents and the Debtor. All parties' interests are aligned in seeking a successful reorganization of the Debtor in an expeditious manner so that the Debtor can continue serving the Residents.

55.      The Debtor has no intention of reducing the level of care in any part of the Campus, or make changes to the individuals who are providing that care to the Residents who need it.

56.      The Debtor has its own systems in place to monitor Resident care, and report to management should any incidents or deficiencies occur. Furthermore, the Debtor's internal quality management program provides Residents with the means to file any grievances.

57.      The Debtor has a limited amount of funds which are available for the payment of creditors in this case. The fees and costs generated by a health care ombudsman in this case will necessarily erode the amount of funds available to pay creditors. The likely benefit to residents, creditors and the Debtor's estate from the appointment of an ombudsman is minimal and difficult to justify under the circumstances.

58.      As the COVID-19 virus is especially dangerous to the health of the older population, Park Place takes its commitment and responsibility to protect the health and safety of its Residents, patients, and staff very seriously.  Park Place has enacted a number of precautions

to protect the people in its charge.  Together with its corporate Manager (Providence Life Services of Tinley Park, IL) Park Place closely monitors guidance from the Centers for Disease Control and Prevention (CDC) and local Health Departments regarding protocols for visitors on the Campus. Park Place adjusts its protocols in line with DuPage County and state directives. It contacts family members and responsible parties on a daily basis to provide information and transparency and make direct phone calls when needed to communicate any updates to close family members of Residents.  In addition, Park Place helps Residents and their families find ways to connect safely, whether that is by coordinating a video chat (such as Facebook, FaceTime, or Zoom), phone call, or other creative solutions.   While Park Place respects the independence, dignity, and self-determination of each of its Residents, it has strongly encouraged Residents to engage in social distancing, wear face masks, and perform hand hygiene, to protect themselves and their neighbors. Park Place helps ensure that its Residents have the groceries, medications, and supplies they need.

59.    Concerning staff, before the start of each shift, all staff are screened with a questionnaire asking about their symptoms and their proximity to others who may be infected, as well as a temperature check. Essential vendors who enter the building are subjected to the same screening process.  Employees and vendors are required to wear a mask at all times while inside the Campus buildings. Those employees working more than four hours have their temperature checked a second time mid shift.

60.    Cloth face masks are reasonably effective in limiting the spread of infection from the person wearing them to the people around them. We have distributed cloth masks to all Residents, and require them to wear the masks when they are in public areas or during an interaction with a staff member (such as a housekeeper in an apartment, or an aide assisting with

activities of daily living). Park Place's staff are required to wear face masks while at work. Staff in healthcare wear surgical masks and face shields for optimal protection.

61.     The Campus has not been immune to the effects of the nationwide Covid-19 pandemic.  Since March of 2020, four (4) Residents and thirty (30) staff were infected by the Covid-19 virus.  Of these, one 1 Resident succumbed to the disease – a loss which Park Place mourns.  Given the highly contagious nature of Covid-19 and the frailty of many of Park Place's Residents, Park Place is grateful that its efforts have been successful, thus far, to protect the vast majority of its Residents and staff from this dreadful national scourge.

62.     Park Place is willing to self-report to this Court.  Specifically, Park Place agrees that, beginning from 30 business days following entry of an order approving this Motion, and every 60 days thereafter, or as may otherwise be ordered by this Court, Park Place will provide a verified affidavit or affirmation reporting the following information described in the Ombudsman Motion. Park Place will ensure that all self-reporting affidavits will comply with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  For instance, the Debtor will redact "individually identifiable information" from any self-report affidavit provided to a third party to comply with HIPAA as necessary.

63.     Park Place will report the number of its Staff Members, their positions, the status or standing of any licenses held by Staff Members, and any formal complaints made by Residents or families of Residents concerning the Care Provided by the Staff Members at the Campus. The term "Staff Members" includes: (a) W-2 employees or independent contractors, who are directly contracted with or by Park Place, and (b) individuals who, at the request of Park Place, whether or not directly contracted with, provide any form of care to the Residents at the Campus. The term

"Care Provided" includes, but is not limited to: (a) services of medical personnel, whether licensed or unlicensed, who provide care to Residents in the skilled nursing, assisted living, assisted memory support and independent living sections of the Campus; (b) use of physicians, medical specialists, dentists, or other medical practitioners whose practices are based, in whole or in part, within the Campus, or who at the request of Park Place or its employees, treat Residents on a regular and recurring basis, (c) use of rehabilitation or therapy rooms and related medical equipment by Residents, and (d) the providing of pharmaceutical services or supplies to Residents.

64.     Park Place will report any material increase or decrease in the number of Staff Members during the reporting period, and the reasons for such changes.

65.     Park Place will report the measures taken by Park Place to continue securing Resident records at the Campus.

66.     Park Place will report all formal complaints, if any, raised by Park Place's vendors regarding payment or ordering issues.

67.     Park Place will report all formal complaints, if any, made by Residents, the families of Residents, or referring physicians (including formal complaints made by physicians, medical specialists, dentists or other medical practitioners whose practices are based, in whole or in part at the Campus or who at Park Place's request, treat Residents on a regular and recurring basis) regarding patient care and/or other services rendered by Park Place.

68.     Park Place will report any postpetition litigation or administrative actions exempt from the automatic stay under section 362(b)(4) of the Bankruptcy Code initiated against Park Place and the status of any pending administrative actions.

69.     Park Place will report any plans to open or close any part of the Campus.

70. Park Place will report any new maintenance work that needs to be done or that has been done at the Campus.

71. Park Place will affirmatively report any life safety issues regarding any part of the Campus where Residents live and are treated or otherwise receive care. Life safety issues include the ability of Park Place's medical personnel to respond in a timely manner, using staff members on premises, to emergency situations whether by phone or emergency pull cord. If life-safety issues occur, Park Place shall report them immediately to the Court and state what is being done to rectify them.

**Motion For the entry of Order (I) Authorizing The Continued Use of the Debtor's Cash Management System, (II) Authorizing Maintenance of Existing Bank Accounts and Existing Business Forms, (III) Authorizing the Continuation of Intercompany Transactions and Preservation of Existing Intercompany Setoff Rights Between the Debtor and Certain of Its Affiliates and (IV) Waiving Certain Investment and Deposit Requirements.**
**(the "Bank Account Motion") (Doc. 14).**

72. In the ordinary course of business, Park Place uses a cash management system (the "**Cash Management System**") to efficiently collect, transfer, and disburse funds generated by Park Place's business operations. The Cash Management System facilitates Park Place's cash monitoring, forecasting, and reporting, and enables Park Place to maintain control of the Bank Accounts. Park Place accurately records all collections, transfers, and disbursements made through the Cash Management System as they are made.

73. On April 1, 2016, Park Place, the Bond Trustee and Fifth Third Bank, N.A. f/k/a MB Financial Bank, N.A. ("FTB") entered into two (separate) control agreements relative to the deposit accounts maintained by Park Place. The first of these, titled "Deposit Account Control Agreement (Access Restricted after Notice)" specifically referred to Park Place account -1295 at

FTB (the "Operating Account").    The second agreement, titled "Deposit Account Control Agreement (Access Restricted Immediately)" specifically referred to Park Place account -1287 at FTB (the "Sweep Account").

74.    In practice, Park Place is required (by other agreements with the Bond Trustee) to transfer its available cash collateral over certain levels from the Operating Account to the Sweep Account on a periodic basis.  Each Friday, FTB is required to wire the entire contents of the Sweep Account into a "Destination Account" specified by the Bond Trustee.

75.    In effect, the Deposit Account Control Agreement is intended to protect and perfect the Bond Trustee's interest in Park Place's cash collateral which is on deposit in the Operating Account and the Sweep Account.

76.    In addition to the Operating Account and the Sweep Account, Park Place maintained the following Bank Accounts on the Petition Date:

a.    Fifth Third Bank checking account (ending in -1104), which serves as the Debtor's merchant bank account which had a balance of $80.00 on the Petition date;

77.    Each of the Bank Accounts complies with section 345(b) of the Bankruptcy Code because the Bank Accounts are maintained at Banks that are insured by federal agencies or are otherwise backed by the full faith and credit of the United States.

78.    Park Place's hope and expectation is that it will complete the reorganization phase of this case within the next four to five months.  As an officer of Park Place, I know that management believes that it is important for Park Place to minimize expenses which are necessary to Park Place's business and avoid all unnecessary expense, including the legal and financial costs of establishing a new cash management system (along with a new set of control agreements needed

to adequately protect the interests of the Bond Trustee in such accounts), Park Place respectfully requests that the Court allow it to continue to use its existing Bank Accounts as they were in use immediately before the Petition Date.

79.     Park Place uses a variety of preprinted Business Forms (including checks, letterhead and correspondence forms, purchase orders, credit and purchase cards, and invoices) in the ordinary course of business. Park Place also maintains books and records to document its financial results and a wide array of necessary operating information (collectively, the "Books and Records"). To minimize expenses to Park Place's estate and avoid unnecessarily confusing their employees, customers, vendors, and other commercial counterparties, Park Place respectfully requests that the Court allow it to continue to use all of its Business Forms and Books and Records in use immediately before the Petition Date — without reference to Park Place's status as chapter 11 Debtor in possession — rather than requiring Park Place to incur the expense and delay of ordering new Business Forms and creating new Books and Records.

80.     Park Places share certain services with their non-debtor affiliates such as administering payroll, contracting for telephone services, obtaining insurance, and contracting with clinical assessment coordinators. The Intercompany Transactions are recorded by Park Places and their non-debtor affiliates as intercompany transactions and are reconciled at the end of each month. These Intercompany Transactions allow Park Places, among other things, to meet the needs

[Intentionally Blank]

of their residents and maintain a centralized corporate administration in an efficient and cost-effective manner.

Further, the declarant sayeth not.

_____
Barry VanderGenugten, CFO